# 26-1416

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Mid Vermont Christian School, on behalf of itself and its students and its students' parents, Nathan Partington, individually, O.P., by and through his father and natural guardian, Nathan Partington,

*Plaintiffs-Appellants,*

T.S., K.S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve, Nathaniel Slarve, individually, Dawna Slarve, individually, A.G., M.G., by and through their parents and natural guardians, Chris and Bethany Goodwin, Christopher Goodwin, individually, Bethany Goodwin, individually,

*Plaintiffs*,

v.

Zoie Saunders, in her official capacity as Secretary of the Vermont Agency of Education, Jennifer Deck Samuelson, in her official capacity as Chair of the Vermont State Board of Education, Waits River Valley (Unified #36 Elementary) School Board,

*Defendants-Appellees*,

Heather Bouchey, in her official capacity as Interim Secretary of the Vermont Agency of Education, Christine Bourne, in her official capacity as Windsor Southeast Supervisory Union Superintendent, Hartland School Board, Randall Gawel, in his official capacity as Orange East Supervisory Union Superintendent, Jay Nichols, in his official capacity as the Executive Director of The Vermont Principals' Association,

*Defendants*.

On Appeal from the United States District Court
for the District of Vermont / Case No. 2:23-cv-00652

**OPENING BRIEF OF APPELLANTS**

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jreed@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Ryan J. Tucker
Jeremiah Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Mid Vermont Christian School has no parent corporation, does not issue stock, and is not a subsidiary or an affiliate of a publicly owned corporation. No publicly owned corporation or its affiliate, not a party to this appeal, has a financial interest in the outcome of this case.

Nathan Partington and O.P. are individuals.

## TABLE OF CONTENTS


Corporate Disclosure Statement .......... i

Table of Authorities .......... iv

Statement Regarding Oral Argument .......... 1

Statement of Jurisdiction .......... 2

Statement of Issues .......... 3

Introduction .......... 4

Statement of the Case .......... 6

A. Mid Vermont and other religious schools meet the needs of religious Vermont families. .......... 6

B. Vermont's benefit programs are supposed to help sending-district families equally. .......... 8

C. Vermont discriminates against religious schools for decades, disregards multiple court rulings, and forces the religious to get relief from this Court. .......... 10

D. Vermont devises new ways to exclude religious schools and families again. .......... 13

1. Vermont tries a religious-use based restriction. .......... 13

2. Vermont tries to evade *Carson*. .......... 15

3. Vermont tries a nondiscrimination rule, originally prompting this lawsuit. .......... 17

E. Vermont passes Act 73, again excluding all religious schools shortly after they became eligible. .......... 19

F. The district court denies a preliminary injunction. .......... 25

Standard of Review .......... 28

Summary of the Argument ........ 29

Argument ........ 31

I. At a minimum, Section 21 and its exclusionary criteria must face strict scrutiny under the Free Exercise Clause. ........ 31

  A. Section 21 is not neutral or generally applicable. ........ 33

    1. Vermont exempts and favors comparable secular schools over religious ones. ........ 34

    2. Section 21 targets religious schools and perpetuates Vermont's religious discrimination. ........ 43

    3. Disparaging and hostile statements *per se* fail the minimum requirement of neutrality. ........ 53

  B. Section 21 conditions Mr. Partington's tuition benefit on abandoning his religious exercise. ........ 55

  C. Section 21 violates *Carson, Espinoza*, and *Trinity Lutheran* by carving out religious schools. ........ 58

II. Section 21 and its exclusionary criteria fail strict scrutiny. ........ 61

  A. Vermont's purported interests are too broad, vague, and generalized. ........ 61

  B. There are less restrictive options to further Vermont's claimed interests. ........ 62

III. As the district court correctly concluded, Plaintiffs satisfy the remaining preliminary injunction factors. ........ 64

Conclusion ........ 66

Certificate of Compliance ........ 68

Certificate of Service ........ 69

# TABLE OF AUTHORITIES

**Cases**

*A.H. ex rel. Hester v. French*,
985 F.3d 165 (2d Cir. 2021) .................................................. passim

*Agudath Israel of America v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) .................................................. 64

*Brigham v. State*,
692 A.2d 384 (Vt. 1997) .................................................. 64

*Campbell v. Manchester Board of School Directors*,
641 A.2d 352 (Vt. 1994) .................................................. 10, 11

*Carson v. Makin*,
596 U.S. 767 (2022) .................................................. passim

*Central Rabbinical Congress of United States and Canada v. New York City Department of Health & Mental Hygiene*,
763 F.3d 183 (2d Cir. 2014) .................................................. 40

*Chittenden Town School District v. Department of Education*,
738 A.2d 539 (Vt. 1999) .................................................. 9, 11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................. passim

*Crosspoint Church v. Makin*,
No. 1:23-CV-00146-JAW, 2024 WL 2830931 (D. Me. June 4, 2024) .................................................. 15

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020) .................................................. 12

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
82 F.4th 664 (9th Cir. 2023) .................................................. 40

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) .................................................. 41

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .................................................................. passim

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ..................................................................61

*Guinn v. United States*,
238 U.S. 347 (1915) ..................................................................45

*In re A.H.*,
999 F.3d 98 (2d Cir. 2021) ........................................................ passim

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) ........................................................ 35, 55, 61

*M.A. ex rel. H.R. v. Rockland County Department of Health*,
53 F.4th 29 (2d Cir. 2022) ...........................................................35

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .................................................................. passim

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018) .................................................................. passim

*Mid Vermont Christian School v. Saunders*,
151 F.4th 86 (2d Cir. 2025) ...................................................... passim

*Mid Vermont Christian School v. Saunders*,
No. 2:23-CV-652, 2026 WL 1296339 (D. Vt. May 12, 2026) ............6

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) ..................................................................57

*Monclova Christian Academy v. Toledo-Lucas County Health Department*,
984 F.3d 477 (6th Cir. 2020) .......................................................35

*Myers v. Anderson*,
238 U.S. 368 (1915) ..................................................................45

*New Hope Family Services, Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ....................................................... passim

*Our Lady of Guadalupe School v. Morrisey-Berru*,
591 U.S. 732 (2020) ........................................................ 46

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......................................................... 64

*St. Dominic Academy v. Makin*,
744 F. Supp. 3d 43 (D. Me. 2024) .................................. 15, 60

*St. Mary Catholic Parish v. Roy*,
No. 25-581, 2026 WL 1052111 (U.S. Apr. 20, 2026) ...................... 15

*Swart v. South Burlington Town School District*,
167 A.2d 514 (Vt. 1961) .................................................... 10

*Tandon v. Newsom*,
593 U.S. 61 (2021) ...................................................... passim

*Tandon v. Newsom*,
992 F.3d 916 (9th Cir. 2021) ............................................ 43

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .................................................... passim

*Valente v. French*,
No. 2:20-CV-00135, 2021 WL 3620073 (D. Vt. Aug. 16, 2021) ...... 13

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ................................................... 55, 58

**Statutes**

9 V.S.A. § 4502 .................................................................. 17

16 V.S.A. § 11 ..................................................................... 22

16 V.S.A. § 165 ............................................................. 21, 47

16 V.S.A. § 212 ...................................................................... 9

16 V.S.A. § 821 ...................................................................... 8

16 V.S.A. § 822 ................................................................ 8, 21

16 V.S.A. § 824 ........ 36, 37, 64

16 V.S.A. § 828 ........ passim

16 V.S.A. § 944 ........ 9

16 V.S.A. § 946 ........ 9

16 V.S.A. § 1127 ........ 57

21 V.S.A. § 495 ........ 17

28 U.S.C. § 1292 ........ 2

28 U.S.C. § 1331 ........ 2

28 U.S.C. § 1343 ........ 2

42 U.S.C. § 1983 ........ 2

Me. Rev. Stat. tit. 5, § 4602 ........ 15

Vt. Admin. Code § 7-1-3:2223 ........ 19

Vt. Admin. Code § 7-1-3:2226.6 (2022) ........ 17

Vt. Admin. Code § 7-1-3:2229 ........ 38

Vt. Admin. Code § 7-1-3:2230 ........ 22, 39

**<u>Other Authorities</u>**

1869 Vt. Acts & Resolves No. 9, § 1 ........ 10

Act R-40 (H.C.R. 23), 2017-2018 Gen. Assemb., Reg. Sess. (Vt. 2017) ........ 10

*Candidate Questionnaire*, Friends of Vermont Public Education ........ 20

H.454, Draft No. 4.1, 2025-2026 Gen. Assemb., Comm. on Educ. (Apr. 24, 2025) ........ 22

*Hearing on H.454 Before the H. Comm. on Educ.*, Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt. 2025) ........ 23, 53

*Hearing on H.454 Before the S. Comm. on Educ.*, Apr. 25, 2025, 2025-2026 Reg. Sess. (Vt. 2025) .......... 23, 49

Howard Weiss-Tisman, *Vermont school choice system scrutinized as Legislature responds to U.S. Supreme Court decision*, Vermont Public (Feb. 16, 2023) .......... 17, 18

Jeremy D. Finn et al., *The Enduring Effects of Small Classes*, 103 Teachers College Record 145 (Apr. 2001) .......... 47

Keith Whitcomb Jr., *School choice bills raise concerns, face uncertain political future*, Rutland Herald (Mar. 6, 2023) .......... 16, 49

Letter from Falko Schilling, Advoc. Dir., ACLU of Vt., to Vt. House Comm. on Educ. (Jan. 11, 2023) .......... 17, 19

Letter from Harrison Stark, Staff Att'y, ACLU of Vt., to Vt. House Comm. on Educ. (Apr. 5, 2022) .......... 14

Peter D'Auria, *What Will Vermont Lawmakers Do About Religious Schools?,* VTDigger (Dec. 28, 2022) .......... 16

S.219, 2021-2022 Gen. Assemb., Comm. on Educ. (Vt. 2022) .......... 14

Vt. Agency of Educ., *Vermont State Report Card School Year 2024-2025* (Feb. 27, 2026) .......... 36, 51

**Rules**

Fed. R. App. P. 4 .......... 2

**Constitutional Provisions**

U.S. Const. art. VI, cl. 3 .......... 54

## STATEMENT REGARDING ORAL ARGUMENT

This case involves free-exercise rights under the First Amendment. Vermont has barred Plaintiffs—and all other religious schools and families in the State—from public-education benefits. This harm is happening now and is irreparable. This case also involves a lengthy procedural history (including one prior trip to this Court), several parties, extensive facts, and important questions of constitutional law. Because Plaintiffs' constitutional rights are at stake, they respectfully request oral argument and ask that it be scheduled as soon as possible.

