# 26-1416

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Mid Vermont Christian School, on behalf of itself and its students and its students' parents, Nathan Partington, individually, O.P., by and through his father and natural guardian, Nathan Partington,

*Plaintiffs-Appellants,*

T.S., K.S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve, Nathaniel Slarve, individually, Dawna Slarve, individually, A.G., M.G., by and through their parents and natural guardians, Chris and Bethany Goodwin, Christopher Goodwin, individually, Bethany Goodwin, individually,

*Plaintiffs,*

v.

Zoie Saunders, in her official capacity as Secretary of the Vermont Agency of Education, Jennifer Deck Samuelson, in her official capacity as Chair of the Vermont State Board of Education, Waits River Valley (Unified #36 Elementary) School Board,

*Defendants-Appellees,*

Heather Bouchey, in her official capacity as Interim Secretary of the Vermont Agency of Education, Christine Bourne, in her official capacity as Windsor Southeast Supervisory Union Superintendent, Hartland School Board, Randall Gawel, in his official capacity as Orange East Supervisory Union Superintendent, Jay Nichols, in his official capacity as the Executive Director of The Vermont Principals' Association,

*Defendants.*

On Appeal from the United States District Court
for the District of Vermont / Case No. 2:23-cv-00652

### JOINT APPENDIX – VOLUME 4 (685-889)

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

Ryan J. Tucker
Jeremiah J. Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Appellants*

Samuel B. Stratton
OFFICE OF THE VERMONT
ATTORNEY GENERAL
109 State Street
Montpelier, VT 05609
(802) 828-3171
sam.stratton@vermont.gov

*Counsel for Appellees Zoie
Saunders and Jennifer Deck
Samuelson*

Pietro J. Lynn
Sean M. Toohey
LYNN, LYNN, BLACKMAN &
TOOHEY, P.C.
76 St. Paul St., Suite 400
Burlington, VT 05401
(802) 860-1500
plynn@lynnlawvt.com
stoohey@lynnlawvt.com

*Counsel for Appellee Waits River
Valley (Unified #36 Elementary)
School Board*

# TABLE OF CONTENTS

| Document Description | ECF No. | Appendix Page |
|---|---|---|
| **VOLUME 1** | | |
| District Court Docket | | 1-32 |
| Memorandum from Daniel M. French, Ed.D. to Vermont State Board of Education dated February 1, 2023 | 14-3 | 33-40 |
| Declaration of Randall Gawel | 28-2 | 41-43 |
| Email dated October 3, 2023 re tuition payment | 28-4 | 44-45 |
| Supplemental Declaration of Jennifer Deck Samuelson | 50-2 | 46-48 |
| Amended Verified Complaint | 100 | 49-165 |
| **VOLUME 2** | | |
| Exhibit 1 to Amended Complaint – Act 73 | 100-1 | 166-313 |
| Exhibit 2 to Amended Complaint – Mid Vermont Christian School Website Pages | 100-2 | 314-338 |
| Exhibit 4 to Amended Complaint – Vermont Agency of Education's Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students | 100-4 | 339-348 |
| Exhibit 5 to Amended Complaint – September 13, 2022 Guidance Letter | 100-5 | 349-351 |
| Exhibit 6 to Amended Complaint – Mid Vermont Addendum for Independent School Applications - 2022 | 100-6 | 352-353 |

i

| | | |
|---|---|---|
| Exhibit 7 to Amended Complaint – Agency of Education Status Letter dated August 3, 2023 | 100-7 | 354-355 |
| Exhibit 8 to Amended Complaint – Gawel and Bourne October 4, 2023 Emails to Vicky Fogg | 100-8 | 356-358 |
| Exhibit 9 to Amended Complaint – January 4, 2024 Letter re approval status | 100-9 | 359-360 |
| Exhibit 10 to Amended Complaint – Declaration of Jennifer Deck Samuelson | 100-10 | 361-363 |
| Exhibit 11 to Amended Complaint – February 2025 & September 2025 Independent School Directories | 100-11 | 364-413 |
| Exhibit 12 to Amended Complaint – Mid Vermont 2025 Application Clarifier | 100-12 | 414-415 |
| Plaintiffs' Motion for Preliminary Injunction | 105 | 416-420 |
| **VOLUME 3** | | |
| Memorandum in Support of Motion for Preliminary Injunction | 105-1 | 421-451 |
| Declaration of Nathan Partington in Support of Motion for Preliminary Injunction | 105-2 | 452-456 |
| Declaration of Vicky Fogg in Support of Motion for Preliminary Injunction | 105-3 | 457-463 |
| Exhibit 1 to Fogg Declaration – List of Religious Schools Now Ineligible Due to Act 73 | 105-4 | 464-467 |
| School Board's Opposition to Motion for Preliminary Injunction | 121 | 468-478 |
| State Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction | 122 | 479-502 |

| | | |
|---|---|---|
| Plaintiffs' Reply to State Defendants' Opposition to Motion for Preliminary Injunction | 124 | 503-519 |
| State Defendants' Motion to Dismiss Official Capacity Claims in Plaintiffs' Amended Complaint | 126 | 520-544 |
| Plaintiffs' Response in Opposition to State Defendants' Motion to Dismiss Official Capacity Claims | 129 | 545-577 |
| State Defendants' Reply in Support of Motion to Dismiss Official Capacity Claims in Plaintiffs' Amended Complaint | 133 | 578-588 |
| Plaintiffs' Notice of Supplemental Declarations in Support of Motion for Preliminary Injunction | 141 | 589-592 |
| Declaration of David Young | 141-1 | 593-594 |
| Declaration of Micah Hayre | 141-2 | 595-598 |
| Declaration of Robert Congdon, Jr. | 141-3 | 599-600 |
| Declaration of Brandon Damaska | 141-4 | 601-604 |
| Exhibit 1 to Damaska Declaration – School Tuition Website Pages | 141-5 | 605-640 |
| Exhibit 2 to Damaska Declaration – Chart of Secular Independent Schools Approved for Town Tuition | 141-6 | 641-643 |
| Exhibit 3 to Damaska Declaration – Religious Schools Tuition Website Pages | 141-7 | 644-676 |
| Exhibit 4 to Damaska Declaration – Chart of Religious Independent Schools Unapproved for Town Tuition | 141-8 | 677-679 |

| | | |
|---|---|---|
| Exhibit 5 to Damaska Declaration – Announced Tuition Rates for SY 2026-2027 | 141-9 | 680-684 |
| **VOLUME 4** | | |
| Exhibit 6 to Damaska Declaration – Announced Tuition Rates for the 2025-2026 School Year | 141-10 | 685-702 |
| Exhibit 7 to Damaska Declaration – Agency of Education 2024-2025 Final Allowable Tuition Calculation | 141-11 | 703-709 |
| Exhibit 8 to Damaska Declaration – School Redistricting Task Force's December 1, 2025 Report to the General Assembly | 141-12 | 710-751 |
| Declaration of David Evans | 141-13 | 752-754 |
| Exhibit 1 to Evans Declaration – Map of Private Schools/Programs Eligible for Tuition and Religious Schools Ineligible for Tuition | 141-14 | 755-759 |
| Order on Motion for Preliminary Injunction | 143 | 760-793 |
| State Defendants' Exhibit A – Act 73 (2025) Approved Independent School Eligibility | 144-1 | 794-796 |
| Notice of Appeal | 146 | 797-799 |
| Transcript of Motions Hearing | 148 | 800-889 |

# EXHIBIT 6

JA.685

**Vermont Agency of Education**
**School Finance**
**2025-2026  School Year**

**The 2025-2026 Average Announced Tuition of Union Elementary Schools is $19,120.00**
**The 2025-2026 Average Announced Tuition of Union 7th-12th Grade Schools is $20,910.00**

## Average Announced Tuition

16 V.S.A. § 823. Elementary tuition

(a) Tuition for elementary students shall be paid by the district in which the student is a resident. The district shall pay the full tuition charged its students attending a public elementary school. If a payment made to a public elementary school is three percent more or less than the calculated net cost per elementary pupil in the receiving school district for the year of attendance, the district shall be reimbursed, credited, or refunded pursuant to section 836 of this title. Notwithstanding the provisions of this subsection or of subsection 825(b) of this title, the boards of both the receiving and sending districts may enter into tuition agreements with terms differing from the provisions of those subsections, provided that the receiving district must offer identical terms to all sending districts, and further provided that the statutory provisions apply to any sending district that declines the offered terms.
(b) Unless the electorate of a school district authorizes payment of a higher amount at an annual or special meeting warned for the purpose, the tuition paid to an approved independent elementary school or an independent school meeting education quality standards shall not exceed the least of:
(1) the average announced tuition of Vermont union elementary schools for the year of attendance;
(2) the tuition charged by the approved independent school for the year of attendance; or
(3) the average per-pupil tuition the district pays for its other resident elementary students in the year in which the student is enrolled in the approved independent school.

16 V.S.A. § 824. High school tuition

(a) Tuition for high school students shall be paid by the school district in which the student is a resident.
(b) Except as otherwise provided for technical students, the district shall pay the full tuition charged its students attending a public high school in Vermont or an adjoining state or a public or approved independent school in Vermont functioning as an approved area career technical center, or an independent school meeting education quality standards; provided:
(1) If a payment made to a public high school or an independent school meeting education quality standards is three percent more or less than the calculated net cost per secondary pupil in the receiving school district or independent school for the year of attendance then the district or school shall be reimbursed, credited, or refunded pursuant to section 836 of this title.
(2) Notwithstanding the provisions of this subsection or of subsection 825(b) of this title, the board of the receiving public school district, public or approved independent school functioning as an area career technical center, or independent school meeting education quality standards may enter into tuition agreements with the boards of sending districts that have terms differing from the provisions of those subsections, provided that the receiving district or school must offer identical terms to all sending districts, and further provided that the statutory provisions apply to any sending district that declines the offered terms.
(c) The district shall pay an amount not to exceed the average announced tuition of Vermont union high schools for the year of attendance for its students enrolled in an approved independent school not functioning as a Vermont area career technical center, or any higher amount approved by the electorate at an annual or special meeting warned for that purpose.

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

---

### IS126   SHARON ACADEMY

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| IS126 | SHARON ACADEMY THE | 7-12 | Yes | $0.00 | $0.00 | $0.00 | $22,900.00 | $0.00 |

### PA002  BURR AND BURTON ACADEMY

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| PA002 | BURR AND BURTON ACADEMY | 9-12 | No | $0.00 | $0.00 | $0.00 | $19,987.00 | $0.00 |

### PA003  LYNDON INSTITUTE

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| PA003 | LYNDON INSTITUTE | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $25,202.00 | $0.00 |

### PA004  ST JOHNSBURY ACADEMY

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| PA004 | ST JOHNSBURY ACADEMY | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $24,600.00 | $24,600.00 |

### PA005  THETFORD ACADEMY

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| PA005 | THETFORD ACADEMY | 7-12 | Yes | $0.00 | $0.00 | $0.00 | $25,060.00 | $0.00 |

### SU001  MT. ABRAHAM USD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U061 | MT. ABRAHAM USD | PK-12 | Yes | $0.00 | $20,542.00 | $20,542.00 | $21,441.00 | $0.00 |

## FY 2025 Announced Tuition
## Vermont Agency of Education
### As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
### Sorted by SU number

### SU002  ADDISON NORTHWEST SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U054 | ADDISON NORTHWEST USD #54 | PK-12 | Yes | $0.00 | $20,450.00 | $20,450.00 | $23,545.00 | $0.00 |

### SU003  ADDISON CENTRAL SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U055 | ADDISON CENTRAL USD #55 | PK-12 | Yes | $0.00 | $17,530.00 | $17,530.00 | $23,520.00 | $0.00 |

### SU004  SLATE VALLEY UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U062 | SLATE VALLEY UUSD | PK-12 | Yes | $0.00 | $17,500.00 | $17,500.00 | $19,000.00 | $0.00 |

### SU005  SOUTHWEST VERMONT SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T005 | ARLINGTON | PK-12 | Yes | $0.00 | $20,000.00 | $20,000.00 | $21,000.00 | $0.00 |
| T141 | NORTH BENNINGTON ID | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T181 | SANDGATE | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T259 | GLASTENBURY | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U014 | MT. ANTHONY UHSD 14 | 6-12 | Yes | $0.00 | $0.00 | $18,500.00 | $18,500.00 | $0.00 |
| U087 | SOUTHWEST VT UESD | PK-6 | Yes | $0.00 | $16,500.00 | $16,500.00 | $0.00 | $0.00 |

## FY 2025 Announced Tuition
### Vermont Agency of Education
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
#### Sorted by SU number

### SU006  BENNINGTON RUTLAND SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T248 | WINHALL | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U063 | Taconic and Green Regional SD | PK-8 | Yes | $0.00 | $19,800.00 | $19,800.00 | $19,800.00 | $0.00 |
| U084 | Mettawee School Distirct | PK-6 | Yes | $0.00 | $25,300.00 | $25,300.00 | $0.00 | $0.00 |

### SU007  COLCHESTER SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T050 | COLCHESTER | PK-12 | Yes | $0.00 | $17,200.00 | $17,200.00 | $23,300.00 | $0.00 |

### SU009  CALEDONIA CENTRAL SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T038 | CABOT | PK-12 | Yes | $0.00 | $20,000.00 | $25,000.00 | $25,000.00 | $0.00 |
| T057 | DANVILLE | PK-12 | Yes | $0.00 | $20,000.00 | $23,000.00 | $25,000.00 | $0.00 |
| T151 | PEACHAM | PK-6 | Yes | $0.00 | $20,000.00 | $25,000.00 | $0.00 | $0.00 |
| U033 | TWINFIELD USD 33 | PK-12 | Yes | $0.00 | $20,000.00 | $25,000.00 | $25,000.00 | $0.00 |
| U078 | Caledonia Cooperative Unified US | PK-8 | Yes | $0.00 | $20,000.00 | $25,000.00 | $25,000.00 | $0.00 |

### SU010  MILTON SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T126 | MILTON ID | PK-12 | No | $7,625.00 | $15,250.00 | $15,250.00 | $17,750.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU011  ST JOHNSBURY SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T179 | ST. JOHNSBURY | PK-8 | Yes | $0.00 | $19,000.00 | $19,000.00 | $19,000.00 | $0.00 |

### SU012  MT. MANSFIELD UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T255 | BUELS GORE | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U401 | MT. MANSFIELD UUSD | PK-12 | Yes | $0.00 | $14,082.00 | $14,082.00 | $19,100.00 | $0.00 |

### SU014  CHAMPLAIN VALLEY SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U056 | CHAMPLAIN VALLEY USD #56 | PK-12 | Yes | $0.00 | $21,077.00 | $21,077.00 | $20,283.00 | $0.00 |

### SU015  BURLINGTON SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T037 | BURLINGTON | PK-12 | Yes | $0.00 | $19,000.00 | $19,000.00 | $20,000.00 | $0.00 |
| VC004 | BURLINGTON TECHNICAL CENTER | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $24,934.00 |

### SU016  SOUTH BURLINGTON SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T191 | SOUTH BURLINGTON | PK-12 | Yes | $0.00 | $20,739.00 | $20,739.00 | $21,734.00 | $0.00 |

### SU017  WINOOSKI SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T249 | WINOOSKI ID | PK-12 | Yes | $0.00 | $13,900.00 | $13,900.00 | $14,400.00 | $0.00 |

## FY 2025 Announced Tuition
## Vermont Agency of Education
### As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
### Sorted by SU number

### SU019  ESSEX NORTH SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T041 | CANAAN | PK-12 | Yes | $0.00 | $21,500.00 | $21,500.00 | $24,000.00 | $0.00 |
| T256 | AVERILL | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T257 | Avery's Gore | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T258 | FERDINAND | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T260 | Lewis | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T262 | Warner's Grant | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T263 | Warren Gore | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U065 | Northeast Kingdom Choice SD | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

### SU020  FRANKLIN NORTHEAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U085 | NORTHERN MOUNTAIN VALLEY U | PK-8 | No | $0.00 | $17,500.00 | $17,500.00 | $17,500.00 | $0.00 |
| U088 | ENOSBURGH-RICHFORD UUSD | PK-12 | Yes | $0.00 | $21,000.00 | $21,000.00 | $24,000.00 | $0.00 |
| VC005 | COLD HOLLOW CAREER CENTER | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $16,000.00 |

### SU021  MISSISQUOI VALLEY SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U089 | MISSISQUOI VALLEY SD | PK-12 | Yes | $9,000.00 | $18,000.00 | $18,000.00 | $19,000.00 | $0.00 |

## FY 2025 Announced Tuition
## Vermont Agency of Education
### As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
### Sorted by SU number

**SU022  FRANKLIN WEST SU**

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T071 | FAIRFAX | PK-12 | Yes | $15,950.00 | $15,950.00 | $15,950.00 | $18,750.00 | $0.00 |
| T077 | FLETCHER | PK-6 | No | $0.00 | $14,500.00 | $14,500.00 | $0.00 | $0.00 |
| T079 | GEORGIA | PK-8 | Yes | $0.00 | $14,750.00 | $14,750.00 | $17,500.00 | $0.00 |

**SU023  MAPLE RUN SD**

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U057 | MAPLE RUN USD | PK-12 | Yes | $9,000.00 | $18,000.00 | $18,000.00 | $21,000.00 | $0.00 |
| VC003 | NORTHWEST TECHNICAL CENTER | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $14,000.00 |

**SU024  GRAND ISLE SU**

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T003 | ALBURGH | PK-8 | No | $0.00 | $18,640.00 | $18,640.00 | $18,640.00 | $0.00 |
| T192 | SOUTH HERO | PK-8 | No | $0.00 | $20,895.00 | $20,895.00 | $20,895.00 | $0.00 |
| U066 | CHAMPLAIN ISLANDS UUSD | PK-6 | No | $0.00 | $19,093.00 | $19,093.00 | $0.00 | $0.00 |

**SU025  LAMOILLE NORTH SU**

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T040 | CAMBRIDGE | PK-6 | No | $8,468.00 | $16,936.00 | $16,936.00 | $0.00 | $0.00 |
| U058 | LAMOILLE NORTH UUSD | PK-12 | Yes | $7,250.00 | $14,500.00 | $14,500.00 | $12,275.00 | $29,369.00 |
| VC008 | GREEN MTN TECHNOLOGY/CAREE | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $29,369.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

## SU026  LAMOILLE SOUTH SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T198 | STOWE | PK-12 | Yes | $0.00 | $18,000.00 | $18,000.00 | $21,000.00 | $0.00 |
| U090 | ELMORE-MORRISTOWN USD | PK-12 | Yes | $0.00 | $18,000.00 | $18,000.00 | $21,000.00 | $0.00 |

## SU027  ORANGE EAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T205 | THETFORD | PK-6 | Yes | $0.00 | $17,500.00 | $17,500.00 | $0.00 | $0.00 |
| U021 | BLUE MOUNTAIN USD 21 | PK-12 | Yes | $0.00 | $15,100.00 | $15,100.00 | $17,000.00 | $0.00 |
| U036 | WAITS RIVER VALLEY USD 36 | PK-8 | Yes | $0.00 | $13,000.00 | $13,000.00 | $13,000.00 | $0.00 |
| U091 | OXBOW UNIFIED UNION SD | PK-12 | Yes | $0.00 | $14,700.00 | $14,700.00 | $17,000.00 | $0.00 |
| VC011 | RIVER BEND CAREER AND TECH CT | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $18,650.00 |

## SU028  ORANGE SOUTHWEST UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U059 | ORANGE SOUTHWEST UUSD | PK-12 | Yes | $0.00 | $21,072.00 | $21,072.00 | $27,412.00 | $0.00 |
| VC012 | RANDOLPH TECHNICAL CAREER C | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $23,490.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
**As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)**
**Sorted by SU number**

## SU030  WHITE RIVER VALLEY SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T184 | SHARON | PK-6 | Yes | $0.00 | $22,020.00 | $22,020.00 | $0.00 | $0.00 |
| T199 | STRAFFORD | PK-8 | Yes | $0.00 | $14,928.00 | $14,928.00 | $22,484.00 | $0.00 |
| U079 | White River Unified District | PK-12 | Yes | $0.00 | $19,900.00 | $19,900.00 | $19,900.00 | $0.00 |
| U080 | Granville Hancock Unified District | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U081 | Rochester Stockbridge Unified SD | PK-6 | Yes | $0.00 | $18,687.00 | $18,687.00 | $0.00 | $0.00 |
| U082 | First Branch Unified SD | PK-12 | Yes | $0.00 | $19,293.00 | $19,293.00 | $15,321.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU031  NORTH COUNTRY SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| J105 | JAY/WESTFIELD JOINT ELEM. DIST | PK-6 | Yes | $0.00 | $23,000.00 | $23,000.00 | $0.00 | $0.00 |
| T030 | BRIGHTON | PK-8 | Yes | $0.00 | $20,000.00 | $20,000.00 | $20,000.00 | $0.00 |
| T044 | CHARLESTON | PK-8 | Yes | $0.00 | $23,000.00 | $23,000.00 | $23,000.00 | $0.00 |
| T054 | COVENTRY | PK-8 | Yes | $0.00 | $29,000.00 | $29,000.00 | $29,000.00 | $0.00 |
| T058 | DERBY | PK-6 | Yes | $0.00 | $15,500.00 | $15,500.00 | $0.00 | $0.00 |
| T097 | HOLLAND | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T105 | JAY | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T114 | LOWELL | PK-8 | Yes | $0.00 | $23,000.00 | $23,000.00 | $23,000.00 | $0.00 |
| T131 | MORGAN | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T139 | NEWPORT CITY | PK-6 | Yes | $0.00 | $25,500.00 | $25,500.00 | $0.00 | $0.00 |
| T140 | NEWPORT TOWN | PK-6 | Yes | $0.00 | $25,000.00 | $25,000.00 | $0.00 | $0.00 |
| T209 | TROY | PK-8 | Yes | $0.00 | $21,000.00 | $21,000.00 | $21,000.00 | $0.00 |
| T231 | WESTFIELD | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U022A | NORTH COUNTRY JR UHSD 22 | 7-8 | Yes | $0.00 | $0.00 | $0.00 | $23,000.00 | $0.00 |
| U022B | NORTH COUNTRY SR UHSD 22 | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $20,500.00 | $0.00 |
| VC010 | NORTH COUNTRY CAREER CTR | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $20,990.00 |

### SU032  WASHINGTON CENTRAL UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U092 | WASHINGTON CENTRAL UUSD | PK-12 | Yes | $0.00 | $25,626.00 | $25,626.00 | $24,728.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU033  MILL RIVER UNIFIED UNION SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U052 | MILL RIVER USD #52 | PK-12 | Yes | $0.00 | $20,000.00 | $20,000.00 | $21,500.00 | $0.00 |

### SU034  ORLEANS CENTRAL SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T235 | WESTMORE | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U024 | LAKE REGION UHSD 24 | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $23,500.00 | $0.00 |
| U093 | ORLEANS CENTRAL UESD | PK-8 | Yes | $0.00 | $23,000.00 | $23,000.00 | $23,000.00 | $0.00 |

### SU035  ORLEANS SOUTHWEST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T055 | CRAFTSBURY | PK-12 | Yes | $0.00 | $16,000.00 | $16,000.00 | $23,000.00 | $0.00 |
| T195 | STANNARD | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T250 | WOLCOTT | PK-6 | Yes | $0.00 | $22,500.00 | $22,500.00 | $0.00 | $0.00 |
| U026 | HAZEN UHSD 26 | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $23,000.00 | $0.00 |
| U094 | ORLEANS SOUTHWEST UESD | PK-6 | Yes | $0.00 | $17,500.00 | $17,500.00 | $0.00 | $0.00 |

### SU036  RUTLAND NORTHEAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U049 | BARSTOW USD #49 | PK-8 | Yes | $0.00 | $21,950.00 | $21,950.00 | $21,950.00 | $0.00 |
| U053 | OTTER VALLEY USD #53 | PK-12 | Yes | $0.00 | $19,900.00 | $19,900.00 | $22,155.00 | $0.00 |

## FY 2025 Announced Tuition
## Vermont Agency of Education
### As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
### Sorted by SU number

### SU040  RUTLAND CITY SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T173 | RUTLAND CITY | K-12 | Yes | $0.00 | $18,400.00 | $18,400.00 | $22,000.00 | $0.00 |
| VC013 | STAFFORD TECHNICAL CENTER | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $22,260.00 |

### SU042  HARWOOD UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U060 | HARWOOD USD #60 | Pk-12 | No | $0.00 | $19,743.00 | $19,743.00 | $22,340.00 | $0.00 |

### SU046  WINDHAM CENTRAL SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T120 | MARLBORO | PK-8 | Yes | $0.00 | $18,928.00 | $18,928.00 | $20,020.00 | $0.00 |
| T200 | STRATTON | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T246 | WINDHAM | PK-6 | No | $0.00 | $18,200.00 | $18,200.00 | $0.00 | $0.00 |
| U072 | West River Union Education Distri | PK-12 | Yes | $0.00 | $18,928.00 | $18,928.00 | $21,972.00 | $0.00 |
| U073 | RIVER VALLEYS UNIFIED SD | PK-6 | Yes | $0.00 | $19,383.00 | $19,383.00 | $0.00 | $0.00 |

### SU047  WINDHAM NORTHEAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T169 | ROCKINGHAM | PK-8 | Yes | $0.00 | $22,000.00 | $22,000.00 | $22,000.00 | $0.00 |
| T234 | WESTMINSTER | PK-6 | Yes | $0.00 | $30,000.00 | $30,000.00 | $0.00 | $0.00 |
| U027 | BELLOWS FALLS UHSD 27 | 9-12 | Yes | $0.00 | $0.00 | $0.00 | $23,500.00 | $0.00 |
| U095 | WINDHAM NORTHEAST UESD | PK-6 | Yes | $0.00 | $15,000.00 | $15,000.00 | $0.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU048  WINDHAM SOUTHEAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T214 | VERNON | PK-6 | Yes | $9,500.00 | $19,000.00 | $19,000.00 | $0.00 | $0.00 |
| U096 | WINDHAM SOUTHEAST UUSD | PK-12 | Yes | $9,500.00 | $19,000.00 | $19,000.00 | $19,500.00 | $0.00 |
| VC014 | WINDHAM REGIONAL CAREER CT | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $19,000.00 |

### SU049  WINDHAM SOUTHWEST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T090 | HALIFAX | PK-8 | No | $0.00 | $12,000.00 | $12,000.00 | $12,000.00 | $0.00 |
| T164 | READSBORO | PK-6 | No | $0.00 | $15,000.00 | $15,000.00 | $0.00 | $0.00 |
| T182 | SEARSBURG | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T194 | STAMFORD | PK-8 | No | $0.00 | $15,500.00 | $15,500.00 | $15,500.00 | $0.00 |
| T261 | SOMERSET | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U075 | Twin Valley Unified SD | PK-12 | No | $0.00 | $17,600.00 | $17,600.00 | $19,800.00 | $0.00 |

### SU051  WINDSOR CENTRAL SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T153 | PITTSFIELD | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| U076 | Windsor Central Unified USD | PK-12 | Yes | $0.00 | $19,680.00 | $19,680.00 | $22,510.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU052  WINDSOR SOUTHEAST SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T094 | HARTLAND | PK-8 | Yes | $10,939.00 | $21,878.00 | $21,878.00 | $21,878.00 | $0.00 |
| T227 | WEATHERSFIELD | PK-8 | Yes | $10,949.00 | $21,878.00 | $21,878.00 | $21,878.00 | $0.00 |
| U086 | MT. ASCUTNEY SD | PK-12 | Yes | $10,939.00 | $21,878.00 | $21,878.00 | $21,878.00 | $0.00 |

### SU054  HARTFORD SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T093 | HARTFORD | PK-12 | Yes | $0.00 | $21,500.00 | $21,500.00 | $23,000.00 | $23,900.00 |
| VC007 | HARTFORD AREA CAREER/TECH C | | No | $0.00 | $0.00 | $0.00 | $0.00 | $23,900.00 |

### SU055  SAU 70

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T145 | NORWICH | PK-6 | No | $0.00 | $17,668.00 | $17,668.00 | $0.00 | $0.00 |

### SU056  SPRINGFIELD SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| T193 | SPRINGFIELD | PK-12 | No | $0.00 | $21,300.00 | $21,300.00 | $26,400.00 | $0.00 |

### SU061  BARRE UUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|---|---|---|---|---|---|---|---|---|
| U097 | BARRE UUSD | PK-12 | Yes | $0.00 | $18,000.00 | $18,000.00 | $19,000.00 | $0.00 |

## FY 2025 Announced Tuition
## Vermont Agency of Education
### As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
### Sorted by SU number

### SU063  TWO RIVERS SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U077 | Green Mountain Unified SD | PK-12 | Yes | $0.00 | $16,000.00 | $16,000.00 | $22,000.00 | $0.00 |
| U083 | Ludlow-Mt. Holly Unified USD | PK-6 | Yes | $0.00 | $19,000.00 | $19,000.00 | $0.00 | $0.00 |

### SU064  RIVENDELL INTERSTATE SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U146 | RIVENDELL INTERSTATE SCHOOL | PK-12 | Yes | $0.00 | $20,500.00 | $20,500.00 | $20,500.00 | $0.00 |

### SU065  ESSEX WESTFORD ECUUSD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U051 | ESSEX WESTFORD ECUUSD | PK-12 | Yes | $0.00 | $21,000.00 | $21,000.00 | $21,000.00 | $0.00 |
| VC006 | CENTER FOR TECHNOLOGY ESSEX | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $22,500.00 |

### SU066  GREATER RUTLAND COUNTY SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T101 | IRA | None | No | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| T174 | RUTLAND TOWN | PK-8 | Yes | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $0.00 |
| U069 | Wells Spring Unified USD | PK-6 | Yes | $17,500.00 | $17,500.00 | $17,500.00 | $0.00 | $0.00 |
| U070 | Quary Valley Unified USD | PK-12 | Yes | $17,500.00 | $17,500.00 | $17,500.00 | $20,000.00 | $0.00 |

### SU067  KINGDOM EAST SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U064 | Kingdom East Unified USD | PK-8 | Yes | $0.00 | $22,827.00 | $22,827.00 | $22,827.00 | $0.00 |

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)
Sorted by SU number

### SU068  CENTRAL VERMONT SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U067 | Echo Valley Community SD | PK-8 | Yes | $0.00 | $12,500.00 | $18,500.00 | $18,500.00 | $0.00 |
| U068 | Paine Mountain SD | PK-12 | Yes | $0.00 | $12,500.00 | $18,500.00 | $26,000.00 | $0.00 |

### SU069  MONTPELIER ROXBURY SU

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| U071 | MONTPELIER ROXBURY SD | PK-12 | Yes | $0.00 | $17,500.00 | $17,500.00 | $18,500.00 | $0.00 |

### SU070  LINCOLN SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| T112 | LINCOLN SD | PK-6 | Yes | $10,271.00 | $20,542.00 | $20,542.00 | $0.00 | $0.00 |

### TE001  PATRICIA A HANNAFORD CAREER CTR SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| VC001 | PATRICIA HANNAFORD CAREER CT | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $34,920.00 |

### TE002  SW VT CAREER DEVELOPMENT CTR SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| VC009 | SOUTHWEST TECH | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $29,619.00 |

### TE003  RIVER VALLEY TECHNICAL CENTER SD

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| VC016 | RIVER VALLEY TECHNICAL CENTER | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $20,535.00 |

JA.701

**FY 2025 Announced Tuition**
**Vermont Agency of Education**
**As reported by VT's Supervisory Unions/Districts per 16 V.S.A. §826(a)**
**Sorted by SU number**

**TE004   CENTRAL VERMONT CAREER CENTER**

| LEAID | District | Grade Range | Form Received | K-Part-Time | K-Full-Time | Elementary | Secondary | Vocational |
|-------|----------|-------------|---------------|-------------|-------------|------------|-----------|------------|
| VC002 | CENTRAL VERMONT CAREER CTR | | Yes | $0.00 | $0.00 | $0.00 | $0.00 | $20,847.00 |

