# No. 26-1416

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students, parents, Nathan Partington, individually, O. P., by and through his father and natural guardian, Nathan Partington,

Plaintiffs - Appellants,

T. S., K. S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve, Nathaniel Slarve, individually, Dawna Slarve, individually, A. G., M. G., by and through their parents and natural guardians, Chris and Bethany Goodwin, Christopher Goodwin, individually, Bethany Goodwin, individually,

Plaintiffs,

v.

ZOIE SAUNDERS, in her official capacity as Secretary of the Vermont Agency of Education, Jennifer Deck Samuelson, in her official capacity as Chair of the Vermont State Board of Education, Waits River Valley (Unified #36 Elementary) School Board,

Defendants - Appellees,

HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education, Christine Bourne, in her official capacity as Windsor Southeast

Supervisory Union Superintendent, Hartland School Board, Randall Gawel, in his official capacity as Orange East Supervisory Union Superintendent, Jay Nichols, in his official capacity as the Executive Director of The Vermont Principals' Association,

Defendants.

_____

On Appeal from the United States District Court
for the District of Vermont, No. 2:23-cv-00652
Hon. Geoffrey W. Crawford, United States District Judge

_____

**BRIEF OF *AMICUS CURIAE* SUTHERLAND INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE AND REVERSAL**

_____

William C. Duncan
Sutherland Institute
420 E South Temple, Suite 510
Salt Lake City, UT 84111
(801) 355-1272
*Attorney for Amicus Curiae*

June 30, 2026

ii

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Sutherland Institute states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... iii

TABLE OF CONTENTS ................................................................................ iv

TABLE OF AUTHORITIES ............................................................................v

INTEREST OF *AMICI CURIAE* .................................................................1

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ................................................................................................2

    I.   Vermont's exclusion of religious schools from public benefit programs burdens the religious exercise of the States' families and schools with religious missions. ....................................................................................................2

    II.    Vermont's *de facto* exclusion of religious schools is no less problematic because it is accomplished indirectly by regulations rather than through a categorical exclusion of religious schools as such. ..............................................6

CONCLUSION .............................................................................................9

CERTIFICATE OF COMPLIANCE ...............................................................10

CERTIFICATE OF SERVICE ........................................................................11

## TABLE OF AUTHORITIES

**Cases**

*Carson v. Makin*, 596 U.S. 767 (2022)......................................................7, 9

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 US 520, 534 (1993)...............3

*Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020).............. 5, 7, 8

*Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025)..............................................4, 7

*Meyer v. Nebraska*, 262 US 390 (1923) ...................................................................6

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) .............................. 6, 7, 9

*Walz v. Tax Comm'n of New York City*, 397 U. S. 664, 696 (1970)........................3

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 50 (1825).........................................8

*Wisconsin v. Yoder*, 406 U.S. 205, 213-214 (1972) ............................................4, 6

**Other Authorities**

*Distribution of Public and Private Schools: Vermont*, Learning Policy Institute
 (March 2025), https://learningpolicyinstitute.org/sites/default/files/2025-
 03/pub_private_Vermont_MAP.pdf.........................................................................3

Gregory A. Smith, et al., *Decline of Christianity in the U.S. Has Slowed, May Have
 Leveled Off* Pew Research Center 151 (2025),
 https://www.pewresearch.org/religion/2025/02/26/religion-fertility-and-child-
 rearing/ ...................................................................................................................3

Melanie Hanson, *Average Cost of Private School* Education Data Initiative (Feb.
 13, 2026), https://educationdata.org/ average-cost-of-private-school#vermont....4

## INTEREST OF *AMICI CURIAE*

*Amicus*[1] Sutherland Institute is a Utah nonprofit, nonpartisan public policy organization with a mission to promote the constitutional values of faith, family, and freedom. Sutherland promotes the constitutional right to the free exercise of religion and works to explain the individual and societal benefits of the involvement of people of faith and religious organizations in our communities.

This case provides this Court with an opportunity to clarify that Vermont cannot circumvent the Constitutional protection of religious exercise by imposing a *de facto* religious exclusion in its education funding laws or the right of parents to exercise their responsibility to direct the education of their children.

## SUMMARY OF ARGUMENT

With its *de facto* exclusion of religious schools from public benefit programs, Vermont not only burdens the free exercise of petitioners. The religious exercise of all private schools that operate consistently with the teachings of their faith is burdened by the State's exclusion. Vermont law enforces a preference for secular private schools. Significantly, the policy also interferes with the ability of parents

---

[1] *Amicus* affirms that no counsel for a party authored this brief in whole or in part and that no person other than *amicus*, its members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties, other than the State of Vermont, have consented to the filing of this brief. The State of Vermont has communicated that it has no position on its filing.

and families to exercise their responsibility, motivated by their faith, to direct their children's education by removing from them an opportunity to receive otherwise publicly available financial assistance necessary for many to access private schooling consistent with their religious beliefs.