## STATEMENT OF JURISDICTION

Mid Vermont Christian School and some of its students and their parents originally sued in November 2023 in the United States District Court for the District of Vermont under 42 U.S.C. § 1983 for violations of their constitutional rights. In January 2026, Plaintiffs amended their complaint to challenge part of a recently enacted Vermont law, Act 73, on First and Fourteenth Amendment grounds. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On May 12, 2026, the district court denied Plaintiffs a preliminary injunction. Plaintiffs timely appealed on May 20, 2026. Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

In 2021, this Court held that Vermont violated the Free Exercise Clause by excluding religious schools and their students from the State's Town Tuition Program, *In re A.H.*, 999 F.3d 98 (2d Cir. 2021) (*French II*), and Dual Enrollment Program, *A.H. ex rel. Hester v. French*, 985 F.3d 165 (2d Cir. 2021) (*French I*). Last year, Vermont enacted Act 73 to continue the exclusion. To receive tuition now, certain private schools must satisfy religiously gerrymandered exclusionary criteria. Vermont achieved its intended result: 75% of private *secular* schools and all out-of-state public schools remain eligible but 100% of all 15 previously-eligible *religious* schools are not. Mid Vermont is an excluded religious school; the Partingtons attend Mid Vermont.

The district court denied a preliminary injunction, concluding that Plaintiffs were unlikely to succeed on the merits of their claims because Act 73 is religiously neutral and satisfies rational-basis review. There are two issues on appeal:

1. Whether Act 73 likely violates the Free Exercise Clause.
2. Whether Plaintiffs are entitled to a preliminary injunction.

## INTRODUCTION

They say history repeats itself. In Vermont, that's certainly true. And this historical repeat violates the First Amendment.

Vermont's history is blemished with discrimination against religious schools and families. For years, the Vermont Agency and Board of Education ("the State" or "Vermont"), and school districts that followed their lead, banned religious schools from Vermont's Town Tuition Program. Eventually, this Court held that Vermont's "decades-long policy of unconstitutional religious discrimination" violated the Free Exercise Clause. *French II*, 999 F.3d at 108. A year later, the Supreme Court held that states cannot exclude religious schools from education benefits, "[r]egardless of how the benefit and restriction are described." *Carson v. Makin*, 596 U.S. 767, 789 (2022). Accordingly, Mid Vermont Christian—and 14 other approved religious schools—briefly became eligible.

Then Vermont reacted quickly to keep them out. Last year, the State passed Act 73, which amends the Town Tuition Program and again puts Mid Vermont and the 14 other religious schools right back where they were before *French I* and *II* and *Carson*: *Zero* religious schools qualify for Town Tuition; 75% of private secular schools still do.

Section 21 of Act 73 tries to circumvent *Carson* and this Court's holdings in *French I* and *French II* by not mentioning "religion," instead imposing three new criteria on some (but not all) private schools as a

condition of receiving public tuition. The district court blessed that gambit and denied a preliminary injunction. But Section 21 and its exclusionary criteria violate the First Amendment in four ways.

First, Section 21 is not neutral or generally applicable. Several categories of schools—including most private secular and *all* out-of-state public schools—are exempt, undermining the State's asserted interests. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). And the criteria—especially the 25% threshold— target religious schools, a reverse grandfather clause that ensured no religious school qualified. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

Second, key public officials expressed animosity and hostility toward religious schools leading up to and during Act 73's enactment. Such religious hostility is unconstitutional *per se*. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018).

Third, Section 21 penalizes Nathan Partington's religious upbringing of O.P. by forcing him to choose between a public benefit or his religious education. *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025).

Fourth, Section 21 carves all religious schools out of Vermont's education benefits, contravening the *Carson* line of precedents.

Vermont's religious schools and families spent years seeking constitutional vindication in federal court, only to be banished again by the hostile Vermont legislature. This Court should again invalidate

Vermont's religious discrimination, reverse, and direct the entry of a preliminary injunction allowing Mid Vermont and the Partingtons to participate in Vermont's public-benefit programs.

## STATEMENT OF THE CASE

Plaintiffs appeal the Honorable Geoffrey W. Crawford's decision denying Plaintiffs' motion for a preliminary injunction. SA.1–34; *Mid Vermont Christian Sch. v. Saunders*, No. 2:23-CV-652, 2026 WL 1296339 (D. Vt. May 12, 2026).

### A. Mid Vermont and other religious schools meet the needs of religious Vermont families.

Mid Vermont is a Christian pre-K–12 school in Quechee, Vermont. Since 1987, its religious beliefs have formed the foundation for everything it does—its curriculum, employment, and operations. JA.59–63. Mid Vermont welcomes students of all faiths and backgrounds, yet many families choose it for its Christian character and biblical worldview education. JA.60, 94.

The Partingtons are one such family. Mr. Partington believes he has a religious mandate to raise his children to follow Jesus Christ and live according to a Christian worldview. JA.453–455. He believes that sending them to a public or secular private school would expose them to worldly influences and undermine his religious obligation. JA.453. For these reasons, after homeschooling for several years, Mr. Partington sent his children to Mid Vermont. JA.453–454. His oldest and middle

children graduated from Mid Vermont, and his youngest, O.P., is a rising eighth-grader there. JA.453–454.

Mid Vermont is the closest Christian school to the Partingtons' home in West Topsham, which lies in the Waits River Valley School District—a so-called "sending" district that operates no public high school and thus pays for resident students to be educated at other public and private high schools. JA.453. But because of Act 73, the Waits River Valley School Board will not pay O.P.'s tuition once he enters 9th grade. JA.454–455. Mr. Partington must therefore choose between a public or tuition-eligible secular school—conflicting with his religious obligation to raise his children in the faith—or paying out-of-pocket for Mid Vermont, causing serious financial strain. JA.454–455.

Act 73 affects 14 other religious schools too—Grace Christian School, Rutland Christian School, and all 12 Catholic schools affiliated with the Diocese of Burlington. JA.593–600. Like Mid Vermont, they provide a much-needed option for families who want a religious education, and many families choose them precisely for their Christian beliefs, mission, and worldview. JA.593–600.

### B. Vermont's benefit programs are supposed to help sending-district families equally.

***Town Tuition Program.***

Many Vermonters live in school districts that do not operate public schools, called "sending districts." Vermont's Town Tuition Program requires a sending district to "provide for the high school education of its students by paying tuition to a public high school, an approved independent high school, or an independent school meeting education quality standards, *to be selected by the parents or guardians of the student*, within or outside the State." 16 V.S.A. § 822(a)(1) (emphasis added); *id.* § 822(b). The same goes for elementary school: school districts without one may pay tuition to an approved independent elementary school. *Id.* § 821(d).

Although local school districts pay the tuition, *see id.* § 822(a)(1), Defendants—as the executive leaders of the Vermont Agency and Board of Education—"administer Vermont's Town Tuition Program," *French II*, 999 F.3d at 100. The Board has "ultimate oversight authority." *Id.* at 101–102; 16 V.S.A. § 828(c). The Agency of Education "provides guidance" on how districts "should discharge their responsibilities under the [Town Tuition Program]." 999 F.3d at 102. And the Agency has the power of the purse and can "terminate[ ] state aid to education" to a district for paying town tuition contrary to Agency directives. 16

V.S.A. § 212(5)-(6); *see Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 543 (Vt. 1999).

Together, the Agency and Board enforce Act 73, including Section 21's exclusion of religious schools from the Town Tuition Program. The Agency classifies Vermont's private schools as either "eligible for public funding" or "ineligible for public funding." JA.364–413. And there is no dispute that Defendant Waits River Valley School Board will enforce Section 21 by refusing to pay tuition for O.P. at Mid Vermont.

***Dual Enrollment and Early College Programs.***

Two other public-education benefit programs are contingent on a school's ability to receive Town Tuition funding.

First, the Dual Enrollment Program pays for high school juniors and seniors to take up to two college courses. 16 V.S.A. § 944. For a private-school student to be eligible, his "district of residence" must "publicly fund[ ]" his tuition through the Town Tuition Program. *Id.* § 944(b)(1)(A)(i)(III); *see also French I,* 985 F.3d at 171 (explaining Dual Enrollment's dependency on Town Tuition).

Second, the Early College Program pays for high school seniors to enroll full-time in an early college program. 16 V.S.A. § 946. Although the program's statute does not require a student to be "publicly funded," *see id.* § 946(c)(2), the Agency unilaterally requires that a private-school student be "publicly funded ... during their junior year" to be eligible. JA.80. So Early College is also contingent on Town Tuition.

### C. Vermont discriminates against religious schools for decades, disregards multiple court rulings, and forces the religious to get relief from this Court.

In 1869, Vermont created the Town Tuition system, allowing "any school district in this State ... to make any arrangement or agreement with" private academies "to instruct in said academy all or part of the scholars belonging to such district ... ." 1869 Vt. Acts & Resolves No. 9, § 1. The legislature recently declared a "School Choice Day," resolving that Vermont's historic tuitioning system "gives parents of all races, incomes, and backgrounds the opportunity to place their child in the most suitable learning environment for that child, giving the child the best chance to succeed in school and later in life" and that "competition for school choice has been shown to provide a valuable incentive for all schools to meet diverse educational needs, thus better serving all students." Act R-40 (H.C.R. 23), 2017-2018 Gen. Assemb., Reg. Sess. (Vt. 2017).

Despite these sentiments, Vermont has routinely excluded religious schools. In 1961, the Vermont Supreme Court considered the Town Tuition statute's "operation and effect rather than" its "form" to hold that sending tuition to religious schools violated the Establishment Clause. *Swart v. S. Burlington Town Sch. Dist.*, 167 A.2d 514, 518, 521 (Vt. 1961), *overruled by Campbell v. Manchester Bd. of Sch. Directors*, 641 A.2d 352 (Vt. 1994). So religious schools were barred from receiving Town Tuition for 33 years—until the court reversed *Swart* under the

now-defunct *Lemon* test. *Campbell*, 641 A.2d at 361. But then Vermont quickly found another way to exclude religious schools.

Two years after *Campbell*, the Chittenden School Board approved tuition payments for students at Mount Saint Joseph Academy, a Catholic school. *Chittenden Town,* 738 A.2d at 543. But the Commissioner of Education (predecessor to the Secretary) terminated state funding to the district, claiming that the payments violated the Compelled Support Clause of the Vermont Constitution. The state supreme court agreed, at least "in the absence of adequate safeguards against the use of such funds for religious worship" and "religious education." *Id.* at 541–42, 562. And because Chittenden had "no restrictions on the purpose or use of the tuition funds," it violated the state constitution. *Id.* at 563. Thus, there remained a *possibility* of funding religious schools, but the court left it to the State to "craft" a permissible "tuition-payment scheme." *Id.*

The State never crafted any such scheme. Vermont's Agency of Education decided it would *not* accommodate religious schools. Rather, it imposed a "blanket ban," *French II*, 999 F.3d at 103, telling sending districts they "may *not* publicly fund tuition for students attending religious schools," *French I*, 985 F.3d at 172 (emphasis added). The result was 60 years of religious discrimination.