Monday, March 10, 2025 | Vermont Agency of Education | Page 17 of 17 JA.702

# EXHIBIT 7

JA.703

JA.704

| | | | | | | Net Regular Education Current Instructional Expenditures | | Long-Term Facility Cost | | Last Update: 12/23/25  v.1 |
|---|---|---|---|---|---|---|---|---|---|---|
| **VT Agency of Education 2024-2025 Final Allowable Tuition Calculation Elementary K-6** | | | | | | | | | | |
| AdminID | OrgId | OrgName | Full Time Equivalent Student | Current Instructional Expenditures | Offsetting Revenues | Net Exp | Per Pupil w/o Debt/Facilities | Debt/Facility Total | Per Pupil D/F | Allowable Tuition Per Pupil with Debt/Facilities |
| | | Vermont Totals and Averages: | 37,425 | 803,809,108 | 42,188,190 | 761,620,918 | 20,351 | 12,063,420 | 322 | 20,673 |
| SU001 | U061 | Mt Abraham Unified School District #61 | 549 | 13,538,274 | 1,965,322 | 11,572,952 | 21,062 | 1,162,151 | 2,115 | 23,177 |
| SU002 | U054 | Addison Northwest UUSD #54 | 433 | 8,252,031 | 727,881 | 7,524,150 | 17,376 | 0 | 0 | 17,376 |
| SU003 | U055 | Addison Central UUSD #55 | 798 | 17,381,987 | 1,887,341 | 15,494,646 | 19,414 | 0 | 0 | 19,414 |
| SU004 | U062 | Slate Valley UUSD #62 | 587 | 12,850,735 | 431,248 | 12,419,487 | 21,174 | 0 | 0 | 21,174 |
| SU005 | T005 | Arlington | 185 | 3,035,551 | 573,044 | 2,462,507 | 13,317 | 0 | 0 | 13,317 |
| SU005 | U014 | Mt Anthony UHSD #14 | 123 | 1,358,545 | 0 | 1,358,545 | 11,039 | 0 | 0 | 11,039 |
| SU005 | U087 | Southwest Vermont Union Elemenray SD #87 | 1,077 | 20,847,423 | 65,568 | 20,781,854 | 19,288 | 0 | 0 | 19,288 |
| SU006 | U063 | Taconic And Green Regional School District #63 | 643 | 13,072,212 | 104,697 | 12,967,514 | 20,167 | 0 | 0 | 20,167 |
| SU006 | U084 | Mettawee School District #84 | 99 | 2,441,938 | 1,628 | 2,440,310 | 24,555 | 0 | 0 | 24,555 |
| SU007 | T050 | Colchester | 1,137 | 19,088,317 | 1,567,218 | 17,521,099 | 15,414 | 0 | 0 | 15,414 |
| SU009 | T038 | Cabot | 73 | 2,089,237 | 3,513 | 2,085,725 | 28,769 | 0 | 0 | 28,769 |
| SU009 | T057 | Danville | 148 | 3,140,890 | 3,131 | 3,137,759 | 21,150 | 0 | 0 | 21,150 |
| SU009 | T151 | Peacham | 45 | 1,374,337 | 0 | 1,374,337 | 30,829 | 0 | 0 | 30,829 |
| SU009 | U033 | Twinfield USD #33 | 152 | 3,809,444 | 0 | 3,809,444 | 25,046 | 0 | 0 | 25,046 |
| SU009 | U078 | Caledonia Cooperative Unified School District #78 | 209 | 6,661,794 | 126,961 | 6,534,833 | 31,194 | 0 | 0 | 31,194 |
| SU010 | T126 | Milton | 672 | 9,769,954 | 378,618 | 9,391,336 | 13,965 | 0 | 0 | 13,965 |
| SU011 | T179 | St Johnsbury | 422 | 10,823,407 | 3,183,505 | 7,639,902 | 18,122 | 0 | 0 | 18,122 |
| SU012 | U401 | Mt Mansfield USD #401 | 1,209 | 24,023,989 | 372,549 | 23,651,439 | 19,567 | 0 | 0 | 19,567 |
| SU014 | U056 | Champlain Valley UUSD #56 | 1,809 | 33,717,661 | 1,043,715 | 32,673,946 | 18,060 | 2,619,831 | 1,448 | 19,508 |
| SU015 | T037 | Burlington | 1,647 | 36,793,166 | 5,497,278 | 31,295,888 | 18,998 | 0 | 0 | 18,998 |
| SU016 | T191 | South Burlington | 1,180 | 23,508,193 | 479,909 | 23,028,284 | 19,508 | 960,063 | 813 | 20,322 |
| SU017 | T249 | Winooski ID | 361 | 10,551,987 | 890,242 | 9,661,745 | 26,801 | 1,813,994 | 5,032 | 31,833 |
| SU019 | T041 | Canaan | 77 | 1,959,580 | 7,507 | 1,952,073 | 25,243 | 0 | 0 | 25,243 |
| SU020 | U085 | Northern Mountain Valley UUSD #85 | 553 | 10,000,516 | 170,520 | 9,829,996 | 17,779 | 0 | 0 | 17,779 |
| SU020 | U088 | Enosburgh-Richford UUSD #88 | 411 | 7,429,058 | 255,565 | 7,173,493 | 17,458 | 0 | 0 | 17,458 |
| SU021 | U089 | Missisquoi Valley School District #89 | 902 | 18,043,145 | 1,411,565 | 16,631,580 | 18,432 | 0 | 0 | 18,432 |
| SU022 | T071 | Fairfax | 466 | 8,130,987 | 5,767 | 8,125,221 | 17,433 | 5,045 | 11 | 17,444 |
| SU022 | T077 | Fletcher | 96 | 1,979,376 | 0 | 1,979,376 | 20,709 | 0 | 0 | 20,709 |
| SU022 | T079 | Georgia | 416 | 6,671,909 | 11,451 | 6,660,458 | 16,006 | 115,472 | 277 | 16,283 |
| SU023 | U057 | Maple Run UUSD #57 | 1,096 | 21,648,144 | 369,115 | 21,279,029 | 19,411 | 0 | 0 | 19,411 |
| SU024 | T003 | Alburgh | 130 | 3,338,179 | 0 | 3,338,179 | 25,617 | 0 | 0 | 25,617 |
| SU024 | T192 | South Hero | 110 | 2,716,360 | 84,417 | 2,631,943 | 23,909 | 0 | 0 | 23,909 |
| SU024 | U066 | Champlain Islands UUSD #66 | 165 | 4,652,128 | 0 | 4,652,128 | 28,171 | 0 | 0 | 28,171 |
| SU025 | T040 | Cambridge | 263 | 5,226,274 | 303,949 | 4,922,325 | 18,746 | 441,351 | 1,681 | 20,427 |
| SU025 | U058A | Lamoille North Musd #058A | 503 | 12,936,372 | 933,630 | 12,002,742 | 23,861 | 863,710 | 1,717 | 25,578 |
| SU026 | T198 | Stowe School District | 339 | 7,810,664 | 83,225 | 7,727,439 | 22,762 | 0 | 0 | 22,762 |
| SU026 | U090 | Lamoille South UUSD #90 | 324 | 8,129,087 | 75,184 | 8,053,903 | 24,854 | 0 | 0 | 24,854 |
| SU027 | T205 | Thetford | 169 | 4,447,357 | 60,544 | 4,386,813 | 25,965 | 29,649 | 175 | 26,141 |
| SU027 | U021 | Blue Mountain USD #21 | 181 | 4,442,672 | 218,729 | 4,223,943 | 23,301 | 0 | 0 | 23,301 |
| SU027 | U036 | Waits River Valley USD #36 | 181 | 3,919,119 | 536,447 | 3,382,672 | 18,708 | 38,700 | 214 | 18,922 |
| SU027 | U091 | Oxbow UUSD #91 | 281 | 8,502,639 | 787,271 | 7,715,368 | 27,437 | 79,540 | 283 | 27,720 |
| SU028 | U059 | Orange Southwest UUSD #59 | 408 | 9,406,297 | 1,167,284 | 8,239,013 | 20,204 | 0 | 0 | 20,204 |
| SU030 | T184 | Sharon | 126 | 2,643,910 | 78,124 | 2,565,786 | 20,321 | 0 | 0 | 20,321 |
| SU030 | T199 | Strafford | 79 | 1,825,012 | 105,104 | 1,719,908 | 21,848 | 0 | 0 | 21,848 |
| SU030 | U079 | White River Unified District #79 | 278 | 4,518,574 | 5,126 | 4,513,448 | 16,220 | 0 | 0 | 16,220 |

| VT Agency of Education 2024-2025 Final Allowable Tuition Calculation Elementary K-6 | | | Full Time Equivalent Student | Current Instructional Expenditures | Offsetting Revenues | Net Regular Education Current Instructional Expenditures | | Long-Term Facility Cost | | Last Update: 12/23/25 v.1 |
|---|---|---|---|---|---|---|---|---|---|---|
| AdminID | OrgID | OrgName | | | | Net Exp | Per Pupil w/o Debt/Facilities | Debt/Facility Total | Per Pupil D/F | Allowable Tuition Per Pupil with Debt/Facilities |
| | | Vermont Totals and Averages: | 37,425 | 803,809,108 | 42,188,190 | 761,620,918 | 20,351 | 12,063,420 | 322 | 20,673 |
| SU030 | U081 | Rochester Stockbridge Unified School District #81 | 108 | 2,464,776 | 71,657 | 2,393,119 | 22,159 | 0 | 0 | 22,159 |
| SU030 | U082 | First Branch Unified School District #82 | 151 | 4,078,212 | 149,098 | 3,929,113 | 26,074 | 0 | 0 | 26,074 |
| SU031 | J105 | Jay/Westfield Joint Elementary District | 60 | 1,422,912 | 10,196 | 1,412,716 | 23,545 | 0 | 0 | 23,545 |
| SU031 | T030 | Brighton | 80 | 1,902,958 | 890 | 1,902,068 | 23,696 | 0 | 0 | 23,696 |
| SU031 | T044 | Charleston | 79 | 1,802,593 | 21,961 | 1,780,631 | 22,542 | 0 | 0 | 22,542 |
| SU031 | T054 | Coventry | 77 | 1,925,583 | 698 | 1,924,885 | 25,106 | 0 | 0 | 25,106 |
| SU031 | T058 | Derby | 401 | 5,536,667 | 1,347 | 5,535,320 | 13,792 | 0 | 0 | 13,792 |
| SU031 | T114 | Lowell | 49 | 1,096,967 | 4,428 | 1,092,539 | 22,260 | 0 | 0 | 22,260 |
| SU031 | T139 | Newport City | 252 | 5,837,768 | 104,685 | 5,733,082 | 22,779 | 0 | 0 | 22,779 |
| SU031 | T140 | Newport Town | 98 | 2,331,781 | 18,004 | 2,313,777 | 23,656 | 0 | 0 | 23,656 |
| SU031 | T209 | Troy | 137 | 2,692,561 | 3,227 | 2,689,335 | 19,577 | 0 | 0 | 19,577 |
| SU032 | U092 | Washington Central UUSD #92 | 553 | 13,158,738 | 397,626 | 12,761,113 | 23,064 | 247,913 | 448 | 23,513 |
| SU033 | U052 | Mill River Unified Union SD #52 | 337 | 7,555,819 | 1,000,196 | 6,555,623 | 19,455 | 484,225 | 1,437 | 20,892 |
| SU034 | U093 | Lake Region Union Elem-Middle School District | 427 | 12,037,540 | 31,425 | 12,006,115 | 28,100 | 0 | 0 | 28,100 |
| SU035 | T055 | Craftsbury | 102 | 2,298,197 | 1,600 | 2,296,597 | 22,620 | 5,888 | 58 | 22,678 |
| SU035 | T250 | Wolcott | 99 | 2,160,722 | 5,000 | 2,155,722 | 21,725 | 373,582 | 3,765 | 25,489 |
| SU035 | U094 | Orleans Southwest Union Elementary SD #94 | 261 | 6,703,563 | 112,046 | 6,591,517 | 25,211 | 608,889 | 2,329 | 27,540 |
| SU036 | U049 | Barstow Unified Union SD #49 | 119 | 3,009,758 | 680 | 3,009,078 | 25,342 | 25,030 | 211 | 25,553 |
| SU036 | U053 | Otter Valley Unified Union SD #53 | 563 | 11,935,661 | 111,451 | 11,824,210 | 20,996 | 372,164 | 661 | 21,657 |
| SU040 | T173 | Rutland City | 783 | 19,316,500 | 2,951,495 | 16,365,005 | 20,890 | 0 | 0 | 20,890 |
| SU042 | U060 | Harwood UUSD #60 | 870 | 17,010,025 | 415,264 | 16,594,761 | 19,076 | 0 | 0 | 19,076 |
| SU046 | T120 | Marlboro | 53 | 1,609,650 | 21,494 | 1,588,156 | 29,977 | 0 | 0 | 29,977 |
| SU046 | U073 | River Valleys USD #73 | 103 | 3,372,728 | 39,224 | 3,333,504 | 32,411 | 0 | 0 | 32,411 |
| SU047 | T169 | Rockingham | 291 | 5,203,732 | 0 | 5,203,732 | 17,901 | 495,570 | 1,705 | 19,606 |
| SU047 | T234 | Westminster | 125 | 3,211,563 | 0 | 3,211,563 | 25,617 | 95,000 | 758 | 26,374 |
| SU047 | U095 | Windham Northeast Union Elementary SD#95 | 32 | 1,309,312 | 0 | 1,309,312 | 41,199 | 0 | 0 | 41,199 |
| SU048 | T214 | Vernon | 142 | 3,667,757 | 169,289 | 3,498,468 | 24,660 | 0 | 0 | 24,660 |
| SU048 | U096 | Windham Southeast UUSD #96 | 1,025 | 23,643,551 | 730,845 | 22,912,706 | 22,359 | 0 | 0 | 22,359 |
| SU049 | T090 | Halifax | 53 | 1,261,737 | 20,204 | 1,241,532 | 23,359 | 0 | 0 | 23,359 |
| SU049 | T164 | Readsboro | 34 | 1,031,690 | 76,376 | 955,313 | 27,982 | 9,202 | 270 | 28,252 |
| SU049 | T194 | Stamford | 57 | 1,357,006 | 93,094 | 1,263,912 | 22,358 | 0 | 0 | 22,358 |
| SU049 | U075 | Twin Valley Unified School District #75 | 175 | 4,677,579 | 4,372 | 4,673,207 | 26,753 | 275,319 | 1,576 | 28,329 |
| SU051 | U076 | Windsor Central Unified Union SD | 466 | 10,842,132 | 32,318 | 10,809,815 | 23,207 | 0 | 0 | 23,207 |
| SU052 | T094 | Hartland | 183 | 4,152,537 | 32,015 | 4,120,522 | 22,464 | 0 | 0 | 22,464 |
| SU052 | T227 | Weathersfield | 185 | 3,333,536 | 19,676 | 3,313,860 | 17,945 | 0 | 0 | 17,945 |
| SU052 | U086 | Mt Ascutney School District #86 | 266 | 5,564,362 | 41,580 | 5,522,782 | 20,728 | 0 | 0 | 20,728 |
| SU054 | T093 | Hartford | 605 | 14,001,389 | 889,357 | 13,112,032 | 21,667 | 539,606 | 892 | 22,559 |
| SU055 | T145 | Norwich | 291 | 6,568,374 | 329,549 | 6,238,825 | 21,452 | 258,247 | 888 | 22,340 |
| SU056 | T193 | Springfield | 557 | 10,932,753 | 468,440 | 10,464,313 | 18,780 | 0 | 0 | 18,780 |
| SU061 | U097 | Barre UUSD #97 | 1,023 | 19,352,851 | 1,484,835 | 17,868,016 | 17,458 | 0 | 0 | 17,458 |
| SU063 | U077 | Green Mountain Unified School District #77 | 268 | 5,370,441 | 7,228 | 5,363,213 | 19,997 | 2,113 | 8 | 20,005 |
| SU063 | U083 | Ludlow Mt Holly UUSD #83 | 150 | 3,758,781 | 21,677 | 3,737,105 | 24,939 | 12,717 | 85 | 25,024 |
| SU064 | U146 | Rivendell Interstate School District | 168 | 2,909,474 | 114,354 | 2,795,120 | 16,673 | 0 | 0 | 16,673 |
| SU065 | U051 | Essex Westford Ed Community UUSD #51 | 1,584 | 33,055,672 | 589,340 | 32,466,332 | 20,496 | 0 | 0 | 20,496 |
| SU066 | T174 | Rutland Town | 248 | 5,051,489 | 33,155 | 5,018,334 | 20,276 | 0 | 0 | 20,276 |

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 27 of 211

| VT Agency of Education 2024-2025 Final Allowable Tuition Calculation Elementary K-6 | | | Net Regular Education Current Instructional Expenditures | | | | | Long-Term Facility Cost | | Last Update: 12/23/25 v.1 |
|---|---|---|---|---|---|---|---|---|---|---|
| AdminID | OrgID | OrgName | Full Time Equivalent Student | Current Instructional Expenditures | Offsetting Revenues | Net Exp | Per Pupil w/o Debt/Facilities | Debt/Facility Total | Per Pupil D/F | Allowable Tuition Per Pupil with Debt/Facilities |
| | | Vermont Totals and Averages: | 37,425 | 803,809,108 | 42,188,190 | 761,620,918 | 20,351 | 12,063,420 | 322 | 20,673 |
| SU066 | U069 | Wells Spring UUSD #69 | 113 | 2,905,843 | 95,650 | 2,810,193 | 24,847 | 0 | 0 | 24,847 |
| SU066 | U070 | Quarry Valley UUSD #70 | 476 | 8,589,851 | 172,417 | 8,417,434 | 17,702 | 0 | 0 | 17,702 |
| SU067 | U064 | Kingdom East UUSD #64 | 801 | 26,359,386 | 4,136,954 | 22,222,432 | 27,737 | 0 | 0 | 27,737 |
| SU068 | U067 | Echo Valley Community USD #67 | 135 | 3,145,678 | 157,908 | 2,987,770 | 22,097 | 0 | 0 | 22,097 |
| SU068 | U068 | Paine Mountain USD #68 | 477 | 9,541,542 | 122,781 | 9,418,762 | 19,756 | 0 | 0 | 19,756 |
| SU069 | U071 | Montpelier Roxbury UUSD#71 | 538 | 10,736,758 | 891,913 | 9,844,845 | 18,298 | 0 | 0 | 18,298 |
| SU070 | T112 | Lincoln School District | 81 | 2,502,224 | 5,282 | 2,496,942 | 30,811 | 128,447 | 1,585 | 32,396 |

**VT Agency of Education 2024-2025 Final Allowable Tuition Calculation Secondary 7-12**

Last Update: 12/17/25  v.1

| AdminID | OrgID | OrgName | Full Time Equivalent Student | Current Instructional Expenditures | Offsetting Revenues | Net Regular Education Current Instructional Expenditures Net Exp | Per Pupil w/o Debt/Facilities | Long-Term Facility Cost Debt/Facility Total | Per Pupil D/F | Allowable Tuition Per Pupil with Debt/Facilities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Vermont Totals and Averages:** | 28,754 | 684,427,189 | 27,935,381 | 656,491,808 | 22,831 | 9,988,799 | 347 | 23,179 |
| SU001 | U061 | Mt Abraham Unified School District #61 | 506 | 12,153,751 | 264,867 | 11,888,884 | 23,489 | 2,206,982 | 4,360 | 27,850 |
| SU002 | U054 | Addison Northwest UUSD #54 | 344 | 9,047,871 | 321,638 | 8,726,232 | 25,332 | 0 | 0 | 25,332 |
| SU003 | U055 | Addison Central UUSD #55 | 715 | 18,933,658 | 321,431 | 18,612,227 | 26,042 | 0 | 0 | 26,042 |
| SU004 | U062 | Slate Valley UUSD #62 | 476 | 10,499,865 | 475,256 | 10,024,609 | 21,051 | 0 | 0 | 21,051 |
| SU005 | T005 | Arlington | 153 | 3,835,631 | 472,261 | 3,363,370 | 21,976 | 0 | 0 | 21,976 |
| SU005 | U014 | Mt Anthony UHSD #14 | 1,057 | 22,729,570 | 6,583 | 22,722,987 | 21,496 | 0 | 0 | 21,496 |
| SU006 | U063 | Taconic And Green Regional School District #63 | 205 | 3,805,163 | 33,080 | 3,772,083 | 18,403 | 0 | 0 | 18,403 |
| SU007 | T050 | Colchester | 956 | 21,239,858 | 1,476,893 | 19,762,964 | 20,678 | 0 | 0 | 20,678 |
| SU009 | T038 | Cabot | 57 | 1,751,632 | 5,665 | 1,745,967 | 30,701 | 0 | 0 | 30,701 |
| SU009 | T057 | Danville | 146 | 4,071,628 | 7,085 | 4,064,543 | 27,773 | 0 | 0 | 27,773 |
| SU009 | U033 | Twinfield USD #33 | 117 | 3,129,681 | 3,446 | 3,126,235 | 26,796 | 0 | 0 | 26,796 |
| SU009 | U078 | Caledonia Cooperative Unified School District #78 | 84 | 2,811,748 | 54,031 | 2,757,717 | 33,019 | 0 | 0 | 33,019 |
| SU010 | T126 | Milton | 554 | 12,698,166 | 626,472 | 12,071,694 | 21,809 | 0 | 0 | 21,809 |
| SU011 | T179 | St Johnsbury | 150 | 3,493,054 | 1,088,083 | 2,404,970 | 16,060 | 0 | 0 | 16,060 |
| SU012 | U401 | Mt Mansfield USD #401 | 986 | 20,981,326 | 330,529 | 20,650,797 | 20,953 | 0 | 0 | 20,953 |
| SU014 | U056 | Champlain Valley UUSD #56 | 1,693 | 33,226,223 | 880,848 | 32,345,375 | 19,102 | 1,986,176 | 1,173 | 20,275 |
| SU015 | T037 | Burlington | 1,273 | 33,304,390 | 4,364,970 | 28,939,420 | 22,728 | 0 | 0 | 22,728 |
| SU016 | T191 | South Burlington | 1,111 | 24,319,053 | 457,671 | 23,861,382 | 21,481 | 937,295 | 844 | 22,325 |
| SU017 | T249 | Winooski ID | 258 | 9,665,993 | 593,416 | 9,072,577 | 35,115 | 1,335,301 | 5,168 | 40,283 |
| SU019 | T041 | Canaan | 63 | 2,561,102 | 159,004 | 2,402,098 | 38,335 | 0 | 0 | 38,335 |
| SU020 | U085 | Northern Mountain Valley UUSD #85 | 170 | 3,058,470 | 19,203 | 3,039,267 | 17,909 | 0 | 0 | 17,909 |
| SU020 | U088 | Enosburgh-Richford UUSD #88 | 486 | 11,381,333 | 630,295 | 10,751,038 | 22,111 | 0 | 0 | 22,111 |
| SU021 | U089 | Missisquoi Valley School District #89 | 703 | 15,336,331 | 1,223,644 | 14,112,687 | 20,070 | 0 | 0 | 20,070 |
| SU022 | T071 | Fairfax | 353 | 7,558,095 | 4,356 | 7,553,739 | 21,416 | 5,359 | 15 | 21,431 |
| SU022 | T079 | Georgia | 106 | 3,214,434 | 9,598 | 3,204,835 | 30,115 | 96,793 | 910 | 31,025 |
| SU023 | U057 | Maple Run UUSD #57 | 1,083 | 25,107,345 | 339,145 | 24,768,200 | 22,870 | 0 | 0 | 22,870 |
| SU024 | T003 | Alburgh | 35 | 1,652,100 | 0 | 1,652,100 | 46,696 | 0 | 0 | 46,696 |
| SU024 | T192 | South Hero | 33 | 906,207 | 25,583 | 880,625 | 26,398 | 0 | 0 | 26,398 |
| SU025 | U058B | Lamoille North Musd #058B | 630 | 15,103,052 | 260,108 | 14,842,944 | 23,542 | 150,205 | 238 | 23,780 |
| SU026 | T198 | Stowe School District | 325 | 7,861,599 | 79,656 | 7,781,943 | 23,950 | 0 | 0 | 23,950 |
| SU026 | U090 | Lamoille South UUSD #90 | 359 | 7,963,370 | 216,098 | 7,747,272 | 21,556 | 0 | 0 | 21,556 |
| SU027 | U021 | Blue Mountain USD #21 | 153 | 4,288,763 | 209,590 | 4,079,173 | 26,647 | 0 | 0 | 26,647 |
| SU027 | U036 | Waits River Valley USD #36 | 53 | 1,144,342 | 156,761 | 987,581 | 18,655 | 11,300 | 213 | 18,868 |
| SU027 | U091 | Oxbow UUSD #91 | 272 | 7,862,369 | 554,056 | 7,308,313 | 26,898 | 349,536 | 1,286 | 28,185 |
| SU028 | U059 | Orange Southwest UUSD #59 | 286 | 8,904,924 | 820,824 | 8,084,101 | 28,252 | 0 | 0 | 28,252 |
| SU030 | T199 | Strafford | 19 | 611,219 | 25,996 | 585,223 | 30,027 | 0 | 0 | 30,027 |
| SU030 | U079 | White River Unified District #79 | 308 | 7,089,662 | 5,708 | 7,083,955 | 23,005 | 0 | 0 | 23,005 |
| SU030 | U082 | First Branch Unified School District #82 | 49 | 1,573,021 | 49,134 | 1,523,886 | 30,854 | 0 | 0 | 30,854 |
| SU031 | T030 | Brighton | 24 | 574,852 | 269 | 574,583 | 23,743 | 0 | 0 | 23,743 |
| SU031 | T044 | Charleston | 22 | 505,465 | 6,158 | 499,307 | 22,562 | 0 | 0 | 22,562 |
| SU031 | T054 | Coventry | 34 | 866,125 | 309 | 865,816 | 25,450 | 0 | 0 | 25,450 |

JA.707

| AdminID | OrgID | OrgName | Full Time Equivalent Student | Current Instructional Expenditures | Offsetting Revenues | Net Exp | Per Pupil w/o Debt/Facilities | Debt/Facility Total | Per Pupil D/F | Allowable Tuition Per Pupil with Debt/Facilities |
|---|---|---|---|---|---|---|---|---|---|---|
| VT Agency of Education 2024-2025 Final Allowable Tuition Calculation Secondary 7-12 | | | | | | Net Regular Education Current Instructional Expenditures | | Long-Term Facility Cost | | Last Update: 12/17/25 v.1 |
| | | Vermont Totals and Averages: | 28,754 | 684,427,189 | 27,935,381 | 656,491,808 | 22,831 | 9,988,799 | 347 | 23,179 |
| SU031 | T114 | Lowell | 17 | 383,420 | 1,549 | 381,872 | 22,241 | 0 | 0 | 22,241 |
| SU031 | T209 | Troy | 33 | 639,817 | 767 | 639,049 | 19,555 | 0 | 0 | 19,555 |
| SU031 | U022A | North Country Union Jr High School | 232 | 5,441,407 | 32,102 | 5,409,305 | 23,294 | 0 | 0 | 23,294 |
| SU031 | U022B | North Country Union High School | 519 | 19,454,889 | 158,101 | 19,296,788 | 37,166 | 0 | 0 | 37,166 |
| SU032 | U092 | Washington Central UUSD #92 | 580 | 14,811,707 | 444,334 | 14,367,373 | 24,776 | 0 | 0 | 24,776 |
| SU033 | U052 | Mill River Unified Union SD #52 | 336 | 7,136,567 | 479,284 | 6,657,284 | 19,818 | 366,851 | 1,092 | 20,910 |
| SU034 | U024 | Lake Region UHSD #24 | 315 | 8,989,873 | 59,610 | 8,930,263 | 28,323 | 0 | 0 | 28,323 |
| SU034 | U093 | Lake Region Union Elem-Middle School District | 145 | 4,050,910 | 10,649 | 4,040,261 | 27,906 | 0 | 0 | 27,906 |
| SU035 | T055 | Craftsbury | 82 | 2,026,726 | 6,628 | 2,020,098 | 24,563 | 322,461 | 3,921 | 28,484 |
| SU035 | U026 | Hazen UHSD #26 | 240 | 6,536,469 | 52,552 | 6,483,917 | 26,987 | 89,369 | 372 | 27,359 |
| SU036 | U049 | Barstow Unified Union SD #49 | 33 | 829,210 | 187 | 829,023 | 25,329 | 6,896 | 211 | 25,540 |
| SU036 | U053 | Otter Valley Unified Union SD #53 | 444 | 11,066,171 | 102,032 | 10,964,139 | 24,702 | 702,436 | 1,583 | 26,285 |
| SU040 | T173 | Rutland City | 863 | 21,539,080 | 2,744,398 | 18,794,681 | 21,789 | 0 | 0 | 21,789 |
| SU042 | U060 | Harwood UUSD #60 | 647 | 15,374,367 | 574,806 | 14,799,561 | 22,883 | 0 | 0 | 22,883 |
| SU046 | T120 | Marlboro | 16 | 425,090 | 6,315 | 418,775 | 26,896 | 0 | 0 | 26,896 |
| SU047 | T169 | Rockingham | 157 | 2,373,248 | 0 | 2,373,248 | 15,114 | 268,020 | 1,707 | 16,821 |
| SU047 | U027 | Bellows Falls UHSD #27 | 237 | 5,614,734 | 3,735 | 5,610,999 | 23,684 | 97,333 | 411 | 24,095 |
| SU048 | U096 | Windham Southeast UUSD #96 | 901 | 22,680,281 | 683,962 | 21,996,319 | 24,402 | 0 | 0 | 24,402 |
| SU049 | T164 | Readsboro | 1 | 13,000 | 1,389 | 11,610 | 11,610 | 265 | 265 | 11,876 |
| SU049 | U075 | Twin Valley Unified School District #75 | 149 | 4,040,786 | 7,931 | 4,032,855 | 27,005 | 196,324 | 1,315 | 28,319 |
| SU051 | U076 | Windsor Central Unified Union SD | 416 | 11,879,258 | 28,839 | 11,850,419 | 28,510 | 0 | 0 | 28,510 |
| SU052 | T094 | Hartland | 55 | 1,415,237 | 9,552 | 1,405,684 | 25,684 | 0 | 0 | 25,684 |
| SU052 | T227 | Weathersfield | 52 | 1,029,828 | 5,517 | 1,024,311 | 19,782 | 0 | 0 | 19,782 |
| SU052 | U086 | Mt Ascutney School District #86 | 274 | 6,277,946 | 135,953 | 6,141,993 | 22,398 | 0 | 0 | 22,398 |
| SU054 | T093 | Hartford | 621 | 14,349,823 | 548,834 | 13,800,989 | 22,240 | 857,569 | 1,382 | 23,622 |
| SU056 | T193 | Springfield | 359 | 11,368,296 | 913,266 | 10,455,030 | 29,108 | 0 | 0 | 29,108 |
| SU061 | U097 | Barre UUSD #97 | 838 | 17,464,275 | 1,127,463 | 16,336,812 | 19,497 | 0 | 0 | 19,497 |
| SU063 | U077 | Green Mountain Unified School District #77 | 266 | 6,333,713 | 10,673 | 6,323,041 | 23,775 | 2,327 | 9 | 23,784 |
| SU064 | U146 | Rivendell Interstate School District | 154 | 3,059,858 | 9,240 | 3,050,619 | 19,787 | 0 | 0 | 19,787 |
| SU065 | U051 | Essex Westford Ed Community UUSD #51 | 1,622 | 34,225,347 | 1,828,216 | 32,397,131 | 19,975 | 0 | 0 | 19,975 |
| SU066 | T174 | Rutland Town | 77 | 1,577,762 | 10,356 | 1,567,406 | 20,227 | 0 | 0 | 20,227 |
| SU066 | U070 | Quarry Valley UUSD #70 | 429 | 9,821,659 | 165,015 | 9,656,645 | 22,526 | 0 | 0 | 22,526 |
| SU067 | U064 | Kingdom East UUSD #64 | 275 | 162,953 | 123,099 | 39,854 | 145 | 0 | 0 | 145 |
| SU068 | U067 | Echo Valley Community USD #67 | 44 | 1,664,418 | 50,977 | 1,613,441 | 36,963 | 0 | 0 | 36,963 |
| SU068 | U068 | Paine Mountain USD #68 | 397 | 11,836,793 | 112,178 | 11,724,615 | 29,497 | 0 | 0 | 29,497 |
| SU069 | U071 | Montpelier Roxbury UUSD#71 | 520 | 11,709,831 | 906,153 | 10,803,678 | 20,767 | 0 | 0 | 20,767 |

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 30 of 211

## Vermont Agency of Education
### Fiscal Year 2025 Final Allowable Tuition          Last Update: 12/24/25 v.1
### Vermont Technical Centers

| AdminID | Tech ID | Tech Name | FTE VT | FTE NonVT | Expenditures VT | Expenditures NonVT | Offsetting Revenue VT | Offsetting Revenue NonVT | Net Expenditures VT | Net Expenditures NonVT | Allowable Tuition VT | Allowable Tuition NonVT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TE001 | VC001 | Patricia Hannaford Career Ctr | 135.5 | 0.0 | 6,107,280 | - | 1,693,888 | - | 4,413,392 | - | 32,566 | - |
| TE004 | VC002 | Central Vermont Career Center | 184.0 | 0.0 | 4,786,572 | - | 1,327,109 | - | 3,459,464 | - | 18,801 | - |
| SU023 | VC003 | Northwest Technical Center | 189.7 | 0.0 | 3,869,930 | - | 1,440,295 | - | 2,429,635 | - | 12,811 | - |
| SU015 | VC004 | Burlington Technical Center | 126.1 | 0.0 | 9,960,465 | - | 6,836,475 | - | 3,123,991 | - | 24,780 | - |
| SU020 | VC005 | Cold Hollow Career Center | 73.3 | 0.0 | 1,750,007 | - | 684,440 | - | 1,065,568 | - | 14,547 | - |
| SU065 | VC006 | Center For Technology Essex | 346.7 | 0.0 | 9,369,926 | - | 2,443,150 | - | 6,926,776 | - | 19,982 | - |
| SU054 | VC007 | Hartford Area Career/Tech Ctr | 99.6 | 74.4 | 2,583,168 | 1,948,706 | 1,399,287 | 712,284 | 1,183,881 | 1,236,422 | 11,892 | 16,621 |
| SU025 | VC008 | Green Mtn Technology/Career Ctr | 128.2 | 0.0 | 4,475,518 | - | 1,405,137 | - | 3,070,381 | - | 23,956 | - |
| TE002 | VC009 | Southwest Tech | 151.3 | 8.2 | 4,030,980 | 212,157 | 1,240,355 | 65,282 | 2,790,625 | 146,875 | 18,443 | 17,868 |
| SU031 | VC010 | North Country Career Ctr | 161.9 | 0.0 | 3,710,728 | - | 1,229,099 | - | 2,481,628 | - | 15,326 | - |
| SU027 | VC011 | River Bend Career And Tech Ctr | 83.7 | 36.6 | 2,047,268 | 877,400 | 743,048 | 154,151 | 1,304,220 | 723,249 | 15,588 | 19,753 |
| SU028 | VC012 | Randolph Technical Career Ctr | 133.9 | 0.0 | 4,546,532 | - | 1,869,055 | - | 2,677,477 | - | 19,993 | - |
| SU040 | VC013 | Stafford Technical Center | 222.5 | 0.0 | 6,428,425 | - | 1,807,650 | - | 4,620,775 | - | 20,768 | - |
| SU048 | VC014 | Windham Regional Career Ctr | 99.8 | 1.4 | 4,267,664 | 43,108 | 1,025,570 | 5,752 | 3,242,094 | 37,356 | 32,489 | 27,267 |
| TE003 | VC016 | River Valley Technical Center | 101.9 | 9.9 | 4,960,674 | 490,616 | 2,995,714 | 250,221 | 1,964,960 | 240,395 | 19,293 | 24,233 |
| | | **Totals/Averages:** | **2,237.8** | **130.5** | **72,895,139** | **3,571,987** | **28,140,272** | **1,187,689** | **44,754,867** | **2,384,298** | **19,999** | **18,268** |

# EXHIBIT 8

JA.710



**REPORT TO THE GENERAL ASSEMBLY**

# A MAP FOR THE FUTURE: THE VERMONT REGIONAL EDUCATION PARTNERSHIP MODEL

- Cooperative Regional Education Services
- Strategic Voluntary Mergers
- Comprehensive Regional High Schools

School District Redistricting Task Force | December 1, 2025

JA.711

**VT SCHOOL DISTRICT REDISTRICTING TASK FORCE**            December 1, 2025

## TABLE OF CONTENTS

| | |
|---|---|
| **EXECUTIVE SUMMARY** | **3** |
| **CHALLENGES ACT 73 AIMS TO ADDRESS** | **5** |
| **HOW THE TASK FORCE APPROACHED ITS WORK** | **6** |
| Charge Under Act 73 | 6 |
| Task Force Membership & Process | 6 |
| Limitations & Constraints | 7 |
| Areas of Deliberation and Differing Perspectives | 7 |
| **WHAT VERMONTERS TOLD US: PUBLIC INPUT HIGHLIGHTS** | **9** |
| Who Participated & Who Was Missing | 9 |
| Types of Feedback Received | 10 |
| Key Themes | 11 |
| Public Priorities and Confidence Levels | 12 |
| Implications | 13 |
| **A MAP FOR THE FUTURE: VERMONT REGIONAL EDUCATION PARTNERSHIP OVERVIEW** | **14** |
| Purpose & Vision | 14 |
| Rationale | 15 |
| Key Components | 16 |
| Implementation Strategy | 17 |
| Expected Outcomes | 18 |
| **DATA SUPPORTING THIS APPROACH** | **19** |
| Cost Drivers | 19 |
| Enrollment Decline, Excess Capacity, and Uneven Regional Trends | 20 |
| Staffing Challenges and Uneven Access to Specialized Programs | 20 |
| Capacity at The Agency of Education | 21 |
| Special Education | 22 |
| Program Access and Equity Gaps Across Vermont | 22 |
| Transportation and Geographic Realities | 23 |
| Evidence from Comparable Rural States | 23 |
| **CONCLUSION** | **24** |
| **ACKNOWLEDGMENTS** | **24** |
| **APPENDICES** | **25** |
| Appendix A: Definitions | 26 |
| Appendix B: Status of Private and Independent Schools | 29 |
| Appendix C: Cost Drivers in Education | 31 |
| Appendix D: Implementation Risks and Best Practices | 39 |
| Appendix E: The Vermont Regional Education Partnership Model | 41 |

JA.712

## EXECUTIVE SUMMARY

Vermont is confronting a set of structural challenges in its public education system: declining enrollment, rising costs, persistent inequities in access to programs, and a governance structure that makes regional coordination difficult. Vermont's school buildings are the second oldest in the nation.  In addition, Vermont funds services out of its public education fund that in other states are funded by non-education revenue sources. Act 73 was passed to respond to these pressures, directing the School District Redistricting Task Force to examine statewide consolidation options and propose new district configurations intended to improve equity, quality, and fiscal sustainability.