It is no answer to assert that the exclusion here is different from other similar exclusions invalidated by the Supreme Court because it does not impose an enumerated blanket exclusion on all religious schools. Governments cannot foreclose the educational choices of families for reasons of the family's religious practice. What a State cannot do directly, as through a blanket *per se* exclusion, it cannot do indirectly, as through a "religious gerrymander." Vermont cannot do through a nominally neutral policy what it has been repeatedly forbidden by prior court decisions to do openly.

## ARGUMENT

**I.    Vermont's exclusion of religious schools from public benefit programs burdens the religious exercise of the States' families and schools with religious missions.**

As Petitioners have demonstrated, Act 93 is Vermont's latest step in a continued effort to exclude religious schools from public benefit programs. In prior steps, the State tried to circumvent constitutional protections against religious discrimination by forthrightly denying religious schools the ability to access benefits available to others. Now, it has adopted a "religious gerrymander" (*Church of Lukumi Babalu*

2

*Aye, Inc. v. Hialeah*, 508 US 520, 534 (1993), quoting *Walz v. Tax Comm'n of New York City*, 397 U. S. 664, 696 (1970) (Harlan, J., concurring)) to accomplish that result. In doing so, the State burdens the religious exercise of private schools and of families.

The burdens imposed by the State's targeted exclusion are not felt only by Mid Vermont Christian School. They are also experienced by other private schools that seek to operate consistently with a religious mission. There are 121 private schools in Vermont, making up about 28% of the State's schools. Of these, more than 25% are religious.[2] Vermont's law implicates the religious exercise of any of these schools.

There are also many families that, because of their faith, desire a religiously-influenced education for their children. Some indication of this is the finding of a Pew Research Center survey involving a large nationally representative sample of Americans that reported 17% of respondents who are parents of minor children have chosen "homeschooling or private religious schooling instead of public school."[3] This statistic only captures a portion of the likely interest among parents since the choice of these educational opportunities can require significant outlays of time and

---

[2] *Distribution of Public and Private Schools: Vermont*, Learning Policy Institute (March 2025), https://learningpolicyinstitute.org/sites/default/files/2025-03/pub_private_Vermont_MAP.pdf.

[3] Gregory A. Smith, et al., *Decline of Christianity in the U.S. Has Slowed, May Have Leveled Off* Pew Research Center 151 (2025), https://www.pewresearch.org/religion/2025/02/26/religion-fertility-and-child-rearing/.

money. The average annual tuition at private elementary schools in Vermont is estimated to be $23,576.[4]

These costs are an important reason Vermont adopted a program of financial assistance that allows families to choose options for education that might otherwise be out of reach for financial reasons. The reality, however, is that the value of this welcome public benefit is not available for families that would utilize it to ensure a preschool education that respects their religious beliefs about gender and sexuality.

The U.S. Supreme Court has recognized this challenge. The Court recently noted that "financial and other constraints" may deprive some parents of educational options other than public school. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025). Ironically, Vermont's Town Tuition Program could ameliorate this challenge in the State by making a wide range of options available without cost. This would allow the State, in the context of early childhood education, to avoid the problem addressed in *Mahmoud* where parents had only an "empty promise" of being able to exercise their right "'to direct the religious upbringing of their' children." *Id*. (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213-214 (1972)). Unfortunately, with Act 73, the State threatens to withdraw that promise for a set of parents who desire for their children an educational setting that is consistent with their religious convictions.

---

[4] Melanie Hanson, *Average Cost of Private School* Education Data Initiative (Feb. 13, 2026), https://educationdata.org/ average-cost-of-private-school#vermont.

In *Espinoza v. Montana Department of Revenue*, the Supreme Court struck down a Montana law excluding private religious schools from participating in a "program to provide tuition assistance to parents who send their children to private schools." 591 U.S. 464 (2020). The Court noted that the limitation did not only affect the excluded schools but "also bars parents who wish to send their children to a religious school from those same benefits . . . solely because of the religious character of the school." *Id*. at 476. Later, the Court reiterated that the no-aid "provision puts families to a choice between sending their children to a religious school or receiving [government] benefits." *Id*. at 480.