But change was coming. Two decades after *Chittenden*, the U.S. Supreme Court held that states could not exclude religious organizations from public benefits because of their "religious character" or "status." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 476, 479 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017). Those cases "made clear" that Vermont's "policy" of "excluding religious schools" was "unconstitutional." *French II*, 999 F.3d at 103; *French I*, 985 F.3d at 179–80.

Even so, Vermont refused to "alter course," saying *Espinoza* did not "change" a "district's [in]ability to pay tuition to a parochial school" under Vermont law. *French II*, 999 F.3d at 103 (citation modified).

Religious schools and families sued and won in this Court. In *French I*, a high school senior was denied participation in the Dual Enrollment Program while attending Rice Memorial High School, a Catholic school. 985 F.3d at 173. This Court held that Vermont's exclusion likely violated the Free Exercise Clause because the "effect of [the] law" was to "exclusively" deny "students attending religious schools." *Id.* at 181.

In *French II,* this Court held that Vermont's "decades-long policy" of excluding religious schools from the Town Tuition Program also violated the First Amendment. 999 F.3d at 108. Religious families were

thus eligible for public tuition "to the same extent as parents who choose secular schools for their children[.]" *Id.*[1]

### D. Vermont devises new ways to exclude religious schools and families again.

#### 1. Vermont tries a religious-use based restriction.

Vermont officials didn't give up. Having lost on their status-based exclusion in *French I* and *II*, the State and local districts sought the same result through a religious-*use*-based restriction. For example, one family was forced to sue because it was denied tuition based on Agency guidance that such funds could not be used for religious instruction. V. Compl. at 10–12, *E.W. v. French*, No. 2:22-cv-59 (D. Vt. Feb. 24, 2022), 2022 WL 845700, ECF 1 (*French III*).

Around the same time, Maine's similar religious-use-based restriction reached the Supreme Court. *Carson*, 596 U.S. 767. Maine insisted it could exclude a school that "promotes a particular faith and presents academic material through the lens of that faith." *Id.* at 787. Vermont backed Maine, arguing it could not "comply with both [the Vermont] constitution" and the Free Exercise "position advanced by" the religious schools there. Vt. Amicus Br., *Carson v. Makin*, 596 U.S. 767 (2022) (No. 20-1088), 2021 WL 5086374, at *1.

[1] Other religious families filed lawsuits too. *See, e.g.*, *Valente v. French*, No. 2:20-CV-00135, 2021 WL 3620073 (D. Vt. Aug. 16, 2021).

Vermont legislators wanted to go further. While *Carson* was pending, the Vermont Senate passed S.219, which would have excluded religious schools unless they "ensure[d] that none of the tuition" would "support religious instruction or worship or the propagation of religious views." S.219 at 1, 2021-2022 Gen. Assemb., Comm. on Educ. (Vt. 2022), https://perma.cc/VN98-LYRM. The Vermont ACLU urged the House to "table" the bill so the "legislature c[ould] craft a more *permanent solution* in the wake of *Carson*," while in "the meantime" executive officials "refin[ed] schools' anti-discrimination obligations through the Series 2200 Rules." Letter from Harrison Stark, Staff Att'y, ACLU of Vt., to Vt. House Comm. on Educ. at 6 (Apr. 5, 2022), https://bit.ly/3JYl4qR (emphasis added). Both branches followed course—the Board imposed nondiscrimination rules, *infra* § D(3), and the House tabled S.219.

Maine lost *Carson*. The Supreme Court held that states could not "exclude religious persons" from public benefits because "of their anticipated religious use of the benefit." 596 U.S. at 789. The Agency conceded that *Carson* "renders Vermont's adequate safeguards requirement unconstitutional" and prohibited denying tuition payments to "independent schools based on their religious status, affiliation, beliefs, exercise, or activities." Modified Stipulated J. ¶¶ 5–7, *French III*, No. 2:22-cv-59 (D. Vt. Oct. 27, 2022), ECF 47. And it told school districts that they "may not deny tuition payments to religious approved

independent schools." JA.350. But the Agency delayed issuing that directive until *after* the 2022-2023 school year began, so 2023-2024 was the first *full* year religious schools were eligible.

### 2. Vermont tries to evade *Carson*.

Vermont officials wasted no time trying to circumvent *Carson*.[2] Many made clear that was their plan.

First, the day the Supreme Court decided *Carson*, Rebecca Holcombe—Vermont's former Secretary of Education, former gubernatorial candidate, and current state representative—called the opinion a "monumental loss" that "risk[ed]" creating church-state relations like in Afghanistan. JA.84–86. She retweeted then-attorney general candidate Rory Thibault, stating that public funds "have no place supporting religious schools that discriminate or push bigotry," and committing "to fight th[e] [*Carson*] decision." JA.87. Holcombe attacked religious

[2] Other states did too. Maine's own (preemptive) answer to *Carson* was to amend nondiscrimination laws that apply to schools in its tuitioning program, which excluded religious schools from participation. *See* Me. Rev. Stat. tit. 5, § 4602. That law is now the subject of ongoing litigation. *See St. Dominic Acad. v. Makin,* 744 F. Supp. 3d 43, 84 (D. Me. 2024), *appeal pending* No. 24-1739; *Crosspoint Church v. Makin*, No. 1:23-CV-00146-JAW, 2024 WL 2830931, at *2 (D. Me. June 4, 2024), *appeal pending* No. 24-1590. Similarly, Colorado made participation in its universal preschool program contingent on religious schools' willingness to follow a nondiscrimination rule that burdens their religious exercise. The Supreme Court recently agreed to hear a case challenging that rule. *St. Mary Cath. Par. v. Roy*, No. 25-581, 2026 WL 1052111 (U.S. Apr. 20, 2026).

schools directly too, scorning their "religious indoctrination and stigmatization," JA.86, and calling those with fundamental Christian beliefs about marriage "homophobic" and "exclusionary," JA.87–88.

Next, officials "gear[ed] up for a pitched debate over how best to respond to" *Carson* because "the prospect of public dollars going to religious schools [wa]s an uncomfortable one." Peter D'Auria, *What Will Vermont Lawmakers Do About Religious Schools?,* VTDigger (Dec. 28, 2022), https://perma.cc/A3F8-9L28. Vermont's House and Senate quickly introduced companion bills—H.258 and S.66—both "in response to the U.S. Supreme Court decision [in] *Carson*[.]" Keith Whitcomb Jr., *School choice bills raise concerns, face uncertain political future*, Rutland Herald (Mar. 6, 2023), https://perma.cc/MS84-3MAB. The "premise behind the bills," the director of the Vermont Independent Schools Association candidly announced, was to "prevent public funds from reaching religious independent schools," and "the only way to do that is to shut down tuitioning to all independent schools that are taking public funds." *Id.*

Senator Ruth Hardy, S.66's sponsor, characterized her bill as "a response to a 'radical, conservative' U.S. Supreme Court," *id.*, which had "ma[d]e it very, very difficult to parse between different types of private schools," JA.88 (emphasis omitted). But the secular private-school lobby opposed the bills because the funding parameters would have cut out all but four secular schools. Whitcomb, *supra*; *see also*

Howard Weiss-Tisman, *Vermont school choice system scrutinized as Legislature responds to U.S. Supreme Court decision*, Vermont Public (Feb. 16, 2023), https://perma.cc/WYD7-B8S5 (private schools were "going to fight this bill really hard").

So those bills fizzled-out. But anti-religious advocates pushed onward and proposed several options, including limiting tuition to public schools and "strengthening anti-discrimination" rules. Letter from Falko Schilling, Advoc. Dir., ACLU of Vt., to Vt. House Comm. on Educ. at 5 (Jan. 11, 2023), https://bit.ly/4aFVp0L.

### 3. Vermont tries a nondiscrimination rule, originally prompting this lawsuit.

Initially, Vermont tried the nondiscrimination-rule route. Through Board Rule 2200, Vermont required approved independent schools to "assur[e]" compliance with, and "post[ ]" a "statement of nondiscrimination" consistent with the Vermont Public Accommodations and Fair Employment Practices Acts. Vt. Admin. Code § 7-1-3:2226.6 (2022) (amended July 4, 2024). The rule thus barred schools from discriminating in "all aspects of [their] admissions and operations," *id.*, and in employment, based on religion, marital status, sexual orientation, or gender identity, 21 V.S.A. § 495 (employment); 9 V.S.A. § 4502(a) (public accommodations). This rule had the effect of banning schools from considering religion in their admissions or employment decisions.

Everyone knew the rule was aimed at harming religious schools. *See, e.g.*, Weiss-Tisman, *supra* (State Board "tried to address" *Carson* by writing "a new rule" "that requires religious schools to sign an agreement that they won't discriminate"). The rule would have burdened Mid Vermont's policies on restroom use, pronoun use, athletic teams, and dress code—all based on the School's religious views about biological sex. JA.94–95. And the rule would have required Mid Vermont to employ those who do not share its religious beliefs. JA.94.

The School explained to the State that it has "a statutory and constitutional right" to maintain its operations and employment practices and so could not "affirm" compliance to the extent the rule conflicted with its beliefs and practices. JA.353. The Board responded with an ultimatum: comply fully and submit an unaltered assurance, or the Board "would make a finding that the condition has not been met, and the school would not be approved." JA.39. Mid Vermont could not surrender its religious practices.

In August 2023, just before the school year, the Agency demoted Mid Vermont to a "Recognized Independent School" for 2023-2024—meaning it was *again* ineligible for public tuition. JA.355. Two local school districts then recouped tuition payments made to the School while the Agency stayed mum. JA.95–96.

After Mid Vermont sued Vermont, the State back-peddled what it previously said about Mid Vermont's status. Now—for the first time—

the Agency told Mid Vermont that because the Board didn't *officially* act on Mid Vermont's application, it stayed eligible. JA.360. Mid Vermont submitted a new application last year, but the Board and Agency have done nothing with it.[3] JA.98–99.

### E. Vermont passes Act 73, again excluding all religious schools shortly after they became eligible.

The State had a backup plan. The legislature adopted the anti-religious advocates' other ploy—crafting what they deemed "neutral and generally applicable standards" (they're not) to exclude religious schools. *See* Falko Shilling Letter at 6, *supra*. But state officials said the quiet part out loud. During the 2024 election season, legislators—including several who voted for Act 73—publicly declared that religious schools shouldn't receive public tuition, despite *French I*, *French II*, and *Carson*:

- Representative Masland: "No taxpayer money for religious schools[.]"
- Representative Emmons: "[N]o, taxpayer dollars should not fund religious schools[.]"
- Representative Waszazak: "No, no religious school/institution should be receiving public dollars."

---

[3] The Board has since amended Rule 2200, but the amended Rule still contains a nondiscrimination rule. Vt. Admin. Code § 7-1-3:2223.2. Yet because the Board has yet to officially act on Mid Vermont's application, the rule is not *currently* at issue in this appeal.