Over four months, the Task Force conducted a rigorous, data-driven review of Vermont's educational landscape, drawing on statewide fiscal and enrollment data, research from comparable rural states, public input from more than 5,000 Vermonters, and extensive deliberation among members. The Task Force did not find evidence that mergers of the scale contemplated in Act 73 would reliably lower costs, improve educational outcomes, or expand equity. Instead, the evidence pointed toward targeted, regional approaches that strengthen opportunity while respecting Vermont's rural geography, community identity, and limited statewide capacity for major structural change.

To follow the evidence and meet the intent of Act 73 the Task Force recommends a phased roadmap that advances three complementary strategies:

**1. Cooperative Education Service Areas (CESAs)**
Regional shared-service structures for special education, transportation coordination, staffing, purchasing, data systems, and other high-cost, low-scale areas that small districts cannot efficiently manage alone. Research from states with similar geography shows that cooperative services improve access and reduce duplication far more effectively than consolidation.

**2. Strategic Voluntary Mergers**
Mergers pursued only where communities identify a shared educational purpose and where feasibility studies show clear value. This approach avoids arbitrary size targets (e.g., 4,000–8,000 ADM) and instead emphasizes educational benefit, community priorities, and fiscal sustainability.

**3. Comprehensive Regional High Schools**
Regionally governed high schools designed to expand student opportunity—advanced coursework, world languages, technical education, mental health services, and extracurricular access—especially in small or rural districts that cannot sustainably provide these offerings alone.

The data reviewed by the Task Force consistently showed that Vermont's largest education cost drivers—health care, administering of special education, facilities, transportation, and agency capacity—are not solved by district size. Regional coordination, shared staffing, and

JA.713

well-planned high school collaborations address these drivers more effectively than mandated structural change.

Public input underscored this conclusion. Vermonters expressed strong concerns about student wellbeing, loss of local control, transportation burdens, rural equity, and a process perceived as rushed or unclear. At the same time, they showed broad support for improving quality and expanding equitable access through collaboration rather than state-directed mergers.

The roadmap recommended by the Task Force provides:

- Immediate gains through shared services
- Long-term improvements through voluntary, community-driven mergers and regional high schools
- Protection of local identity alongside improved statewide coherence
- A feasible implementation path aligned with Vermont's geography, capacity, and public sentiment

This approach does not reject the intent of Act 73 — it advances this intent in realistic, evidence-based, and community-responsive ways.

JA.714

## CHALLENGES ACT 73 AIMS TO ADDRESS

Vermont's education system is facing a set of interconnected challenges that prompted the General Assembly to pass Act 73. Rising education costs, coupled with declining student enrollment, are placing increasing pressure on local budgets and straining the sustainability of school operations. These demographic and fiscal trends make it harder for many districts—particularly small and rural ones—to maintain program breadth, retain specialized staff, and deliver the full range of services students need. At the same time, frustration has grown with the complexity of the existing funding system and the impact of rising property taxes.

Vermont's highly decentralized governance structure limits the ability of districts to share resources, coordinate specialized services, or benefit from economies of scale. Persistent inequities in access to programs and opportunities remain, particularly for students in smaller and geographically isolated communities. Rural realities including mountainous terrain, long travel distances, and dispersed populations, make uniform statewide solutions difficult to design or implement.

JA.715

## HOW THE TASK FORCE APPROACHED ITS WORK

### Charge Under Act 73[1]

Act 73 established the School District Redistricting Task Force and directed it to develop up to three statewide redistricting map proposals that considered geographic, demographic, fiscal, and operational factors. The charge required the Task Force to examine statewide consolidation options; consider the use of supervisory unions and supervisory districts; continue access to tuitioning; and, where practical, avoid separating districts. The work was intended to support improved equity, quality, and fiscal sustainability across the state.

### Task Force Membership & Process

The Task Force consisted of eleven members—six legislators and five non-legislative members with extensive experience in Vermont's public education system. Over eight full-day meetings between August and November 2025, members reviewed data, developed scenarios, and explored governance models, supported by staff from relevant state agencies and an independent facilitator. Meetings were open, recorded, and accessible both in-person and virtually. Public input was gathered through comment at each meeting, written submissions, four public hearings, and input collected by the Commission on the Future of Public Education.

**Legislative Members**

- ❖ Senator Scott Beck
- ❖ Senator Martine Larocque Gulick, Co-Chair
- ❖ Senator Wendy Harrison
- ❖ Representative Edye Graning, Co-Chair
- ❖ Representative Rebecca Holcombe
- ❖ Representative Beth Quimby

**Non Legislative Members**

- ❖ Dr. Jay Badams
- ❖ Dr. Jen Botzojorns
- ❖ Kim Gleason
- ❖ Chris Locarno
- ❖ Dave Wolk

---

[1] Act No. 73. An act relating to transforming Vermont's education governance, quality, and finance systems.
https://legislature.vermont.gov/Documents/2026/Docs/ACTS/ACT073/ACT073%20As%20Enacted.pdf?_gl=1*pc93xn*_ga*MTEyNzIxNDU0My4xNjU4ODQ2NTc5*_ga_V9WQH77KLW*czE3NjQwMDI1MDkkbzk0JGcxJHQxNzY0MDAyNTE3JGo1MiRsMCRoMA

JA.716

The Task Force grounded its work in a clear set of guiding principles designed to ensure that recommendations were evidence-based, feasible within Vermont's context, and aligned with the intent of Act 73. These principles emphasized pragmatism amid tight timelines and limited data; attentiveness to political and operational realities; reliance on fiscal, enrollment, and equity data rather than assumptions; respect for the lived experiences and local knowledge of Vermont communities; a commitment to avoiding unnecessary disruption; and the importance of designing governance structures capable of adapting to future demographic, fiscal, and policy changes. Together, these principles shaped the Task Force's deliberations and provided a consistent framework for evaluating trade-offs across cost, equity, quality, and local democratic engagement.

## Guiding Principles

1. **Be pragmatic and focused:** Work within time and information constraints while prioritizing proposals with the highest likelihood of success.

2. **Acknowledge political realities:** Recognize the need for system stability and the disruptive effects of major structural shifts, while still advancing necessary improvements.

3. **Use data, not assumptions:** Analyze available fiscal, enrollment, and equity data to inform judgments and maintain transparency.

4. **Honor local knowledge:** Value the lived experience of Vermont communities and recognize the importance of local context in designing feasible governance models.

5. **Do no harm:** Build on what works rather than creating disruption for its own sake.

6. **Design for resilience:** Ensure that proposed structures can withstand future demographic, fiscal, and policy shifts.

## Limitations & Constraints

The Task Force operated within a compressed four-month timeline and faced challenges obtaining complete and consistent data from the Agency of Education—particularly regarding facilities, staffing, special education delivery, and cost modeling. Vermont's varied local contexts, rural geography, and the complexity of the charge further limited the ability to fully model statewide redistricting scenarios. While the task force began its work in August, the bulk of this data was not made available to the Task Force until October 6th. Despite these constraints, the Task Force engaged deeply with the charge and worked toward evidence-informed recommendations aligned with Vermont's needs.

## Areas of Deliberation and Differing Perspectives

Early in its process, the Task Force explored a wide range of potential redistricting models before narrowing its focus to two proposals for deeper analysis. Throughout these discussions, members contributed perspectives that reflected Vermont's varied communities, governance structures, and educational priorities.

JA.717

One area of differing opinion centered on whether tuitioning is meant to ensure every student has access to a school or to support school choice. Some members viewed tuitioning as an expression of local control and community identity, while others raised concerns about affordability, stability, and fairness. They noted that access to public and approved independent schools varies widely, and that public dollars flowing to independent schools may leave rural public schools—already facing declining enrollment—more vulnerable. Others pointed to cases where tuition dollars support public schools and strengthen their enrollment and revenue.

Members also differed in how much implementation detail was necessary before recommending major structural changes. Some pushed for clarity around feasibility, staffing capacity, service delivery, transportation logistics, and cost implications. Others felt it was more important to set a broad structural direction, even if the detailed modeling would need to follow.

In early meetings, the Task Force discussed the natural alignment between Career and Technical Education (CTE) centers and the high schools they serve. A working group created a regional map based on existing CTE catchment areas, noting that each CTE already has a regional advisory board, its own budget, program advisory committees, and student services. The group saw these structures as evidence of existing, functional regional collaboration. The model was revised based on public testimony and Task Force feedback, adjusting boundaries to preserve school choice and align with local preferences for contiguous districts. Supporters of the CTE-based approach felt these existing systems warranted further study and offered a familiar, operationally aligned starting point.

As deliberations progressed, the Task Force narrowed its focus from four scenarios, including a single statewide district and a county-based model, to two proposals for deeper analysis:

1. A regional governance map organized around CTE centers, and
2. A combined proposal built around Cooperative Education Service Areas (CESAs), Voluntary Strategic Mergers, and Comprehensive Regional High Schools.

After extensive discussion, the Task Force voted 8–3 not to advance the regional CTE map, citing concerns about governing unit size, and limited evidence that forced mergers would increase access, decrease cost or improve quality. Supporters of the CTE-based map emphasized its grounding in existing regional relationships, its responsiveness to public input, and its potential to respect local patterns of collaboration.

The Task Force then voted 7–4 to advance the combined CESA–Strategic Merger–Regional High School proposal. Supporters highlighted its emphasis on locally driven cooperation, shared services, and implementation feasibility, while opponents questioned whether the approach fully met Act 73's consolidation expectations.

Despite these differing perspectives, members consistently agreed on key values: the need for stronger regional cooperation, reliance on evidence and data, equitable access to high-quality education, meaningful attention to community voices, and solutions that reflect the unique challenges and strengths of Vermont's rural geography. These shared insights ultimately shaped the proposal advanced in this report.

JA.718

## WHAT VERMONTERS TOLD US: PUBLIC INPUT HIGHLIGHTS

From the outset, the Task Force recognized that meaningful public input was essential to understanding how statewide redistricting could affect Vermont's students, families, and communities. Over a four-month process, public feedback was gathered through multiple channels, including:

- Four public hearings across the state, each offering in-person and virtual participation for over 700 people
- An online public comment portal, which received 463 written submissions (between July 7 and November 20, 2025)
- Online and paper surveys aligned with hearing activities
- A statewide survey of school board chairs conducted by the Vermont School Boards Association (VSBA)
- Data from the Commission on the Future of Public Education's statewide survey, completed by over 3,931 Vermonters

**Public Hearing Locations & Dates**

**Oxbow High School,** Bradford, VT
October 10, 2025

**Leland & Gray High School,** Townshend, VT
October 16, 2025

**Rutland High School,** Rutland, VT
October 22, 2025

**Winooski High School,** Winooski, VT
October 28, 2025

In total, more than **5,000 Vermonters** contributed input, representing at least 96 towns and 11 counties.

## Who Participated & Who Was Missing

Participants included parents and caregivers, educators, school board members, administrators, and residents from operating, non-operating, unified, and independent/town academy districts. Survey responses suggest contributors were disproportionately people already engaged with their schools or local education issues. High "prefer not to answer" rates for demographic questions indicate both limited participation from historically marginalized groups and discomfort with sharing sensitive information. Paper surveys available at in-person hearings broadened access for some rural communities.

Despite multiple avenues for engagement, significant barriers limited participation from groups most dependent on public systems and most affected by structural changes. The compressed timeline, limited number of hearings, reliance on virtual tools, and lack of engagement supports (such as stipends, childcare, transportation assistance, or outreach through trusted community partners) made it difficult to reach: low-income families; residents with disabilities; people of color and other historically marginalized groups;  students and younger Vermonters; and caregivers with inflexible work schedules or limited internet access.

Equitable engagement requires intentional outreach and trusted relationships, not just open invitations. When those most affected by transportation, school closures, special education

JA.719

services, and access to programs are underrepresented, the risk of widening disparities grows. Their lived experience is essential to understanding how policies work on the ground and should guide interpretation of these findings.

## Types of Feedback Received

Different engagement methods provided complementary perspectives. Public hearings captured personal stories and community-level concerns about belonging, stability, and identity, while surveys produced structured data on priorities, perceived benefits, and concerns. Written comments offered detailed reflections grounded in lived experience, and VSBA and Commission surveys provided system- and governance-level insights. Together, these sources offered a layered picture of Vermonters' hopes, questions, and concerns.

---

### Vermont School Boards Association Survey Themes

The VSBA survey of school board chairs provided governance-level insights:

- **97%** of all boards that responded have discussed redistricting
- **Strengths:** strong academics, community-centered schools, small class sizes, and flexible local programming
- **Challenges:** fiscal pressures, staffing shortages, transportation barriers, and inequities across regions
- **Mixed views on consolidation:** some anticipated expanded opportunities and shared staffing; others questioned whether larger districts would preserve community identity or deliver efficiencies
- **Consensus:** any successful system change requires clear data, state support, and transparent implementation

*Note: Survey had a 50% response rate: Many districts are not represented in these results, including two of the state's most diverse school districts, Winooski and Burlington*

---

JA.720

## Key Themes

Across hearings, surveys, written comments, and testimony, seven themes emerged consistently across the state.

**1** – **Student Wellbeing and Belonging –** Vermonters expressed deep concern about students' mental health, social disconnection, and the need for stability and close relationships. Many worried that larger schools or longer commutes could reduce students' sense of belonging.

*"Kids need a sense of belonging to learn."*

**2** – **Loss of Local Control, School Choice, and Community Identity –** Participants emphasized the importance of local governance and the role schools play in community vitality. Many feared losing local voice or access to existing school choice arrangements if redistricting were implemented.

*"Local schools are the heart of our communities"*

**3** – **Need for Stability After Years of Change –** Communities described years of hard and intentional work to successfully implement mergers following Act 46 and urged policymakers not to impose additional structural changes without clear benefit. Even those open to reform stressed the need for stability before undertaking major transitions.

*"Please hold harmless those districts that just completed Act 46 mergers."*

**4 – Transportation and Access Challenges –** Transportation was one of the most frequently mentioned concerns. Rural families in particular worried about longer bus rides, limited access to extracurriculars, and safety implications of regionalizing schools.

*"Students without transportation will have limited access to opportunities."*

**5** – **Skepticism About Cost Savings or Efficiency –** Many questioned whether redistricting would meaningfully reduce costs or improve outcomes. Participants noted that major cost drivers—health care, transportation, special education, and aging facilities—lie largely outside the realm of district boundary configurations.

**6** – **Rural Equity and Access –** Rural residents worried that consolidation could deepen inequities by concentrating opportunities in more populated areas and leaving small communities with fewer options. Many feared losing local access to educational programs and community institutions.

**7** – **Desire for a Transparent, Evidence-Based Process –** Participants expressed frustration with what felt like a rushed or unclear process and called for more transparency, clearer data, and genuine local involvement before major changes proceed.

*"Slow down – do it right the first time."*

11

JA.721

## Public Priorities and Confidence Levels

Vermonters prioritized quality of education and equitable access as the most important goals. Cost savings, efficiency, governance coherence, and preserving local voice were also valued but ranked lower relative to direct impacts on students.

**Figure 1. Overall priorities among six guiding criteria**



Participants expressed low overall confidence that redistricting alone would deliver improvements across the six guiding criteria. Even participants supportive of certain structural changes expressed uncertainty about whether district reconfiguration would address Vermont's underlying challenges. This is aligned with the findings from the Commission on The Future of Public Education in Vermont's recent survey. The Commission notes that "*Many believe that forced consolidation under state mandate will not produce cost savings or better outcomes, especially in rural Vermont.*"

**Figure 2. Confidence levels across six criteria (Aligned Order)**



JA.722

## Implications

Public input revealed several patterns that can inform policymaking. Vermonters and education experts aligned on key points: consolidation alone will not address major cost drivers; structural changes must be grounded in evidence and transparency; and collaboration and shared services may expand opportunities without the disruption of forced consolidation.

At the same time, notable areas of misalignment surfaced. Policymakers often frame consolidation around system-level efficiency, while communities emphasize stability, identity, and student-level impacts. Many experts prioritize statewide equity, while rural residents view school choice as essential access. Policymakers focus on long-term structural outcomes, while the public is concerned with near-term disruptions for students and families.

Research shows that reforms lacking alignment between experts and communities struggle to gain legitimacy and are harder to implement[2]. Durable change requires trust, shared understanding, and processes that honor local voice. Legitimacy matters, implementation depends on trust, and designing for those most affected strengthens the entire system. These insights underscore the importance of building capacity and collaboration over time rather than relying solely on top-down restructuring.

---

[2] Giliberto Capano, Michael Howlett, Leslie A Pal, M Ramesh, Dealing with the challenges of legitimacy, values, and politics in policy advice, Policy and Society, Volume 42, Issue 3, September 2023, Pages 275–287, https://doi.org/10.1093/polsoc/puad026; Leighninger, Matt. 2006. The Next Form of Democracy: How Expert Rule Is Giving Way to Shared Governance — and Why Politics Will Never Be the Same. Vanderbilt University Press. https://www.vanderbiltuniversitypress.com/9780826515414/the-next-form-of-democracy/?utm; Yankelovich, Daniel 1991. Coming to Public Judgement-Making Democracy Work in A Complex World https://archive.org/details/comingtopublicju0000yank?utm

JA.723

VT SCHOOL DISTRICT REDISTRICTING TASK FORCE          December 1, 2025

## A MAP FOR THE FUTURE: VERMONT REGIONAL EDUCATION PARTNERSHIP OVERVIEW

This section presents a high-level summary of the Regional Education Partnership roadmap, highlighting its purpose, vision, and core design features. Additional detail—including citations, regional maps, governance materials, cost assumptions, and the complete technical submission—is available in *Appendix E: The Vermont Regional Education Partnership Model*.

**Figure 3. Map of proposed cooperative education service areas**



**CHAMPLAIN VALLEY REGION**
Towns: 56
Public Schools: 88
Students: 34,104
Grand List/Student: $1,245,519

**NORTHEAST REGION**
Towns: 59
Public Schools: 41
Students: 10,173
Grand List/Student: $875,681

**SOUTHEAST REGION**
Towns: 49
Public Schools: 48
Students: 11,847
Grand List/Student: $1,892,490

**SOUTHWEST REGION**
Towns: 45
Public Schools: 44
Students: 12,381
Grand List/Student: $1,159,162

**WINOOSKI VALLEY REGION**
Towns: 47
Public Schools: 60
Students: 14,661
Grand List/Student: $1,322,946

### Purpose & Vision

Vermont is becoming increasingly unaffordable. Housing, health care, transportation, and food costs are rising faster than wages, and Vermonters are struggling to meet basic needs. Education cannot be insulated from these economic realities. Every sector must make every public dollar go as far as possible for what matters most — and in education, that means stability, opportunity, and fairness for students.

JA.724

At the same time, Vermont is experiencing significant demographic and geographic shifts. All regions continue to lose population, and even our population centers are educating far fewer students than in past decades. Vermont's identity — and its economic resilience — are closely tied to its rural communities and schools. Strong schools are essential to attracting and retaining families, supporting local economies, and sustaining civic life. Effective policy must honor both community identity and the realities of a changing state.

The Task Force reviewed research, state data, cost modeling, and public input from more than 5,000 Vermonters. It found no peer-reviewed evidence that large, forced mergers of the scale contemplated by Act 73 reliably improve student outcomes, reduce costs, or increase equity. In contrast, the strongest evidence supports *shared service models*, targeted *voluntary* mergers, and *regional high school partnerships* that expand opportunities without destabilizing communities. For mergers involving tuitioning districts — which make up 60% of districts under 500 students — the Task Force found significant public concern and complex implications for cost, equity, and local school viability.

This proposal follows the evidence. It offers a phased, collaborative roadmap that targets real cost drivers, expands opportunity, and respects Vermont's geographic and community diversity through three core strategies: cooperative regional services, voluntary mergers where they strengthen educational opportunity, value, sustainability, and comprehensive regional high schools. Together, these components aim to improve equity, efficiency, and program access while safeguarding community identity and local voice.

## Rationale

Throughout the state districts face increasing challenges, including declining enrollment, limited curricular offerings, and financial strain. The proposal argues that cooperative approaches and strategic consolidations can address these pressures by pooling resources, expanding access to specialized programs, and reducing duplication. The goal is not compulsory consolidation but voluntary, community-driven partnerships that produce sustainable, high-quality education for all students.

The roadmap is grounded in extensive analysis of district demographics, staffing, facilities, cost modeling, special education patterns, and program access, as well as peer-reviewed research on effective rural education structures. Analysis shows:

- **Cost drivers not solved by district size:** The Task Force found no evidence that mandated district-size targets would reduce Vermont's major cost drivers. District size is not linked to improvements in health care, special education, or facility expenses—the largest pressures on the education budget. Cooperative service models directly address these areas, which is why the Task Force prioritized them.

- **Immediate vs long-term benefits:** CESAs can produce immediate gains, while mergers and regional high-school models require longer-term planning.

JA.725

- **Equity guardrails:** The regional designs intentionally avoid long commutes, "education deserts," and inequitable access.

- **Alignment with Act 73:** The roadmap responds to Act 73's charge to make intentional, evidence-based improvements that strengthen Vermont's public education system. The proposed plan enhances statewide coherence and builds regional capacity.

- **Voluntary vs forced mergers:** Research shows voluntary, purpose-driven mergers—centered on shared goals, phased transitions, and governance tied to local identity—are far more effective than mandated consolidation. Large, forced mergers often underestimate transition costs, destabilize staffing, erode trust, and do not reduce major cost drivers.

- **Value of regional high schools:** Regional high schools expand equitable access to programs that small high schools struggle to sustain, including world languages, advanced coursework, CTE integration, and specialized staffing. They improve opportunities without requiring elementary school closures.

- **Limitations of large, mandated mergers:** Studies of 4,000–8,000 ADM mergers show they often fail to reduce costs, produce uneven results, and can increase expenses during transition. Evidence suggests cooperative regional service models carry lower implementation risk. Some efficiencies are possible when very small districts consolidate under the right conditions.

**Design Principles**

- Address real costs now — not potential savings years in the future
- Require districts to share services regionally to support lower cost and better quality
- Protect educational access for students most dependent on public systems
- Reflect Vermont's rural geography and transportation realities
- Respect the limits of state and local implementation capacity

## Key Components

**1. Cooperative Education Service Areas (CESAs)**
- Encourages inter-district collaboration for shared services such as special education, technology, transportation, and professional development.
- Proposes regional frameworks for coordination to ensure equitable access and cost-efficiency.
- Highlights examples of successful cooperative models to illustrate benefits and scalability.
- Additional access to career ready programming in high schools and middle schools can come through the CESAs.

JA.726

**2. Strategic Voluntary Mergers**
- Mergers based on educational value, community priorities, and fiscal sustainability — not arbitrary size targets.
- Phased processes with feasibility studies, shared data, community engagement, and state support.
- Incentives for mergers that improve opportunity or address structural deficits.
- Preservation of local voice and identity.

**3. Comprehensive Regional High Schools**
- Advocates for regionally governed high schools offering diverse pathways — academic, technical, and experiential learning — tailored to 21st-century skills.
- Suggests shared facilities and faculty expertise to expand course offerings, advanced placement, and career-technical education.
- Promotes inclusive governance models to ensure representation from all participating districts.
- Recognizes the need for strategic investment of school construction aid.

## Implementation Strategy

Effective implementation requires pacing, capacity, and clear expectations. The Task Force recommends a sequenced, multi-year plan designed to produce early wins while building toward long-term structural coherence.

**Phase 1 — Regional Readiness & Shared Baseline (Year 1)**

- Establish regional planning teams
- Map services, staffing, facilities, transportation patterns
- Identify immediate shared-service opportunities
- Provide technical and financial assistance for planning

**Phase 2 — Early Action Through Cooperative Services (Years 1–2)**

- Launch shared service pilots (e.g., special education staffing, data systems, transportation coordination)
- Begin regional staffing models where feasible
- Produce annual progress reports and implement mid-course corrections

**Phase 3 — Community-Driven Structural Decisions (Years 2–4)**

- Conduct feasibility studies for potential mergers or regional high school partnerships
- Support deep community engagement and transparent data-sharing
- Enable voluntary merger votes with targeted incentives

**Phase 4 — Long-Term Integration & Continuous Improvement (Years 4+)**

- Expand successful cooperative models statewide

JA.727

- Implement approved mergers and regional high school governance structures
- Evaluate implementation fidelity, program access, and cost trends
- Maintain an iterative, data-driven improvement cycle

This phased approach aligns with implementation science – start with shared capacity and early wins, support informed decision-making, and move toward structural integration where communities choose it.[3]

## Expected Outcomes

- Enhanced student opportunity and program variety
- Improved operational efficiency, cost savings and fiscal sustainability
- Strengthened regional collaboration and community engagement
- A modernized educational infrastructure aligned with demographic and economic realities

The roadmap calls for collaboration rather than required consolidation. It strengthens Vermont's public education system through evidence-based strategies that expand opportunity, improve quality, and respect local identity. By focusing on cooperative services, strategic voluntary mergers, and comprehensive regional high schools, this approach offers a pragmatic, community-centered path toward a more equitable and sustainable future for all Vermont students.

---

[3] See Appendix D: Implementation Risks and Best Practices

JA.728

## DATA SUPPORTING THIS APPROACH

The roadmap advanced by the Task Force is grounded in extensive analysis of Vermont's educational landscape, including cost drivers, demographic trends, staffing challenges, capacity at the Agency of Education, special education, program access, geographic realities, and research from comparable rural states. Across all of the evidence reviewed, a clear conclusion emerged: Vermont's core cost pressures and opportunity gaps are not solved by district size alone. Instead, the data consistently pointed toward the strengths of cooperative service models, strategic voluntary mergers, and regionally governed high schools. The data also raised significant concerns about the feasibility and effectiveness of large, forced district consolidations. The key findings that shaped the Task Force's proposal are summarized below.

### Cost Drivers

Across the data reviewed, Vermont's most significant education cost pressures are structural and statewide—not functions of district boundaries. Rising health care costs, increasing demand for mental health, behavioral, and special education services, and the substantial capital needs of aging or contaminated school facilities all exert upward pressure on spending regardless of governance structure. Rural geography adds transportation costs that consolidation cannot offset, while duplication and privatization, particularly in tuitioning and specialized placements, further strain the Education Fund. These pressures are compounded by long-standing capacity limitations at the Agency of Education, which limit the state's ability to provide consistent guidance, technical assistance, and oversight during major system change. Because these drivers operate independently of district configuration, shifting boundaries does little to meaningfully reduce them. For a detailed analysis, see *Appendix C: Cost Drivers in Education*.

**Figure 4. Total proportion of education spending that is health insurance premiums paid by school districts and employees per year**

| Table showing total proportion of Education Spending that is health insurance premiums paid by school districts and employees, by year | | | |
|---|---|---|---|
| | Education Spending in Billions | Health insurance premiums paid by school districts and employees | % of Education Spending | Source of data: |
| FY23 | $1,917,168,186 | $266,517,469 | 13.90% | JFO 5 yr web report |
| FY24 | $2,078,429,521 | $301,281,227 | 14.50% | JFO 5 yr web report |
| FY25 | $2,309,900,000 | $344,905,222 | 14.90% | July 30 closeout report |
| FY26* | $2,430,399,971 | $381,372,844 | 15.69% | FY26 budgeted |

Source: Vermont Education Health Initiative: https://vehi.org/client_media/files/Board%20Docs/VEHI%20Annual%20Report%20for%20FY%2025%20Final.pdf; JFO Education Spending Data (FY23 and FY 24) https://ljfo.vermont.gov/custom_reports/5yr/2025_Conf_BigBill%20-%202024-08-26/default.php#govfunc5; FY 2026 Big Bill Conference Web Report

JA.729

https://ljfo.vermont.gov/custom_reports/reports/BigBill/v1/FY%202026%20Big%20Bill%20Conference%20Web%20Report%202025-09-02%201017am.html#govfu; JFO Closeout Report
https://ljfo.vermont.gov/assets/Meetings/Joint-Fiscal-Committee/2025-07-31/Fiscal-2025-Closeout-GF-EF-TF.pdf

## Enrollment Decline, Excess Capacity, and Uneven Regional Trends

Vermont continues to experience long-term enrollment decline—especially in rural regions—leading to excess building capacity, difficulty sustaining full program offerings, and higher per-pupil costs. These trends are highly uneven: some areas have stabilized while others have seen steep decreases. As a result, uniform statewide consolidation targets, such as 4,000–8,000 students, do not reflect actual regional variation and may exacerbate inequities rather than resolve them.

**Figure 5. Selected Vermont high schools, population decline, students**



Source: VSA Education Directory 2004-05 and 2024-25 VSA

## Staffing Challenges and Uneven Access to Specialized Programs

Declining enrollment and geographic isolation amplify staffing shortages. Vermont schools—especially small and rural ones—struggle to recruit and retain special educators, behavior specialists, mental health providers, STEM and world language teachers, and instructors for advanced coursework. Cooperative service models offer a way to share specialized staff across districts, improving access to programs while reducing duplication and competition for scarce talent.

JA.730

VT SCHOOL DISTRICT REDISTRICTING TASK FORCE                December 1, 2025

**Figure 6. Staffing patterns: K12 teachers down 8% between FY20-25, but support staff numbers are increasing**

## Staffing patterns: K12 teachers down 8% between FY20-25, but support staff numbers are increasing

| Change from FY20 to FY25* | FTE Change | % Change |
|---|---|---|
| **Student enrollment** | -5,508 | -7.2% |
| **Teachers** | -164 | -2.0% |
| Classroom teachers (K-12) | -417 | -8.0% |
| Pre-K teachers | 46 | 22.8% |
| Special educators (driven by child count) | 86 | 6.3% |
| **Administrators** | 112 | 12.1% |
| Principals or assistant principals | 19 | 4.5% |
| CTE directors/adult education specialists | 13 | 73.2% |
| **Support staff** | 814 | 22.1% |
| Behavior specialists | 95 | 108.3% |
| Behavior interventionists | 111 | 67.4% |
| Reading interventionists | 128 | 85.4% |
| Math interventionists | 99 | 126.9% |
| Paraprofessionals | -354 | -9.0% |

➢ Number of K-12 classroom teachers has **fallen** in line with the decline in student enrollment **(K12 teachers down 8%, students down 7%)**

➢ Number of CTE directors has increased

➢ Number of Pre-K teachers has increased

➢ Numbers of support staff have increased significantly (22%)
  - Weak implementation of Act 173 at state level
  - Possible shift of non-education costs to the Education Fund

➢ Number of special educators increases as the number of students identified as eligible for an IEP increases.

➢ Excludes increases in staffing in taxpayer-funded private schools.

*Table includes only selected subcategories of staff from each category. As a result, subcategory changes do not sum to category total changes.

Source: Agency of Education dataset. A.5.
https://map.vermont.gov/education/redistricting-data-requests/?_gl=1*53ycfq*_ga*MTA0NDg1NjAzOC4x
NzYyODgyNTQx*_ga_V9WQH77KLW*czE3NjQwMDk0MTckbzE2JGcxJHQxNzY0MDEwNzAxJGoxNCRsMC
RoMA

## Capacity at The Agency of Education

Vermont's ability to carry out major statewide reforms is constrained by long-standing capacity limitations at the Agency of Education. After a reduction of roughly 38 positions following the Great Recession, many responsibilities once centralized at the state level—curriculum development, policy guidance, technical assistance, implementation support, and compliance monitoring—shifted to individual districts. This has led to significant variation in practice, inconsistent expectations, and costly duplication as districts independently interpret requirements and design systems once developed centrally. At the same time, policy churn has left many initiatives—such as Act 173 implementation, proficiency-based learning, reserve fund rules, district quality standards, statewide finance modernization, a uniform school calendar, and integrated field reviews—incomplete or abandoned. These capacity gaps complicate any large governance redesign: without robust staffing, modernized data systems, and coordinated technical assistance, major redistricting efforts risk higher transition costs and increased burden on communities already facing staffing, enrollment, and fiscal pressures.

JA.731

**Figure 7. Position Count at DOE/AOE - FY03 to FY24**



Source:
https://humanresources.vermont.gov/sites/humanresources/files/documents/DHR-Workforce_Report_0.
pdf

## Special Education

Special education data reveal significant variation across districts in identification rates, program models, contracted services, and the use of substantially separate placements. Small districts often lack the staffing and programmatic capacity to support students locally, leading to reliance on high-cost, out-of-district placements that are expensive and not always effective. Cooperative service regions (CESAs) enable districts to pool expertise, expand local program capacity, reduce reliance on costly placements, and improve consistency and quality across schools. This remains one of the strongest and most data-supported arguments for regional coordination.

## Program Access and Equity Gaps Across Vermont

Students' access to academic and career pathways varies widely across the state. Data reviewed by the Task Force show uneven availability of advanced coursework (such as AP and dual enrollment), world language offerings, mental health and counseling supports, extracurricular and after-school programs, and CTE pathways. Regional high schools and shared-service structures offer the most reliable mechanisms for equalizing these opportunities by pooling staffing, aligning schedules, and coordinating regional pathway development.

JA.732

## Transportation and Geographic Realities

Transportation is one of the most significant logistical and cost challenges in rural Vermont. Data indicate that many students already face long bus rides, that expanding district size often increases rather than decreases travel time, and that long commutes limit access to extracurricular and after-school opportunities—especially for students from low-income families without access to private transportation. The evidence strongly supports regional coordination built around natural travel patterns, not large consolidated districts that overlook geographic constraints. Taken together, these findings point to a need for regional coordination, shared services, and strategic, community-driven restructuring rather than large, mandatory district mergers.

## Evidence from Comparable Rural States

Research from states with similar geography—such as Maine, New Hampshire, and Wisconsin—shows that regional service models reliably reduce costs and improve access without forced consolidation. These states demonstrate that cooperative structures can lower costs through regional purchasing, staffing, and program sharing; expand student opportunities; preserve local governance; and provide coherence across small, rural districts. Vermont's district landscape more closely resembles these states than the large, county-based systems often referenced in consolidation research.

**Figure 8. Percentage of expenditures devoted to support services by state each year**



Source: Wallace, Carter; Krusoe, Leilani; & Schimelman, Brooke. (2014). Vermont Education Expenditures. A Vermont Legislative Research Report under the supervision of VLRS Director, Professor Anthony "Jack" Gierzynski.
Note: New Hampshire and Maine 2023 data were not included because no post-COVID data were available from either state.

JA.733

JA.734

## CONCLUSION

Vermont's public education system is at a pivotal moment, facing rising costs, declining enrollment, and widening disparities in opportunity. After extensive analysis and significant public engagement, a majority of Task Force members reached the following conclusion. The most effective path forward is a phased, collaborative approach that builds regional capacity through cooperative services, supports voluntary mergers where they add educational value, and advances comprehensive regional high schools to expand opportunities for all students. This roadmap reflects Vermont's geography, honors community identity, and targets the real drivers of cost and inequity. It offers an actionable, evidence-based foundation for long-term improvement, and provides the Legislature with a clear direction for strengthening the quality, affordability, and resilience of Vermont's public education system.