The baneful effects of the State's position here go beyond even those experienced by schools and families whose educational options are limited based on their beliefs. The government's preference for secular private schools creates a competitive imbalance in the private school sector. If Vermont solely subsidizes private schools that are secular, only parents who can choose private schooling without financial assistance will be able to enroll their children in schools that have religious missions and practices that align with their faith. This will result not only in decreased options for families but also in decreased enrollments and potential closures of schools with different faith commitments.

5

This, in turn, will further limit options for families over the long term. The demand for educational options that align with families' religious beliefs will thus be less likely to be met well into the future.

**II.    Vermont's *de facto* exclusion of religious schools is no less problematic because it is accomplished indirectly by regulations rather than through a categorical exclusion of religious schools as such.**

Supreme Court precedent, particularly its decisions striking down restrictions on the use of public benefit programs to attend religious schools, should control the outcome of this case.

This Court long ago established as a constitutional baseline that governments cannot foreclose educational choices by prohibiting alternatives to public schooling. *Meyer v. Nebraska*, 262 US 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972). These cases also establish that the right of parents to direct their children's upbringing includes the ability to select teachers and schools they believe will assist them in that responsibility. *Meyer*, 262 U.S. at 400 (referring to a "right of parents to engage [a teacher] so to instruct their children"); *Pierce*, 268 U.S. at 535 (holding that choosing a nonpublic school is part of a parent's right and duty to "prepare [their child] for additional obligations" through education).

In *Mahmoud*, the Court made this abundantly clear:

6

> The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution. . . . And this is not merely a right to teach religion in the confines of one's own home. Rather, it extends to the choices that parents wish to make for their children outside the home. It protects, for example, a parent's decision to send his or her child to a private religious school instead of a public school. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025) (citing *Pierce*, 268 U.S. at 532-535).

More directly relevant to this case are the Court's decisions related to state laws that prohibited educational funding from being used in private religious schools.

Thus, in *Carson v. Makin*, 596 U.S. 767 (2022), the Court explained "that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id*. at 778. The Court said that while a state "may provide a strictly secular education in its public schools," the Maine policy challenged in that case involved a decision, "not to operate schools of its own, but instead to offer tuition assistance that parents may direct to the public or private schools of their choice." That meant that its policy was "subject to the free exercise principles governing any such public benefit program— including the prohibition on denying the benefit based on a recipient's religious exercise." *Id*. at 785.

In *Espinoza*, religious schools were barred "from public benefits solely because of the religious character of the schools." 591 U.S. 464, 476 (2020). Surely, "religious character" is more than just affiliation, but also includes the teaching and operational decisions of the school prompted by its religious mission and beliefs.

7

Consistent with this, the Court explained that one result of the policy is that schools were being put to "a choice between *being* religious or receiving government benefits." *Id*. at 480 (emphasis added).

Here, the State suggests these cases are distinguishable because Vermont's law does not categorically exclude religious schools but only incidentally has that effect. Given the State's history of repeatedly pushing to exclude religious schools from public benefit programs, that is a distinction without a difference. It is reasonable to conclude that when prior exclusions by the State are corrected by court decisions, only to be followed by new ones, that nothing of substance is changing even if the mechanism of exclusion and the proffered rationale are different.

The State's argument is mistaken. The Supreme Court has long recognized "a general rule, that what cannot be done directly from defect of power, cannot be done indirectly." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 50 (1825). The precedent described above establishes that a State cannot exclude an otherwise eligible religious school from a generally available public benefit. Since the State lacks the power to do that directly, it cannot do it indirectly by imposing that exclusion through a regulation that has the effect of a *de facto* religious exclusion while ensuring the eligibility of most secular providers.

As with the law invalidated in *Carson*, "Regardless of how the benefit and

restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 596 U.S. 789.

One final lesson from these cases is also relevant. In *Pierce*, the Court identified a corollary to the principle that the State must provide parents latitude to carry out their right and duty to direct their children's education—that the State does not have authority to attempt to "standardize" children. *Pierce*, 268 U.S. at 535. Here, too, Vermont should not be able to impose ideological conformity in education on parents who may not be able to afford educational opportunities without generally available public support. While the State may not have a mandate to fund private educational opportunities, having determined it will do so, it cannot limit the free exercise of beneficiaries by insisting that they endorse a belief preferred by the State when doing so cuts against their religious principles.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully urges this Court to reverse the judgment of the district court.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amicus Curiae*

9

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 2,084 words.

This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amicus Curiae*

10

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via ACMS) on June 30, 2026, and that all counsel of record were served by ACMS.

Respectfully submitted,

/s/ William C. Duncan
William C. Duncan
*Attorney for Amicus Curiae*

11