- Representative Satcowitz: "No, absolutely not," taxpayer money shouldn't fund religious schools.
- Representatives Goldman and Hooper: "No," taxpayer money shouldn't fund religious schools.

JA.100–101 (citing *Candidate Questionnaire*, Friends of Vermont Public Education, https://perma.cc/WYM6-AFM2). Other legislators admitted "*Carson v. Makin* complicates things for us given our tuitioning system in Vermont," so excluding religious schools might "not be a straightforward task." JA.100–101. But they succeeded by enacting Act 73, signed into law on July 1, 2025.

Section 21 of Act 73 accomplishes the State's unrelenting goal of excluding religious schools by adding new eligibility criteria for approved independent schools (including all religious schools) to be eligible for Town Tuition. But the law exempts most secular schools. Act 73 § 21; 16 V.S.A. § 828 (codified).

Three of the eligibility criteria together operate as a de facto religious exclusion ("the exclusionary criteria").

First, a 25% threshold. An approved independent school must have "had at least 25 percent of its student enrollment composed of [town tuitioned students] during the 2023–2024 school year," which was the *first full year* that religious schools were eligible for Town Tuition. *Id.* § 828(a)(2)(D). Because the threshold is retroactive, falling below it

bars future eligibility. Predictably, none of the 15 religious schools met it. JA.459, 593–600.

Second, a geographic restriction. An approved independent school must be located within either "a supervisory district that does not operate a public school for some or all grades as of July 1, 2024," or "a supervisory union with one or more member school districts that does not operate a public school for some or all grades as of July 1, 2024." 16 V.S.A. § 828(a)(2)(C). Before Act 73, only the student's location mattered. *See* 16 V.S.A. § 822. Mid Vermont and 10 other religious schools fail this requirement too. JA.460, 593–600.

Third, minimum class sizes: 10 students for first grade; 12 for grades two through five; 15 for grades six through eight; and 18 for grades nine through twelve. 16 V.S.A. § 828(a)(2)(E); *id.* § 165(a)(9)(A). The State Board can waive this requirement for "geographic isolation" or if a school plans to meet the minimums. *Id.* § 165(a)(9)(B). And several classes—terminal and AP courses, driver's ed, career and technical education, and others—are categorically exempt. *Id.* § 165(a)(9)(A)(vi). The minimums take effect July 1, 2026. Act 73 § 70(c)(1). Because religious schools often favor smaller classes to help inculcate their beliefs and improve educational quality, none meet this requirement. JA.460–461, 593–600.

Meanwhile, the following secular schools automatically qualify for tuition and are exempt from the 25% threshold, geographic, and class-

size requirements: in-state public schools; independent schools meeting education quality standards (no private religious school in Vermont meets those criteria); State Board-approved tutorial programs; approved education programs (programs that educate pregnant or parenting pupils; approved independent schools do not qualify, *see* 16 V.S.A. § 11(a)(34), (35)); out-of-state public schools; and therapeutic approved independent schools (which limit publicly funded enrollment to students on an individualized education program or under an agreement with a local education agency or court order). *Id.* § 828(a)(1), (3), (4), (5), (6), (7).

Plus, the Secretary of Education has discretion to "permit" and pay for a "special education placement" in an independent school that is not approved for public tuition "in exceptional circumstances." Vt. Admin. Code § 7-1-3:2230.1.

The legislative process corroborated that the criteria were tailored to exclude religious schools. In one hearing, the Senate Education Committee deliberated a version of the bill that would have allowed tuition to an "independent school located in a bordering state or province" without restriction. H.454, Draft No. 4.1, 2025-2026 Gen. Assemb., Comm. on Educ. (Apr. 24, 2025), https://perma.cc/5NNZ-UGQG. In other words, the draft bill had a loophole for out-of-state religious schools. Senator Ram-Hinsdale provided the solution—it was "important" that the 25% threshold apply to those schools too because

"otherwise *we're starting to send people back to religious schools* over the border and someone could have a religious school right over the border." *Hearing on H.454 Before the S. Comm. on Educ.*, Apr. 25, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 1:51:02–1:52:17 (emphasis added) ("Senate H.454 Hearing").[4] Not a single Committee member objected.

And at an earlier House Education Committee hearing, one representative celebrated—exclaiming "great, good news"—after learning that no religious school would likely qualify under the law. *Hearing on H.454 Before the H. Comm. on Educ.*, Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 17:45–17:50 ("House H.454 Hearing").[5]

By design, Section 21's effect is shockingly lopsided. Zero of the religious schools that became eligible for Town Tuition funding as a result of court rulings over the past few years qualify. And that means religious schools' students are also barred from the Dual Enrollment and Early College Programs. Yet 75% (53/70) of in-state secular private schools—and all out-of-state public schools—remain eligible.

The following table shows that while the law eliminated eligibility for 100% of Vermont's private religious schools, the law kept more than

[4] Video available at https://www.youtube.com/watch?v=w01PzeEpT0U.

[5] Video available at https://www.youtube.com/watch?v=cUhb73o943Q.

75% of Vermont's private secular schools (according to the Agency's own directories):

| **Secular School** | **Number Eligible Pre-Act 73** (*see* February 2025 Directory, JA.365–388) | **Number Eligible Post-Act 73** (*see* September 2025 Directory, JA.389–413) |
|---|---|---|
| Approved Independent Schools | 33 | 18 |
| Approved Therapeutic Schools | 28 | 27 |
| Approved Education Programs | 5 | 4 |
| Approved Tutorial Programs | 4 | 4 |
| Out-of-State Public Schools | No limit | No limit |
| | | |
| **Totals** | **70** | **53** |

JA.364–413.[6]

In sum, sending-district families can still pick more than 50 secular schools—including winter sports academies like the Killington

[6] Only 13 (14 at most) secular schools lost eligibility. One approved independent school appears to have closed (The Compass School). So did one approved education program (Rutland County Parent/Child Center's Teen Parent Program) and one therapeutic school (INSPIRE School). And one approved independent school (Green Mountain Valley School) does not appear in the September 2025 directory, so its status is unclear.

and Stratton Mountain Schools—or any out-of-state public school. But religious schools are segregated and their funding prospects eliminated—just like before the *Carson* and *French* decisions.

### F. The district court denies a preliminary injunction.

After Act 73 passed, Plaintiffs amended their complaint and moved to enjoin the exclusionary criteria so they could participate in the Town Tuition, Dual Enrollment, and Early College Programs. JA.416. They argued the law (1) is not neutral or generally applicable and results from religious hostility; (2) violates *Carson*, *Espinoza*, *Trinity Lutheran*, and this Court's *French* cases; and (3) violates Mr. Partington's religious exercise under *Mahmoud* and *Yoder*. JA.421–451. The district court held a hearing on Friday, May 8, 2026, and denied the motion on Tuesday, May 12. SA.1–34.

On the facts, the court downplayed Vermont's discriminatory history as merely the State's effort to "follow[] the evolving decisional law of the Vermont Supreme Court and the U.S. Supreme Court in determining whether to pay town tuition to religious-based schools." SA.10. It did not cite *French II* and gave short shrift to *French I*, saying only that "Vermont was involved in litigation that closely parallelled the *Carson* case in Maine." SA.11. The opinion said nothing about how Vermont's "decades-long policy" of excluding religious schools from the

Town Tuition Program violated the First Amendment. *French II*, 999 F.3d at 108.

In quantifying the law's impact, the court omitted the categorically exempt schools, 16 V.S.A. § 828(a)(3), (4), (5), (6), (7), counting only the secular schools subject to the exclusionary criteria.[7] SA.15. That omission enabled the court to conclude that Act 73 "disqualified religious and secular schools alike and in similar numbers." SA.16. But even under the district court's view, religious and secular schools were *not* impacted in the same degree. Now, 0% of religious schools qualify compared to more than 75% of in-state private secular schools.

On the law, the court acknowledged Plaintiffs' four, separate free-exercise claims, SA.17, but addressed only the neutrality and hostility arguments—overlooking the *Carson* line, *Tandon*'s general-applicability analysis, and Mr. Partington's separate *Mahmoud-Yoder* claim.

The court correctly recognized that the "requirement of 'burden'" was met because "Act 73 disqualifies" Mid Vermont and "makes it more difficult for [Mr. Partington] to practice his faith." SA.23. The same is true for "other observant families in the state." SA.23.

---

[7] The court incorrectly said, "17 secular independent schools also lost their eligibility for town tuition." SA.16. The court appears to have counted four schools that were ineligible before Act 73 (Bridge School, Mountain School of Milton, Mt. Mansfield Academy, and Orchard Valley School) in addition to the 13 that became ineligible after Act 73. But those schools did not *lose* eligibility; they were already ineligible.

Next, to assess neutrality, the court considered three factors: (1) text, (2) the law's effects, and (3) "subjective animus or prejudice." SA.28.

As to text, the court said "Act 73 contains no reference to religious belief or religious education" and so opined that it was facially neutral. SA.28.

As to effects, the court found the law permissible because it "disfavors both" religious and secular schools "in equal measure." SA.30. It refused to compare Mid Vermont to therapeutic schools, because it said they differ by serving only disabled students (but ignored that Mid Vermont serves disabled students too, *see* JA.415), or to the other categorically exempt schools, reasoning that religious organizations could theoretically form one even though none ever has. SA.29–30 n.8.

As to animus, the court deemed the many hostile statements about religious schools "unsurprising" given those schools' history of exclusion, SA.32, and declined to consider legislators' comments because they did not arise from "administrative action [or] enactment of a municipal ordinance," SA.31. It also attributed that history of religious discrimination to the "best efforts" of judges interpreting "the federal and state constitution." SA.31–32.

Finally, while the court ruled Plaintiffs were not likely to succeed on the merits, it acknowledged that if the "ruling is reversed and remanded, it is likely that the plaintiffs will prevail on" the irreparable

harm and public interest factors. SA.34. So this appeal is really about Plaintiffs' likelihood of success on the merits.

Plaintiffs timely appealed and moved to expedite, which this Court granted. ECF 21.1.

## STANDARD OF REVIEW

To win a preliminary injunction, Plaintiffs "must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Mid Vermont Christian Sch. v. Saunders,* 151 F.4th 86, 92 (2d Cir. 2025) (citation omitted). The Court "review[s] a district court's denial of a preliminary injunction for abuse of discretion, but must assess de novo whether the court proceeded on the basis of an erroneous view of the applicable law." *Id.* (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court erred as a matter of law by concluding that Section 21—and its three exclusionary criteria—does not likely violate the First Amendment, despite its "practical effect of barring [all] access to a benefit to students enrolled in religious schools." SA.21. The Free Exercise Clause demands that Vermont treat Mid Vermont equal to the best-treated comparable secular school. The State does not do that. Section 21 triggers strict scrutiny under three lines of free-exercise precedent and is *per se* unconstitutional under a fourth.