## ACKNOWLEDGMENTS

The Task Force would like to thank the many Vermont residents who took the time to submit written public comments, offer public testimony, attend public hearings or answer a survey. We heard you and your input informed our work.

The Task Force would also like to acknowledge Chrissy Gilhuly and Mariko Evans from the Agency of Administration for their dedication and many hours of support.

We also deeply appreciate the support of John Adams from the Agency of Digital Services, Toren Ballard from the Agency of Education, and Orca Media.

Finally, the Task Force would like to thank Susan McCormack and Dr. Nadia DuBose of The Creative Discourse Group for support with meeting facilitation, public engagement and analysis, and report writing.

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 57 of 211
2:23-cv-00652-gwc    Document 141-12    Filed 05/07/26    Page 26 of 42

VT SCHOOL DISTRICT REDISTRICTING TASK FORCE                December 1, 2025

## APPENDICES

JA.735

## Appendix A: Definitions

This section defines key terms and structures relevant to Vermont's education governance system. Establishing a shared vocabulary ensures that analyses on cost, equity, capacity, and implementation are grounded in common understanding.

**Governance Structure**
A governance structure refers to the formal arrangement of authority, decision-making, and accountability within the education system. In Vermont, governance structures determine who makes decisions about schools, how budgets and policies are set, and how services are administered and shared across towns and regions. They include the network of school districts, supervisory unions, supervisory districts, and the State Board of Education, each with defined statutory roles and responsibilities. The structure of governance directly affects efficiency, equity, cost, transparency, and community voice.

**Types of Governance Structures**

*School*
A school is a building in which education occurs. For the purposes of the redistricting process, a school is either a public or approved independent school.

*Public School*
"'Public school' means an elementary school or secondary school operated by a school district…" (16 V.S.A. § 11(a) (7)). Public schools operate under the governance of a publicly elected school board, must meet specific Education Quality Standards (EQS) and provide a minimum course of study as required by state law and the State Board of Education rules.

*Approved Independent School*
An Approved Independent School is a school other than a public school, which is approved by the State Board of Education to offer elementary or secondary education, provides a minimum course of study pursuant to 16 VSA §906, and substantially complies with all statutory and regulatory requirements for approved independent schools. An Approved Independent School is operated by a private entity under the governance of a private board of directors or trustees, and is supported primarily through tuition, charitable giving, and/or endowment income. "An approved independent school that intends to accept public tuition… agrees… to enroll any student who requires special education services…" (16 V.S.A. § 166)

*Comprehensive High School*
"'Comprehensive high school' means a public or independent school other than a career technical center that provides secondary career technical education approved under section 16 V.S.A. § 1533." (16 V.S.A. § 1522(14))

JA.736

*School District*
A school district is an independent municipal entity with the authority to raise taxes to provide education for resident children. Each district must ensure access to education by operating one or more schools, paying tuition for resident students to attend another public or approved independent school, operating certain grades and tuitioning others. Key characteristics of school districts include one publicly elected governing board, with proportional representation, one district-wide budget approved by the electorate, boundaries that may include one or more towns, and administrative support services are typically provided by a supervisory union unless the district operates as its own supervisory district.

*Supervisory Union (SU)*
A supervisory union is a collaborative administrative and educational service entity made up of multiple school districts that share a superintendent and certain support functions. It is not a municipality and does not have an elected board; instead, representatives from each member district's board compose its governing body. Key functions of an SU are business and finance, curriculum coordination, special education, payroll, technology, transportation, and federal grant management. SUs cannot own property or incur debt.

*Supervisory District (SD)*
A supervisory district is a single, unified district that performs all the functions of both a school district and a supervisory union. It has one school board, one superintendent, one budget, one tax rate, and one set of policies.

*Interstate School Districts*
In Vermont, two interstate districts jointly serve Vermont and New Hampshire students (one PK–12 and one 6–12). They operate under interstate compacts enacted by both state legislatures and Congress.

**Types of School Choice in Vermont**

School choice describes the range of policies and mechanisms that ensure all Vermont students have access to PreK-12 education and in some circumstances, allow students to attend a school other than the one they would typically attend based on residence.

*Statewide Public High School Choice (Act 129 of 2012)*
This policy allows students in districts that operate a public high school to apply for admission to another public high school anywhere in Vermont. Funding does not follow the student, by design, to expand access while avoiding destabilizing financial shifts between schools. As of 2017, 391 students participated; receiving schools tended to be larger, and participating students were less likely to be economically disadvantaged.

*Tuition Payment (Districts Without Operating Schools)*
Districts that do not operate schools at some or all grade levels must pay tuition for resident students to attend either a public or approved independent school (16 V.S.A. § 822). This

JA.737

structure emerged historically to ensure access for students in small or geographically isolated towns, not to create a system of "choice."

*Student Specific Arrangements*
School District Boards that operate schools may approve tuition payment for individual students under unique circumstances (16 V.S.A. § 821(c) and 822(c)(1), allowing flexibility to meet specific student needs.

*Intra-District School Choice*
Larger, merged districts may allow families to choose among multiple schools operated within the district.

*Designation (16 V.S.A. § 827)*
Districts without operating schools may designate up to three approved public or independent high schools as their "public schools" for tuition purposes.

JA.738

## Appendix B: Status of Private and Independent Schools

The following is a brief summary of the changes in law that lead to the current regulation of independent schools as it relates to the tuitioning system, from the late 1980s to today. This is not an exhaustive analysis of every change that occurred in Vermont law related to the regulation of independent schools during the applicable time period. It is meant to serve as a high-level overview of major changes.

Prior to 1991, under 16 V.S.A. § 11(7), the term "**public school**" was defined as "elementary and high schools which **are principally supported by public taxation or tuition payments** derived from public funds…This definition shall not be construed to require **any public school not managed by a school board** to comply with provisions of law relating to teachers."

Subdivision (8) of the same section defined "private school" as "a school other than a public school, which provides a program of elementary or secondary education, or both." 1991 Acts and Resolves No. 24, Sec. 1 amended both definitions to the following:

> (7) "Public school" means an elementary or secondary school for which the governing board is publicly elected.
>
> (8) "Independent school (formerly private school)" means a school other than a public school which provides a program of elementary or secondary education, or both. An "independent school meeting public school standards" means an independent school in Vermont that applies to the State Board of Education for public school approval and meets the standards for public school approval.

Under the pre-1991 definition of public school, a private (independent) school that was **"principally supported" by tuition would, by definition, be a public school and therefore subject to the same laws and requirements as public schools,** except "provisions of law relating to teachers." Prior to approximately 1997, the 2000 rule series, which now contains Vermont's Education Quality Standards, was the Public School Approval Standards. Under the pre-1991 definition of public school, private schools principally supported by tuition would need to go through the public school approval process, with the exception of laws relating to teachers. The 2000 rule series has evolved over the years, from School Quality Standards in 1997 to Education Quality Standards in 2014. Thus, while the standards private schools principally supported by tuition were required to follow has changed over the years, so have the standards applicable to public schools.

Both pre-and post-1991 school districts were allowed to pay tuition to public and private/independent schools.

> (1) While some pre-1991 private schools may have been required to follow all laws applicable to public schools (except laws related to teachers) because they were principally

29

JA.739

supported by tuition payments, approved private schools that were NOT principally supported by tuition payments and therefore not subject to all the same laws as public schools were still eligible for tuition. The principal difference appears to be that "public schools" could charge full tuition while approved private schools were limited to charging the average announced tuition.

(2) But both pre-and-post 1991 a private/independent school could charge more than the average announced tuition if the voters approved such tuition.

(3) In the post-1991 change, independent schools could apply to the State Board for public school approval if they met the standards for public school approval (now akin to EQS) and if approved, charge full tuition (like a public school). In this post-1991 approval process, independent schools were not necessarily exempt from the laws applicable to teachers.

1 See 16 V.S.A. §§ 821 and 822.
2 See 16 V.S.A. §§ 823 and 824.
3 See Id.

*Prepared for the RedistrictingTask Force by Legislative Council*

JA.740

## Appendix C: Cost Drivers in Education

Understanding Vermont's educational cost pressures requires looking beyond governance structures or district size. The largest and most persistent cost drivers arise from forces that are largely independent of school district configuration—such as health care inflation, aging and contaminated facilities, rising demand for regulated support services, the fiscal impact of privatization and duplication, and the limited capacity of the Agency of Education to provide coherent statewide guidance. These cost drivers shape what is financially possible for school districts and are essential context for evaluating any proposed changes under Act 73.

### 1. Health Care Costs

Health care is one of the largest and fastest-growing components of Vermont's education spending. Because employee health benefits are bargained at the state level and apply uniformly to all districts, these costs rise regardless of local governance structure. Declining enrollment amplifies the effect: when there are fewer students, rising personnel costs push per-pupil spending upward even if staffing levels remain stable.

*Key Data Points*

- Health care costs account for an increasingly large share of school budgets statewide; districts have limited ability to control these expenses
- Benefit structures are set through statewide bargaining, meaning district consolidation does not produce savings in this category
- As enrollment decreases, the fixed cost of employee benefits is spread across fewer students, increasing per-pupil spending even when staffing remains flat

**Figure C-1. Total proportion of education spending that is health insurance premiums paid by school districts and employees per year**

| Table showing total proportion of Education Spending that is health insurance premiums paid by school districts and employees, by year | | | |
|---|---|---|---|
| | Education Spending in Billions | Health insurance premiums paid by school districts and employees | % of Education Spending | Source of data: |
| FY23 | $1,917,168,186 | $266,517,469 | 13.90% | JFO 5 yr web report |
| FY24 | $2,078,429,521 | $301,281,227 | 14.50% | JFO 5 yr web report |
| FY25 | $2,309,900,000 | $344,905,222 | 14.90% | July 30 closeout report |
| FY26* | $2,430,399,971 | $381,372,844 | 15.69% | FY26 budgeted |

Source: Vermont Education Health Initiative:
https://vehi.org/client_media/files/Board%20Docs/VEHI%20Annual%20Report%20for%20FY%2025%20Final.pdf; JFO Education Spending Data (FY23 and FY 24)
https://ljfo.vermont.gov/custom_reports/5yr/2025_Conf_BigBill%20-%202024-08-26/default.php#govfunc5; FY 2026 Big Bill Conference Web Report
https://ljfo.vermont.gov/custom_reports/reports/BigBill/v1/FY%202026%20Big%20Bill%20Conference%20Web%20Report%202025-09-02%201017am.html#govfu; JFO Closeout Report

JA.741

https://ljfo.vermont.gov/assets/Meetings/Joint-Fiscal-Committee/2025-07-31/Fiscal-2025-Closeout-GF-EF-TF.pdf

**Figure C-2. How the sticker price of Vermont health insurance compares to other states**

Source: Kaiser Family Foundation's  Average Monthly Marketplace Premiums by Metal Tier dataset
https://www.kff.org/affordable-care-act/state-indicator/average-marketplace-premiums-by-metal-tier/?activeTab=graph&currentTimeframe=2&startTimeframe=8&selectedRows=%7B%22states%22:%7B%22all%22:%7B%7D%7D,%22wrapups%22:%7B%22united-states%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

## 2. Construction and Maintenance of Facilities

Vermont's school infrastructure is aging, uneven in quality, and costly to maintain. Many buildings require significant capital investment to remain safe, accessible, and functional. PCB and other environmental contamination has added substantial new financial pressure. Deferred maintenance has accumulated due to decades without a state school construction aid program. These costs are driven by building conditions, not governance configuration.

JA.742

*Key Data Points*

- Vermont has had no operational school construction aid program for more than a decade; Act 73 creates a new program beginning July 2026, but it has not yet been funded or implemented
- PCB remediation and other safety mandates are generating significant unplanned capital costs
- Many districts operate schools well below capacity, increasing per-pupil building costs
- Consolidation may reduce facilities costs only if communities choose to close or repurpose buildings—cost savings are not automatic or immediate
- Even when redistricting reduces the number of buildings, remaining facilities still require ongoing capital investment, including heating, maintenance, and compliance upgrades

**Figure C-3. One year change in costs related to school facilities (maintenance and construction)**

| One-year change in costs related to school facilities (maintenance and construction) | | |
|---|---|---|
| Driver | % increase, FY25-FY26 | $ increase, FY25-FY26 |
| Operations and Maintenance of Plant (Includes School Construction) | 27.10% | $27.6 million |

Source: Vermont Agency of Education School Facilities Assessment Reports
https://outside.vermont.gov/agency/aoe/schoolfacilitiesassessment/_layouts/15/start.aspx?_gl=1*9bhlj6*_ga*MTM4MTIxOTMxNy4xNzUzNjMwNzE4*_ga_V9WQH77KLW*czE3NjQwMDg4ODQkbzE1NiRnMSR0MTc2NDAwOTI5OCRqMzYkbDAkaDA.#/SitePages/Home.aspx

## 3. Support Services (Mental Health, Social Supports, and Special Education)

The need for support services has increased, particularly in mental health, behavioral health, and special education.  These needs require specialized personnel - psychologists, speech-language pathologists, behavior specialists, etc. - whose availability is limited statewide.  Rising student needs and workforce shortages drive costs upward for every district, no matter its size or structure.  In Vermont, payment for much of the social services provided in schools comes out of the Education Fund as opposed to other states that pay for these services out of other funding sources such as their Health and Human Services budget.  Additionally, changing identification criteria in Act 173, without fully implementing the needed changes in Multi-Tiered Systems of Support (MTSS) and Universal instruction Vermont now identifies more students as eligible for Individual Education Plans (IEPs).

JA.743

**Figure C-4. Percentage of expenditures devoted to instruction by state each year**



Source: Wallace, Carter; Krusoe, Leilani; & Schimelman, Brooke. (2014). Vermont Education Expenditures. A Vermont Legislative Research Report under the supervision of VLRS Director, Professor Anthony "Jack" Gierzynski.
Note: New Hampshire and Maine 2023 data were not included because no post-COVID data were available from either state.

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 67 of 211
2:23-cv-00652-gwc    Document 141-12    Filed 05/07/26    Page 36 of 42

VT SCHOOL DISTRICT REDISTRICTING TASK FORCE                December 1, 2025

**Figure C-5. Percentage of expenditures devoted to support services by state each year**



Source: Wallace, Carter; Krusoe, Leilani; & Schimelman, Brooke. (2014). Vermont Education Expenditures. A Vermont Legislative Research Report under the supervision of VLRS Director, Professor Anthony "Jack" Gierzynski.

Note: New Hampshire and Maine 2023 data were not included because no post-COVID data were available from either state.

*Key Data Points*

- Special education needs have grown across the state, and small districts struggle to provide consistent, high-quality services without shared staffing
- High-cost, out-of-district placements rise when districts cannot staff specialized programs locally
- Mental health needs, intensified since the pandemic, require specialized professionals who are difficult to recruit and retain

**Figure C-6. Staffing patterns: K12 teachers down 8% between FY20-25, but support staff numbers are increasing**

JA.745

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 68 of 211
2:23-cv-00652-gwc    Document 141-12    Filed 05/07/26    Page 37 of 42

VT SCHOOL DISTRICT REDISTRICTING TASK FORCE                    December 1, 2025

## Staffing patterns: K12 teachers down 8% between FY20-25, but support staff numbers are increasing

| Change from FY20 to FY25* | FTE Change | % Change |
|---|---|---|
| **Student enrollment** | -5,508 | -7.2% |
| **Teachers** | -164 | -2.0% |
| Classroom teachers (K-12) | -417 | -8.0% |
| Pre-K teachers | 46 | 22.8% |
| Special educators (driven by child count) | 86 | 6.3% |
| **Administrators** | 112 | 12.1% |
| Principals or assistant principals | 19 | 4.5% |
| CTE directors/adult education specialists | 13 | 73.2% |
| **Support staff** | 814 | 22.1% |
| Behavior specialists | 95 | 108.3% |
| Behavior interventionists | 111 | 67.4% |
| Reading interventionists | 128 | 85.4% |
| Math interventionists | 99 | 126.9% |
| Paraprofessionals | -354 | -9.0% |

➢ Number of K-12 classroom teachers has **fallen** in line with the decline in student enrollment **(K12 teachers down 8%, students down 7%)**

➢ Number of CTE directors has increased

➢ Number of Pre-K teachers has increased

➢ Numbers of support staff have increased significantly (22%)
  o Weak implementation of Act 173 at state level
  o Possible shift of non-education costs to the Education Fund

➢ Number of special educators increases as the number of students identified as eligible for an IEP increases.

➢ Excludes increases in staffing in taxpayer-funded private schools.

*Table includes only selected subcategories of staff from each category. As a result, subcategory changes do not sum to category total changes.

Source: Agency of Education data A.5.
https://map.vermont.gov/education/redistricting-data-requests/?_gl=1*53ycfq*_ga*MTA0NDg1NjAzOC4xNzYyODgyNTQx*_ga_V9WQH77KLW*czE3NjQwMDk0MTckbzE2JGcxJHQxNzY0MDEwNzAxJGoxNCRsMCRoMA

### 4. Transportation

Long bus routes, sparse populations, and rugged terrain drive transportation costs upward in nearly all rural regions. Larger or merged districts do not automatically reduce those costs; in fact, in rural settings they often increase both route length and cost, because students may be farther from centrally located schools and bus utilization falls.

*Key Data Points*

- A national study found that "school bus transportation costs for rural districts are 40% more per student than a city or suburban district."  *(ScienceDirect)*
- Rural geography increases transportation costs, especially for special education routes and vocational access
- Research on rural school consolidation reports that "despite widespread school and school district consolidation, transportation costs have increased, and transportation costs per child are greater in rural than urban school districts." *(Academia)*
- States report that transportation costs per student rose by 33% between 2008 and 2018, reaching an average of $1,152 per student transported—before accounting for increased commute distance, staffing shortages and rising fuel/maintenance costs *(files.eric.ed.gov)*

JA.746

**5. Duplication and Privatization**

Vermont's unique mix of operating and non-operating districts, tuitioning, and a growing reliance on private special education placements creates cost pressures that are not addressed through district consolidation. Duplication also occurs when small supervisory unions must replicate administrative functions that larger systems can share. Privatization—both in tuitioning and in special education—can increase per-pupil spending, and result in inequitable access to educational opportunities where additional tuition costs are required to be paid by the family of the student to enable attendance at some independent schools (i.e. "topping up tuition").

*Key Data Points*

- Tuitioning districts send public dollars to public and approved independent schools
- Reliance on private special education placements to therapeutic schools is a major cost driver due to high tuition rates and transportation needs
- Supervisory unions maintain duplicative administrative structures, which often includes business operations, HR, curriculum leadership, and compliance functions
- These duplications persist regardless of district boundaries unless service-sharing or consolidation is structured intentionally

**Figure C-7. Descriptive statistics on tuition paid FY09 to FY24, by sector**

| Type of School | Tuition Paid in FY24 | % Change, FY09-FY24 |
|---|---|---|
| VT Non-Public | $63,380,204 | 87.38% |
| VT Public | $55,446,336 | 34.32% |
| CTE | $43,963,204 | 42.12% |
| NonVT | $14,739,411 | 38.91% |

Source: Vermont Agency of Education
https://map.vermont.gov/education/redistricting-data-requests/?_gl=1*53ycfq*_ga*MTA0NDg1NjAzOC4x NzYyODgyNTQx*_ga_V9WQH77KLW*czE3NjQwMDk0MTckbzE2JGcxJHQxNzY0MDEwNzAxJGoxNCRsM CRoMA, A.3.

**6. Agency Capacity Challenges**

The ability of the state to oversee, coordinate, and support major structural change is itself a significant cost driver. Following significant staffing reductions during the Great Recession, the Agency of Education (AOE) no longer maintains the centralized capacity it once had for curriculum development, model policies, legal interpretation, statewide technical assistance, or consistent compliance monitoring. As documented in the *VSBA Task Force on Collaboration to Benefit All Students* report, districts now routinely shoulder responsibilities that were previously performed once at the state level, including professional development, implementation planning, policy interpretation, data analysis, and compliance support. This can result in duplication, inconsistency, and higher local costs funded through property taxes. Act 73 directs the state to rebuild AOE's staffing, data systems, and implementation infrastructure to manage sweeping reforms, including new district boundaries, statewide calendars, construction aid, updated

JA.747

Education Quality Standards, and expanded reporting requirements. However, even with new investment, rebuilding statewide capacity will take time, and gaps during the transition can increase costs, reduce implementation fidelity, and strain local systems already operating at the edge of feasibility.

*Key Points*

- AOE currently lacks the staffing, expertise, and modernized technical infrastructure needed to support large-scale governance transitions. Pre-recession staffing reductions were never restored, leaving the Agency with responsibilities that exceed its capacity

- Work once performed by the AOE (such as curriculum development support, model policy creation, legal interpretation, and implementation guidance) is now duplicated across dozens of districts and associations. This duplication increases property-tax-funded local costs and produces wide variation in practice

- The Agency must simultaneously develop and administer a new State Aid for School Construction Program by 2026, significantly increasing administrative demands before its core capacity has been rebuilt. Major new responsibilities are being added while foundational functions remain under-resourced

- Limited state capacity creates unclear and inconsistent guidance, raising costs as districts navigate uncertainty. Districts report conflicting interpretations—especially in special education, flexible pathways, and Act 173—across Agency offices.

- Outdated or incomplete state data systems require districts to submit duplicative reports and manual workarounds, adding administrative burden and cost. The underdeveloped eFinance platform is one example of how system limitations elevate local workload

- Implementation science shows that insufficient state-level coaching, oversight, and technical support reduces fidelity and increases long-term costs. When districts interpret reforms differently—or must hire consultants to fill gaps—inefficiencies compound across the system

- When major reforms overlap, state capacity becomes a bottleneck that can delay or weaken intended benefits. Without strong statewide support, implementation costs increase and inequitable outcomes become more likely.

Many of Vermont's most significant education cost drivers lie outside the control of individual districts and are not substantially affected by redistricting or consolidation. Health care, aging facilities, rising support-service needs, privatization pressures, and limited state capacity all exert upward pressure on spending regardless of governance structure. Recognizing these underlying forces is essential for crafting policy responses that are both realistic and equitable. These cost drivers also underscore why the Task Force's recommendations emphasize shared services, regional collaboration, and phased implementation, rather than assuming that structural consolidation alone can resolve Vermont's fiscal challenges.

JA.748

## Appendix D: Implementation Risks and Best Practices

Act 73 envisioned major structural changes to Vermont's education system, including the creation of substantially larger, reconfigured school districts. Decades of research in implementation science—much of it derived from health care and K–12 innovation—shows that the success of large-scale reforms depends on the quality of implementation. When preparation, capacity, and sequencing are insufficient, even well-designed policies fail to deliver desired outcomes and may unintentionally cause long-lasting harm to students and communities.

Because Act 73 originally contemplated rapid, top-down consolidation, it is critical to understand the implementation risks associated with this approach and the conditions necessary for any major school governance change to succeed.

**Six Research-Based Implementation Risks—And What They Mean for Vermont**

Implementation science identifies several recurrent pitfalls in complex system reforms. Below, each risk is explained alongside its implications for forced mergers and for cooperative service models (CESAs).

1. **Rushing Phases (Skipping Exploration and Preparation)**
   Research: Rushed implementation leads to low fidelity, staff overload, and failed reforms. (Wiley Online Library)

2. **Underbuilt Implementation Drivers (Unclear Authority, Weak Data Systems, No Coaching)**
   Reforms flounder when core "drivers"—clear authority, coaching, data systems, communication structures—are not established first. (*FPG Implementation Center*)

3. **Poor Fidelity–Adaptation Balance (Too Rigid or Too Vague)**
   Overly rigid models create resistance; overly vague models create incoherence and inequity. (*BioMed Central*)

4. **Lack of Implementation Metrics**
   Systems without dashboards cannot identify emerging problems early, leading to delayed interventions and disappointing outcomes.(*PubMed*)

5. **Weak Spread Mechanics (Lack of Champions, Networks, and Peer Learning)**
   Successful reforms rely on champions, cross-site learning networks, and peer support. Without these, innovations stall or revert. (*PubMed*)

6. **Bundling Too Many Policy Shifts at Once**
   Research shows that when multiple large reforms roll out simultaneously, leaders cannot implement any of them with high quality. Capacity becomes overwhelmed, and it becomes impossible to diagnose which change is driving which effect. (PubMed)

JA.749

Each of these initiatives requires planning, communication, data systems alignment, community engagement, and local capacity to implement. Stacking them on top of a forced statewide merger significantly heightens the risk of failure across all reforms.

**What Vermont Can Learn from This Research**

Implementation science makes one point unmistakably clear. Mandated, statewide district consolidation—implemented quickly and without adequate preparation—carries significantly higher risks than the phased, cooperative roadmap advanced by the Task Force.

In contrast, cooperative services, voluntary mergers, and regional high schools:

- Align with Vermont's implementation capacity,
- Can be phased and adapted to local context,
- Build on existing regional relationships,
- Reduce disruption, and
- Produce more reliable, equitable outcomes for students.

This research base is a central reason the Task Force advanced a collaborative, staged roadmap rather than a single, statewide consolidation plan.

JA.750

2:23-cv-00652-gwc    Document 141-12    Filed 05/07/26    Page 42 of 42

## Appendix E: The Vermont Regional Education Partnership Model

An informal working group of Task Force members, including two former superintendents, developed a detailed technical plan titled *The Vermont Regional Education Partnership Model*, elaborating on the regional education partnership redistricting proposal adopted by the Task Force.

The full document includes regional maps, governance schematics, draft functional responsibilities, cost assumptions, statutory crosswalks, and illustrative implementation materials. It is provided separately as Supplemental Appendix E[4]

---

[4] Full link to Appendix E:
https://aoa.vermont.gov/sites/aoa/files/Appendix%20E_%20The%20Vermont%20Regional%20Education%20Partnership%20Model_UPDATED%2012.2.25%20v.%202.pdf

41

JA.751

2:23-cv-00652-gwc    Document 141-13    Filed 05/07/26    Page 1 of 3

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT

MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students and its students' parents; ABEL GOODWIN; M.G., by and through her parents and natural guardians, Christopher and Bethany Goodwin; CHRISTOPHER GOODWIN, individually; BETHANY GOODWIN, individually; O.P., by and through his father and natural guardian, Nathan Partington; and NATHAN PARTINGTON, individually,

Plaintiffs,

v.

ZOIE SAUNDERS, in her official capacity as Secretary of the Vermont Agency of Education and in her individual capacity; JENNIFER DECK SAMUELSON, in her official capacity as Chair of the Vermont State Board of Education and in her individual capacity; and WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD,

Defendants.

Case No. 2:23-cv-00652

DECLARATION OF DAVID EVANS

JA.752

2:23-cv-00652-gwc    Document 141-13    Filed 05/07/26    Page 2 of 3

I, David Evans, hereby declare as follows:

1.  I am a litigation fellow at Alliance Defending Freedom.

2.  In that role, I prepared the following exhibit: Map of Private Schools/Programs Eligible for Tuition and Religious Schools Ineligible for Tuition.

3.  To create the exhibit, I consulted Exhibit 11 to the Amended Verified Complaint (ECF No. 100-11) and copied its information to create the Map key.

4.  I pulled the Britannica map of Vermont from Maps of US at https://www.mapofus.org/vermont/.

5.  Working through Exhibit 11 and consulting Google Maps for location information, I modified the Britannica map with dots approximating the location of the Exhibit 11 schools.

1

JA.753

2:23-cv-00652-gwc   Document 141-13   Filed 05/07/26   Page 3 of 3

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of May 2026, in Lansdowne, Virginia.

David Evans

2

JA.754

# EXHIBIT 1

JA.755



| Approved Therapeutic Schools eligible for public tuition | Approved Independent Schools eligible for public tuition | Religious Schools that were eligible for public tuition pre-Act 73 that are no longer eligible post-Act 73 | Approved Education Programs eligible for public tuition | Approved Tutorials eligible for public tuition |
|---|---|---|---|---|
| 🔴 | 🟢 | 🔵 | 🟠 | 🟡 |
| The Arlington School | Burke Mountain Academy | All Saints Catholic Academy | Addison County Parent/Child Center's Teen Parent Program | 204 Depot Street Program |
| Baird School | Burr & Burton Academy | Christ the King (Burlington) | Capstone Community Action Brook Street Family Literacy Ctr.'s Teen Parent Program | Beckley Day Program |
| Bellcate School | East Burke School | Christ the King (Rutland) | The Family Place / Families Learning Together | Inclusion TABS |
| BRIGHTality | Expeditionary School of Black River | Good Shepherd Catholic School | Sunrise Family Resource Center Teen Parent Program | Mountainside House |
| Brookhaven | Killington Mountain School | Grace Christian School | | |
| Changing Our Idea Concerning Education | Long Trail School | Mater Christi School | | |

JA.757

| | | | | |
|---|---|---|---|---|
| Academy (Ch.O.I.C.E.) | | | | |
| Community Schoolhouse | Lyndon Institute | Mid Vermont Christian School | | |
| Connected Circles | Maple Street School | Mt. Saint Joseph Academy | | |
| Cornerstone School | Mountain School at Winhall | Rice Memorial High School | | |
| East Meadow School | Okemo Mountain School | Rutland Area Christian School | | |
| East Valley Academy | Riverside School | Sacred Heart School | | |
| Fay Honey Knopp School | St. Johnsbury Academy | Saint Francis Xavier | | |
| Foundation | The Sharon Academy | St. Michael's Catholic School | | |
| Greenwood School | Southshire Community School | St. Monica-St. Michael School | | |
| The Jean Garvin School | Stratton Mountain School | St. Paul's Elementary School | | |
| Kindle Farm School | Thaddeus Stevens School | | | |
| Laraway School | Thetford Academy | | | |
| Manchester Village School | Village School of North Bennington | | | |
| Maplehill School | | | | |
| The Mill School | | | | |
| New England School for Girls | | | | |
| New School of Montpelier | | | | |

JA.758

| | | | | |
|---|---|---|---|---|
| Priority Placements | | | | |
| Sheldon Academy | | | | |
| Soar Learning Center | | | | |
| Turning Points | | | | |
| Two Roads Academy | | | | |

JA.759



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 MAY 12  PM 2:54

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

MID VERMONT CHRISTIAN              )
SCHOOL, et al ;                    )
                                   )
     Plaintiffs,                   )
                                   )
     v.                            )          Case No. 2:23-cv-652
                                   )
ZOIE SAUNDERS, JENNIFER            )
DECK SAMUELSON, and WAITS          )
RIVER VALLEY (UNIFIED #36          )
ELEMENTARY SCHOOL                  )
BOARD),                            )

     Defendants.

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (Doc. 105-1)

As originally filed, this case concerned a dispute over plaintiff Mid Vermont Christian School's ("Mid Vermont") expulsion from the Vermont Principals Association after its forfeiture of a girls' basketball game at which the opposing team included a transgender player. Following a decision by the Second Circuit Court of Appeals holding that "Plaintiffs are likely to succeed in establishing that [state education administrators] acted with hostility toward Mid Vermont's religious beliefs," this court entered a preliminary injunction restoring Mid Vermont's membership in the athletic organization. *Mid Vt. Christian Sch. v. Saunders*, 151 F.4ᵗʰ 86, 95 (2d Cir. 2025).

On October 31, 2025, Mid Vermont and members of two families seeking financial support through the town tuition program filed a motion to amend the

1

JA.760

complaint. (Doc. 86). The court granted the motion. (Doc. 98.) The amended complaint challenges the constitutionality of Section 21 of Act 73 – a statute enacted in 2025 that imposes broad changes on many aspects of public education in Vermont. (Doc. 100).[1]

One feature of Act 73 is a marked reduction in tuition payments to independent high schools by school districts that do not operate high schools of their own. *See* Act 73, § 21. Vermont has long provided for the education of these students by requiring the so-called "sending towns" to pay a base amount established by the Agency of Education to public and independent schools that receive the students. 16 V.S.A. § 822. Mid Vermont is among the independent schools that no longer qualify for these "town tuition" payments. Mid Vermont alleges that its exclusion from these payments is the result of religious discrimination in violation of the First Amendment. It also alleges a violation of the Equal Protection Clause.

Plaintiffs seek a preliminary injunction restoring Mid Vermont's eligibility to receive town tuition payments. (Doc. 105.) Because the Agency of Education conditions eligibility for two programs for college-bound students on an independent school's qualification for town tuition payments, Mid Vermont also challenges the exclusion of its students from these programs.

---

[1] Act 73 is a substantial statute, 147 pages in length. Its provisions will be codified primarily in Titles 16 (Education) and 32 (Taxation and Finance) of the Vermont Statutes Annotated. For purposes of this decision, the court uses the citations to the various sections as these appear in the session laws for the 2025 legislative session. This version appears in the record of this case as Ex. 1 to the Amended Verified Complaint (Doc. 100-1). Section 21 is the section most relevant to this case. It is codified at 16 V.S.A. § 828. That portion of Act 73 took effect on July 1, 2025, and is codified at 16 V.S.A. § 828. Other portions of Act 73—particularly the mandatory consolidation of school districts—are the subject of continuing legislative action but are not at issue in this case.

JA.761

Defendants respond that Act 73 is neutral with respect to religion.[2]  They defend the limits Act 73 places on eligibility for town tuition payments on the ground that the limits apply to all independent schools whether these are secular or religious. In Defendants' view, Act 73 restricts which schools qualify for the town tuition payments in order to achieve economies of scale through a more centralized educational system.   (*See* Docs. 121, 122.)

The court heard argument on Mid Vermont's preliminary injunction motion on May 8, 2026.  At the court's invitation (Doc. 132), the State Defendants provided a witness at the May 8 Hearing.  The court has also considered supplemental declarations filed by Mid Vermont in support of its preliminary injunction motion. (Doc. 141.)

## Background

To understand the parties' dispute, it is necessary to understand something of the history of public and independent schools in Vermont, the role of the Vermont state constitution in shaping that history, and the effect of recent U.S. Supreme Court decisions concerning the Free Exercise Clause.  The provisions of Act 73, including Section 21, reflect Vermont's long engagement in questions of local control over education, the establishment of common standards for all schools, economies of scale, and equitable levels of tax support.  The court seeks to give full consideration to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements

---

[2] After the amendment of the complaint shifting the focus of the case from the question of athletics to the question of Act 73's constitutionality (Doc. 100), and after dismissal of the claims against the Executive Director of the Vermont Principals Association (Doc. 135), the remaining defendants in this case are the Vermont Secretary of Education, Zoie Saunders, and the Chair of the Vermont State Board of Education, Jennifer Deck Samuelson (collectively, the "State Defendants"), plus the Waits River Valley (Unified #36 Elementary) School Board.

3

JA.762

made by members of the decisionmaking body." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 510, 541 (1993). Through this process, the court seeks to answer the central question in this case which is whether Section 21 is a neutral and generally applicable provision of law subject to a rational basis test or if it infringes on the free exercise of religion by improperly excluding religious schools from a benefit afforded to other schools, both public and independent.

## A. The Education and Compelled Support Clauses of the Vermont Constitution

In July 1777, following its own Declaration of Independence in January of that year, Vermont adopted its first Constitution. The document drew heavily on the Pennsylvania Constitution of 1776 which itself owed much to the Virginia Declaration of Rights, also published in 1776. Vermonters are proud that their original Constitution was the first in America to abolish slavery. More to the point here, it addressed two fundamental issues that converge in this case: freedom of religion and public support of education.