First, Section 21 is neither neutral nor generally applicable under the *Tandon*, *Fulton*, and *Lukumi* line of Supreme Court cases:

a. Section 21 treats comparable secular schools more favorably than Mid Vermont and all other religious schools. *Tandon*, 593 U.S. at 62. Vermont exempts dozens of secular schools from the exclusionary criteria, thus undermining its asserted interests that supposedly justify excluding religious schools. *Id.*

b. The "object" of Section 21's exclusionary criteria is religious schools, as shown by their "effect" in "real operation." *Lukumi,* 508 U.S. at 535. For decades, Vermont excluded religious schools and after losing in this Court (twice), officials devised several ways to do the same thing. Section 21 is the culmination of those efforts. The 25% requirement is a reverse-grandfather clause pegged to the first full year religious schools were eligible, so religious schools had no chance to meet that threshold.

The geographic requirement also targets religious schools, and the class-size requirement allows for categorical and individualized exemptions. *Fulton v. City of Phila.*, 593 U.S. 522, 542 (2021). The result is all religious schools are out; 75% of secular schools remain in. Nor is excluding all religious schools necessary to achieve the State's nebulous, generalized interests that it puts forward in defense. *Lukumi*, 508 U.S. at 538–40.

c. Vermont officials' statements indicate a lack of neutrality and also render Section 21's religious exclusion *per se* unconstitutional. *Masterpiece*, 584 U.S. 617. Government officials publicly castigated and ridiculed religious schools in the wake of *Carson*, openly stated their intentions to exclude them from public funding, compared funding religious schools to Afghanistan's fear-based theocracy, and exclaimed that the 25% threshold was needed to keep people from attending religious schools.

Second, Section 21 violates the *Mahmoud* and *Yoder* line by conditioning public tuition availability on Mr. Partington's willingness to sacrifice O.P.'s religious upbringing. *Mahmoud,* 606 U.S. at 547.

Third, Section 21 violates the *Carson*, *Espinoza*, and *Trinity Lutheran* line because "public funds flow[ ] to support tuition payments at private schools," yet Vermont "carve[s] out private religious schools from those eligible to receive such funds." *Carson*, 596 U.S. at 780. The Supreme Court warned against states attempting to "recast a condition

on funding" in neutral terms to avoid this principle. *Id.* at 784 (citation modified).

Vermont cannot survive strict scrutiny. Its interests are stated at too high a level of generality, the record is devoid of evidence that excluding Mid Vermont is necessary, and the law's many secular exemptions undermine any claim that the exclusionary criteria "can brook no departures." *Fulton*, 593 U.S. at 542.

Plaintiffs easily satisfy the other injunction factors, as the district court acknowledged. The loss of First Amendment freedoms qualifies as irreparable harm. And no public interest is served by eliminating religious schools as an option for Town Tuition.

## ARGUMENT

### I. At a minimum, Section 21 and its exclusionary criteria must face strict scrutiny under the Free Exercise Clause.

The "Constitution commits government itself to religious tolerance, and upon even *slight suspicion* that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece,* 584 U.S. at 638–39 (citation modified; emphasis added).

"At its heart," the Free Exercise Clause "protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts." *Mahmoud*, 606

U.S. at 546 (citation modified). For "many people of faith," there are "few religious acts more important than the religious education of their children" and many view it as a "religious obligation." *Id*. at 547. That right "extends to the choices that parents wish to make for their children outside the home." *Id*.

The Free Exercise Clause also "protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson*, 596 U.S. at 778 (citation modified). That is, it protects "substance," not "semantic[s]"—the government cannot manipulate it through the "presence or absence of magic words." *Id*. at 784–85 (citation modified). The Clause thus prohibits "subtle departures from neutrality" and "covert suppression" of the religious. *Lukumi,* 508 U.S. at 534 (citation modified). The Supreme Court has instructed courts to "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* (citation omitted); *Carson*, 596 U.S. at 784.

These free-exercise principles apply with full force here and forbid Vermont's attempt to skirt the First Amendment via Section 21's exclusionary criteria. Those criteria trigger (and fail) strict scrutiny because (1) they are not neutral or generally applicable, (2) they burden Mr. Partington's religious upbringing of his child, and (3) they violate the *Carson* line of precedents.

### A. Section 21 is not neutral or generally applicable.

A law is not neutral or generally applicable "whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

Starting with general applicability, a law fails "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it provides "a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533–34 (citation modified).

Turning to neutrality, a law is not neutral if its "object" is religion; to assess that, courts "'survey meticulously' the totality of the evidence, 'both direct and circumstantial.'" *New Hope Fam. Servs., Inc. v. Poole,* 966 F.3d 145, 163 (2d Cir. 2020) (quoting *Lukumi*, 508 U.S. at 534–35, 540). This includes "the effect of a law in its real operation," plus "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 535, 540; *Masterpiece*, 584 U.S. at 639.

"Neutrality and general applicability are interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi,* 508 U.S. at 531.

Section 21 is not neutral or generally applicable for at least three, independent reasons: (1) Vermont funds many comparable secular schools, thus undermining its purported interests; (2) the law targets religious schools and creates a religious gerrymander; and (3) the law is infected with religious animus. The latter also renders the de facto religious exclusion *per se* unconstitutional.

#### 1. Vermont exempts and favors comparable secular schools over religious ones.

Section 21 is not neutral or generally applicable because it treats comparable secular schools more favorably than Mid Vermont and all other religious schools. *Tandon*, 593 U.S. at 62. On its face, Section 21 treats scores of secular schools far better by categorically exempting them from the burdensome 25%, geographic, and class size requirements. The exempt schools include independent schools that meet education quality standards (standards that themselves discriminate against religious schools), independent schools that serve disabled students, and all *out-of-state* public schools. 16 V.S.A. § 828(a)(3), (4), (5), (6), (7).

##### a. The exempt secular schools are comparable.

The relevant comparator is all schools, including the exempt schools, not just approved independent schools. That's because whether "activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies

the regulation at issue. Comparability is concerned with the risk various activities pose to the government's interests," not labels or resemblances. *Tandon*, 593 U.S. at 62 (citation modified); *Fulton*, 593 U.S. at 534; *Lukumi*, 508 U.S. at 543 (law lacks generally applicability if it "fail[s] to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree than [religious conduct]"). Schools that are "comparable" in relevant ways may be "in other ways very different." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481 (6th Cir. 2020).

Start with the government interest. Act 73's text does not say what interests justify the exclusionary criteria. In its briefing below, the State offered vague interests stated at "artificially high level[s] of generality." *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health,* 53 F.4th 29, 42 (2d Cir. 2022) (Park, J., concurring) (citation modified). Yet "[g]overnment justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (citation modified).

Even taking those interests at face value, excluded religious schools like Mid Vermont are comparable to many of the included secular schools. Consider what Vermont calls its "compelling interest": "providing a high-quality, cost-effective, and substantially equal education to every child." JA.496, 543. Mid Vermont is comparable to

the eligible secular schools because funding it advances those same State interests, while funding many of the secular schools undermines those interests. *Tandon*, 593 U.S. at 62.

First, quality. There is no record evidence that Mid Vermont offers a lower quality education than eligible schools—its students excel academically and most go on to college. But Vermont will fund *out-of-state* public schools even though the State has no authority to regulate their quality at all. If quality is truly the concern, Vermont should focus on its own public schools, where "academic proficiency remains below expectations," Vt. Agency of Educ., *Vermont State Report Card School Year 2024-2025* at 21 (Feb. 27, 2026), https://perma.cc/R4FT-EZNK, rather than cut out high-quality private religious schools.

Second, cost. It's actually *less expensive* for sending districts to pay tuition at Mid Vermont than nearly every other school, public or private. That's because Town Tuition at private schools is capped at the State's "average announced tuition of Vermont union high schools," 16 V.S.A. § 824(c), meaning a sending district will pay *up to* $22,603 for the 2026–2027 school year, JA.681–684. Mid Vermont charges $4,000 *less* than that cap, saving those districts money, JA.126, whereas all 18 eligible approved independent schools charge tuition well-above $20,000, JA.642–643. The other religious schools' tuitions are also much lower than the capped rate. JA.678–679.

Moreover, a sending district must pay "the full tuition charged" for its students who attend a public high school "or an independent school meeting education quality standards." 16 V.S.A. § 824(b). Those rates are higher still. For example, tuition is $25,635 at St. Johnsbury Academy (one such school), and $25,500 at Hartford High School, the closest public school to Mid Vermont. JA.681, 684. Allowing Mid Vermont to participate would *improve* cost-effectiveness.

Third, consider equal-educational opportunities. Mid Vermont provides the same educational opportunities as the exempt schools and the 18 favored eligible private schools. Mid Vermont is directly analogous to those 18 schools because they are all *approved independent schools* satisfying the same state regulations. The only differences—location, past percentage of tuitioned students, and class sizes—have no bearing on equal-educational opportunities. There is nothing equal about telling religious families to look elsewhere while families at St. Johnsbury and other eligible secular schools may continue at their chosen school.

Mid Vermont is also directly analogous to the categorically exempt therapeutic schools because, as an approved independent school, it must enroll and "demonstrate the ability to serve students with disabilities," which is what therapeutic schools do. Vt. Admin. Code § 7-1-3:2229; *see* JA.415 (explaining Mid Vermont complies with that Board Rule). Act 73

undermines "equal educational opportunities" by giving Vermonters *less opportunities* when picking a school.

The State also offered other justifications for its exclusionary criteria in its briefs below. They fare no better.

Vermont claimed an interest in achieving public school "consolidation and economies of scale" (whatever these vague interests may mean), which it says justify the 25% and geographic requirements. JA.543, 497. Yet Vermont still funds secular private schools *and* out-of-state public schools, thus creating a *greater* risk to its consolidation goals than funding Mid Vermont would. Plus, even *under* Section 21's criteria, 18 approved independent schools are eligible. Continuing to fund private schools at all undermines any interest in public-school consolidation. The criteria are thus "underinclusive for those ends." *Lukumi*, 508 U.S. at 543.

Vermont also said the 25% requirement ensures that only schools with "historical tuitioning patterns" continue to receive tuition funding. JA.579. But that is just another way of saying Vermont will not fund religious schools—because they could not develop such a history. *See French II*, 999 F.3d at 108. The State's own briefing thus betrays this requirement's non-neutrality. *See infra* § I(A)(2). And that logic fails under *Tandon* too. Dozens of exempt schools—including any out-of-state public school that never enrolled a Vermont student before—can receive

Town Tuition regardless of past tuitioning practices. 16 V.S.A. § 828(a)(3), (4), (5), (6), (7).

Last, Vermont said the geographic requirement ensures only "independent schools in or near districts without full K-12 school[s]" receive Town Tuition. JA.532. But this doesn't say what the State's interest or goal is; it just re-states what the regulation does. And Vermont undercuts any interest or goal by paying tuition to independent schools that meet education quality standards and therapeutic independent schools *regardless* of their location.