Section 40 of the 1777 Constitution called for the creation of a state-wide system of schools:

> A school or schools shall be established in each town, by the legislature for the convenient instruction of youth … One grammar school in each county, and one university in the State ought to be established by the General Assembly.

In 1786 Vermont combined two provisions of the original 1777 Constitution to create the Education Clause which remains in effect today. The Education Clause calls for the creation of a system of public education.

4

JA.763

Laws for the encouragement of virtue and prevention of vice and immorality, ought to be constantly kept in force, and duly executed; and a competent number of schools ought to be maintained in each town unless the General Assembly permits other provisions for the convenient instruction of youth.

Vt. Const. ch. II, § 68.   It endorses the role of religious education in Vermont.

All religious societies, or bodies of people that may be united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates, which they in justice ought to enjoy under such regulations as the general assembly of this state shall direct.

*Id.*

The Vermont Constitution also contains the Compelled Support Clause. This clause recognizes the importance of religious freedom, both in the form of free exercise ("That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings...") and disestablishment ("no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Vt. Const., Ch. 1, Art. 3.

These state constitutional provisions, both predating Vermont's admission to the union in 1791, touch directly on the issues raised by Act 73 and the claims made in this case. These include public support of local and regional schools, debate about

5

JA.764

whether funding and control are matters for the towns or the state legislators, and the recognition of a constitutionally protected role for religious schools.

Of the three central constitutional elements – free exercise; no compelled support; and the essential role of education –it would be the Compelled Support Clause that would direct state policy concerning religious schools in the modern era.[3]   Before considering the rise and fall of that clause, we detour to consider the development of public education in Vermont.

## B.  Development of Public Education

In the years prior to statehood, public education generally meant primary education.  In 1782, the Vermont legislature enacted a law authorizing the creation of local school districts, funded by tuition payments from parents of children attending schools.  *Laws of Vermont 1781-1784,* pp. 137-139 (John A. Williams, ed. 1965.)  "Townspeople traditionally maintained complete control over collecting taxes, building schools, and hiring teachers."  Potash, *State Government and Education:  "For the Due Encouragement of Learning and the Better Regulating and Ordering of Schools,"  65 Proceedings of the Vermont Historical Society,* 45, 48 (1997),  https://vermonthistory.org/journal/misc/StateGovernmentAnd Education.pdf [https://perma.cc/B39M-SG7R].  In the early nineteenth century, Vermont developed a patchwork of independent academies, supported by tuition, and county grammar schools to educate high school age children.  Five of the independent academies survive to the present day and function both as the local public high school where they are located and as independent schools accepting students from outside their communities.

---

[3] Vermont was not among the 37 states that adopted the anti-Catholic "Blaine Amendments" that sought to prevent public support of parochial education in the 1870's.  See Komer, *Trinity Lutheran and the Future of Educational Choice,* 44 Mitchell Hamline Law Rev. 551 (2018).

Local control and funding – and the severe limits on travel in the state's early years – led to an astonishing number of individual school districts. In 1846, the first annual report of the State Superintendent of Schools reported more than 2,000 districts. Potash, *State Government and Education* at 54.

In 1856, the Vermont legislature created the State Board of Education. The annual report of the Secretary of Education in 1857 describes the establishment of union high schools in cities including St. Johnsbury, Rutland, Burlington, St. Albans, Williston and Montpelier. George Gary Bush, *History of Education in Vermont* 61 (1900). In 1869, the legislature passed an act allowing school districts that lacked their own high school to pay tuition for students at the independent academies. Public Act No. 9, 1869 Session Laws. This measure was the forerunner of what would become the town tuition system and was one of the first school-choice measures in the United States.

## C. Vermont's Struggle with Property Tax Inequity

From its earliest days, the Vermont system of public education has struggled with the problem of equitable funding of local schools due to the uneven distribution of wealth among communities. The original funding formula based on tuition payments by parents of students resulted in relatively wealthy districts in population centers and inadequate schools in rural areas.

In 1864, the legislature authorized property taxes for all landowners, including those without school age children, at rates set by school districts. No. 61 of the Acts of 1864 of the State of Vermont 69. Funding levels varied widely based on the distribution of wealth as well as the high number of very small districts (2,951 statewide in 1860).

7

JA.766

In 1890, legislators from rural towns, aided by an electoral system awarding one House representative to each town, regardless of population, enacted a statewide property tax. Tax revenue was divided on the basis of the number of schools in a district, not by student population. Legislation in 1892 required municipalities to form single school districts, reducing the total number of districts to 251.

In 1931, the state income tax replaced the state property tax. School funding returned to local property taxes with resulting inequity between property-rich and property-poor towns. State government sought to address the unfairness through a series of formulas to distribute state aid to education: in 1935 (Vermont State Tax Commission); early 1960's (Hunt-Simpson Formula); 1969 (Miller Formula); 1982 (Morse-Giuliani Formula); and 1988 (Foundation Formula). Short History of Education Finance in Vermont, Secretary of State. https://ljfo.vermont.gov/assets/Meetings/Task-Force-n-the-Implementation-of--the-Pupil-Weighting-Factors-Report/2021-06-29/eaff3ab644/GENERAL-356877-v1-Short_History_of_Education_Finance_in_Vermont.pdf [https://perma.cc/FF33-JSZP].

In 1997, the Vermont Supreme Court issued its decision in *Brigham v. State*, 166 Vt. 246, 256 (1997), ruling that the distribution of local tax revenues and state-wide aid to education through the Foundation Formula "which concededly denies equal educational opportunities, is constitutionally deficient." The Court held that the Education Clause identifies public education as a fundamental obligation of the state, subject to the Common Benefits Clause. The decision struck down the funding formula as it existed at the time and referred the "specific means of discharging this broadly defined duty [to make educational opportunity available on substantially equal terms]" to the legislature. *Id.* at 268.

8

The immediate result of the *Brigham* decision was the passage of Act 60 in 1997. The statute redistributed the funds available for school funding by requiring relatively wealthy school districts to share property tax revenues with less affluent districts. The details of Act 60 are not relevant to this dispute. While Act 60 reduced disparities in educational funding, Vermont continued to struggle with unresolved issues including the burden of increased spending on education, growing property values and slower income growth, and concerns about where the education tax burden falls most heavily as the basis for further reform. See Dary Rollins Saas, *School Finance in Vermont: Balancing Equal education and Fair Tax Burdens*, New England Public Policy Center, Federal Reserve Bank of Boston (2007). https://www.bostonfed.org/-/media/Documents/Workingpapers/PDF/nep-cdpf0701.pdf [https://perma.cc/8V8Z-27841].

Two more school funding laws, Act 68 in 2003, and Act 130 in 2004, sought to address the problem of inequality between towns through state aid to augment local school district property taxes. Vermont Department of Education, Vermont's Education Funding System 2011, http://education.vermont.gov/documents/EDU-Finance_Education_Funding_System_2011.pdf

A recent vexing problem has been the decline in student enrollment. Between 2002 and 2024, the total number of students enrolled in the Vermont public schools (pre-k –12) fell from 94,038 to 77,408 students. https://education.vermont.gov/data-and-reporting/vermont-education-dashboard/vermont-education-dashboard-enrollment (navigate to "information Page") [https://perma.cc/XUB7-Z8KX]. This decline has resulted in calls to consolidate small schools, often in rural areas, and increase minimum class size to reduce costs.

9

JA.768

This abbreviated tour of two centuries of educational policy brings us to the enactment of Act 73 in 2025. Before taking up that legislation, it is necessary to consider the history of tax support for religious schools in Vermont through the town tuition program.

### D. Tax Support of Religious-Based Education

Over the course of the last 75 years, Vermont has followed the evolving decisional law of the Vermont Supreme Court and the U.S. Supreme Court in determining whether to pay town tuition to religious-based schools. Prior to the decision of the Vermont Supreme Court in *Swart v. South Burlington Town School Dist.*, 122 Vt 177, *cert. denied*, 366 U.S. 925 (1961), towns that did not operate their own high schools (or join supervisory unions that did) paid tuition to Catholic high schools as well as public schools and other approved independent schools. *Id.* at 179. In the *Swart* decision, the court held that these payments violated the Establishment Clause of the U.S. Constitution.

In *Campbell v. Manchester Bd. of School Directors*, 161 Vt. 441, 456 (1994), the Vermont Supreme Court abrogated the *Swart* decision, holding that under the three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "giving tuition reimbursement to this plaintiff will not offend the Establishment Clause."

But what the Vermont Supreme Court gave, it soon took away. In *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 312 (1999), the Court held that "a school district violates [the Compelled Support Clause] when it reimburses tuition for a sectarian school under [16 V.S.A.] § 822 in the absence of adequate safeguards against the use of such funds for religious worship." There the issue rested until 2017 when the U.S. Supreme Court issued its ruling in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). The *Trinity Lutheran*

10

JA.769

decision and the subsequent rulings in *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020) and, most significantly, *Carson v. Makin*, 596 U.S. 767 (2022) held that any educational benefit available to public school students must also be afforded to students enrolled in religious schools.

Before the *Carson* decision, Vermont was involved in litigation that closely paralleled the *Carson* case in Maine. See *A.H. ex rel.Hester v. French*, 985 F.3d 165 (2d Cir. 2021). Following the *Carson* decision, the State of Vermont announced that the town tuition program would be open to students attending religious schools that met state educational standards. On February 19, 2025, Mid Vermont appeared in a state directory of independent schools approved for public funding. (Doc. 100-11, p. 4) This state of affairs changed in 2025 when the Vermont legislature enacted Act 73, the relevant components of which became effective July 1, 2025. A new directory issued in September 2025 placed Mid Vermont on a list of approved independent school ineligible for public funding. *Id.* at 35.

**E. Changes to Vermont Educational Law in Act 73**

Act 73 is entitled "An act relating to transforming Vermont's education governance, quality and finance systems." The title accurately captures the comprehensive overhaul embodied in the Act. It is helpful to review the provisions of the Act, including those not directly relevant to this case, to understand the scope of the Act and its place within two centuries of Vermont educational policy.

The Act opens with a series of legislative findings highlighting the decline in public school enrollment from more than 110,000 students in the 1980's to 84,000 in 2025. The findings describe the legislative intent to enact further reforms in the 2026 legislative session, including the consolidation of school districts;

11

JA.770

improvements in career and technical education; school board elections by ward; mitigation of school taxes by redrawing district boundaries, updating programs to improve the delivery of services in the areas of pre-K, career and technical, and special education; returning educational funding to a "foundational formula" that reduces variations in levels of support between towns; reducing property tax bills through budget changes and a cap on local spending; and increasing income sensitive tax benefits for low and moderate income property owners.

As often happens with reform efforts, the Act creates a new Commission on the Future of Public Education in Vermont to study future changes as well as a School District Redistricting Task Force to recommend new school district boundaries and a School District Voting Ward Working Group. These bodies are tasked with studying additional measures to implement the changes identified in the Findings.

In Sections 5-8 entitled "Class Size Minimums," the Act establishes minimum class sizes for the various grades to "transform education in Vermont by leveraging attainable and research-based scale to increase equity of opportunity and promote efficiency and affordability." There is a waiver program through the State Board of Education that addresses particular obstacles to meeting the class size requirement. In the event of repeated violations of the minimum class size rules, the State Board has authority to take measures including closing schools and consolidating districts.

At the preliminary injunction hearing, the State Defendants' witness testified that implementation of these sections is subject to additional rulemaking by the Agency of Education. The minimum class size requirements are not yet in place and have not led to the disqualification of any independent school from the town tuition program.

12

JA.771

Section 21 addresses Tuition to Approved Schools. It permits school districts to pay the tuition of a student to a public school located in Vermont or to "an approved independent school" that meets the following criteria:

- Located within Vermont;
- Qualified as an approved independent school before July 1, 2025;
- Located within a district or supervisory union that does not operate a public school for some or all grades as of July 1, 2024;
- Received district-funded tuition for at least 25 % of its enrollment during the 2023-2024 school year; and
- Complies with minimum class size requirements, subject to the right to seek a waiver.

Section 22 provides for the continuation of tuition payments for students who received payments during the 2024-2025 school year until graduation even though their schools may no longer qualify.

The remaining sections (9-11 and 23-70) order significant changes to educational practices, primarily through consolidation and state-wide changes to the property tax system. [4] These are not directly relevant to the town tuition program. The

---

[4] Section 9 proposes changes to graduation requirements.

Section 10 authorizes rulemaking by the State Board of Education.

Section 11 is deleted.

Sections 12-20 address changes in the program governing state aid for school construction. Sections 23-26 make changes to the governance of the State Board of Education.

At Sections 27-28A, the Act returns to the issue of tuition payments by revising the formula used to set tuition paid by sending schools.

Sections 29-30 call for a broad reevaluation of the delivery of special education, including a review of special ed programs offered by independent schools.

Sections 31 and 33 authorize additional staff positions at the Agency of Education. Section 32 authorizes support for school districts undergoing consolidation.

13

JA.772

court summarizes them in the footnote to draw attention to the breadth of the changes to state education policy.

Act 73 imposes change on public school education and its funding through several directions, all sharing common themes of centralization, equalization of funding, and economies of scale. These include combining more than 200 school districts into a small number of far larger districts, consolidating or closing schools that cannot maintain minimum class size, recalculating support for programs such as

---

Sections 34-35 make changes to the calculation of per-pupil spending or so-called "base amounts" by public schools.

Section 36 authorizes the payments of base amounts and other state-wide funding amounts to public schools on a per-pupil basis.

Section 37 creates an exception to the funding formula for small rural schools. These schools may receive additional state funds.

Sections 38-39 create a state-wide Education Fund to receive revenues from the "supplemental district spending tax."

Section 40 authorizes payments from the Education Fund to school districts.

Section 41 modifies the statutory powers of school boards to enable them to address the supplemental district spending funds through their budget process.

Section 42 is a "housekeeping" section addressing repeals of existing provisions.

Section 43 creates a spending reserve for the supplemental district spending tax.

Section 44 requires more information about school transportation.

Section 45 calls for evaluation of measures to combat inflation as well as funding alternatives for pre-K education.

Sections 45a and 45b revise the funding formula for special education and ESL students.

Sections 46-56 impose very substantial changes to the system of statewide property taxation. These sections address tax rates, homestead exemptions, income sensitivity and many other issues related to the creation of a new tax system for supporting public education.

Section 57 creates a new advisory body to monitor Vermont's education financing system.

Sections 58 and 59 are deleted.

Sections 60-67 impose broad changes on the computation of the grand lists. This changes include a distinction between homestead and nonhomestead uses of property (second homes).

Sections 68 and 69 are omitted.

Section 70 governs effective dates for the various sections.

14

JA.773

special education and ESL, and providing a more equitable level of state-wide aid to districts. Many changes appear as topics referred to study groups for specific proposals. But the general purpose of the Act is clear: an increase in centralized authority over school spending, administration, and taxation. These changes, all in the service of greater uniformity and efficiency, come at some cost to Vermont's tradition of local control and property tax funding.

## F.  Reduction in the Number of Approved Independent Schools

Act 73 greatly reduces the eligibility of independent schools, secular and religious, for town tuition payments. On February 19, 2025, prior to enactment of Act 73, the Vermont Agency of Education published a directory of approved independent schools eligible for public funding. (Doc. 100-11.) Excluding therapeutic schools serving students with special educational needs, there are 48 schools on the list, including eleven Roman Catholic day schools and one school described as "Christian." (The court understands the term "Christian" to refer to schools that follow the evangelical Protestant faith.) The list is not exact. It includes Mid Vermont Christian Academy and Rutland Area Christian School but does not describe these as "Christian." The court understands this to be an inadvertent omission and counts three Christian schools, including Mid Vermont, on the approved list, bringing the total number of approved religious schools to 14.[5]

On September 9, 2025, following the effective date for Act 73, the Agency of Education published a new Independent School Directory. Excluding therapeutic schools, 18 independent schools remain eligible for town tuition payments. All the Catholic and Christian schools previously approved for town tuition are no longer

---

[5] The September 2025 directory and the table provided as State's Ex. A at the hearing are not entirely consistent. The court counts 14 ineligible religious schools on the first and 15 on the second. Neither list identifies schools as religious or secular so the court has drawn conclusions from the names of the schools about their religious basis.

eligible. 17 secular independent schools also lost their eligibility for town tuition. Vermont Technical College in Randolph Center also lost town tuition payments for its special 12th grade only science-based program.

The independent schools that remain eligible for town tuition include four ski academies located in East Burke, Ludlow, Stratton, and Killington as well as the five traditional Vermont academies. These hybrid institutions are Lyndon Institute, Burr & Burton Academy, The Sharon Academy, Thetford Academy, and St. Johnsbury Academy. 10 other secular independent schools remain eligible.

At the hearing, the state defendants' witness provided a table showing the basis for ineligibility. Most schools that lost eligibility did so on the basis of *both* geography (location in a community already served by a public high school) and the 25 % town tuition requirement. These included 10 religious schools and 10 secular schools. Five religious schools were disqualified on the basis of the 25 % requirement only. Eight secular schools were disqualified on that basis. One secular school (the Pond Brook Project) met the 25 % requirement but not the geographic requirement.

What is undisputable is that Section 21 disqualifies religious and secular schools alike and in similar numbers. Of the independent schools that remain eligible, five are traditional academies. These have long served the function of the public high school in their community. Four are ski academies located in relatively remote areas where there are no high schools. Only a handful of independent schools remain of the 48 schools eligible for town tuition immediately before passage of Act 73.

## ANALYSIS

The legal standard governing issuance of a preliminary injunction requires a showing by the plaintiffs that they meet three criteria:

- Likelihood of success on the merits;

16

- Irreparable harm if they do not receive injunctive relief;

- Public interest in favor of the proposed injunction.

*Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 92 (2d Cir. 2025).

I.      Likelihood of success on the merits

Plaintiffs identify four reasons for their contention that they are likely to succeed. These are:

1.   The provisions of Act 73 disqualifying Mid Vermont from receiving town tuition payments were "borne out of hostility to religious schools." (Doc. 105-1 at 6-7.) Plaintiffs allege that Act 73 was enacted in the wake of "myriad religiously hostile comments by public officials" and following multiple court rulings requiring equal treatment of religious schools. *(Id.* at 7.)

2.   Act 73 manipulates the definition of eligible independent schools to exclude all the religious ones in violation of *Carson v. Makin*, 596 U.S. 767 (2022).

3.   Act 73 treats comparable secular activity more favorably than religious exercise in violation of *Tandon v. Newsom*, 593 U.S. 61 (2021).

4.   Act 73 requires a student's parents to choose between funding or his religious obligation to send his child to a Christian school in violation of *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

The state responds:

1.   The eligibility criteria in Act 73 governing town tuition are neutral as to religion and apply to all independent schools. (Doc. 122 at 9-10.)

2.   There is no implicit discrimination against religion because Act 73 disqualifies secular and religious independent schools from town tuition in

17

JA.776

similar numbers and based on rules that apply equally to all independent schools. (*Id.* at 11-16.)

3. Act 73 does not interfere with a parent's right to guide the religious development of their child. (*Id.* at 16-18.)

The State Defendants also argue that Plaintiffs have not shown that they will be irreparably harmed without an injunction. (*Id.* at 20.)

## A. Establishment v. Free Exercise Clause

It is helpful in this case to identify which First Amendment guarantee is at issue – the Establishment or Free Exercise Clause. The Supreme Court first considered the issue of public financial support of religious education in *Everson v. Board of Education of Ewing Tp.*, 330 U.S. 1 (1947). The case concerned the use of public funds to pay for school buses for parochial school children. When it came to the use of tax money for religious purposes, the majority was unequivocal about the effect of the Establishment Clause:

> No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they adopt to reach or practice religion.

*Id.* at 16. But *Everson* does not end there. Turning to the Free Exercise Clause, the decision observes that the state cannot exclude citizens of various and multiple and religious faiths "from receiving the benefits of public welfare legislation." *Id.* The First Amendment "requires the state to be neutral in its relations with groups of religious believers and non-believers: it does not require the state to be their

18

JA.777

adversary." *Id.* at 18. Since denying children transportation on a public bus – and a host of other public services identified in the decision – burdens their participation in religious observance, the Free Exercise Clause prevents the state from withholding the public subsidy.

Since the *Everson* ruling, the Supreme Court has frequently extended the public benefits available to religious institutions on the grounds that particular subsidies of religious education did not violate the Establishment Clause. See *Bd. of Ed. of Central Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968)(upholding New York statute requiring public schools to lend textbooks to parochial schools); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970)(upholding property tax exemption for church property); *Mueller v. Allen*, 463 U.S. 388 (1983)(upholding state income tax deduction for educational expenses incurred in the course of religious education); *Witters v. Wash. Dept. of Services for the Blind*, 474 U.S. 481 (1986)(public assistance to blind student at religious college); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993)(allowing publicly-funded ASL interpreter to assist parochial school student); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)(upholding 'school choice' tuition payments to religious schools). These cases held that the public support in particular cases remained neutral as to religion and thus avoided violating the Establishment Clause either because they were paid to third-parties such as parents or because their effect on religious observance was *de minimis*.

The trend towards allowing public support of religious education took a step back in *Locke v. Davey*, 540 U.S. 712 (2004), in which the Court upheld a Washington State constitutional ban on funding a devotional degree. In the Court's view, the scholarship sought by a seminary student did not violate the Establishment Clause, but it did violate a more stringent state constitutional provision similar to the Compelled Support Clause in Vermont.

19

JA.778

The distinction in *Locke* between the federal and state constitutional restrictions did not last long. In *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2017), the Court applied strict scrutiny to Missouri's denial of access to an educational grant program on state constitutional grounds. The Establishment Clause – so long the field of battle for disputes about government payments to benefit religious organizations – played no role. "The parties agree that the Establishment Clause … does not prevent Missouri from including Trinity Lutheran [in the grant program.]" *Id.* at 458. Instead, the Court identified the Free Exercise Clause as the basis for striking down a state policy derived from a state constitutional bar to public subsidies of religious institutions.

*Trinity Lutheran* was followed in short order by *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), extending the Free Exercise Clause to require a state-sponsored scholarship program to support study at a religious school. In place of the incremental consideration of whether a subsidy was too closely tied to religious purposes, the Court announced a broad prohibition against excluding religious organizations and their members from any public benefit on the basis of their beliefs. "Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Espinoza*, 591 U.S. at 478.

In *Carson v. Makin,* 596 U.S. 767 (2022), the Supreme Court applied this principle to town tuition payments to religious schools. The *Carson* decision struck down Maine's system of restricting these payments to secular independent schools. The Court ruled that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 781. Applying a standard of strict scrutiny, the majority ruled that Maine's interest in separating church and state "more

20

JA.779

fiercely" than the Federal Constitution requires violated the Free Exercise rights of parents and students who sought tuition payments for their choice of a religious school.

Vermont was involved in litigation that closely parallelled the *Carson* case. *See A.H. ex rel. Hester v. French*, 985 F.3d 165 (2d Cir. 2021). Following the *Carson* decision, the Vermont Agency of Education announced that the town tuition program would be open to students attending religious schools that met state educational standards.

## A. Explicit Exclusion v. Inferred Effects on Religious Practices

The public subsidy cases described above, including *Trinity Lutheran* and subsequent decisions, all addressed the *explicit* exclusion of religious organizations from public benefits on grounds of separation of church and state. Today neither the Establishment Clause nor state constitutional provisions permit states to exclude students at religious schools from programs such as town tuition that are available to public school students. As the majority wrote in *Trinity Lutheran*, "[t]he State has pursued its preferred policy to the point of expressly denying a qualified religious entity a public benefit solely because of its religious character. Under our precedents, that goes too far." 582 U.S. at 466.

This case presents a different issue. If a state law is silent about religion but has the practical effect of barring access to a benefit to students enrolled in religious schools, does it violate the Free Exercise clause? Mid Vermont does not claim that Act 73 says anything about religious independent schools. It does not. Instead, Mid Vermont objects to Section 21 because it has the *effect* of excluding the school from the town tuition program. It also directs attention to the statements of some state legislators who opposed spending public funds on religious education.

21

Cases in which public funds are alleged to have been withheld from religious organizations for unstated reasons of discrimination against religious belief are uncommon. But cases in which a law of general application is passed that has the effect of curtailing free exercise have long been with us. These include mandatory flag salutes in public schools, *West Virginia v. Barnette*, 319 U.S. 624 (1943), the application of compulsory education laws to the Amish community, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and ordinances against proselytizing, *Cantwell v. Conn.*, 310 U.S. 296 (1940). Each of these cases required the Supreme Court to weigh religious freedom against some other public good. These cases establish the principle that a state statute may limit or encroach on religious practice if it is a neutral law of general application. The critical case establishing this legal standard in the modern era is *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878 (1990).

In *Oregon v. Smith*, the state sought to defend its practice of denying unemployment benefits to people who possessed drugs in violation of state law. The drug at issue was peyote which Smith claimed to use for sacramental purposes. The law which denied him access to unemployment benefits due to his use of peyote was silent about religion. It neither singled out religion for adverse treatment nor provided a sacramental exception to the ban on peyote. It applied to all persons.

Writing for the majority, Justice Scalia announced a new legal standard, discarding the strict scrutiny standard previously described in *Sherbert v. Verner*, 374 U.S. 398 (1963). In its place, the Court substituted the current rule. "[I]f prohibiting the exercise of religion … is not the object of the [state law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." 494 U.S. at 878.

JA.781

*Oregon v. Smith* requires the court to make two inquiries: whether the law burdens religious practice and whether it is neutral and generally applicable. The requirement of "burden" is present in this case. The amended complaint alleges that Nathan Partington wishes to send his child to a religious school as part of the free exercise of his religious beliefs. Act 73 disqualifies the school he has chosen from his town's tuition payments. The denial of payment makes it more difficult for him to practice his faith, thereby placing a burden on his free exercise. Plaintiffs have supplied evidence of similar burdens for other observant families in the state. (See Docs. 141-1, 141-2, 141-3).

The more critical question is whether Act 73 is neutral about issues of religious belief and practice and generally applicable to everyone. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Mid Vermont points to the Act's effect of disqualifying all religious schools from town tuition payments. The State points to the neutral standards for qualification for the payments and the comparable number of secular independent schools that lost eligibility for the same reasons as the religious schools.

If the only issue was whether the language of the statute was neutral, the State would win in a walk. As the State Defendants observe, "[t]he statutory criteria governing town tuition have always been neutral as to religion." (Doc. 122 at 3). It is the state and federal courts that have forbidden Vermont to provide financial support to religious schools on Establishment Clause grounds, restored it on the same basis, subsequently removed it on state constitutional grounds, and, most recently, restored it once again through operation of the Free Exercise Clause. .

Mid Vermont has a second string to its bow. Drawing on the "animus" cases such as *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018),

23

JA.782

it offers evidence of what it describes as prejudice against public support for religious schools by some of the legislators who voted for Act 73. Whether this court should consider subjective evidence of legislative intent to restrict the free exercise of religious belief is a relatively novel issue. *See Slattery v. Hochul*, 61 F. 4th 278, 293 (2d Cir. 2023)  In several decisions, the Supreme Court has allowed such evidence to be considered in evaluating municipal and state agency decision making for evidence of intolerance of religious practice.  It is not so clear that the same principle applies to the passage of state statutes. "It is an open question whether a court considering a free exercise claim should consider evidence of individual lawmakers' personal intentions, as is done in the equal protection context." *Stormans, Inc. v. Wiesman*, 579 U.S. 942 n.3 (2016)(Alito, J. dissenting from the denial of certiorari).

Supreme Court cases allowing inquiry into the motives of lawmakers restricting free exercise begin with *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).  Faced with the prospect of animal sacrifice at a proposed Santeria church in Hialeah, Florida, the city council enacted ordinances prohibiting the ritual slaughter of domestic animals.  The Court determined that the texts of these laws, although neutral on their face, were not conclusive in identifying their purpose. Instead, the Court turned to "the effect of a law in its real operation [as] strong evidence of its object." *Id.* at 535.  The Court reviewed resolutions of the city council describing the concerns of residents of Hialeah about religious practices, the exemption of kosher practices, the allowance of fishing and hunting, pet euthanasia, and slaughter houses, and the eradication of insects and pests as evidence of improper animus directed against religious belief.  The Court welcomed direct and circumstantial evidence of purpose including "the historical background of the decision under challenge, the specific series of events leading to the enactment or

24

JA.783

official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." 508 U.S. at 540. The plurality opinion conducted a detailed summation of statements by city councilors, residents, and other city officials, all exhibiting fear and dislike of the Santeria faith. On this fulsome record, the Court concluded that "the neutrality inquiry leads to one conclusion: [t]he ordinances had as their object the suppression of religion." *Id.* at 542.

The Court also addressed the principle of general applicability. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543. The Court identified numerous ways in which the ordinances at issue were "under inclusive" and applied only to the religious sacrifice of animals without reaching broader concerns of animal suffering or human health.

Not every member of the Court was pleased with the analysis. Justice Scalia joined in the result but questioned the methodology of "consider[ing] the subjective motivation of the *lawmakers*, i.e. whether the Hialeah City Council actually *intended* to disfavor the religion of Santeria." *Id.* at 558 (Scalia, J., concurring in part.) In the case of First Amendment cases, Justice Scalia proposed an examination not of the legislators' purpose but of the effects of the law at issue. "This [mode of analysis] does not put us in the business of invalidating laws by reason of the evil motives of their authors….Nor, in my view, does it matter that a legislature consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens." *Id.* at 558-559.

In *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), the Court extended similar reasoning to detecting whether a state civil rights

JA.784

commission exhibited "some elements of a clear and impermissible hostility toward the sincere religious beliefs [motivating a baker's refusal to make a wedding cake for a gay couple." *Id.* at 634.

In this case, the appeals panel that considered the actions of the Vermont Agency of Education and the Vermont Principals Association also cast a wide net in identifying "official expressions of hostility to religion." *Mid Vermont Christian Sch.*, 151 4th at 93. These included testimony by the Executive Director of the VPA before a state legislative committee considering a bill that would prevent religious schools from receiving public funding and a written statement by the VPA committee that heard the disciplinary case.

*Lukumi, Masterpiece Cakeshop* and the panel decision in this case permit judicial inquiry into the statements of municipal leaders, members of independent state commissions, and state administrators in the search for prejudice against religious belief. The methodological issue presented by the amended complaint in this case is whether the same subjective inquiry into motivation is appropriate when a federal court considers the constitutionality of state legislation.[6] Certainly the plaintiffs invite such an inquiry although they also contend that the effect of Section 21 is

---

[6] The question of legislative motive in constitutional jurisprudence is hardly a new problem. In *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960), the Supreme Court struck down state legislation redrawing the boundaries of the city of Tuskegee, Alabama because "[acts] generally lawful may become unlawful when done to accomplish an unlawful end." In the Sunday closing law cases, the Supreme Court applied a similar analysis, holding that a law intended by the legislature to aid or hinder religion would violate the establishment or free exercise clauses despite its general application to all stores. See *Abington School District v. Schempp*, 374 U.S. 203, 222 (1963)("The [constitutional] test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."). The Court applied similar tests for purpose and effect in the establishment clause context in *Board of Education v. Allen*, 392 U.S. 236 (1968) and *Epperson v. Arkansas*, 393 U.S. 97 (1968). In contrast, in *United States v. O'Brien*, 391 U.S. 367 (1968), a Free Speech clause case challenging a federal statute making it a crime to burn a draft card, the Court inveighed against consideration of legislative purpose. "The decisions of this Court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." Id. at 383. Professor John Ely provides an early and comprehensive review of the issue in his article *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205 (1970).

enough to demonstrate its unconstitutionality. Plaintiff's memorandum in support of the motion for preliminary injunction recounts a dozen or more statements by state administrators and lawmakers who oppose state funding of religious schools.

There is very little authoritative guidance about what evidence a court may consider in determining whether "a purportedly neutral law 'targets' religious exercise or has the restriction of religious exercise as its 'object.'" *Fulton v. City of Philadelphia*, 592 U.S. 511, 605 (2021)(Alito et al concurring)(cleaned up). Justice Alito's concurrence in *Fulton* frames the issue:

> A threshold question is whether 'targeting' calls for an objective or subjective inquiry. Must 'targeting' be assessed based solely on the terms of the relevant rule or rules? Or can evidence of the rulemakers' motivation be taken into account? If subjective motivations may be considered, does it matter whether the challenged state action is an adjudication, the promulgation of a rule, or the enactment of legislation? Should courts consider the motivations of only the officials who took the challenged action, or may they also take into account comments by superiors and others in a position of influence? And what degree of hostility to religion or a religious group is required to prove 'targeting'?

*Id.* at 606. A comprehensive and authoritative answer to these searching questions would be welcome, but Justice Alito was after bigger game – reconsideration of the *Smith* neutrality test. Since *Fulton*, the Court has had few occasions to address these issues of proof because the cases concerning public benefits and tuition payments have involved the explicit exclusion of religious schools from tax funding.[7]

_____

[7] The *Fulton* decision concerned agency action, not a legislative enactment. Similarly, *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) addresses agency action. Research reveals no cases in which the Supreme Court or the Second Circuit has endorsed consideration statements of state legislators as evidence of religious animus and counsel have not provided any either. In *Slattery v. Hochul*, 61 F.4th 278, 292 (2d Cir. 2023), the court

27

JA.786

The court proposes to answer the questions identified in the *Fulton* concurrence by considering all of the evidence offered by both sides concerning the effects and the intent of Act 73. The court will start with the question of whether the text of Act 73 is neutral as to religion. It will then consider the effects of the Act on town tuition eligibility, both for religious and for secular independent schools. Finally, the court will survey the statements of legislators and other leaders in state government in a search for evidence of subjective animus or prejudice against religion. No category of information is excluded altogether. The text weighs most heavily because it is the most direct, unfiltered expression of legislative purpose. The effects come second because they are objective facts from which a court may infer purpose. The subjective statements of intent by individual lawmakers come third and weigh least since they represent the views of a fraction of the legislators, speaking in their individual capacities, in many cases in response to an opinion survey.

## 1. Text

The text of Act 73 contains no reference to religious belief or religious education. Section 21, the provision at issue here, identifies seven categories of schools or education programs that qualify for town tuition payments. These are: public schools located in Vermont; approved independent schools that meet certain criteria; independent schools meeting education quality standards; approved tutorial programs; approved education programs; public schools located in another state; and therapeutic schools. A religious organization may sponsor or operate a school or program fitting into any of these categories (excluding public schools.)

---

rejected a claim that a licensing provision, neutral on its face as to religious belief, was the product of hostility by some legislators to religious belief.

JA.787

The most relevant category is that of "approved independent school." Mid Vermont has long been recognized by the Vermont Department of Education as an approved independent school. To qualify for town tuition payments, an approved independent school must now meet the criteria set out in Section 21. None of these concern religious belief or practice. The application of the statutory criteria resulted in the disqualification of both religious and secular independent schools in similar numbers.

The criteria that disqualify Mid Vermont include its location in White River Junction, Vermont – a mid-sized city by Vermont standards that operates a high school, a middle school, 3 primary schools, and several specialty programs. Mid Vermont satisfies the requirement of being approved for town tuition payments before July 1, 2025. It does not satisfy the 25 percent requirement.