In addition to the categorical exemptions, Vermont law contains a "system of entirely discretionary exceptions," *Fulton,* 593 U.S. at 536, that allows the Secretary to place and permit the payment of tuition for a special education student at an approved independent school that is ineligible for public tuition, Vt. Admin. Code § 7-1-3:2230.1. Although such exceptions require "exceptional circumstances," the Secretary retains discretion and the State Board has final review authority. *Id.*; 16 V.S.A. § 828(c). "As a result, [the Town Tuition Program] as a whole contains no generally applicable" bar on funding approved independent schools deemed ineligible. *Fulton*, 593 U.S. at 537.

* * *

At bottom, the exclusionary criteria treat comparable schools more favorably than Mid Vermont. And "the record" is "entirely devoid of explanation, much less evidence in support of explanation, for such

selectivity." *Cent. Rabbinical Congress of U.S. and Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). "Simply put, there is no meaningful constitutionally acceptable distinction between the types of exclusions at play here." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc). Strict scrutiny applies.

**b. Vermont's explanations are unpersuasive.**

Vermont's two main responses below are unpersuasive.

First, Vermont explained why some schools are exempt from Section 21's requirements. Approved independent schools meeting education quality standards are eligible because they "function" more like a public school. JA.487. Tutorial programs, education programs, and therapeutic schools are eligible because they "serve specific classes of students with needs that public schools are not well-suited to meet." JA.488. And out-of-state schools are eligible for students in "far-flung corners of the state." JA.583.

But giving "the reasons why" the State decided to exempt some schools from Section 21's criteria answers the wrong question under *Tandon*. 593 U.S. at 62. The correct question is whether those schools "pose" a risk to the "interest that justifies the regulation *at issue*"—the three exclusionary criteria. *Id.* (emphasis added). And they do, as just explained.

Like eligible tutorial programs, education programs, and therapeutic schools, religious schools also "serve specific classes of students with needs that public schools are not well-suited to meet," JA.488: those who desire a religious education. Section 21's subjective line-drawing—by preferring secular groups of students over religious groups—"devalues religious reasons" by "judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537–38; *see also Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (law not generally applicable when it "creates a categorical exemption" for "secular" reasons "but not for" religious reasons).

Second, Vermont insisted that Section 21 is generally applicable because some secular schools also became ineligible. But "[i]t is no answer" that Vermont "treats some comparable secular [schools]" "as poorly as or even less favorably" than religious schools. *Tandon,* 593 U.S. at 62. The Free Exercise Clause demands that the State treat Mid Vermont as the best-treated comparable secular school.

**c. The district court erred as a matter of law.**

The district court did not address *Tandon* or conduct a general applicability analysis. Rather, it simply said in a footnote that it would "not count" the exempt schools because they "are open to religious and secular organizations alike" and a religious organization could create a

therapeutic school. SA.29–30 n.8. But such flawed legal rationale flips free exercise precedent on its head.

General applicability is assessed based on "the religious exercise at issue," not whether the challengers can exercise their religion differently or transform to fit into a secular exemption. *Tandon*, 593 U.S. at 62. Under the district court's logic, every law with a secular exemption would be generally applicable just because the religious observer *might* otherwise qualify for the *secular* exemption. But the "Free Exercise Clause protects religious observers against unequal treatment." *Lukumi*, 508 U.S. at 542 (citation modified). It doesn't require them to change their religious character or practices to obtain that equal treatment.

*Tandon* itself is a case in point. There, the Supreme Court held at-home private religious gatherings of more than three households comparable to gatherings at "hair salons, retail stores, movie theaters" and the like because those places posed similar risks to stopping the spread of Covid-19. 593 U.S. at 63. It rejected the dissent's and Ninth Circuit's view that the gathering ban was generally applicable because it was a "blanket restriction on at-home gatherings of all kinds, religious and secular alike." *Id*. at 65 (Kagan, J., dissenting).

Nor did it matter that "[i]ndoor services at houses of worship" were permitted subject to 25% or 50% capacity restrictions and outdoor services without limits. *Tandon v. Newsom*, 992 F.3d 916, 918 (9th Cir.

2021), *application for injunction granted*, 593 U.S. 61. The Supreme Court did not ask whether *churches* were comparable to hair salons, movie theaters, and other places. It was irrelevant that the individual petitioners could have exercised their religion differently by meeting with more than three households *at church*. What mattered was the "religious exercise at issue"—private at-home religious gatherings for Bible studies and worship. *Tandon*, 593 U.S. at 62–63.

The same is true here. The district court's logic is like saying the at-home ban in *Tandon* was generally applicable simply because religious observers could have gathered at a church, retail store, or movie theater. The analysis must focus on Mid Vermont and the 14 other religious schools excluded from the benefit programs, not some non-existent religious school that might hypothetically fall under a secular exemption.

### 2. Section 21 targets religious schools and perpetuates Vermont's religious discrimination.

#### a. The exclusionary criteria create a religious gerrymander.

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. Importantly, "[f]acial neutrality is not determinative." *Id.* at 534. "Official action that targets

religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'" *Id.* (citation modified).

The Supreme Court invalidated the ordinances at issue in *Lukumi* because it was "a necessary conclusion that almost the only conduct subject to" the laws was "religious exercise." *Id*. at 535. In other words, the ordinances were carefully crafted as a religious gerrymander, one that allowed secular conduct to continue while prohibiting religious conduct.

The same is true here. Section 21 creates a religious gerrymander that ensures that 0% of religious schools are eligible for Town Tuition funding while 75% of secular private schools (plus all out-of-state public schools) remain eligible.

To start, the 25% requirement is a reverse grandfather clause that targets religious schools. Under the requirement, at least 25% of a school's students during the 2023–2024 school year had to be receiving town tuition funding. 16 V.S.A. § 828(a)(2)(D). Vermont tethered the 25% requirement to the *first* full year that religious schools were eligible after six decades of being banned from Town Tuition. *French II*, 999 F.3d at 108. Requiring religious schools to jump from zero publicly

funded students to 25% of their enrollment in one year reeks of "covert" religious targeting. *Lukumi,* 508 U.S. at 534.

The 25% requirement mirrors racially discriminatory grandfather clauses that the Supreme Court has long held unconstitutional. For example, in *Guinn v. United States*, the Court held that a literacy test and grandfather clause in the Oklahoma Constitution violated the Fifteenth Amendment because the "substance and effect" of the provision disenfranchised black voters. 238 U.S. 347, 365 (1915).

After admission to the Union, Oklahoma required voters to "be able to read and write" a section of the state constitution. *Id.* at 357. But there was a grandfather exception: anyone who was "entitled to vote" (or a descendant of such a person) as of January 1, 1866, need not pass the literacy test. *Id.* As the Court explained, although the provision "contain[ed] no express words of an exclusion" in violation of the Fifteenth Amendment, "the standard itself inherently brings that result into existence since it is based purely upon a period of time before [its] enactment" and makes that date "the controlling and dominant test of the right of suffrage." *Id.* at 364–65. To be sure, white voters who failed the literacy test and didn't fall under the grandfather clause would be disenfranchised too. But because the standard was based on a date before black suffrage, there was no "serious dispute concerning the repugnancy" of that standard. *Id.* at 363; *see also Myers v. Anderson*, 238 U.S. 368, 377 (1915) (striking down Maryland grandfather clause).

Similarly here, the State admitted the threshold's purpose was to direct funding to schools with "historical tuitioning patterns," JA.579, and it "ensur[es] that schools that have historically filled the gaps in Vermont's education infrastructure can continue to do so," JA.543. That's the reverse side of the same discriminatory coin—religious schools never had a chance to develop historic tuitioning practices. *Cf. Carson*, 596 U.S. at 784 ("Saying that Maine offers a benefit limited to private secular education is just another way of saying that Maine does not extend tuition assistance payments to parents who choose to educate their children at religious schools."). The State thus admits that the "object" of the 25% threshold is schools that did not historically participate in the Town Tuition Program, *i.e.*, religious schools. But a law is not neutral if its "object" is religion. *Lukumi*, 508 U.S. at 533. The 25% reverse grandfather clause *guarantees* religious schools are excluded for good.

Next, the class-size requirement is also part of the gerrymander. Mid Vermont and other religious schools prioritize small class sizes for a better learning environment and to ensure teachers can—through close personal relationships—"educat[e] young people in their faith." *Our Lady of Guadalupe Sch. v. Morrisey-Berru,* 591 U.S. 732, 753 (2020); JA.460–461. So this requirement is suspect at the outset.

Drilling down further, other flaws emerge. For one, the requirement is not generally applicable because it categorically exempts

classes, 16 V.S.A. § 165(a)(9)(A)(vi), and has a system for granting individualized exemptions, *id.* § 165(a)(9)(B).

For another, it is not neutral because there is an "apparent disconnect" because what it mandates—class size minimums—and Act 73's purported goal—improving education throughout the state. *New Hope*, 966 F.3d at 165. Vermont has not pointed (and cannot point) to any evidence that mandating *larger* classes will improve the overall quality of education. In fact, studies suggest the opposite. *See, e.g.*, Jeremy D. Finn et al., *The Enduring Effects of Small Classes*, 103 Teachers College Record 145, 174 (Apr. 2001), http://bit.ly/3R2WDMe (concluding that attending small classes early and consistently "produces, on average, significant and noteworthy improvements in academic achievement at least through grade 8 in all school subjects").

Finally, the geographic restriction excludes 11 of the 15 religious schools. That's because most religious schools are in or near Vermont's largest cities—Mid Vermont (Hartford); Rice Memorial (South Burlington); Rutland Area Christian, Mt. Saint Joseph Academy, and Christ the King (Rutland); and Christ the King and Mater Christi School (Burlington)—where school districts are most likely to have brick-and-mortar schools. The geographic restriction doesn't make practical sense. Though Mid Vermont is in the Hartford School District, a non-sending district, the School is just a few miles north of the Hartland School District, which does not operate a high school. So a

student could live mere miles from Mid Vermont but still be denied town tuition there. Or that student could drive 100 miles to a secular private school, or an out-of-state public school, and receive the tuition.

#### b. Additional evidence shows a lack of neutrality

In evaluating the ordinances in *Lukumi*, the Supreme Court also looked to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." 508 U.S. at 540. Such circumstantial evidence favors Plaintiffs here as well.

The historical background and series of events leading to Act 73 reveal that religious schools were in the crosshairs. For decades, Vermont categorically excluded religious schools from the Town Tuition Program until *French I* and *II* and *Carson* put an end to that religious discrimination. Vermont legislators responded with several bills that again sought to exclude religious schools. And the Agency and Board—heeding anti-religious advocates' advice—enforced poison-pill nondiscrimination rules. When Mid Vermont took a stand and challenged that attempt, the State responded with Act 73. Every time religious schools and families take one step forward, the State puts them two steps back.