## 2. Effect of Section 21 on town tuition eligibility

Like the text, the effect of Section 21 is neutral as to religion. By limiting town tuition payments to public schools when available in the same location, Act 73 eliminates town tuition payments to 18 secular independent schools and 15 Catholic and Christian schools. Eligibility remained unchanged for therapeutic schools.[8] The

---

[8] Mid Vermont lumps the therapeutic schools in with other independent schools, greatly increasing the number of secular schools that continue to be eligible for the town tuition program. Therapeutic schools differ from other independent schools because they serve only students eligible for individualized education programs ("IEPs") or as otherwise mandated by federal law or court order. Act 73, Section 21(d). Therapeutic schools are subject to regulation by the Vermont Agency of Education. Code of Vermont Regulations, Section 2232. A religious organization is free to establish a therapeutic school. The record contains no evidence that any religious organization has done so.

Because therapeutic schools are not subject to the location, class size and other limits placed on secular and religious independent schools by Act 73, they now form the majority of schools qualifying for town tuition. But including them in the category of "secular independent schools" distorts the statistical effect of Act 73 by increasing the number of secular schools that remain eligible for town tuition.

Similarly, in assessing the neutrality of section 21, the court does not count "independent school[s] meeting education quality standards," "tutorial program[s] approved by the State Board," or "approved education program[s]" as these appear in §§ 21(a)(3)-(6). None of these programs are subject to the geographic requirements

JA.788

traditional academies remained eligible because their communities have never offered public high school education, long preferring to support the independent academies.

Considered in its entirety, the policy concerns addressed by Act 73 are also neutral as to religion. These are primarily issues of local versus central control that have long informed public debate over education in Vermont. They also include concerns about economies of scale and equity among the towns. Act 73 contains many elements that favor a more centralized system of public education. It does not favor school choice and reduces access to public funding of independent schools. These are policy decisions made by the state legislature. They concern issues that have been present in Vermont since before statehood. Act 73 also favors consolidation of schools through class size restrictions for public and independent schools alike. Act 73 prevents the addition of more independent schools to the town tuition program by closing the program to new applications after July 1, 2025, and by imposing a 25 % requirement for student enrollment. Like the other requirements of Section 21, these restrictions apply equally to secular and religious schools.

As these examples illustrate, Section 21 applies the same criteria for eligibility for the town tuition program to all independent schools. Its effect on eligibility falls on religious and secular independent schools alike as recipients of public aid. It disfavors both in equal measure.

### 3. Statements by lawmakers and administrators

Mid Vermont identifies statements by six members of the Vermont House of Representatives offered in response to a questionnaire circulated by the organization Friends of Vermont Public Education. All six opposed the use of taxpayer money

---

or other limitations that are challenged here. All of these programs are open to religious and secular organizations alike.

for religious schools. (Doc. 105-1, p. 12). To these statements, Mid Vermont adds statements by Rebecca Holcombe, Vermont's Secretary of Education from 2014 – 2018 and a current member of the Vermont House, criticizing the *Carson* decision. Finally, Mid Vermont identifies two more House members who advocated for separation of church and state (Representative Arsenault) and called for the amendment of the "process by which religious schools have been included as recipients of Vermont's Town Tuition Program." (Representative Headrick).

The Vermont House consists of 150 members. Mid Vermont identifies nine who have questioned the use of public funds to support religious education. None said anything critical of the Christian faith or its adherents. Representative Holcombe was the most critical, drawing a comparison with Afghanistan where (one assumes) religious education is the norm and arguing that religious schools were intolerant of LGBTQ people. (Doc. 105-1), p. 18.

The statements of the nine legislators identified by Mid Vermont are a thin basis for describing Act 73 – or just Section 21 – as motivated by religious animus. None of the statements were made in floor debate or as part of the Act's legislative history. Instead, most were made in response to an opinion survey and indicate no more than opposition to public funding of religious schools. They cannot reasonably be said to show "pervasive religious intolerance and hostility" as required by *Masterpiece Cakeshop* and *Lukumi* in the case of administrative action and enactment of a municipal ordinance. (Doc. 105-1 at 16.)

Mid Vermont seeks to augment the record of opposition to public funding of religious schools by drawing attention to the history of Vermont Supreme Court decisions finding a basis first in the First Amendment and later in the Compelled Support Clause for holding public funding to be unconstitutional. *(See* Doc. 105-1 at 9-10.) These decisions represent the best efforts of the Justices to interpret the

31

JA.790

federal and state constitution. Their decisions were well within the mainstream of Establishment Clause jurisprudence until the recent line of cases that started with *Trinity Lutheran* in 2017. These judicial decisions do not establish an historical record of religious bigotry.

Finally, Mid Vermont relies on statements by administration officials opposing public funding for religious schools. Such statements served as a basis for a decision by the Second Circuit panel in this case that the administrative disciplinary action against Mid Vermont was a product of prejudice against religious belief. It is a step too far, however, to attribute the views of executive officials to state legislators. The executive branch officials who took action before passage of Act 73 had no vote on the measure.

The court has devoted space in this ruling to placing Act 73 and the town tuition program in the context of two centuries of educational policy in Vermont. Public funding of religious schools was permitted until the *Swart* decision in 1961. The Vermont Supreme Court abrogated *Swart* in 1994 in the *Campbell* decision. The Court restored the ban on public funding in the *Chittenden Town School District* case in 1999 where the matter rested at both the state and national levels until the *Trinity Lutheran* decision by the U.S. Supreme Court in 2017. With this history in mind, it is unsurprising that some legislators opposed public funding of religious schools after the *Carson* decision and may have voted in favor of Act 73 because its effects include restrictions on payments to religious schools. Their views as expressed in the survey results relied upon by Plaintiffs do not make them bigots and their support of Act 73 does not define it as the product of prejudice against religious belief.

The court concludes that the Plaintiffs are not likely to succeed in meeting their burden of proving that Act 73 as a whole or Section 21 alone is an unconstitutional infringement on the free exercise of religion. The Act is a complex funding and

32

JA.791

organizational measure driven by long-standing concerns about the cost, equity and efficient delivery of public education. It excludes payments to all independent schools when a public school is present in the same district. It imposes limits on class size that are consistent with the limits it imposes on public schools. It discourages the application of independent schools to join the town tuition program by imposing requirements for the minimum percentage of students eligible for town tuition payments and foreclosing the admission of new schools to the program. These requirements may fairly be characterized as favoring tax support for public schools over independent schools at a time of declining enrollment and rising costs. Neither Act 73 as a whole nor Section 21 viewed in isolation is likely to be found to be the product of anti-religious bias.

If the court is correct in identifying Act 73 as a statute that is neutral as to religion, then its constitutionality is subject to a rational basis test. It is likely to pass such a test since it addresses multiple issues of educational policy through a program of comprehensive reform. Act 73 addresses issues of local versus central control and equitable funding that have formed the educational debate in Vermont for two centuries. The specific provision at issue – Section 21 – addresses issues of school funding, falling enrollment, class size and the role of public education in Vermont. The legislative choice that resulted in ineligibility for 15 religious schools and a somewhat higher number of secular independent schools was the preference for favoring the public school system over independent schools. That is the type of policy decision that state legislators are entitled to make. Their decision provides a rational basis for the changes to Vermont law that appear in Section 21.

## II.    IRREPARABLE HARM AND PUBLIC INTEREST

Because the court finds no reasonable likelihood of success, it does not reach the issues of irreparable harm and public interest. The court recognizes that the appellate

33

JA.792

Case: 26-1416, 06/26/2026, DktEntry: 41.1, Page 115 of 211

panel found these elements to be present in *A.H. ex rel Hester v. French,* and, in the event that the preliminary injunction ruling is reversed and remanded, it is likely that the plaintiffs will prevail on these elements of their claim.

## III.   EQUAL PROTECTION

The court agrees with the state defendants that an equal protection claim brought on the same grounds as a Free Exercise claim is subject to the same rational basis test. *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, n. 4 (2025). Act 73 passes the rational basis test under either Clause.

## CONCLUSION

The court DENIES the motion for preliminary injunction on the ground that Plaintiffs have failed to make the required showing of a likelihood of success on the merits.

Dated at Burlington, in the District of Vermont, this 12 day of May, 2026.

Geoffrey W. Crawford, Judge
United States District Court

JA.793

## Act 73 (2025) Approved Independent School Eligibility

| | School Name | Geographic Eligibility? | >25% Public Tuition Students? | Eligible for Public Funding? |
|---|---|---|---|---|
| 1. | All Saints Academy | No | No | No |
| 2. | Bridge School Inc | No | No | No |
| 3. | Burke Mountain Academy | Yes | Yes | Yes |
| 4. | Burr & Burton Academy | Yes | Yes | Yes |
| 5. | Christ the King (Burlington) | No | No | No |
| 6. | Christ the King (Rutland) | No | No | No |
| 7. | East Burke School | Yes | Yes | Yes |
| 8. | Expeditionary School of Black River | Yes | Yes | Yes |
| 9. | Good Shepherd Catholic School | Yes | No | No |
| 10. | Grace Christian School | Yes | No | No |
| 11. | Grammar School (The) | Yes | No | No |
| 12. | Green Mountain Valley School | No | No | No |
| 13. | Hiland Hall School | Yes | No | No |
| 14. | Hilltop Montessori School | Yes | No | No |
| 15. | Killington Mountain School | Yes | Yes | Yes |
| 16. | Kurn Hattin Homes | Yes | No | No |
| 17. | Lake Champlain Waldorf | No | No | No |
| 18. | Long Trail School | Yes | Yes | Yes |
| 19. | Lyndon Institute | Yes | Yes | Yes |
| 20. | Maple Street School | Yes | Yes | Yes |
| 21. | Mater Christi School | No | No | No |
| 22. | Mid Vermont Christian School | No | No | No |
| 23. | Mountain School at Winhall (The) | Yes | Yes | Yes |

1

STATE DEFENDANTS'
EXHIBIT A
2:23-cv-00652

JA.794

## Act 73 (2025) Approved Independent School Eligibility

| | School Name | Geographic Eligibility? | >25% Public Tuition Students? | Eligible for Public Funding? |
|---|---|---|---|---|
| 24. | Mountain School Program of Milton Academy | No | No | No |
| 25. | Mt. Mansfield Academy | No | No | No |
| 26. | Mt. Saint Joseph Academy | No | No | No |
| 27. | Okemo Mountain School | Yes | Yes | Yes |
| 28. | Orchard Valley School, Grace Farm Campus | No | No | No |
| 29. | Pacem School | No | No | No |
| 30. | Pond Brook Project | No | Yes | No |
| 31. | Putney School | Yes | No | No |
| 32. | Red Fox Community School | Yes | No | No |
| 33. | Rice Memorial High School | No | No | No |
| 34. | Riverside School | Yes | Yes | Yes |
| 35. | Rock Point School | No | No | No |
| 36. | Rutland Area Christian School | No | No | No |
| 37. | Sacred Heart School | Yes | No | No |
| 38. | Schoolhouse (The) | No | No | No |
| 39. | Sharon Academy (The) | Yes | Yes | Yes |
| 40. | Southshire Community School | Yes | Yes | Yes |
| 41. | St. Francis Xavier | No | No | No |
| 42. | St. Johnsbury Academy | Yes | Yes | Yes |
| 43. | St. Michael's Catholic School | Yes | No | No |
| 44. | St. Monica-St. Michael School | No | No | No |
| 45. | St. Paul's Elementary School | Yes | No | No |
| 46. | Stratton Mountain School | Yes | Yes | Yes |

2

STATE DEFENDANTS'
EXHIBIT A
2:23-cv-00652

JA.795

## Act 73 (2025) Approved Independent School Eligibility

|  | School Name | Geographic Eligibility? | >25% Public Tuition Students? | Eligible for Public Funding? |
|---|---|---|---|---|
| 47. | Thaddeus Stevens School | Yes | Yes | Yes |
| 48. | Thetford Academy | Yes | Yes | Yes |
| 49. | Upper Valley Waldorf School | No | No | No |
| 50. | Vermont Academy | Yes | No | No |
| 51. | Village School of No. Bennington | Yes | Yes | Yes |

STATE DEFENDANTS'
EXHIBIT A
2:23-cv-00652

JA.796

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF VERMONT

|  |  |
|---|---|
| **MID VERMONT CHRISTIAN SCHOOL**, on behalf of itself and its students and its students' parents; **ABEL GOODWIN**; **M.G.**, by and through her parents and natural guardians, Christopher and Bethany Goodwin; **CHRISTOPHER GOODWIN**, individually; **BETHANY GOODWIN**, individually; **O.P.**, by and through his father and natural guardian, Nathan Partington; and **NATHAN PARTINGTON**, individually, | Case No. 2:23-cv-00652 **NOTICE OF APPEAL** |

Plaintiffs,

v.

**ZOIE SAUNDERS,** in her official capacity as Secretary of the Vermont Agency of Education and in her individual capacity; **JENNIFER DECK SAMUELSON**, in her official capacity as Chair of the Vermont State Board of Education and in her individual capacity; and **WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD**,

Defendants.

Pursuant to 28 U.S.C. § 1292(a)(1) and Federal Rule of Appellate Procedure 3, Plaintiffs Mid Vermont Christian School, O.P., and Nathan Partington, hereby appeal to the United States Court of Appeals for the Second Circuit from the Order on Motion for Preliminary Injunction (ECF No. 143) entered on May 12, 2026, denying Plaintiffs' motion for a preliminary injunction.

1

JA.797

Respectfully submitted this 20th day of May, 2026.

By: *s/ David A. Cortman*

David Cortman
AZ Bar No. 29490
Ryan J. Tucker*
AZ Bar No. 034382
Katherine Anderson*
AZ Bar No. 033104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
rtucker@adflegal.org
dcortman@adflegal.org
kanderson@adflegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

Attorneys for Plaintiffs
**Admitted pro hac vice*

2

JA.798

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2026, I electronically filed the foregoing Notice of Appeal with the Clerk of Court and all counsel of record will be served via the Court's CM/ECF system.

*s/ David A. Cortman*
David A. Cortman
*Counsel for Plaintiffs*

JA.799

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Mid Vermont Christian School,           )
A.G., M.G., Christopher Goodwin,        )
Bethany Goodwin                         )
                                        )
                                        )
v.                                      ) Case No. 2:23-cv-652
                                        )
                                        )
Jennifer Deck Samuelson, Waits River    )
Valley (Unified #36 Elementary) School  )
Board, Jay Nichols, Zoie Saunders       )
                                        )
_____ )


RE:    Hearing on Motion to Dismiss Amended Complaint
       (Doc. 99), Motion for Preliminary Injunction (Doc. 105),
       Motion to Dismiss Official Capacity Claims in Amended
       Complaint (Doc. 126), and Motion to Dismiss Personal
       Capacity Claims in Amended Complaint (Doc. 127)


DATE:  May 8, 2026

LOCATION:  Burlington, Vermont

BEFORE:  Honorable Geoffrey W. Crawford
         District Judge


TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                 United States District Court Reporter
                     *verbatim@vermontel.net*

JA.800

**APPEARANCES**:

David A. Cortman, Esq.
Alliance Defense Fund
1000 Hurricane Shoals Rd NE, Suite D1000
Lawrenceville, GA 30043

Ryan J. Tucker, Esq.
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, AZ 85260

Jacob E. Reed, Esq.
Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, VA 20176

Samuel B. Stratton, Esq.
Jonathan T. Rose, Esq.
Office of the Attorney General
109 State Street
Montpelier, VT 05609

Sean Toohey, Esq.
Lynn, Lynn, Blackman & Manitsky, PC
76 St. Paul Street, Suite 400
Burlington, VT 05401

INDEX OF EXAMINATION

| Witness | Examined By | Page | Line |
|---|---|---|---|
| Andrew Prowten | The Court | 6 | 1 |
| | Atty. Tucker | 17 | 18 |
| | Atty. Stratton | 24 | 3 |

INDEX OF EXHIBITS

                                                                Page

Court's Exhibits

1 - Exhibit 11, Independent School Directory          14

Defense Exhibits

A - Act 73 (2025) Approved Independent                14
    School Eligibility

* * * * *

4

(The hearing began at 1:50 p.m.)

COURTROOM DEPUTY:  Your Honor, this is Civil Case Number 23-652, Mid Vermont Christian School, AG, MG, Christopher Goodwin and Bethany Goodwin versus Jennifer Deck Samuelson, Waits River Valley School Board, and Zoie Saunders. Attorneys David Cortman, Jacob Reed, and Ryan Tucker are present for the plaintiffs.  Attorneys Jonathan Rose and Samuel Stratton are present for defendants Jennifer Samuelson and Zoie Saunders.  Attorney Sean Toohey is present for defendant Waits River Valley School Board.

The matter before this court is a hearing on motion to dismiss the amended complaint, motion for preliminary injunction, motion to dismiss official capacity claims in amended complaint, and motion to dismiss personal capacity claims in amended complaint.

THE COURT:  All right.  Good to see everybody.  Thank you all for -- I appreciate plaintiff's counsel making the trip and the trip as well for the State, though it's considerably shorter.  The only -- I've spent all of my time on the preliminary injunction issue, and I think the time we have today is probably best spent there.  I saw the hearing as having two parts.

As I worked through the record, I had questions, and I put them out.  Did you find them on your tables?  I thought it simplest just to let you know what I'm trying to figure out.

JA.803

Most of it is -- I think all of it is uncontroversial, but I couldn't kind of answer it myself from the exhibits that I had. So I thought the best thing to do would be to call a witness from the State that knows about the administration of the town tuition program, go through these issues with him or her. I'll ask these questions first and give you time to follow up if there's something that's unclear or additional.

That work for the plaintiff?

ATTORNEY TUCKER: Yes, Your Honor.

THE COURT: All right. And, for the State, who have you got?

ATTORNEY STRATTON: We've got Andrew Prowten with the Agency of Education is here.

THE COURT: Sure. Come on up, sir. I'm very grateful for your attendance. You have to kind of slip around the third base line and come in on the --

Andrew Prowten,

having been duly sworn to tell the truth,

testifies as follows:

THE COURT: Before we get started, we have a dean of Vermont journalism with us today. Do we have an extra copy of those evidentiary questions that we can pass back to the gallery?

ATTORNEY TOOHEY: I'm willing to pass over my copy if you'd like.

JA.804

THE COURT: Could you? Yeah, maybe you can look on. All right. Do you have a copy of the questions that I've got for you?

THE WITNESS: I do not.

THE COURT: Oh, no. Thanks. All right. These are just factual questions about the administration of the town tuition plan. I've tried to make them as clear as I can, starting with a super easy one. If we look -- I'm going to call the provision that we're concerned with Section 21. That's not its codification designation, but I'm working with the Act. You with me so far?

THE WITNESS: Yeah.

THE COURT: All right. Section 21 has a list of the categories of schools that are eligible for the town tuition program as newly configured. The first on the list is an easy one, public school located in Vermont, and, if we look ahead to subsection (6), a public school located in another state, that's easy enough to understand, but, as a graduate of Hanover Elementary School, of course, my question was, Is that how Hanover High School remains eligible as a town tuition site?

THE WITNESS: I'm not sure. I don't have the exact list of the schools in front me. So if --

THE COURT: Well, it wouldn't be -- I don't think it would be on the, on the list of eligible schools. It's a public school, a public school located in another state.

JA.805

THE WITNESS: Yeah.

THE COURT: So any public school in any state would be theoretically eligible?

THE WITNESS: Theoretically.

THE COURT: Yeah. But, as a practical matter, is Hanover the only one that receives town tuition payments?

THE WITNESS: It might be -- my understanding is it's really, there's a few, like, border communities that are reliant on neighboring --

THE COURT: Yeah, okay. That's not really relevant, but it was an easy way to get started. That brings us to a good time to ask about state, out-of-state independent schools like the private boarding schools. Are they now ineligible?

THE WITNESS: If it's a therapeutic school providing specific special ed --

THE COURT: Setting that aside.

THE WITNESS: Right, so then --

(Court Reporter clarification.)

THE COURT: Right. Let me start over. Setting aside the question of out-of-state therapeutic schools, the out-of-state private boarding schools, what we would call a prep school, they are ineligible now?

THE WITNESS: Correct.

THE COURT: And were they eligible before?

THE WITNESS: I'm not sure.

JA.806

THE COURT:  Okay.  That takes us to Section 2, an approved independent school that is located in Vermont and is approved for town tuition.  It says, "Under Section 166 of this title, on or before July 1, 2025".  Does this mean that new applications from schools not previously part of the program are simply not accepted?

THE WITNESS:  Right.  And I believe it was prior to this.  We no longer accept applications for new independent schools.

THE COURT:  Is that true of, equally true of secular and religious-based schools?

THE WITNESS:  Yeah, any school, no consideration of it, whether or not it will be considered religious or secular.

THE COURT:  So, if I start the Judge Crawford Country Day School located where a public high school isn't located, you'll just say, Too late?

THE WITNESS:  Right.

THE COURT:  Okay.  Have there been people that have tried and have been turned away, or do they just know?

THE WITNESS:  There, there, we do occasionally have organizations who will reach out asking if they can start an independent school, and that's no longer allowed.

THE COURT:  Okay.  The third category is located within a supervisory district that does not operate a public school for some or all grades as of July 1, 2024.  Is there a

JA.807

town in Vermont that does not offer elementary school education, either itself or through a supervisory union?

THE WITNESS: I'm not sure on the elementary education. There very likely is. I know for certain high school is not offered in some of our districts.

THE COURT: Yeah, many communities don't have high schools, but I had, without really knowing, I had always sort of understood that every community provided elementary-level education.

THE WITNESS: Yeah, that may be the case. That's my -- I don't have the exact yes, but that's my understanding.

THE COURT: All right. And what about middle school; are there town tuition programs for middle schools?

THE WITNESS: I think there can be some of the -- middle school gets different in different communities whether it starts at sixth grade, seventh grade, sometimes in fifth. So I think there could be some where middle school students would being going. Like, I think St. Johnsbury Academy may start in seventh grade.

THE COURT: I was thinking, say, Grand Isle is most familiar to me. Grand Isle would be, from my personal perspective, the community closest to us that is large and doesn't have a high school. Do they use the town tuition program to send middle schoolers to, say, St. Johnsbury Academy?

THE WITNESS:  I think -- I'm not sure exactly on that specific town, but that might be an example that, yeah, I think that that could be allowed.  If they don't have the public school for those grades, they would be able to send to one of the independent eligible schools.

THE COURT:  Okay, all right.  And then this is the part I just didn't understand about how the program works.  If an independent school that otherwise qualifies is located in a town that operates an elementary school but has no high school, it would be eligible for town tuition, right?

THE WITNESS:  Right, yeah.  And those are the cases I'm most familiar with.  A lot of folks will hear of, like, St. Johnsbury Academy and such, they would be eligible.

THE COURT:  Okay.  And then four is the 25 percent, subsection (4), the 25 percent student enrollment requirement.  Does this mean -- my question is, Does this mean no more town tuition payments to schools with under 25 percent enrollment?

THE WITNESS:  Correct, yeah, any numbers that were below 25 are no longer eligible.

THE COURT:  And, class size, I wondered if you could give me some examples of how the class size requirements work at the high school level.

THE WITNESS:  Yeah.  So we have not yet utilized the class size.  There's both legislative and state court rulemaking on that topic.  So, once that's finalized, we would

JA.809

start to utilize that to identify if there are any more schools that are ineligible. We have not done it yet.

THE COURT: Oh, okay. So it's not in force yet?

THE WITNESS: Correct.

THE COURT: And expected, what, in the next year or two?

THE WITNESS: You know, I think there's some components of the education reform currently at the legislature, and then there's going to be state rulemaking after. So it's going to be dependent on this legislative session and what's resolved there, and then the State Board of Education will be able to revise rules to reflect that future legislation. Once that's done, we can enact.

THE COURT: All right. And then there are a list of schools, subsections (3) through (6), that aren't subject to the geographic or class size or, I suppose, the 25 percent student enrollment requirements because their mission is a little different. I wondered if you could give me an example of an independent school meeting education quality standards.

THE WITNESS: Yeah. So there's two, Sharon Academy and Thetford Academy. So what they've been able to do is they've demonstrated that they are, they're meeting the same standards as a public school.

THE COURT: Right.

THE WITNESS: So they have licensed staff. They have

JA.810

much more robust curriculum, a few other components of the state board rules.

THE COURT: Sharon and what was the other one?

THE WITNESS: I believe it's Thetford Academy.

THE COURT: Thetford, right. And what's an example of a tutorial program approved by the state board?

THE WITNESS: Yeah, so tutorial programs are much smaller programs that are really in collaboration with DCF and sometimes law enforcement to really provide educational services with individual students who are, you know, in those systems. So it could be a -- I can't think of a specific name, of course.

THE COURT: I'm familiar with it from another life with Depot Street in Bennington, right? And that would be a school where a student might be placed because she's a runaway or at risk in some other way?

THE WITNESS: Yeah, yeah, exactly. So a lot of times it's state-placed students in DCF custody.

THE COURT: Okay. Some sort of crisis?

THE WITNESS: Exactly.

THE COURT: All right. And an approved education program, what is an example of that?

THE WITNESS: Yeah, so there's a few. These are programs specifically for teens who are parents or are pregnant. So a specific setting to meet their needs so they

JA.811

can continue their education.

THE COURT: Oh, okay. For that particular time in life?

THE WITNESS: Right, yes.

THE COURT: And I think I understand a therapeutic approved independent school. That would be one for a student who was, was benefiting from an IEP?

THE WITNESS: Correct, yeah, special education, IEP plan or a 504 plan, which is similar. So, really, it's a school that's limited to providing specific services to that population of students.

THE COURT: All right. And these are all independent in the sense that they're run by some kind of foundation or 501(c)(3) organization?

THE WITNESS: Yeah, all of these organizations would be privately owned organizations.

THE COURT: And are these four categories open to a religious organization if they wish to sponsor and develop a tutorial program or an approved education program or a therapeutic approved school?

THE WITNESS: Yes.

THE COURT: And I guess those were my questions, but there is no -- is there any bar or problem in welcoming a religious organization into this world?

THE WITNESS: No, there's absolutely no consideration

JA.812

on, in either direction on that question.

THE COURT:  And, to your knowledge, have any ever asked to open one of these?  I'll call them specialty schools.

THE WITNESS:  Not to my knowledge.

THE COURT:  Okay.  The final thing I wanted to do with you is a little more lengthy.  Do you have a copy of Exhibit 11 there?

THE WITNESS:  Not in front of me, no.

ATTORNEY STRATTON: I can get my copy.

THE COURT:  Thanks.  Why don't we mark it as Court's Exhibit 1?

(Court's Exhibit 1 was marked.)

These are two lists put out by the Department of Education, one before Act 73 and one after, and, if you turn to Page 34, there is a list of schools that, following the enactment of Act 73, became ineligible.  And I was hoping we could just go through it and you could tell me which of the criteria they triggered.

THE WITNESS:  Yeah.  We have a --

ATTORNEY STRATTON:  Your Honor, I have a demonstrative exhibit, an illustrative example for the Witness to rely on if that would be helpful.

THE COURT:  Of course, yeah, yeah, sure.  Why don't we call it Court's 2?

(Court's Exhibit 2 was marked.)

Great.  And I'm looking at what we've marked as -- I'm going to call this State Defendant's Exhibit A.  Can you tell me what I'm looking at?

THE WITNESS:  Yeah.  So this here is all of the schools in, within that category that we require the consideration of geographic location and the 25 percent.  So we created this for you, this visual, for you to reflect, for each of the schools, which eligibility they were not, they were not meeting.  For your understanding on our process, we started with the geographic eligibility, and then those that were eligible, we moved on, but this has both categories present for you.

THE COURT:  Super.  Thank you.  That's very helpful. I can see that saves a lot of time.  I won't have to go through every one.  So, if it's yellow on geographic eligibility, that means that the school is located in -- well, you tell me.

THE WITNESS:  Right, perfect.  Yeah.  So that first example, All Saints Academy, you can see it's not within one of those locations.  It's in an area where there's K-12 education programming available.  And then the second column would be their percent tuition.  And so, because neither of them are met or at least one of them is not met, they're not eligible.

THE COURT:  Oh, and class size isn't on here because you're not doing it yet?

THE WITNESS:  Right.  We haven't used it, right.  So,

JA.814

really, the only -- well, obviously, in Vermont approved by the state board, we really then looked at that third and fourth category. So, once all of the rulemaking comes in place, we would then go through this list to see if any, any would then be ineligible because of class size so that we could take some off of this list.

THE COURT: And I understand how you would know the geographic eligibility, because you'd know the address and you'd know what the various districts offer.

THE WITNESS: Yeah.

THE COURT: How did you know whether the prior public tuition funding was at the 25 percent rate or not?

THE WITNESS: Yeah, yeah. So we used two different data sources to make those identifications. The first one we used is what we call our Independent School Census. So there is a -- each independent school reports to us their enrollment for October 1st of the school year. So we get that total number, and then they would also indicate how many of those students are tuitioned. It's not always 100 percent accurate, so we used a second data source, some financial data from the school districts, looking at their tuition costs. So we were able to refine the list with that more accurate number of the tuition. So from there we were able to then determine the percent of students that were receiving the tuition dollars.

THE COURT: Okay. I think this answers all of my

JA.815

questions. Why don't I give the plaintiffs a turn? Anything for this witness?

ATTORNEY TUCKER: Are you asking? I do have just a few questions, Your Honor.

THE COURT: Oh, yeah. No. Now would be a good time.

ATTORNEY TUCKER: So I guess the plaintiffs have no further questions? I mean, defendants have no --

ATTORNEY STRATTON: Your Honor, we're happy to offer more testimony if that would be helpful, but, you know, if the Court has everything it needs, then we're fine with that.

THE COURT: Okay. I was going to give you a turn as well, but I just thought I'd start with the plaintiff and then go to the state defendants.

ATTORNEY TUCKER: Thank you, Your Honor. Don't let this stack of papers scare you. I just have it up there in case I need it.

THE COURT: All right. I've seen worse over the years.

DIRECT EXAMINATION BY ATTORNEY TUCKER

Q. Good evening, Mr. Prowten. My name is Ryan Tucker. Thank you for being here today. I just have a few questions for you.

The judge was referring to -- I guess it's State Defendant's Exhibit A -- here moments ago. It's this chart with the green and yellow on it. I was wondering if you could take a look at the second one there, Bridge School, Inc. I

just had a question about that one.  And do you have the Court Exhibit Number 1 in front of you as well?

A.   This packet?

Q.   Yes, that packet right there.  If you would first turn with me to this Court Exhibit Number 1 and look for Bridge School, Inc., I believe, if you go to Page 36 of 50.  Do you see that on the upper right-hand corner?  It says -- I'm sorry.  35 of 50.  It says "Approved Independent Schools Ineligible for Public Funding".  Do you see that?

A.   I'm not sure if this is -- is this the correct exhibit?

THE COURT:  That's it, yeah.

THE WITNESS:  So on Page 35?

BY ATTORNEY TUCKER:

Q.   It's 35 of 50.  You see at the top right-hand corner?

A.   This packet is out of 49.

Q.   Okay.  Well, then 34 of 49.

A.   Okay, yeah.  So the approved independent schools ineligible for public funding, Bridge School?

Q.   Correct.  And Bridge School is listed there as the second one, correct?

A.   Yes.

Q.   Okay.  And this document here reflects the information as of September of 2025, correct?

A.   Yes.

Q.   If you back up a few pages, there's another document here.

JA.817

It's the Independent School Directory dated February 19th 2025. Does Bridge School appear on that list?

THE COURT:  I'm sorry.  What page?

ATTORNEY TUCKER:  On page -- you begin, Your Honor, with -- make sure I've got the right one.  I'm just looking to see if Bridge School appears at all, and I don't see it reflected.

THE WITNESS:  I'm seeing on Page 14 it being reflected.

THE COURT:  14?  Are you using the pages at the bottom or at the top of the page?  Either is fine, but we should use the same ones.

THE WITNESS:  I see.  Yeah, yeah.  It's Page 15 of 50 on the top.  It's the older one.

BY ATTORNEY TUCKER:

Q.   So, if we look on Page 14 at the very top, you see the Bridge School there, correct?

A.   Um-hum.

Q.   And at the very top it says "Approved Independent Schools Ineligible for Public Funding", correct?

A.   Yes.

Q.   So Bridge School was not eligible as of February 19th 2025?

A.   Yeah, correct.

Q.   Is that the reason why they're not eligible on September

20

of 2025 as well?

A.   I'm not sure.

Q.   Okay.  Well, let's take a look at another one.  I'm sorry.  State Defendant's Exhibit A, Number 24 says Mountain School Program of Milton Academy.

A.   I'm sorry.  Could you repeat that?  I couldn't hear over the printer.

Q.   Sure.  State Defendant's Exhibit A, Number 24, it's the second page.  It says Mountain School Program of Milton Academy.  Do you see that?

A.   Second page of the entire packet?

THE COURT:  It's on the, your colored exhibit.

THE WITNESS:  Oh, sorry.

THE COURT:  The second page.

THE WITNESS:  Thank you.  Apologies.

BY ATTORNEY TUCKER:

Q.   Did you locate it?

A.   Yeah.

Q.   Okay.  Then, if you'll turn to the Court Exhibit Number 1, Page 36 of 49 on the bottom --

A.   Okay.

Q.   -- do you see Mountain School Program of Milton Academy there, and then the next one down is Mt. Mansfield Academy?

A.   Yeah.

Q.   Okay.  These two schools are designated as being approved

JA.819

independent schools ineligible for public funding as of September 2025, correct?

A. Correct.

THE COURT: Can I just make sure I'm following? They were ineligible before Act 73, they're ineligible now for some reason that maybe he knows but I don't know?

BY ATTORNEY TUCKER:

Q. Right. I'm just trying to determine that, if there's some other reason.

Are you aware of any reason beyond that?

A. No, I'm not aware of any reason for the determinations prior to that list. My, my focus is on the September 2025 change.

Q. But, if they were ineligible in February of 2025, they would necessarily be ineligible in September of 2025, correct?

A. Most likely, yes.

Q. When you say "most likely", what other reason would there be?

A. I just don't know the answer to the question, so I guess I should have said I don't know. Sorry.

THE COURT: Just so I can understand, the first list before Act 73, to become eligible an independent school has to meet some kind of standards, right?

THE WITNESS: Yeah.

THE COURT: Presumably, Bridge School didn't meet a

JA.820

standard, didn't have a gym or whatever it was?

THE WITNESS:  Correct.

THE COURT:  Or whatever.  I'm making that up.

THE WITNESS:  For some reason, it was ineligible prior.

THE COURT:  What kind of educational standard might make a school ineligible?

THE WITNESS:  I'm not sure.  I was not in my role at that time.

THE COURT:  Okay.  But, whatever it was is still present after Act 73?

THE WITNESS:  Correct.

BY ATTORNEY TUCKER:

Q.   Just a couple more just to make sure that I'm clear I'm not missing something.  If you look at Number 28 on State Defendant's Exhibit A, it's the colored copy.

A.   The Orchard Valley School?

Q.   Yes, sir.  And then compare that to Court Exhibit Number 1 and then Page 37 of 49.  Do you see Orchard Valley School there?

A.   Yes.

Q.   Again, so they were ineligible as of September 2025.  If we go back to the February 2025 version, do you see Orchard Valley School Grace Farm Campus on that document?