In addition, "even before discovery," the record is chock full of statements expressing animus and disdain for religious schools and their prospect of receiving funding. *New Hope*, 966 F.3d at 167.

In the wake of *Carson*, Vermont's former Secretary of Education said religious schools "indoctrinate[e] and stigmatiz[e]" and are "homophobic" and "exclusionary," and allowing them to receive Town Tuition "risks" turning Vermont into a "place[ ] like Afghanistan." JA.86–88. Senator Hardy sponsored a bill to cut-out all religious schools, in response to the "radical, conservative" Supreme Court. Whitcomb, *supra*. Months before the legislature passed Act 73, dozens of legislators publicly declared that taxpayer money should not go to religious schools. JA.100. And during Act 73's legislative process, Senator Ram Hinsdale didn't mince words about the 25% threshold, stating it was "important" that the threshold "guide the decision" or else the State would "be sending people back to religious schools." Senate H.454 Hearing.

Such anti-religious statements not only undermine the law's neutrality, but also violate the Free Exercise Clause, *per se*, as explained below. *Infra* § I(A)(3).

#### c. Vermont can further its purported interests without excluding religious schools.

In *Lukumi*, the Supreme Court also found "significant evidence" of non-neutrality "in the fact that [the ordinances] proscribe[d] more

religious conduct than [wa]s necessary to achieve their stated ends." 508 U.S. at 538. The government there could have achieved its interests in "protecting the public health and preventing cruelty to animals" through laws that didn't prohibit Santeria sacrifice. *Id.*

So too here. Vermont can address its purported governmental interests without burdening and excluding religious schools.

Act 73's goal is to consolidate public school districts to "ensure each student is provided substantially equal educational opportunities." Act 73 §§ 2(b)(1), (2)(b)(2)(A)(i); SA.15 ( "increase in centralized authority over school spending, administration, and taxation"); JA.543 ("achieve consolidation and economies of scale"). Yet excluding all *private* religious schools from the Town Tuition Program is not necessary to achieve Vermont's goal of *public-school* consolidation and centralization. In fact, it has nothing to do with it. Although the criteria reduce eligible *private* schools, the State has not explained why that is vital for its public-school focused ends. *Lukumi*, 508 U.S. at 538.

Nor does reducing eligible private schools make sense when the number of tuition-eligible students *stays the same*. Sending districts must pay tuition for their residents. Full stop. Yet excluding religious schools does not make those students more likely to attend an in-state public school. They can still choose any out-of-state public school or dozens of secular private schools. Section 21 merely eliminates religious schools as an option.

In fact, the State concedes that Act 73 doesn't achieve its stated objectives. Act 73 required the Vermont School Redistricting Task Force to propose new public-school districts last session. Act 73 § 3(c), (f). The task force declined because it "did not find evidence that mergers of the scale contemplated in Act 73 would reliably lower costs, improve educational outcomes, or expand equity." JA.713. So in one breath, the State says it must exclude religious schools to further its interests, but in the next admits the law does not do that. If Vermont "has a real concern" about consolidation, "the subject of the regulation should be [public school consolidation], not a religious classification that is said to bear some general relation to it." *Lukumi*, 508 U.S. at 539.

Plus, Vermont could address its interests in high-quality, cost-effective, and substantially equal education without excluding religious schools. The State gives "no persuasive indications" that Mid Vermont or the other religious schools are low quality, more expensive, or provide less equal opportunities. *Id.* at 538; *supra* § I(A)(1)(a). Vermont is free to address its public school concerns directly, where academic performance remains "below expectations," Vermont State Report Card at 21, *supra*, and "[c]hange ... is needed," Act 73 § 1(a)(6). But it can do so "stopping far short of a flat prohibition" on religious schools. *Lukumi*, 508 U.S. at 538.

**d. The district court erred.**

The district court didn't address any of this, only stating that Section 21 was neutral because it "disfavors both [secular and religious schools] in equal measure." SA.30. That's factually and legally incorrect.

Factually, *all* 15 previously eligible religious schools are excluded while 75% of the previously eligible secular schools are included. That's not "equal" "disfavor[]." SA.30. And legally, when a law treats religious schools worse than secular schools, it doesn't matter if some secular schools face inferior treatment. *Tandon*, 593 U.S. at 62; *Lukumi*, 508 U.S. at 537–38.

As in *Lukumi*, "the neutrality inquiry leads to one conclusion: [Vermont's law had as its] object the suppression of religion." 508 U.S. at 542. Indeed, *Lukumi*'s conclusions map onto this case directly:

> [Vermont's pattern] discloses animosity to [religious schools and families] and their religious practices; [Section 21] by [its] own terms target [religious schools]; the text[ ] of the [law][was] gerrymandered with care to proscribe religious [private education] but to exclude almost all [private secular education]; and the [law] suppress[es] much more religious conduct than is necessary in order to achieve the legitimate ends asserted in [its] defense. [Section 21] [is] not neutral, and the court below committed clear error in failing to reach this conclusion.

*Id.*

The law's neutrality is suspect and strict scrutiny applies.

### 3. Disparaging and hostile statements *per se* fail the minimum requirement of neutrality.

As explained, a "suspicion of religious animosity is further raised" by Vermont officials' condemning statements directed toward religious schools. *New Hope*, 966 F.3d at 166; *supra* §I(A)(2)(b).

The district court erred by refusing to attribute any weight to these statements. First, the court concluded no one "said anything critical of the Christian faith or its adherents." SA.31. But calling Christian schools "homophobic" and comparing their funding to a theocratic, terrorist-governed country is "neither tolerant nor respectful." *Masterpiece*, 584 U.S. at 639. Nor is saying "Hell No" religious schools shouldn't receive funding, JA.100 n.10, or exclaiming "good news" at their exclusion, House H.454 Hearing. Those comments indicate that religious schools "are less than fully welcome" in Vermont's educational "community." *Masterpiece*, 584 U.S. at 634. Worse, no official "object[ed] to these comments" nor did the State "disavow[ ]" them below. *Id.* at 636. And this Court (in this case) held similar comments—that religious schools "misuse[ ]" "taxpayer dollars to effectively discriminate against many of our children"—amounted to "official expressions of hostility to religion." *Mid Vermont*, 151 F.4th at 94 (citation modified).

Second, the district court distinguished *Masterpiece* and *Lukumi* because the comments there occurred in "administrative action and

enactment of a municipal ordinance." SA.31. Yet the Supreme Court has told us that "*legislative*" history is "relevant," including "statements made by *members of the decisionmaking body*." *Lukumi*, 508 U.S. at 540 (emphasis added). *Lukumi* pointed not only to statements made by city council members (a legislative body), but also to those made by "residents," the chaplain of the city police department, and the city attorney. *Id.* at 541–42. Hostile statements cannot be brushed aside because this case deals with a statute.

Third, that it was "unsurprising that some legislators opposed public funding of religious schools after the *Carson* decision" because the law allowed discrimination against religious schools beforehand does not excuse such animus. SA.32. If anything, it confirms why the comments are not neutral—officials openly touted that they would ignore binding Supreme Court precedent. No one would argue that race discrimination was permissible after *Brown v. Board of Education* simply because separate-but-equal was the prior law. Government officials take an oath to uphold the Constitution, not to find ways around it. U.S. Const. art. VI, cl. 3.

To be sure, the disparaging statements are not a *prerequisite*, but they are *relevant*. *Lukumi*, 508 U.S. at 540 (considering statements as *one* factor); *New Hope*, 966 F.3d at 166 (same); *Mid Vermont*, 151 F.4th at 93. The statements are one factor among many here—including

unequal treatment, religious gerrymandering, and historical discrimination—that collectively, at a minimum, trigger strict scrutiny.

Indeed, the myriad hostile statements do more than trigger strict scrutiny. Such statements amount to the type of non-neutral treatment that the Supreme Court and this Court have held is *per se* unconstitutional. Where "'official expressions of hostility' to religion accompany laws"—like Act 73—that burden the religious, they are "set aside" "without further inquiry." *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece*, 584 U.S. at 639); *accord Mid Vermont*, 151 F.4th at 95–96. There is no justification for legislators calling religious schools "homophobic" and staunchly advocating for their de-funding immediately after *Carson* and this Court's *French* decisions. Nor is it coincidence that Act 73 passed soon after those cases, accomplishing just that. Because Act 73 was accompanied by hostile sentiments from several officials, its de facto religious exclusion must be "set aside" without applying strict scrutiny. *Kennedy*, 597 U.S. at 525 n.1.

### B. Section 21 conditions Mr. Partington's tuition benefit on abandoning his religious exercise.

Section 21 also independently triggers strict scrutiny—regardless of its neutrality or general applicability—because it "'substantially interfere[s]'" with Mr. Partington's "'religious development of'" O.P. *Mahmoud*, 606 U.S. at 565 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)).

In *Mahmoud*, the Supreme Court held that a school board violated parents' free exercise rights by subjecting their children to LGBT-related books with no ability to opt-out. *Id.* at 529–39. First, the Court explained the Free Exercise Clause forbids laws "that substantially interfere with the religious development of children." *Id.* at 546 (citation modified). The school board burdened parents' religious exercise because the books and no-opt-out policy posed "a very real threat of undermining the religious beliefs that the parents wish[ed] to instill in their children." *Id.* at 553 (citation modified). Second, the Court rejected the argument that parents could "simply" educate their children elsewhere. *Id.* at 560. That's because public education is a "public benefit," and the government could not "'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Id.* at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462). Third, strict scrutiny was "appropriate" because of the "special character" of the religious burden on parents. *Id.* at 565.

*Mahmoud* controls.

Section 21 interferes with Mr. Partington's religious development of his child. Mr. Partington sends O.P. to Mid Vermont precisely for the Christian education it provides. JA.452–455. For him, sending O.P. to a secular school would expose O.P. to "worldly influences and ideas that are contrary to [Mr. Partington's] religious beliefs and convictions,"

JA.453, thus posing "a very real threat of undermining," O.P.'s religious upbringing. *Mahmoud*, 606 U.S. at 565 (citation modified).

The State contended below that this principle doesn't apply because the penalty on Mr. Partington's religious exercise is not a threat of criminal prosecution (*Yoder*) or coercion of certain curriculum (*Mahmoud*). JA.539. But *Mahmoud* forecloses such a narrow view. Because the State has chosen "to provide public benefits"—town tuition funding—it "cannot 'condition' its 'availability'" on Mr. Partington's "willingness to accept a burden on [his] religious exercise"—sending O.P. to a secular school. *Mahmoud*, 606 U.S. at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462). Nor are Mr. Partington's free-exercise rights limited to "uniquely coercive curricular requirements." *Mirabelli v. Bonta,* 607 U.S. 492, 495 (2026) (per curiam) (citation omitted).