A.   Which page are you looking at?

Q.    Just one second.  On Page 15 of 49.

A.    Yes.

Q.    Okay.  So, as with the other examples, Orchard Valley Grace Farm Campus was ineligible in February of '25 and is again ineligible in September of 2025?

A.    That appears to be the case.

Q.    Okay.  And then last one, Number 49, Upper Valley Waldorf School on State Defendant's Exhibit A, do you see that?

A.    Yes.

Q.    And then, on Court Exhibit Number 1, Page 39 of 49, you see Upper Valley Waldorf School listed there as well?

A.    I see that, yes.

Q.    That's another example of an independent school ineligible for public funding as of September of 2025?

A.    I believe so.

Q.    And then, compared to February of 2025, we see Upper Valley Waldorf School listed on Page 15 of 49.  Do you see that?

A.    Yes, I see it.

Q.    So, as of February of 2025, that school was likewise ineligible?

A.    Appears to be the case.

        ATTORNEY TUCKER:  Okay.  No further questions, Your Honor.

        THE COURT:  Appreciate it.

JA.822

24

ATTORNEY STRATTON:  Could we ask a few questions, Your Honor?

THE COURT:  Of course.

DIRECT EXAMINATION BY ATTORNEY STRATTON

Q.   I just have a couple more questions on some issues that we haven't quite touched on today.  I think the Court's questions mostly touched on the information that seems relevant, but just a couple of other things.

So I think the first question, you guys talked a bit about approved independent schools.  So maybe we'll start with a little bit of your background.  So could you just tell us what your position is with the Agency?

A.   Yeah.  So my current position, I'm the Director of the Education Program Approvals Division.  So, under a reorganization that took place around September 2025, I moved into this position.

Q.   What are your primary responsibilities in that role?

A.   So in that role I oversee two large teams, so our educator licensing and preparation team.  I also see, oversee our independent school team, home study team, a couple other smaller programs as well.

Q.   And what was your role in implementing Act 73?

A.   So, prior to moving into this role, I was the Assistant Director of our Education Quality Division, which was the division that was responsible for educator licensing,

JA.823

independent schools, and some different programs.  So I worked with my director, you know, sort of in our check-ins and such on as the list was being created by our division.

Q.  Thank you.  So I'm going to turn to some of the categories that actually --

(Court Reporter clarification.)

So what is an independent school meeting education quality standards?

A.  Yeah.  So that would be an approved independent school that has, you know, indicated that it would like to seek that approval.  They have demonstrated to us that they're meeting the state board rules that we expect from our public schools.  So they've gone through a process to really demonstrate this much more rigorous process around their curriculum, their staffing, and what we call our continuous improvement plan, which is basically a strategic plan which is not normally required for an approved independent school.

Q.  So you've touched on this a bit, but what's the top-line difference between an approved independent school and an independent school meeting education quality standards?

A.  Yeah, the education quality standards are, it's really the expectations of a public school.  So it's a much higher standard coming from our program.

Q.  And how does a school become designated an education quality school?

JA.824

A.   Yeah.  So they'd reach out to us, and we'd go through a process to have them demonstrate evidence of meeting those standards.

Q.   And then what's the tuition payment structure?  Can you speak to the difference between the tuition payment structure for education quality schools and general approved independent schools?

A.   Yeah.  So for the general independent schools we have a rate-setting process where a school will provide information, financial information, to us around their costs, and then we -- I don't do this directly, but we have a number of folks between our finance team and our independent school team to calculate what a, like, an allowable tuition reimbursement would be from there.  A school that has that quality standard status is able to charge the full tuition, the actual cost, where an approved independent school has that cap that we determined.

Q.   Okay.  And, if we could switch gears back to the list of schools that you looked at earlier, so that's both the Court's Exhibit 1 and then State Defendant's Exhibit A.  So, with respect to those schools, did the Agency give schools any chance to respond to its eligibility determinations?

A.   Yeah, yes, absolutely.  We had a couple of different processes, a lot of email communication.  We had a Docusign process where we shared the information with the schools and they responded.  If they had any questions, they felt that

JA.825

something was inaccurate, we corrected it, and, ultimately, all schools agreed with our conclusions.

Q.   And what criteria other than the five eligibility criteria in Act 73 did the Agency consider in compiling this list of eligible and ineligible schools?

A.   No other criteria was considered.

ATTORNEY STRATTON:  Okay.  Thank you.  No further questions, Your Honor.

THE COURT:  I think that's one part I'm trying to make sure that I understand is, Which of the schools that were eligible before Act 73, either religious or secular in their formation, lost eligibility?  So to do that I could start with the approved independent schools ineligible for public funding, which are eight schools at Page 14 of 49, and subtract those out of the list at 34 of 49, which is the later September 2025 list, and what I would have remaining would be the schools that had lost their eligibility because of the Act 73 criteria. Would that be accurate?

THE WITNESS:  Yes.

THE COURT:  I mean, I suppose, in theory, a school could go downhill on some other metric, but that doesn't seem terribly likely in a couple of months.

THE WITNESS:  Correct.

THE COURT:  Right, yeah.  All right.  So that would be how I could kind of drill down and make certain I understood

whether, for example, all of the religious schools and none of the secular schools lost funding or that it was equally placed across both or whatever, whatever the math comes out to be?

THE WITNESS:  Yeah, I believe that's accurate.

THE COURT:  Okay, thanks.  Anything further?

ATTORNEY TUCKER:  No, Your Honor.

THE COURT:  Yeah, I appreciate it.  It was very helpful, actually.  I mean, not actually, it was.  Good, thanks.  We'll let you go, and I think we can move on to the argument on the preliminary injunction motion.

Mr. Tucker, it's nice to see you.  Thanks for making the trip.  And I've been looking forward to the chance to engage you on this.  It's a hard issue.

ATTORNEY TUCKER:  You as well, Your Honor.  I always enjoy a chance to get into cooler weather, so I appreciate it. Again, may it please the Court, my name is Ryan Tucker on behalf of the plaintiffs.

Last year 15 religious schools were eligible for town tuition in Vermont.  Today, that answer is zero.  None of those schools are eligible.  Meanwhile, 53 secular schools and countless public schools outside the state still receive public funds.  The government's actions here violate the Constitution in a myriad of different ways, but I want to focus on a few cases that relate to some of the questions Your Honor just asked.

JA.827

I want to start with *Lukumi,* and it's an important case. I think it's dispositive of this case. There are several, I think, that are dispositive, but let's focus on *Lukumi* first and the issue of neutrality. "Although a law targeting religious beliefs is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." That's a quote from *Lukumi* itself.

Now, again, quoting *Lukumi*, "To determine the object of a law, we must begin with its text." So, here, we have to go to Act 73 and look at it on its face. Now, I'll admit that the word "religion" or "religious" is not included in Act 73, but, if you look at the language itself, you can see how this was focused on religious schools.

Just one example, the 25 percent requirement, Act 73 requires that schools have at least 25 percent of its student enrollment composed of town-tuitioned students during the '23 to '24 school year. The problem there is it was impossible for religious schools to meet that requirement because they only had one year to meet the 25 percent threshold. So while, on its face, Act 73 does not mention the words "religion" or "religious schools", the text itself necessarily excludes religious schools from participation.

Again, looking back at *Lukumi* because there's some great quotes in there that I think are dispositive here, even "apart

JA.828

from the text" -- again, quoting *Lukumi* -- "the effect of a law in its real operation is strong evidence of its object." So here, once again, we look to see what happened. 15 religious schools were in the year before, now they're not, while the dozens of secular schools and other out-of-state schools remain eligible. If you do the math, 75 percent of these secular schools remain in the program, again, while zero are in the program today.

The, we had a prior discussion in one of our other hearings where you asked me about some of the statements that were made, and I think one of the statements in particular sort of underscores exactly what happened in this instance. Senator Hinsdale's comment sort of was an example of saying the quiet part out loud. There she said, It was important to me that the percentage requirement be guiding the decision because, otherwise, we're starting to send people back to religious schools, again, talking about the percentage requirement. This is a clear *Lukumi* case. The object of the law was to exclude religious schools, and we see that based upon the real operation of what actually took place. As *Lukumi* says, the design of this law accomplished a religious gerrymander.

THE COURT: Can I ask a question about *Lukumi?* It didn't involve state legislation, it involved a municipal ordinance. Does that make any difference to any judge?

ATTORNEY TUCKER: No. I mean, the analysis is the

JA.829

same.  You look to see, whether it's in the *Masterpiece* context or *Lukumi* context, you look to see what statements were made. That's relevant to the analysis, but here it's just the object of the law, and it doesn't matter whether it was a city council or the state legislature, Your Honor.

THE COURT:  I've been thinking about this, you know, a fair amount since we last talked about it.  I understand *Lukumi* and the context of a municipal ordinance and municipal decision making, and I, I think a kind of flagrant case of prejudice against the Santeria faith.  I understand the, I think, the *Masterpiece Cake* concerns about statements made by the quasi-judicial commission members, and I understand in *Fulton*, I think, the concerns about what executive branch officials may say sort of in the performance of their roles, but I can't find a case in which freedom, a free exercise case in which we've picked through legislative history and floor statements and in this case I think kind of returns.

And I did find my way to the *Slattery* case out of the Second Circuit.  Judge Menashi, who is certainly no opponent of religious freedom, was quite clear that, in order to preserve the Scalia Project of working with text, not working with what people say or think, we should be pretty cautious about not defining legislative purpose from, from the statements of individual legislators.  I'm sure you've read the case.  It does quite a good job.

JA.830

ATTORNEY TUCKER:  Right, right.

THE COURT:  I mean, I didn't mean it that way.  Of course, it does a good job, but it -- should I be sensitive about the fact that this is a legislation, or do I just put it in the same box as *Lukumi*?

ATTORNEY TUCKER:  I think there's a couple.  It's certainly in the same box as *Lukumi,* and, staying with *Lukumi,* Your Honor, just to address the legislature question, *Lukumi* does say that the Free Exercise Clause, quote, "protects religious observers against unequal treatment, and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with religious motivation."

*Lukumi* goes on to say that, "Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices."  One of the things that is important about *Lukumi* is we look to the effect of a law in its real operation.  We don't need the comments.  That's really the whole point of *Lukumi is* the targeting obviously was heinous, but the words themselves are not dispositive.  There was a dispute between -- it's a little bit of a fractured opinion when you read it.

THE COURT:  Yeah, yeah.

ATTORNEY TUCKER:  Justice Kennedy, you know, does talk about that issue.  Justice Scalia came and said, Wait a

JA.831

second.  We can't do that.  And so --

THE COURT:  Right.  What was it he said we can't do?

ATTORNEY TUCKER:  Well, he made the point that Your Honor is making, and that is we have to be careful about, you know, taking one voice and equating that to the whole.

Now, as we've seen in this very case, though, even with Mr. Nichols, again, that's in the hostility realm, and we'll talk about that here in a second.  Even one voice can matter.

THE COURT:  But that's executive action.  That's not a legislator.

ATTORNEY TUCKER:  That's, that's true.  That's true, Your Honor.  But my point is, whether it's in the context of *Lukumi* -- you see them talking about, the justices, talking about it in *Masterpiece Cakeshop*.  There is evidence of it also in the Establishment Clause context where there's references of there was the case in Louisiana involving creation science and a senator there, a state senator, made some comments, and that was utilized in that context, but --

THE COURT:  That one I don't know.  I will go and read it because I've really been hunting for this.

ATTORNEY TUCKER:  Yeah, well, to be, you know, in full transparency, we don't have a lot on this particular area of the law, but, thankfully for us, we don't even need it.  I could come to court with none of those dozen statements and still prevail, and that's really the point of *Lukumi*.  *Lukumi*

JA.832

said, Let's start with the text, and, if it's, if we deem it to be facially neutral, then we go beyond that. We look at it in real operation, what actually happened here, and in this instance, as I mentioned, you've got 15 schools that used to be in, and now they're out, and I think that is sort of a quintessential *Lukumi* argument.

THE COURT: How many, if we count heads on the, amongst the secular independent schools, one point we would differ on is I don't put the therapeutic schools into the same basket because anybody, as we heard from the Witness, any religious or secular organization can go into business as a therapeutic school. It's quite a different process. It's not open to everybody. You have to come with a diagnosis or an IEP. So but, if we look at the schools that are -- what's the right word -- conventional on either the religious or the secular side, what was the breakdown?

ATTORNEY TUCKER: Well, before the Act, just to give you some numbers, before Act 73, there were 70 secular schools. I may have my colleague double-check me on this as I'm doing the math, but 70 secular schools were eligible. There were 33 that were approved independent, 28 therapeutic, I believe 5 that were in that education --

THE COURT: 33 minus 28 leaves how many? I thought I counted about 17 schools that weren't therapeutic schools.

ATTORNEY TUCKER: That's, yeah, I think Your Honor is

JA.833

correct on that.

THE COURT: Yeah. I didn't know quite what to do with the extra year of high school that one of the state colleges offered. It didn't really sound like high school to me.

ATTORNEY TUCKER: Right, right. One comment Your Honor made, and I noticed you asked a question of the Witness earlier that I wanted to briefly address is the question of whether or not a religious school could become one of those other exempted categories.

THE COURT: Yeah, right.

ATTORNEY TUCKER: If you go down that list, number one, a number of these schools, including Mid Vermont, they would have to either violate their beliefs potentially or even give up their religious mission in order to accomplish or pursue one of those different categories. I mean, they're focused on a biblical worldview type of education. So that, that's one concern that's there.

But what's really important, again, going back to, not just *Lukumi,* but also to *Tandon*, when you look at *Tandon,* which is another one that is on point for us, *Tandon* says, quote, "Government regulations are not neutral and generally applicable and therefore trigger strict scrutiny under the Free Exercise Clause whenever they treat any comparable secular activity more favorably than religious exercise."

JA.834

So any time you've got the secular being treated better than the religious you have a *Tandon* problem, general applicability problem.

THE COURT: Sure, yeah.

ATTORNEY TUCKER: And here Act 73 treats comparable secular schools more favorably than all religious schools.

THE COURT: On what measure?

ATTORNEY TUCKER: Well, *Tandon* says that the government -- well, for one, you have to look at the interests that are put forth by the other side. *Tandon* doesn't allow the government to, if you will, define comparators at whatever level of generality such that they can, you know, make the religious claimant disappear.

So, if you look at the facts in *Tandon*, it's the religious gathering prohibition in California. What's interesting about that case is you had the court saying that hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts and/or restaurants, those were all being treated better than the private basically Bible study in the home.

It's, it's interesting, not just to read the majority opinion there that held that, but also Justice Kagan, she was lamenting in her dissent the fact that California was treating these at-home religious organizations just like the hardware store, just like the hair salons. In fact, she used language

JA.835

like "expansive" and "this expansive comparative net". So she was frustrated by the fact that the majority on the US Supreme Court defines this category very broadly. And here, you know, that's exactly what we have. We have secular schools being treated better than private religious schools.

THE COURT: But better how? That's the part I don't understand.

ATTORNEY TUCKER: Well, you have to, in order to determine whether to -- well, they're in the program, and we're out, but, in order to determine whether two activities are comparable for purposes of this analysis, you know, the Free Exercise Clause -- this is quoting the Supreme Court -- "must be judged against the asserted government interest that justifies the regulation at issue."

And so, when you, when you look at what my friend on the other side has stated at least in briefing as to what those interests are, whether that's a high-quality education or being more cost-effective or whatever the interest is that they come forward with, you know, there's no evidence, for example, that religious schools don't provide as good enough of an education as these other secular schools. There's no evidence that the, that eliminating these religious schools are somehow more cost-effective for the state.

So, again, when you, when you look at the language in *Tandon* where it says any comparable secular activity, Act 73

38

treats comparable secular schools better than the religious; therefore, it's a *Tandon* concern, a *Tandon* problem.

THE COURT: But nobody suggests that religious schools don't provide a good education. I mean, that's a bit of a straw man. You and I can knock that one down and beat it up all day long. But, certainly, the State defendants don't say that, and I don't think that, and neither do you.

ATTORNEY TUCKER: Well, I guess we'll hear that in a second. Obviously, I'd like a chance to come up here and respond to any interests that they put forward.

THE COURT: Of course.

ATTORNEY TUCKER: But I'm just using that as an example. So we can hold that discussion probably to see what they have to say about that. But then, going back to, you know, this discussion about the comments made from the legislators and how that interplays with Supreme Court precedent --

THE COURT: Right.

ATTORNEY TUCKER: -- *Masterpiece Cakeshop* is another case on point here. *Masterpiece,* of course, held that hostility functions as per se invalidity. You don't even get to the strict scrutiny analysis if it's hostile. We saw that in this particular case as it went up to the Second Circuit involving the VPA. What's really interesting, though, about those facts is Mr. Nichols, the Second Circuit focused on

JA.837

testimony that Mr. Nichols gave before the legislative -- it was a committee hearing. He was actually talking about a -- he was focused on a, a proposed bill that would have eliminated all religious schools, and it wasn't even about the school issue at all, and the court there found that that would have amounted to or did amount to hostility shown to the school itself.

But in *Masterpiece*, the court starts off by saying the Free Exercise Clause bars even subtle departures from neutrality. So the bar is very low. It's just subtle departures. There are factors that one looks at when making this analysis. So, for example, you look at the historical background of the decision being made. You look at the specific series of events that led up to it. You also look at the legislative or administrative history, and that includes statements as well. This is not a -- these aren't three boxes that every single one has to be checked. You can have hostility without even the statement. It's add-on, it's color, it's helpful, it's relevant, but it's not necessary.

So here, for example, let's just consider the facts. For decades religious schools were not able to participate in the town tuition program.

THE COURT: But, if I can interrupt and push back a little on that, I went back, and I read all of the cases. The reason they weren't able to participate in the town tuition

program, they were able to participate, and the Catholic schools did in the 1950s. It was the Vermont Supreme Court that applied the Establishment Clause to prevent that. They changed their mind, as they may, 15, 20 years later. And then five years after that the Vermont Supreme Court found its way to the Compelled Support Clause, and it was not really until the US Supreme Court changed direction and evolved with the Missouri case that we kind of left behind the Establishment Clause and started to look at these as free exercise cases.

The reason I say all of this isn't to pick sides in that debate. It's just to say the town tuition program has just gone where the courts have sent it. It's, it's not some kind of conspiracy of antireligious people. The, the state and US Supreme Courts have seen these issues differently over the last 70 years.

ATTORNEY TUCKER: Well, certainly, the Vermont Supreme Court decided those cases and, you know, and not in favor of religious schools being able to participate. So I recognize the Vermont Supreme Court precedent here, but it goes beyond that. Cases that we were involved in, the *In re A.H.* case, also the *A.H. v. French* cases at the Second Circuit. Importantly, there Your Honor mentioned what I call sort of the *Carson* trilogy. You start off with *Trinity Lutheran*, you go to *Espinoza*, and you have *Carson* eventually.

But what's interesting about the Second Circuit and how

JA.839

they were talking about these cases, the Second Circuit specifically referenced *Espinoza* in relation to how the State had responded to even that US Supreme Court authority. And I quote: "The Supreme Court has made clear that the prevailing practice in Vermont - maintaining a policy of excluding religious schools from the town tuition program - is unconstitutional. Even so, the AOE and the respondent school districts did not alter course." That was *In re A.H.*, F.3d 999 at 103.

But it, it doesn't stop there. You also look to see. Further on in the opinion it says, "The AOE and the school districts maintained this policy even after the Supreme Court squarely held that such discrimination violates the Free Exercise Clause." So the State, the AOE, did not respond the way at least the US Supreme Court, I think, would have expected them to. They kept discriminating against the religious schools. In fact, we had to file, at that point, our third lawsuit -- it was *E.W. v. French* -- where we had another individual that was not receiving tuition funds.

It wasn't until Your Honor referenced *Carson v. Makin* was decided that finally the State was like, Okay, let's hit the pause button here. There was a memorandum, a letter that secretary, then Secretary French sent in September of '22 following the *Carson* decision that said, Okay, religious schools, you get to come in. Well, immediately after that you

JA.840

had House Bill 258, you had the Senate Bill 66 being put forward to the Vermont legislature.

That's the -- one of those was the one that Mr. Nichols was opining on at the Vermont legislature, and there we have further evidence of, I think, a new way that the State was, was putting in motion to prevent religious schools to receive tuition funds in the state. Every time that, in this instance, courts, federal courts at least, have instructed Vermont to provide tuition, the State has pursued a different path to exclude religious schools, and Act 73 is just further evidence of that.

THE COURT: But the State is not some kind of monolithic totalitarian creature, right?

ATTORNEY TUCKER: Sure.

THE COURT: It's the three branches of government. The Agency of Education had no vote on Act 73, and neither did the school districts, the people that you complain about through the *A.H.*, *French* line of litigation. So the, when you look for evidence of animus, I think you have to look at the legislative body, because they're the ones that had the votes and did what you don't like, right?

ATTORNEY TUCKER: Well, one example, Your Honor, in relation to that. The, the former Secretary of Education, now a current representative, after the *Carson* decision came out, she lamented. She accused religious schools of, quote,

unquote, stigmatizing LGBTQ people and further said that this case risks turning Vermont into a, quote, unquote, place like Afghanistan. We cite that in our amended complaint at Paragraph 212.

THE COURT: Right.

ATTORNEY TUCKER: So you have both someone that was part of, you know, the Secretary of Education and now a state legislator saying things that I think are as hostile as statements that were made in *Masterpiece Cakeshop*. They said, as I mentioned before, the quiet part out loud. I mentioned what Senator Hinsdale said: "It was important to me that the percentage requirement be the guiding decision because, otherwise, we're starting to send people back to, you know, religious schools". So, again, I --

THE COURT: We could definitely find some legislators, and you've located them --

ATTORNEY TUCKER: Sure.

THE COURT: -- who are not in favor of state support of religious education.

ATTORNEY TUCKER: Right.

THE COURT: I mean, that was kind of the majority view when I went to law school in the 70s, and the world has changed, and, you know, we recognize that. But, but how would I go about as a -- factfinding is not quite the right word, but how would I take the temperature of the legislature and decide

JA.842

that this was motivated by animus?

I can see how to do it with a commission like *Masterpiece Cakeshop*. You get a transcript, read what they said. They said snarky things, and you could draw some conclusions. I guess I see how to do it with a municipal ordinance because it's kind of like *Lukumi,* kind of a yeasty half lawmaking, half regulatory sort of -- we've all been to municipal meetings. It's a kind of a different animal than the pure legislature. But I'm not sure I understand how to do it fairly. I mean, you have six or eight legislators who have said fairly mild things. Perhaps Representative Hinsdale -- not perhaps. I think that was more excited. And Rebecca -- I can't think of her last name.

ATTORNEY TUCKER: Holcombe.

THE COURT: But the others simply responded to an opinion poll and said they weren't in favor of public funding of religious schools, but that's about 6 or 8 people, and there are 150 in the 2 houses. How do I -- do you know about the rest of them?

ATTORNEY TUCKER: Well, there -- I don't have in the record what the other, you know, individuals say, but the beauty of this is, from our perspective, is that those statements are relevant, but they're not necessary to prevail on a free exercise claim.

THE COURT: Okay.

JA.843

ATTORNEY TUCKER: So I don't -- you could, Your Honor, you could, if you're struggling with that, I mean, I think they are relevant, but we don't need them even. You know, you go back to *Lukumi*. You look at the effect of the law and its real operation. It doesn't say anything about -- you know, Kennedy says in that opinion, he does mention some of the statements, but that's not what the majority says.

When you go to *Tandon*, *Tandon* makes clear, too, you don't need to go have, you know, statements or evidence to prove a *Tandon* problem. *Masterpiece* obviously talked about some of those statements and really focused in on one, and, in fact, we saw in this particular case as we went up the VPA, we looked at one. So we provided several to really, you know, further bolster what's already present.

So, again, they're relevant to the discussion. They're relevant even to the analysis because, again, if you look at -- I mentioned those three factors. You've got the historical background, you've got the series of events leading up to its enactment, and then you've got legislator administrative history, including those statements, but you don't have to have that in order to find a hostility claim here. It's, it's something you can have. It's something that you can include, and, certainly, we have it here, but it's not necessary to prevail under the free exercise claim.

THE COURT: Fair enough. So I, and the language is

JA.844

neutral as to religion, so it's really the effects, the sort of what happened on the ground after Act 73 passed?

ATTORNEY TUCKER: Well, Your Honor, yeah, you're right. And I want to be careful here because I think, when Your Honor is referring to, you know, intent or animus, you know, we may be saying the same thing because the object -- I mentioned at the outset that, when you look at Act 73 on its face, again, those words "religion" or "religious schools" is not included, but, when you look at the 25 percent exclusionary language, the effect was to exclude those religious schools.

So, again, I recognize it doesn't say that, but whether or not someone looks at that language and says, Oh, well, that's neutral, the whole point of *Lukumi* is to go look at, apart from the text -- again, it's the quote I read before -- apart from the text, the effect of the law and its real operation is strong evidence of its object. And, here, the effect was to exclude all these religious schools, these 15 religious schools, and the secular private -- 53, I count. I realize Your Honor is excluding some of those --

THE COURT: Yeah, yeah.

ATTORNEY TUCKER: -- and countless out-of-state -- you know, again, we don't know how many out-of-state schools remain. I saw the discussion earlier about the Hanover example, but --

THE COURT: Hanover's kind of a unique case because

JA.845

the school district itself spans two states because of the influence of Dartmouth College and the faculty that live on both sides of the river.

ATTORNEY TUCKER: Well, just the mere fact that a, that an out-of-state public school is treated better than Mid Vermont Christian in and of itself is yet another example of a free exercise claim. So whether, whether any out-of-state public schools received those moneys or the simple fact that the statute has that as an exemption, which it does, that, in and of itself, whether it was done in practice or not, is further evidence of a free exercise violation.

That State statute, of course, also talks about -- there was a little bit of a discussion about the waiver during the -- I think that was towards the beginning of the direct examination, Your Honor. You asked a question about the waiver. If you look at Act 73, which I believe those actually go into effect July 1 of this year, the fact that there are -- see the language. It says -- this is just quoting Act 73: "However, that if a school is unable to comply with the class size minimum standards due to geographic isolation or a school has developed an implementation plan to meet the class size minimum requirements, the school may ask the State Board to grant it a waiver from this subdivision."

The fact that there are waivers, the fact that there are exemptions being given for the secular means that they have to

be given for the religious.

THE COURT: Yeah. No. That's a question I had saved up for your friends, yeah. But I, I hear you. I'm alive to that. Let me change the subject and talk to you about the remedy that you seek.

ATTORNEY TUCKER: Sure.

THE COURT: With respect to the remedy, in this case you seek an order only for the parents of O.P., or do you see something broader?

ATTORNEY TUCKER: For the school.

THE COURT: The school?

ATTORNEY TUCKER: For the school, which would necessarily include Mr. Partington and his son.

THE COURT: All right. So an order, a preliminary injunction saying any town tuition request that meets the, that meets the, the person has to qualify?

ATTORNEY TUCKER: Right. Mid Vermont would need to be able to participate in the town tuition program, which necessarily enables Mr. Partington and his child to participate.

THE COURT: That's what I'm trying to say. What about the other religious schools on the ineligible list?

ATTORNEY TUCKER: We've only asked for relief on behalf of as applied to Mid Vermont Christian.

THE COURT: Right, but they can't be far behind

JA.847

because you've submitted declarations about their situations.

ATTORNEY TUCKER: Your Honor, yes. I mean, from a practical perspective, if Mid Vermont, which, again, that's all I'm here on behalf right now, and Mr. Partington, if relief is given to Mid Vermont, then, yes, practically speaking, the others should be entitled to it as well, but that's not what we've requested in the motion.

THE COURT: So, if we go that far or at least kind of look down the road that far, what about the secular independent schools; should I order the restoration of town tuition to them too?

ATTORNEY TUCKER: No, no, Your Honor. No, Your Honor. We're, we're, religious schools and secular schools have different rights.

THE COURT: So parents, one secular family, one religious family, both want to send their kids to a school of their choice that are disqualified by Act 73, but only the religious parents benefit and the secular kids, they just are out of luck?

ATTORNEY TUCKER: Well, I might -- this would be a different case, but let's say I went, you know, through the State's Common Benefits Clause. I'm sure I could find --

THE COURT: They brought it, and they lost it.

ATTORNEY TUCKER: Okay. So I'm saying there are potential remedies, arguments to be made for the secular, but,

JA.848

obviously, the religious have a First Amendment and more rights than, say, the secular.

THE COURT:  So the outcome at the end is that the religious families are treated more favorably than secular families because they have the school of their choice but the other families don't?

ATTORNEY TUCKER:  I think, I mean, I think the US Supreme Court sort of packaged this well, in a statement from *Espinoza*.  If you go look at *Espinoza*, this is 591 US at 487 --

THE COURT:  I'm sorry.  That's the scholarship program?

ATTORNEY TUCKER:  Correct, Your Honor, out of Montana.

THE COURT:  Yeah.

ATTORNEY TUCKER:  The Court there said that a state need not subsidize private education but, once a state decides to do so, it cannot disqualify some private schools solely because they are religious.  So, if you treat -- and, again, this is the same theme running throughout all of these cases. There are different avenues, independent ways to get to the same point, but, when the secular is being treated better than the religious, you have a free exercise problem.

THE COURT:  But bear with me.  *Espinoza* just leveled things up so that both religious families and secular families were entitled to some kind of a tax break.  It was a little

complex, but --

ATTORNEY TUCKER: Right.

THE COURT: -- they both got the same thing at the end of the day. But your remedy is a bit, goes beyond that because you would have the religious families given more choice, a choice that Act 73 removes from everybody else?

ATTORNEY TUCKER: Well, you know, a few years later after -- so you have *Espinoza,* you know*, about, what, six years ago,* give or take. *Tandon,* you know*,* came out close in time. *Tandon*, as I mentioned before, you know, says that the government regulations are not neutral and generally applicable and therefore trigger strict scrutiny under the Free Exercise Clause whenever they treat any comparable secular activity more favorably than religious exercise. It's a most favored nation type clause that says, once you, once you enter into this space -- and, again, you look at this, juxtapose it with *Carson* and *Espinoza* and all of these. The moment that you offer up a secular benefit or a secular offering, then to treat the religious worse or not give them an exemption or way to participate as well, that is a religious, a First Amendment violation.

THE COURT: Right. But you see my point that, when you win and this principle is rolled out to all religious schools disqualified by Act 73, people that want to go to those schools will be much better off than people that want to go to

Waldorf or Country Day or whatever it is?

ATTORNEY TUCKER:  A hundred percent, yes.

THE COURT:  That's okay to treat the religious families better than secular families?

ATTORNEY TUCKER: Well, the --

THE COURT:  I get equal, but better I struggle with.

ATTORNEY TUCKER:  Well, Your Honor, you know, when the, the First Amendment is one of our first freedoms, I think, for a reason.

THE COURT:  Right.

ATTORNEY TUCKER:  And here, if, if there is a -- again, I'd just repeat it, but, if there is a family that for, you know, like Mr. Partington, he's a good example.  He wants his child to be brought up in a school that provides a biblical worldview and he has the right under the First Amendment to pursue that, particularly in this instance where you've got, you know -- think about his exact facts.  He's got a child that's there right now that's grandfathered in, but his younger son is going to be excluded.  It's not just sort of common sensically off.  That, that further illustrates the First Amendment problem here.  He's not able to pursue that, you know, according to his beliefs.

THE COURT:  But neither is his neighbor who wants to send his children to -- I don't know -- an ethical humanism school or something like that, feels strongly about the

benefits of that type of secular education.

ATTORNEY TUCKER: Right.

THE COURT: He's stuck complying with Act 73. Your client gets a pass?

ATTORNEY TUCKER: If, if the religious -- the First Amendment freedoms are very strong for Mr. Partington and those that pursue that education, and I think the US Supreme Court has borne that out in the case law. Now, that doesn't mean that the neighbor of Mr. Partington doesn't have an argument. I don't know where that case is currently, the Common Benefits Clause case.

THE COURT: I can't remember his name. Your friends will help me out. A couple of years ago.

ATTORNEY TUCKER: Well, no, there's a current one pending as well.

THE COURT: Is there a new run at it? I looked at the one four, five, six years ago.

ATTORNEY TUCKER: There's a new one that is pending right now. So for the neighbor he still has a remedy. He still has an opportunity, you know, under the Vermont Constitution to pursue those. So he's not left without a remedy.

But, but, again, wrapping up sort of my general points here, Your Honor, if you go look at *Lukumi*, if you look at *Tandon*, and, again, look at *Masterpiece*, I think probably in

JA.852

that order, those three cases alone, I mean, I've mentioned *Espinoza*, and there's obviously others, but those three cases alone make very clear that what we have here is a First Amendment violation, the secular being treated better than the religious, and, as such, you know, Mid Vermont should prevail along with Mr. Partington in this case.

THE COURT: Yeah, fair enough. It's a very helpful exchange. I'll give you the last word.

ATTORNEY TUCKER: Well, Your Honor, I know my colleague will come up here in a second and --

THE COURT: No, no. I'll give you the last word after him.

ATTORNEY TUCKER: Okay. I appreciate it, Your Honor. Thank you.

ATTORNEY STRATTON: Good afternoon, Your Honor. May it please the Court. So plaintiffs just got up here and cited *Espinoza*, and I'll cite that back, which says that, you know, a state need not support private education, but that's exactly what plaintiffs ask for here. Act 73 is neutral, it's generally applicable, it applies to secular and religious schools alike, as we've heard today, and, nonetheless, plaintiffs are up here asking for an individualized exception to that rule that applies only to their school, only to their students, and allows them to receive a publicly funded education that they aren't entitled to under law. The First

Amendment doesn't require that outcome, and this court should deny the preliminary injunction motion for that reason.

I'll also note that all of these arguments that I'm about to make today also apply to our official capacity motion to dismiss. So we, you know, we'd ask the Court to address that motion as well when it's ruling on the preliminary injunction motion. Of course, Mr. Prowten's testimony would be irrelevant to that motion.

THE COURT: I think what's going to happen if I can interrupt.

ATTORNEY STRATTON: Of course.

THE COURT: I will get a ruling out on that as quickly as I can, and I've been at work on it, so it won't be a long time. On the preliminary injunction, the issue is critical, and it will be -- whoever loses will take it up to the Circuit, and, at that point, I'll drop my tools and wait to hear. So I don't want to delay things going to the ultimate arbiters, and so I don't think we'll get past the preliminary injunction issue, anyway.

ATTORNEY STRATTON: Fair enough, Your Honor. And we would ask that the Court address the personal capacity motion to dismiss. Of course, that's a separate issue that could proceed while the PI is up on appeal. My colleague, Jon Rose, is here to talk about it today if the Court's interested, but if not, we're happy to leave that for another day.

THE COURT: Right. I have plenty to occupy myself just with the preliminary injunction.

ATTORNEY STRATTON: Fair enough. It's certainly pretty weighty stuff. So, turning to the merits of the PI issues, plaintiffs' Act 73 challenges fail because the Act is neutral and it's generally applicable. So, turning to neutrality, neutrality is a prohibition on religious targeting. So there's two ways that a law can target religion. It can either explicitly single out a religion or a religious practice, or it can implicitly reflect some intent to target a religious practice in some other way.

THE COURT: Yeah, fair enough.