Mr. Partington has three options: (1) send O.P. to a secular school and undermine O.P.'s religious upbringing; (2) send O.P. to Mid Vermont and be denied town tuition funds; or (3) don't send O.P. to school and face truancy charges. 16 V.S.A. § 1127. However sliced, Section 21 burdens Mr. Partington's religious exercise. *See Trinity Lutheran*, 582 U.S. at 463 ("Free Exercise Clause protects against 'indirect coercions or penalties'" (citation omitted)).

The district court erred because it did not consider Mr. Partington's free exercise claim under *Mahmoud* and *Yoder* at all. Under *Mahmoud*, the "special character" of the burden on Mr. Partington's

religious exercise requires strict scrutiny no matter Section 21's neutrality or general applicability. 606 U.S. at 565. The burden mirrors the one in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). There, Amish parents objected to sending their children to school after the eighth grade because they didn't want them "expos[ed]" to "worldly influence[s]." *Id.* at 217. Mr. Partington similarly objects to subjecting O.P. to a secular, worldly education and desires a faith-infused one. But he is penalized because of that choice.

### C. Section 21 violates *Carson, Espinoza*, and *Trinity Lutheran* by carving out religious schools.

Section 21 triggers strict scrutiny under the *Carson* line of precedents because it "identif[ies] and exclude[s]" religious schools from a public benefit, "[r]egardless of how the benefit and restriction are described." *Carson,* 596 U.S. at 789. That prohibition turns "on the substance of free exercise protections, not on the presence or absence of magic words." *Id.* at 785. And it reinforces parental rights principles: when the government offers a public benefit, it "cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud*, 606 U.S. at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462).

That principle controls. The district court recognized that Vermont offers a public benefit to private schools and their families but that Act 73's "practical effect" is to bar "access to [that] benefit to

students enrolled in religious schools." SA.20–23. Yet the district court refused to apply the *Carson* trilogy because it said those cases only apply to "the *explicit* exclusion of religious organizations from public benefits," and Act 73 "is silent about religion." SA.21. In other words, it said Vermont may achieve the same practical result so long as it avoids saying so expressly. That's wrong for three reasons.

First, *Carson* forecloses the district court's reasoning. There, Maine argued its tuition program did not exclude schools based on religion but only limited funding to schools providing "the rough equivalent of [a] public school education." 596 U.S. at 782–83 (citation modified). The Supreme Court rejected this: "the definition of a particular program can always be manipulated to subsume the challenged condition," and allowing states to "recast a condition on funding in this manner would be to see the First Amendment reduced to a simple semantic exercise." *Id.* at 784 (citation modified).

Vermont tries a similar maneuver here, crafting criteria to achieve the identical result as before—exclusion of all religious schools. Accepting the district court's view would, as *Carson* warned, "render[] essentially meaningless" *Trinity Lutheran* and *Espinoza* because the governments there "could have obtained the same result ... simply by redefining" their exclusions in neutral terms. *Id.* at 784–85.

Second, the *Carson* trilogy is built on *Lukumi*'s foundation, which holds that religious discrimination "cannot be shielded by mere

compliance with the requirement of facial neutrality." 508 U.S. at 534. *Trinity Lutheran* cited *Lukumi* for the proposition that laws targeting the religious for "special disabilities" trigger "the strictest scrutiny." 582 U.S. at 458 (quoting *Lukumi*, 508 U.S. at 533, 542). The trilogy thus adopts *Lukumi*'s broader framework—analyzing a law's text and "the effect of [the] law in its real operation," 508 U.S. at 535—to the public benefit context.

Other courts agree. In *St. Dominic Academy v. Makin*, the district court applied *Lukumi* and *Carson* to evaluate the law. 744 F. Supp. 3d 43, 53–57 (D. Me. 2024). The district court here severed what the Supreme Court has joined, limiting the *Carson* trilogy to explicit textual exclusions rather than applying *Lukumi*'s rule that government cannot target religion, however drafted.

Third, the district court's holding creates a playbook for constitutional evasion. If a state need only avoid saying "religion" (or explicitly religious terms like "sectarian") to escape strict scrutiny, then states will easily be able to avoid heightened review. States will instead copy Vermont.

A restriction that "falls by design on religious school students and almost no others" is "no accident." *French I*, 985 F.3d at 181–82. And as in *Carson*, the "key manner" in which the Town Tuition Program now operates is that funding is only provided for "private secular education," which "is just another way of saying that [Vermont] does not extend

tuition assistance payments to parents who choose to educate their children at religious schools." *Carson*, 596 U.S. at 784. The Free Exercise Clause cannot be manipulated so easily.

## II. Section 21 and its exclusionary criteria fail strict scrutiny.

If this Court concludes that religious animus accompanied the law, then Section 21 is *per se* unconstitutional without further analysis. *Kennedy*, 597 U.S. at 525 n.1; *Mid Vermont*, 151 F.4th at 95–96. But even if strict scrutiny applies, Section 21 and its exclusionary criteria fail because they neither "advance[ ] interests of the highest order" nor are "narrowly tailored to achieve those interests." *Mahmoud*, 606 U.S. at 565 (citation modified); *Lukumi*, 508 U.S. at 546.

### A. Vermont's purported interests are too broad, vague, and generalized.

Vermont says its compelling interest is "providing a high-quality, cost-effective, and substantially equal education to every child." JA.496. Those may be worthy goals, but strict scrutiny "demands" a "precise analysis," *Fulton*, 593 U.S. at 541, that is "more focused than [Vermont's] categorical approach," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430 (2006). Those interests cannot qualify as compelling because they are stated at too "high [a] level of generality." *Fulton*, 593 U.S. at 541. The State cannot "rely on" such "broadly formulated interests" but must show that it has a compelling interest in excluding Mid Vermont *specifically* from Town

Tuition. *Id.* In other words, the Court "must scrutinize[ ] the asserted harm" in allowing Mid Vermont to be eligible for Town Tuition. *Id.* (citation modified).

Vermont cannot meet that burden. It has failed to explain why excluding Mid Vermont is absolutely necessary to achieve the State's high-quality, cost-effective, and equality goals. If anything, excluding Mid Vermont *hinders* those goals—Mid Vermont offers a top-notch education, is less expensive than all the eligible private schools and nearly all public schools, and any student is welcome to apply. Vermont has no compelling reason why it must ban Mid Vermont from Town Tuition. *See also supra* § I(A)(1)(a) (Vermont undermines its own purported interests).

### B. There are less restrictive options to further Vermont's claimed interests.

Section 21 and its exclusionary criteria are not narrowly tailored.

The State says that its exclusionary criteria are necessary to ensure it provides a high-quality, cost-effective, and equal education to every student, but then immediately turns around and exempts myriad schools from those criteria. That "system of exceptions" "undermines" the State's assertion that the criteria "can brook no departures." *Fulton*, 593 U.S. at 542. Such "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that

supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (citation modified).

Narrow tailoring requires Vermont to show that funding Mid Vermont (and other religious schools) "is more dangerous" to its interests than funding the dozens of secular private schools and out-of-state public schools. *Tandon*, 593 U.S. at 63. It cannot. If Vermont can send Town Tuition funds to out-of-state public schools—where the State has no regulatory authority over quality, cost, or equality of education—then it can also send Town Tuition funds to Mid Vermont—an in-state school that meets the State's private school regulations.

Section 21 isn't even rationally related to the State's purported compelling interests. The criteria exclude schools based on location and past enrollment percentages, and mandate larger class sizes. Yet there is no record evidence that excluding religious schools based on *those attributes* correlates to a general improvement in quality, cost, or equality of education. If those are the State's interests, then the proper response (and less restrictive alternative) is to regulate them directly through laws "that burden[ ] religion to a far lesser degree." *Lukumi*, 508 U.S. at 546. Vermont could pass a law that mandates a baseline of education quality. If cost is a concern, Vermont could amend what receiving schools can charge and sending districts pay. *See* 16 V.S.A. § 824(c). And offering a substantially equal education is a requirement imposed on the State to ensure there is "equity in educational

financing" in Vermont's *public* schools. *Brigham v. State,* 692 A.2d 384, 386 (Vt. 1997) (per curiam). Again, there is no evidence that cutting out all *private* religious schools is needed to achieve funding parity in the public school system. The correct way to address this interest is to regulate public schools, not to eliminate private options for sending district families.

In the end, there may be real issues in Vermont's public education system that need fixed. But the solution is not to carve out all religious schools from public benefits. Religious schools fill a needed gap for families who desire a religious education. Treating them as second-class does nothing to improve education in Vermont, and in fact worsens it.

## III. As the district court correctly concluded, Plaintiffs satisfy the remaining preliminary injunction factors.

Absent an injunction, Mid Vermont and its students will continue to suffer irreparable harm both as a matter of law and as a practical matter. Legally, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mid Vermont,* 151 F.4th at 96 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). So "[r]eligious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation." *Agudath Israel of Am. v. Cuomo,* 983 F.3d 620, 636 (2d Cir. 2020).

Practically, Mid Vermont's ineligibility for Town Tuition—and thus its students' ineligibility for Dual Enrollment and Early College funds—"prevent[s] the school from using" those benefit programs "as a recruiting tool" for new students. *Mid Vermont*, 151 F.4th at 96. The School will lose prospective students because they have been blacklisted from public benefits. JA.461. The same is true for the other religious schools, where Section 21 has already harmed several families. JA.594–595, 599. Mr. Partington is irreparably harmed too because he faces an unconstitutional choice: choose public tuition that his taxes pay for, or the religious education that he desires for his child.

An injunction also serves the public interest. "There is a strong public interest in ensuring that students and schools do not lose out on valuable [public benefits] by virtue of the government's hostility" and lack of neutrality "to religion." *Mid Vermont*, 151 F.4th at 96. There is no public interest served by *reducing* options for Vermonters.

The district court correctly acknowledged that Plaintiffs would likely meet these factors if the "ruling is reversed" on the likelihood of success factor. SA.34. Because the district court misperceived the merits of Plaintiffs' claims, that court's own opinion concedes that a preliminary injunction is in order.

## CONCLUSION

Vermont has strategically gerrymandered its Town Tuitioning laws to exclude every private religious school in the State while continuing to fund most private secular schools. In so doing, Vermont has treated private religious schools worse than their secular comparators, and it did so on purpose as evidenced by reems of history and public comments in the lead-up to the enactment of the law challenged here. Because Plaintiffs are likely to prevail on the merits, and satisfy the other injunction factors, they are entitled to a preliminary injunction.

Accordingly, the Court should reverse and direct the entry of Plaintiffs-Appellants' requested preliminary injunction.

Dated: June 24, 2026

Respectfully submitted,

*s/David A. Cortman*

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Ryan J. Tucker
Jeremiah Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 13,868 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: June 24, 2026

*s/David A. Cortman*
David A. Cortman
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using ACMS system. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the ACMS system.

*s/David A. Cortman*
David A. Cortman
*Counsel for Appellants*