ATTORNEY STRATTON: Plainly, here, this law doesn't target religion on its face. There is nothing about it, about religion, in the statute. So plaintiffs are left having to show some sort of legislative motive, and they can't make that showing. So, first of all, you know, the main argument plaintiffs are advancing is this religious gerrymander argument from *Lukumi*, but *Lukumi* was a completely different case than this. In *Lukumi* the regulation at issue there was artfully drawn so that only Santeria religious practices were affected and other sorts of animal slaughter were left legal.

THE COURT: Right.

ATTORNEY STRATTON: And that's not what we have here. Here, there certainly are several religious schools, according

JA.855

to the complaint, that were made ineligible for funding, but there are roughly an equal number of secular schools that are made ineligible for funding. So this isn't the sort of artful gerrymander that was at issue in *Lukumi*, and, therefore, it's as you know, it's not a case where effects alone can suggest some sort of discriminatory motive on behalf of the legislature.

And, with respect to the legislature itself, as Your Honor noted, a legislature is very different from an administrative body, and we're not aware of any cases where a court struck down a legislative enactment based on alleged religious targeting. This case shouldn't be the first, but it would be if that's the, the line that, that this court adopted. So, while, of course, the Free Exercise Clause does apply to religion, as my colleague noted just a few moments ago, when, or does apply, rather, to legislatures, what doesn't apply to legislatures is the ability to impute a discriminatory motive based on just a few stray remarks from a few individuals who are part of the body.

And that's, that's really all that plaintiffs offer here. There are remarks from, you know, a couple of senators, a couple of representatives. Most them are not made in the context of the Act 73 deliberations, and the ones that are are taken out of context to suggest that they're more, more biased than they really are when read in context. But, even if we do

JA.856

take those at face value, that's still not enough to suggest that the Vermont legislature as a whole enacted a generational overhaul of Vermont's education system simply to carve out religious schools.

The third way that the plaintiffs try to show legislative intent is by looking to the history, but, again, the history isn't particularly availing here. As Your Honor noted, most of the historical exclusion, in fact, all of it, flowed from court decisions being implemented by individual school districts. The Agency didn't make that determination, and, in fact, the Agency listed religious schools as eligible for funding prior to *Carson*.

And, with respect to, you know, imputing intent from the conduct of the Agency or state officials after *Trinity Lutheran* or *Espinoza*, of course, those cases were narrower than *Carson*, and many lower courts believed that those cases drew a distinction between different types of funding for religious schools. So the fact that certain Vermont towns joined in that view of applying those cases consistent with existing Vermont precedent in a way that carved out certain schools doesn't suggest animus and certainly doesn't suggest animus on behalf of the legislature.

THE COURT: Those cases were and those practices were explicit, right? I mean --

ATTORNEY STRATTON: They were, Your Honor.

THE COURT: They were, grew out of sort of Establishment Clause thinking that there should be a separation of church and state. We don't have that as prominent in our thought at the appellate level anymore. But the, the exclusion of religious schools was, was not mysterious. It was entirely explicit, right? The only question was whether it was legal.

ATTORNEY STRATTON: That's exactly right, yeah. And then, with respect to the specific cases of *Espinoza*, *Trinity Lutheran*, and *Carson*, those were all explicitly discriminatory on their face. So, you know, there was the compelled support or the --

THE COURT: I think they were Blaine Amendment --

ATTORNEY STRATTON: The Blaine Amendment in Maine and then in Montana as well. And then *Trinity Lutheran*, of course, was a statutory bar on funding for certain aid to schools.

THE COURT: I'm sorry to interrupt you. Maine never passed it, even though Blaine was Senator Blaine from Maine. It caught on mostly in the West and the Midwest?

ATTORNEY STRATTON: That's right. And then in Maine it was a statutory limitation to the funding provision. You're right about that. But, of course, that's not what Act 73 does at all. Act 73 has no explicit limitation on religious funding. So the *Trinity Lutheran* line of cases just isn't applicable here.

And I think this sort of brings us, maybe taking a step

JA.858

back, to sort of two different types of First Amendment claims. That's claims based on a burden and claims based on a denial of a benefit, and both of those claims can be available under the First Amendment, but they're available in different types of cases. So, of course, an explicit burden is always going to be relevant no matter what type of First Amendment claim you're bringing, but a denial of funding is more limited. So in the speech context, for example, a compelled speech claim can be brought for denial of funding, but certain other types of speech claims can't be brought for that reason.

But the same holds in the religious context as well. So, you know, whether it's discrimination against religion as in *Trinity Lutheran* and *Espinoza*, you know, that discrimination is itself a burden. So a denial of funding that hinges on that necessarily supports a free exercise claim; whereas, here where what plaintiffs are asking for or showing isn't discrimination but some sort of entitlement to a benefit that they think they should get to, you know, fully realize their religious practice, that's a somewhat different claim that no court has ever held can be based on a mere denial of funding.

THE COURT: To be fair, it isn't that they want subsidy, they just want what they see as equal treatment.

ATTORNEY STRATTON: Well, that's exactly right, Your Honor, for what they want, but I think it's important to make clear what equal treatment means. This gets into the general

applicability prong a little bit. So general applicability requires that a policy give every comer a fair opportunity. It doesn't require that every comer receive a fair outcome. So secular and religious schools have to both have the same entitlement to participate in a program. Whether or not they ultimately receive a benefit isn't actually a general applicability issue.

And, you know, I think that looking to the particular regulations here as Your Honor was doing earlier in the questioning of Mr. Prowten makes that clear. So any school coming to Vermont could decide, Does it want to be an approved school? Does it want to be an education quality school? Does it want to be a therapeutic school? And, of course, there can be different motives for why you might start one type of school or another, as plaintiffs were mentioning, and those motives might guide which of those paths you choose to go down.

But at time zero any school, secular or religious, faces the same options, the same regulatory landscape, and that's what the First Amendment requires, and that's what Act 73 does. That distinguishes this from a case like *Tandon* where certain activities, so hair salons, for example, were just expressly treated better and had different opportunities than, in that case, religious gatherings.

So, turning a bit to the parental rights claim, which I haven't heard much discussion on but is also relevant to the PI

motion as well as the motion to dismiss, the parental rights claim hinges on really two lead Supreme Court cases, *Mahmoud* and *Yoder*, but both of those cases are off base for two important reasons.

So, for one, parental rights claims are very fact-intensive, and, of course, on a motion to dismiss what a plaintiff has to show is lesser, but on a PI they have to show that they're likely to succeed, and plaintiffs haven't made that showing here. They haven't shown any specific conflict between their religious beliefs and the specific curricular elements or curricular policies that are required by Act 73.

And, if plaintiffs were to make that showing, of course, this would be a different case, but they haven't done so, and their claim fails for that reason. But, even if plaintiffs had done that, their claim would still be suspect because a parental rights claim also doesn't apply when a mere denial of subsidy is at issue. So, again, this is another one of those cases where the courts have appeared to draw lines between compulsion and denial of benefits.

THE COURT: I thought Mr. French was a parent and he won. He attacked an explicit denial of benefits on religious grounds and won as a parent, right?

ATTORNEY STRATTON: So I understood that as a more traditional free exercise claim and not a *Mahmoud*/*Yoder* style parental rights claim, which can arise under the Free Exercise

Doctrine but is a slightly different doctrine in terms of how it's applied, and the difference is that the parental right doesn't necessarily hinge on a religious practice. It's, it can be a religious practice, but it's the parent's entitlement to control a certain zone of family life without state interference, and that's not something that is particularly susceptible to this benefit-shifting doctrine given that, you know, what it's really all about is shielding the home life from state interference.

So, even if a parent can win under a different doctrine, so a traditional discrimination free exercise claim, that doesn't necessarily amount to a parental rights claim in the style of *Mahmoud* or *Yoder,* which is, you know, somewhat narrower in that respect but can be somewhat broader in others in terms of the types of conduct that can infringe it. Since plaintiffs haven't made that showing here, made any showing, we would urge the Court to reject the parental rights claim as well. I'm happy to address any other questions the Court has about the PI motion.

THE COURT: One thing I wanted to put out on the table and give both of you a chance to address is I know all three of us have now read Act 73, you know, from stem to stern, and I've done a kind of summary of it just to try and keep track of it. Only a little bit is directly relevant to our case, but what strikes me is it reaches deep into issues of

Vermont educational policy that have got nothing to do with religion and everything to do with local control versus centralized control, with economies of scale achieved by larger classrooms and more students sharing a nurse, school nurse or, you know, some other guidance counselors, that kind of thing, the issues that, as a state, we've been talking about for about 200 years and haven't finished yet.

I know that it's not really a question for you, but are there larger purposes behind Act 73 which appear in Section 21?

ATTORNEY STRATTON: I wouldn't say that they appear directly in Section 21. I do think they're implicit, and we've sort of noted this in our briefs, but to get into it a bit more, as Your Honor noted, the main purpose behind Act 73 was this consolidation rationale. So Vermont's been spending a lot on education for a long time, an increasing amount per student, and that reflects both rising costs and decreasing enrollment.

THE COURT: Right.

ATTORNEY STRATTON: So this has been a crisis that's been brewing for a while, and Vermont responded with this generational overhaul of its education system as a whole, of which town tuition is really only a pretty small sliver of this one section. So you can see that, that aim reflected in, for example, the enrollment threshold, which was about limiting the number of private schools that are eligible for town tuition to only those that have really most traditionally played that

gap-filling role in completing the sort of holes in Vermont's education system brought about by its rural character.

THE COURT: It struck me that there's a strong bias throughout Act 73 in directing tax, education tax money to the public system. Whether that's a good policy choice or a bad policy choice is beyond my pay grade, but you see it in lots of ways that, that -- a lot of it is kind of directed at enhancing the support of the public schools at the, to some extent, at the expense of all kinds of private schools.

ATTORNEY STRATTON: That might be right, Your Honor. That's not quite what I see in it. I see a more sort of abstract consolidation rationale, and one element of that is going to necessarily mean directing money to public schools, which are more centralized than independent schools. It's right there in the name.

THE COURT: Right.

ATTORNEY STRATTON: But I do think it's that sort of one step higher goal of consolidation that's mainly there. And I just want to respond to a point on this that the plaintiffs have made out but particularly in their, in their filing last night about school costs. So, just to clarify, the State's interest here is an interest in a high-quality and cost-effective education, and that's, the State, when it's making that policy, is crafting sort of a high-level set of rules to best streamline Vermont's education system.

JA.864

It's not picking and choosing. It's not nickel-and-diming of which school is cheaper than the other, which school is better that the other. It's not making those one-off calls. And that's sort of, you know, part and parcel of our case. These aren't discretionary choices about which schools deserve or don't deserve to receive funding. They're programmatic calls that the legislature made about, How should we design an education system from the ground up? And, you know, that's not necessarily in, in every instance going to result in the cheapest school being the school that's chosen for an individual student, but, as a matter of policy over the whole state, it's designed to reduce costs.

THE COURT: I had a question about the town tuition amounts. I don't think it's really directly relevant to our case, but I had thought for a long time that it was fixed and every school receiving town tuition got the same amount, which was in the vicinity currently of $23,000, but does it vary from school to school based on their expense level?

ATTORNEY STRATTON: So schools can charge up to a statutory amount, which is the average assessor average annual cost, and that's, it's about $23,000 right now, and that's in Section 824 for high schools and Section 823 for elementary schools.

THE COURT: Right.

ATTORNEY STRATTON: That's going to change under Act

73. There's some rulemaking in effect. I won't really get into that because we don't know exactly how it's going to shake out, but that's the cap. But schools can charge less than that, and, as I understand it, Mid Vermont generally does charge less than that. They have the discretion to do so.

And then, of course, education quality standard schools can charge more than that amount. They can charge up to their full tuition, which, again, speaks to the fact that these are just a separate category of schools. But Your Honor is right about the statutory cap.

THE COURT: That's a cap, but not a requirement. So, if your tuition were $10,000 for the student who just walks up and comes in, you couldn't charge $23,000, presumably, to the student from a sending school?

ATTORNEY STRATTON: That's not really in the record in this case. My understand just sort of outside of the case is that, in fact, schools do do that. I think actually Mid Vermont does that. I think there's been some press about this over the years, but, again, that's not really in this case.

THE COURT: I appreciate that. It's not the issue, but I just, I wanted to make sure I wasn't overlooking something.

ATTORNEY STRATTON: Yeah.

THE COURT: The other bone I wanted to pick with you a bit was about the class size waiver. Mr. Tucker has raised

it.  I had written it down too.  The *Smith* case, which kind of gives us the marching orders for what neutrality looks like, seems to say that, if there is an exception to the rule for other nonreligious reasons, that the courts have to think about requiring a religious hardship exception, you know, if other exceptions are present.  You know the line of thought that I'm talking about?

ATTORNEY STRATTON:  I do, yeah.

THE COURT:  So how do I apply that in this case?  I know the class size isn't fully developed, that requirement, but, when it is, it will have some waiver or excuse provisions.  Does that trigger the *Smith* obligation to offer a kind of religious waiver to the class size question as well?

ATTORNEY STRATTON:  I would say my top-line answer is that, because it is not relevant yet, that would be an advisory opinion, and I wouldn't think it would be appropriate in this case to opine on that issue when it hasn't gone into effect.  But, setting that aside, I wouldn't think that that would be offensive to *Smith* or *Fulton*, which sort of fleshes this issue out a bit more, and the reason is that, when we're assessing an exception, we look to the State's purpose behind the policy and behind the exception to determine whether the excepted conduct and the religious conduct at issue implicate that purpose in the same way.

So here the exceptions from the class size are about

JA.867

removing really rural schools. There's a separate exception about schools trying to meet the requirement. I would say that that that's pretty clearly off base. If you're trying to make a good faith effort to comply with something that's different from someone who's not trying to make a good faith effort.

THE COURT: I thought of it as catch-up and remoteness.

ATTORNEY STRATTON: Yeah. So I do think the catch-up one is pretty clearly different, but the remoteness one, we also think that's different. That implicates the State's underlying interest in consolidation and wanting to sort of balance that with respecting Vermont's rural character and not requiring kids to go schools too, too far away from their homes and understanding that, in certain rural areas, it really just isn't feasible to have kids attending schools that are going to be quite large enough to meet that requirement, or at least it might not be.

THE COURT: Like a two-hour bus ride away or something?

ATTORNEY STRATTON: I wouldn't know the exact facts, but that certainly I wouldn't want to do myself.

THE COURT: Yeah, right.

ATTORNEY STRATTON: And so we would think that, if Your Honor were to reach that issue, which, again, I wouldn't think would be necessary in this case or appropriate, the

JA.868

exception doesn't undermine the general applicability of the class size. Even if it did, of course, the class size requirement is separate from the rest of the rule, and the fact that there is an exception for class size doesn't necessarily affect the viability of the other eligibility requirements, which are in effect.

THE COURT: The final nit I have to pick with you. The hair kind of went up on the back of my neck about the exclusion of kids from the dual enrollment and early college programs. I understand these are like basically enrichment programs for high school students who are ready to take on some college-level coursework, and it's a little like I was concerned about in the first half of this case about students at Mid Vermont who would be excluded from Scholars Bowl and other, you know, competitions and activities that both genders typically participate in together.

I don't know quite how to address it, except do you see a problem about excluding schools, students at independent schools from these two special programs?

ATTORNEY STRATTON: Well, I think Your Honor doesn't quite know how to address it because it hasn't been briefed because plaintiffs didn't raise this issue in their PI motion. So that's sort of reason enough not to address it now. But, setting that aside, I sort of see that as coextensive with or the problems involved there as coextensive with any problems

that would be raised by the general town tuition program.

So it's the same idea. There's public money that's going to kids to pursue an education, and, you know, the State is choosing where it's going to direct that money, and it's choosing to do so in a more consolidated way to direct it to schools that either are public, are essentially public, or play an important gap-filling role in the public education system. So it's the same considerations at issue, just a slightly different program and, again, a program that hasn't been addressed in this briefing, and so I wouldn't say it's before the Court right now.

THE COURT: All right. I think we may hear to the contrary in a second, but, since all religious schools have now been excluded from the town tuition program by Act 73 and lots of secular schools as well depending on how you count them, any child attending a religious school can't get the college enrichment class?

ATTORNEY STRATTON: I would say that any child attending a school that's not eligible for funding can't get the college credit. It appears that religious schools aren't eligible, but I would note that the Agency doesn't track that, so we're just relying on plaintiffs' allegations here, and we'll assume that they're valid, but the Agency doesn't track what schools are or aren't religious. That's never been part of the policy. So but --

THE COURT: Fair enough. Yeah. I hadn't appreciated that. I sort of go by the name of the school as best I can do. Usually, it gives you a clue.

ATTORNEY STRATTON: Yeah, it's a good proxy but not necessarily one-to-one. Well, if the Court has no further questions, we would just ask the Court to deny the preliminary injunction motion and to conclude that Act 73 is neutral, generally applicable, and doesn't harm plaintiffs here.

THE COURT: All right. Thank you. Very helpful. Mr. Tucker, I promised you the last word.

ATTORNEY CORTMAN: Your Honor, David Cortman. I'm going to handle rebuttal. And I'm sorry. It's hard for me to sit there and be quiet, so I asked Mr. Tucker if he would be okay if I took a little bit of rebuttal.

THE COURT: It's totally fine.

ATTORNEY CORTMAN: Asking me to sit in a room for two hours and not talk is difficult. I want to address some of the things Your Honor raised and, of course, this colloquy with our friend on the other side. I want to start with Your Honor's concern about better treatment as opposed to equal treatment.

THE COURT: Yeah, right, the remedy question.

ATTORNEY CORTMAN: The remedy question. And what I would say is, Equal treatment to whom? And so what I mean by that is what we're asking for is to get back to the place that we were, which was after several lawsuits and decades -- and we

JA.871

can go through Chittenden and all that, but there's no need to. But, after decades of being out of the program and some lawsuits, we were, the Second Circuit ordered that the State to let the religious schools back in so that, when they were sent back out again, Your Honor said, Well, isn't that special treatment from some of the people? And the answer is, It's equal treatment to all of the religious, all of the secular schools that are still in the program.

So, yes, Your Honor carved out there were some that were removed also from the funding, but, when you look at equal treatment, equal treatment is to all the secular schools that are still in the program. Now, are there some secular schools that are out? And I would say, yes, but that's not the doing of Mid Vermont or religious schools. That's at the hands of the State for making these new requirements. So my point is there's no better treatment. There may be from --

You were talking about Mr. Partington and his neighbor, but that's at the hands of the State because of their new program. What we're looking at is equal treatment to all of the secular schools that are still in the program and, depending on how you calculate it -- I know Your Honor talked about therapeutic schools being different. I don't think they are for free exercise reasons, but even removing them --

THE COURT: Let me interrupt. I think they're different for a particular reason which is that, if Mid Vermont

JA.872

wants to open a therapeutic school next door, they can do it, and the Agency of Education will stand up and applaud.

ATTORNEY CORTMAN: Sure. But here's the problem: We looked at the violation as to what happened today, not whether a religious school can possibly meet one of the new exemptions in the future. So, as of today, we have all of the religious schools that were in the program for the last year, year and a half, and now, as of today, they're all out.

So, when the question is, Well, would the religious school be able to possibly open a therapeutic school in the future? Possibly so. Is it possible the State may change the regulations to keep them out? Well, if history says anything, that's a possibility, too, because, in this instance, we've had several court rulings saying it's a violation of the Free Exercise Clause to keep them out. They've been allowed back in, and then the nondiscrimination rules came, and then we challenged that, and the appellate court said, You need to let them back in. Then the legislature comes in and changes that.

So all my point is the possibility in the future of a religious school being able to open a therapeutic school doesn't eliminate the secular exemption of allowing them in without abiding by all the same rules. And so part of the *Tandon* cases and the free exercise cases we've talked about say, if there are exemptions for secular reasons, therapeutic schools, schools that meet the enhanced criteria, all the

JA.873

different exemptions now, then you -- tutorial schools.

THE COURT: I mean, some of them are kind of what in the old days we would call reform schools.

ATTORNEY CORTMAN: Right, yeah. I appreciate the language, and that is fine. The point is, if you're making secular exemptions, you have to then make religious exemptions, and that's what they didn't do here. So that's the reason I say you can't just disregard the therapeutic schools and the other schools because, when there are secular exemptions for those schools, while those are therapeutic for students who are on individual education plans -- which, by the way, that student can go to Mid Vermont because they, under the rules, have to accept students that are on those plans and special needs kids. So, if that kid said, I want to go to Mid Vermont for religious education, no town tuition. But, if he goes two miles away to the therapeutic school, he now gets that town tuition. That's part of the penalty that is occurring in the program.

So I would include all of the exemptions, which I believe that they total about 70, 75 schools compared to the 100 percent of religious schools that are out. So all my point was I don't think we should push them away because the fact that they're given secular exemptions to ignore all the new criteria means there should be a religious exemption to ignore all the new criteria, and there's not. So that's just one of the

JA.874

things I want to address.

But the equal treatment, back to that point, is the fact that they're requesting equal treatment for all of the secular private schools that are still in the program. And, yes, are there still some out? Sure. But that's not the fault of Mid Vermont or its free exercise that's giving them those rights. It's the fault of the State for carving out those secular schools too. So all my point is it's not like they're asking for better treatment. They're asking for the same treatment, equal treatment of all the secular schools that are still in the program. So I just wanted to address that, the equal treatment point.

My friend on the other side started out saying that this Act 73 was neutral and generally applicable. It is neither. And I'll just quickly talk about that because I don't want to repeat anything that Mr. Tucker said. *Lukumi* was a neutrality case, and so it's not neutral because, even though, on its face, it doesn't say religion, our argument is the object of the law, even if just looking at the 25 percent for previous history of town tuitioning, which, again, it was impossible because we were only in the program for a year, it was impossible to reach that number.

You talked about the one legislator saying you can't basically give that, attribute that to the entire legislative body. That's true, but one of the things *Masterpiece* said, Did

JA.875

anybody disavow? Was there anybody in that body saying, No, no, no, that's wrong? There wasn't any in the history. So when one person says --

THE COURT: How do you know that?

ATTORNEY CORTMAN: Because it has to be put on by the other side. So the evidence is is, What did the legislature stand for? What did they do?

THE COURT: Well, you found six responses to an opinion poll that was sent, I assume, to all the legislators, though I don't know. Did anybody else respond?

ATTORNEY CORTMAN: There was nothing in the record there. What was in the record was, We want to make sure it's 25 percent. We want to make sure the percentage keeps out all the religious schools. That's all we're saying.

THE COURT: Right, but on these comments, you were the one that located six of them and put them in front of the Court?

ATTORNEY CORTMAN: Right.

THE COURT: Did you have 144 other legislators whose comments are quietly sitting in a briefcase somewhere?

ATTORNEY CORTMAN: No. My recollection is nobody -- and I'm not going to represent that this is a fact, but, when I looked through everything, my recollection is nobody stood up and said, No, that's wrong. That's all I'm trying to say. So there may have been some people that disagreed. All my point

was, when that was stated, *Masterpiece* said, Did anybody disavow?  But, again, even without that, that expression was, We want to make sure that whatever percentage we put it at keeps out the religious schools.  Whether that's attributed to the whole legislature is not the question.

So, when you look at *Lukumi*, the fact that all of the religious schools were gone, even though there were some other secular schools that were left out, too -- we've talked about *Tandon*.  If any secular schools are treated better, that's a violation.  So, even if *Lukumi* doesn't answer all of the questions, can we attribute it to a legislature, which *Lukumi* says you can.

I know it's difficult.  I understand Your Honor's point.  I'm not dismissing it.  All I'm saying is that you look at, not only the statements, you look at the legislative history, the history of what's gone on in this case, which is decades of religious schools being out, suit being challenged, winning, getting kicked back out again, suit being challenged, winning, getting kicked back out again.  That all matters to what Your Honor was discussing.  That all matters to what's really going on here, and it doesn't --

THE COURT:  And you sort of attribute the agency action to the legislators and said they all kind of hang together in a kind of conspiracy against religious schools?

ATTORNEY CORTMAN:  No, it's just a pattern of the

same thing happening regardless if it is done by different bodies. Your Honor talked about following *Chittenden*. The Supreme Court said in *Chittenden* that you could allow them in if the State puts in adequate procedural safeguards.

THE COURT: Right.

ATTORNEY CORTMAN: It didn't. So the fact that it didn't kept them all out. The court gave them a way to let them in. They chose not to and left them out.

THE COURT: This was in the use era?

ATTORNEY CORTMAN: Yes.

THE COURT: So spend it on the soccer field but not on the chalice, like that?

ATTORNEY CORTMAN: Yes. And all my point is the State could have found a way to let them back in and didn't. So this is -- we're not talking about conspiracy. We're not talking about anything. What we're saying is the pattern here is, you know, we, they, they're out all those years, we sue, they let them back in. One body does it, a different body does it. Everybody's paying attention to what everybody's doing.

I'm not talking about conspiracy. They're given -- the Supreme Court and the courts say there's knowledge of what goes on legislatively. There's knowledge of what goes on. So knowing all this is going on, it's still occurring. So I'm not saying there's a conspiracy and they're all working together, but there's a pattern, regardless of which body it is and --

JA.878

THE COURT: You would have Justice Scalia turning in his grave, poor man, and I know he may not be here to chastise me, but Judge Menashi is. What do I say to him? Have you read what he said in the *Slattery* case? Because that's binding authority in this court.

ATTORNEY CORTMAN: I have, sure. And so are the *French* cases here, and all my point is --

THE COURT: The *French* cases were explicit discrimination against religion on constitutional grounds. We've crossed that bridge, but now we're into implicit inference of animus or improper purpose, and I've only got one ruling that I can find on the free, in the free exercise world that says you probably shouldn't be looking at what the legislators say as individuals.

ATTORNEY CORTMAN: Yes. And for *Lukumi* we'll start there. We don't need it, so we will push that aside. *Lukumi* is just the object of the law. Don't need statements. And the object of the law is all religious uses are gone. *Tandon*, don't need animus, don't need statements. That's it. If you kept some religious schools in, some secular schools in, you need to let in religious schools. So both under *Lukumi* and *Tandon* completely pushing aside the intent, the animus, we'll just leave that aside because I appreciate Your Honor's concerns. So under *Lukumi* and *Tandon,* you don't need any animus. You don't need any statements. And I'll leave that

JA.879

there.

THE COURT: It's the same question I had for Mr. Tucker. The final remedy is some kind of order that says Vermont has enacted the 25 percent rule and the soon-to-be-fleshed-out class size rule and a geographic restriction, but the Court rules on First Amendment grounds these have no application to religious schools, although they do continue to apply to the secular community?

ATTORNEY CORTMAN: Yes.

THE COURT: That would be the order that you would ultimately seek to sustain?

ATTORNEY CORTMAN: Yes, either the effect of the new rules is to exclude all religious schools, which violates *Lukumi*, or the effect of the new rules is that dozens of secular schools are still allowed in and not religious schools, so that violates the Free Exercise Clause too. So the answer is, yes, there's several ways that the Court can do so.

THE COURT: Yeah, I mean, the mechanical, mechanics of it is I strike down those three requirements when they're geography, class size, and -- I'm getting tired. The third one?

ATTORNEY CORTMAN: Yeah, the town tuition, 25 percent.

THE COURT: The 25 percent?

ATTORNEY CORTMAN: Yes.

THE COURT: I strike down those and say they have no application to a school that says it's a religious school. I don't really question them about that because that's awkward. I just take them at their word. I mean, obviously, Mid Vermont is very sincere. I don't mean to suggest otherwise. But anyone that comes forward and applies as a religious school, they aren't subject to those requirements, the rest of the independent school community is?

ATTORNEY CORTMAN: Yes.

THE COURT: That's kind of weird, don't you think?

ATTORNEY CORTMAN: I do not, and the reason is, as I mentioned before, the reason it seems weird is because the way the State structured Act 73. So this isn't the fault of the religious school to be treated the same as the secular schools that are still in. The question is, Well, what about the secular schools that are out? Well, that's on the State. That's not on us.

THE COURT: All right. And can you think, as a seasoned and imaginative person, can you think of any legitimate reason that would support a 25 percent requirement or a geographic requirement or a, or the third one, the class size requirement? Is there any, other than religious animus, is there any legitimate basis for restrictions like that in the legislation?

ATTORNEY CORTMAN: And I want to clarify one thing.

JA.881

We're not necessarily suggesting there's animus here. It's just the fact that that's the result of it. So I just don't want to shoot that far. The answer is "no", and I want to address that. So my friend on the other side talked about the restructuring of Act 73, about the school district and Your Honor did too. There's a lot of things going on, as you're well aware, in Vermont's school districts that need some work, granted.

THE COURT: Right.

ATTORNEY CORTMAN: Maybe they need to consolidate. Maybe they need to save costs. Maybe they need to do all these things.

THE COURT: They definitely need to do something.

ATTORNEY CORTMAN: Right. Our whole point is cutting out the religious schools doesn't further any of those things. So, question, What does the school's class size in a religious school have to do with any of those factors? Nothing. What does the geography of where a religious school is have to do with the state public school system? Nothing.

Let's talk about saving money. It's actually more expensive for the State to cut out all the religious schools. We filed some charts last night that's all public record about the cost of going to these religious private schools as opposed to the secular private schools that are still in and then the public schools in other districts because you can send your

JA.882

student to a public school anywhere in the state. It's cheaper for the State to send them to the religious private schools than the secular private schools that are still in the program and the public schools that are still in the program.

So all my point is the cost savings, the class size, all the redistricting, restructuring is completely irrelevant, doesn't further any interest by kicking out the religious schools. So the State should go about its business and say, Look, we need to revisit what we do in the public schools. Let's try to cut, you know, increase class sizes, although that hurts the kids because the bigger the class size, the less effective the teaching is, but it can do all those things with the public schools. We have no problem with that, but, when you say --

THE COURT: But we're talking about classes that have eight or ten kids. We're not -- we have underenrollment, not over. So the issue as I understand it is classes that are below what you and I would think of as a large class.

ATTORNEY CORTMAN: Right. But what they're doing, though, is they're still setting a ceiling. All my point is the religious school, if you go to a religious school, what's the difference if that class is 3 people, 30 people or 300 people? It doesn't affect the State's interest is all my point. So, when you look at all these criteria, absolutely okay for the State to restructure the school districts in

JA.883

whatever way it wants. The problem here is they're reaching into the religious private schools and said, We're going to do that to you, and it doesn't further their interests. It costs them more money.

Class size has nothing to do with it. Geography has nothing to do with it, because that same student who can't go to Mid Vermont can go out of state to a state school, can go 50 miles away to another public school and still get his tuition. So the geography doesn't further the interest. Class size doesn't further the interest. Cost saving doesn't further the interest.

Quality of education you mentioned before, and I agree that's a red herring. There's no question about the high quality of education in religious schools. So all of the interests put forward by the other side are not furthered by removing religious schools from the town tuitioning program.

And I'll end with this one point Your Honor brought up at the end, which I thought was a good point. We talked about the dual enrollment program. That, the reason -- it was mentioned in the briefing. The reason it wasn't briefed separately is town tuitioning is the gatekeeper for those programs. So we already have a court case that says they have to be allowed in those programs. Well, if you're cut out of town tuition, that's a prerequisite, you're automatically kicked out of those programs. So it is a problem here. So, when the town

JA.884

tuitioning, if that part of it is upheld, it also is upholding them being removed from the dual enrollment programs, too, because you can't get in the door.

THE COURT: Yeah. No. I appreciate that. I was --

ATTORNEY CORTMAN: But that's why we didn't brief it is because you have to go through town tuition to even get there. That was the reason for that. So, Your Honor, again, I appreciate the Court's questions. I appreciate the dilemma. I did a lot of research on the public schools in Vermont, and I know there's issues that must be dealt with. I will close with the fact that they are certainly free and should be dealing with those. It is not effective or doesn't advance their interests to remove private religious schools from the program because it doesn't advance any of those interests, and it's more beneficial to the kids.

We talked about educational gaps. What about the gap that's left for parents and students who want to go to religious school, their out-of-town tuition? So that educational gap is left open, not filled by the new program.

THE COURT: All right. Thank you. That was very lively and helpful. I'm glad Mr. Tucker gave you a turn.

ATTORNEY CORTMAN: I got it out.

THE COURT: All right, everybody. I will get back to work, and I really appreciate the exchange. I know we've gone on for a long time, and I'm glad for your patience.

JA.885

Mr. Toohey, once again, I've got to apologize to you because I just can't kind of get unstuck and deal with your issue without sort of dealing with these preliminary injunctions and then, once I rule, I lose control of the case and here you are back again. I'm not sure what the right course is because I'm very reluctant to do anything on a case that's on appeal, as either side will obviously appeal this.

ATTORNEY TOOHEY: Understood, Your Honor. I was tempted to try to get up and make an argument at one point, and I realize I'm respecting the fact that you made this decision and --

THE COURT: It's the best I can think to do. I mean, I welcome advice.

ATTORNEY TOOHEY: I mean, all I would say is, you know, I think, as is evident from the evidence that you heard today and the arguments that you heard, there was virtually, there's -- I think it was actually the State said it best is that Act 73 is not about some kind of discretionary thing, that picking and choosing schools. It's about programmatic change, and that change impacts all school districts, and I would just say that it's fundamentally unfair that the Waits River Valley School District is the only one here when all the cases that were cited by all the parties here, *Lukumi*, *Tandon*, *Masterpiece*, *Espinoza*, *Carson*, all those cases were where the, the people who were impacted were suing the entity that was

JA.886

actually responsible for making the decision, whether it was the State, the state agency, the local municipal entity or whatever.

And, in this case, Waits River Valley had no role in this decision and has no authority to do anything other than what is required under the statute as amended by Act 73. So, to the extent you can address the motion to dismiss for the reasons that we've argued, we would appreciate that, but we respect the fact that you've chosen to proceed.

THE COURT: Mr. Tucker, do you still need the Waits River Valley in in this case?

ATTORNEY CORTMAN: I have an idea that may help.

THE COURT: Yes.

ATTORNEY CORTMAN: Because I appreciate the concern. What I was going to suggest was I understand that you've said you'll abide by whatever the Court's ruling is, obviously. One of the things is is the money comes from the school district. That's clear. We think that's enough to keep them in the case. But, so the District doesn't have to do any work, it can agree that it will be bound by whatever the Court rules on and doesn't have to participate in any of the briefing and cause itself to do any work. So, basically, it stays in the case as a defendant because I think it's necessary for full relief but not required to do any of the briefing and can sit as a neutral party if it chooses to do so.

JA.887

89

THE COURT: Can I interrupt? Why this district and not all of them? Why don't we have all 200 in here?

ATTORNEY CORTMAN: Well, the reason is because we had a student from the district. That's the reason why. It wasn't picking on one school district.

THE COURT: Oh, that's right. I had forgotten that. And he or she hasn't graduated yet? Okay, all right. I'll give it some thought. It's just I really wanted to focus on addressing the emergency question first, and, as I say, then I kind of lose control over the case until it comes back some months later.

ATTORNEY TOOHEY: I understand. Thank you, Your Honor.

THE COURT: All right. Good enough. Thank you.

(Whereupon at 3:56 p.m. the hearing was adjourned.)

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription, to the best of my skill and ability, of my stenographic notes of the hearing taken before me in the above-titled matter on May 8, 2026.

*Sunnie Donath, RMR*
--------------------------------

JA.888

Sunnie Donath, RMR