# No. 26-1416

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students and its students' parents, NATHAN PARTINGTON, individually, O. P., by and through his father and natural guardian, Nathan Partington,

*Plaintiffs - Appellants*,

T. S., K. S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve, NATHANIEL SLARVE, individually, DAWNA SLARVE, individually, A. G., M. G., by and through their parents and natural guardians, Chris and Bethany Goodwin, CHRISTOPHER GOODWIN, individually, BETHANY GOODWIN, individually,

*Plaintiffs*,

v.

ZOIE SAUNDERS, in her official capacity as Secretary of the Vermont Agency of Education, JENNIFER DECK SAMUELSON, in her official capacity as Chair of the Vermont State Board of Education, WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD,

*Defendants - Appellees*,

HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education, CHRISTINE BOURNE, in her official capacity as Windsor Southeast Supervisory Union Superintendent, HARTLAND SCHOOL BOARD, RANDALL GAWEL, in his official capacity as Orange East Supervisory Union Superintendent, JAY NICHOLS, in his official capacity as the Executive Director of The Vermont Principals' Association,

*Defendants.*

On Appeal From the United States District Court For The District Of Vermont, No. 23-652

**BRIEF OF AMICUS CURIAE STATE OF WEST VIRGINIA AND 19 OTHER STATES SUPPORTING APPELLANTS AND REVERSAL**

JOHN B. MCCUSKEY
  *Attorney General*
OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
  *Solicitor General*

HOLLY J. WILSON
  *Principal Deputy Solicitor
  General
  Counsel of Record*

EMILY C. AHLSTROM*
  *Assistant Solicitor General*

*Counsel for* Amicus Curiae *State of West Virginia*

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Introduction & Interests of *Amici Curiae* ........................................... 1

Summary of Argument .............................................................................. 3

Argument .................................................................................................... 4

    I.   Act 73 violates the Free Exercise Clause. ................................... 4

        A.   Act 73 is not neutral. ...................................................... 5

        B.   The Act also is not generally applicable. ..................... 15

        C.   The Act fails strict scrutiny. ....................................... 20

    II.   Act 73 embodies an old—and unconstitutional—tradition of religious hostility corrupting government action. ................................ 24

    III.   Vermont's exclusionary strategy harms the families it purports to serve. .................................................................................................... 29

Conclusion .............................................................................................. 32

Additional Counsel ............................................................................... 33

Certificate of Compliance ..................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*In re A.H.*,
999 F.3d 98 (2d Cir. 2021) ..............................................................8

*Aguilar v. Felton*,
473 U.S. 402 (1985) ......................................................................26

*Campbell v. Manchester Bd. of Sch. Dirs.*,
641 A.2d 352 (Vt. 1994) ..................................................................8

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995) ......................................................................25

*Carson v. Makin*,
596 U.S. 767 (2022) ...................................................1, 5, 6, 8, 15

*Chittenden Town Sch. Dist. v. Dep't of Educ.*,
738 A.2d 539 (Vt. 1999) ..................................................................8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*,
508 U.S. 520 (1993) ...............................6, 7, 13, 14, 15, 16, 20, 22

*Comm. For Pub. Ed. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973) ......................................................................26

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) .................................................................25, 26

*Everson v. Bd. of Educ. of Ewing Twp.*,
330 U.S. 1 (1947) .......................................................................4, 5

*Fowler v. Rhode Island*,
345 U.S. 67 (1953) ........................................................................26

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ...............................................................16, 17, 19

ii

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.*
   *EEOC,*
   565 U.S. 171 (2012) ...............................................................4

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ...................................................5, 16, 19

*King v. Burwell,*
   576 U.S. 473 (2015) .............................................................24

*Lovell v. City of Griffin,*
   303 U.S. 444 (1938) .............................................................26

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025) .......................................................15, 20

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
   584 U.S. 617 (2018) ...............................................................6

*Meek v. Pittenger,*
   421 U.S. 349 (1975) .............................................................26

*Mitchell v. Helms,*
   530 U.S. 793 (2000) (plurality opinion) ...............................1, 25

*Murdock v. Pennsylvania,*
   319 U.S. 105 (1943) .............................................................26

*Niemotko v. Maryland,*
   340 U.S. 268 (1951) .............................................................27

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) .......................................................16, 18, 28

*SFFA v. Harvard,*
   600 U.S. 181 (2023) .............................................................21

*Swart v. S. Burlington Town Sch. Dist.,*
   167 A.2d 514 (Vt. 1961).........................................................7

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ...............................................16, 18, 19, 28

iii

*United States v. Hansen*,
    599 U.S. 762 (2023) ..................................................................24

*United States v. Ressam*,
    553 U.S. 272 (2008) ..................................................................24

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) ..................................................22

*United States v. Virginia*,
    518 U.S. 515 (1996) ..................................................................22

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..................................................................26

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ....................................................................5

**Statutes**

16 V.S.A. § 165.............................................................................17

16 V.S.A. § 828....................................................................10, 18

**Other Authorities**

146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statement
    of Sens. Hatch and Kennedy), https://tinyurl.com/3dt6jskh............27, 28

7-1 VT. CODE R. § 3:2223 (2022) ........................................................9

*Candidate Questionnaire,* FRIENDS OF VT. PUB. EDUC.,
    https://perma.cc/WYM6-AFM2 ..............................................14

Corey McDonald, *Vermont's New Education Law Signals An
    End to State Funding for Religious Schools*, VTDIGGER
    (Aug. 20, 2025, 6:18 p.m.), https://tinyurl.com/5axjc59x...........................9

Douglas Laycock, *State RFRAs and Land Use Regulation*, 32
    U.C. DAVIS L. REV. 755 (1999) ...............................................27

H. 454, 2025-2026 Leg., Reg. Sess., at 31 (Vt. 2025) (as introduced), https://tinyurl.com/yntjfa8h ................................................13

*Hearing on H.454 Before the S. Comm. on Educ.*, 2025-2026 Leg., Reg. Sess. (Vt. 2025), http://bit.ly/4vdk97H ..................................13

Huriya Jabbar, Carlton J. Fong, Emily Germain, Dongmei Li, Joanna Sanchez, Wei-Ling Sun & Michelle Devall, *The Competitive Effects of School Choice on Student Achievement: A Systematic Review*, 36 EDUC. POL'Y 247 (2019), https://tinyurl.com/29mwcv8u ......................................................30

Kyle Duncan, *Secularism's Laws: State Blaine Amendments and Religious Persecution*, 72 FORDHAM L. REV. 493 (2003) ..................................................................................................25

Report of the Committee of Conference on H. 454, 2025-2026 Leg., Reg. Sess., at 54 (Vt. 2025), https://tinyurl.com/265z9am4 ......................................................13

*Search for Private Schools*, NCES, https://tinyurl.com/yeyrt5ey (last visited June 26, 2026)........................12

U.S. CENSUS BUREAU, A STATE-SORTED LIST OF ALL 2020 CENSUS URBAN AREAS FOR THE U.S. (July 2023), https://tinyurl.com/mu984zm8 ................................................................11

VERMONT CATHOLIC SCHOOLS DIRECTORY 2025-2026, ROMAN CATH. DIOCESE OF BURLINGTON, https://tinyurl.com/yc6ckwh7 (last visited June 26, 2026) ......................11

VT. AGENCY OF EDUC., TOWN AND UNIFIED UNION SCHOOL DISTRICTS TUITIONING ONE OR MORE GRADES (Mar. 25, 2024), https://tinyurl.com/bddnzexs ......................................................11

VT. CONST. ch. I, art. 3 ......................................................................8

Vt. H. 454 § 1 ................................................................18, 19, 20, 23

## INTRODUCTION & INTERESTS OF *AMICI CURIAE*

State-level hostility toward religious education has a long and "shameful pedigree" in America. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion). For generations, States excluded Catholic schools, then other religious schools, from public programs. Though they did so openly at first, they later moved to increasingly creative workarounds as courts closed each avenue of overt discrimination. *Carson v. Makin*, 596 U.S. 767, 789 (2022), closed one such avenue, holding that States can't "exclude otherwise eligible schools [from public benefit programs] on the basis of their religious exercise."

Act 73 is one of the latest state efforts to wound religious schools. Unable to exclude religious schools from state funding by name, Vermont engineered a triple-lock. Act 73 imposes three facially neutral criteria—a funding floor, a geographic restriction, and class-size minimums—that work in concert to ensure no religious school can qualify for public funds. The result almost speaks for itself: Fifteen religious schools were eligible before Act 73. Zero are eligible after it. Roughly three-quarters of secular schools remain untouched.

Vermont built its triple-lock to target religious schools. The public funding floor measured eligibility against the 2023–2024 school year—the first

1

full year religious schools were allowed in the program. But after decades of unconstitutional exclusion, they had no chance of meeting it. The geographic requirement confined eligibility to rural areas, where religious schools are scant. And the class-size minimums favor large secular schools and penalize religious ones, whose small classes are a matter of faith, not failure. Together, the requirements form a purpose-built exclusion.

Vermont's triple-lock is the latest iteration of an all-too-common pattern. The Blaine amendments gave way to Establishment Clause doctrine; and now facially neutral but ultimately discriminatory eligibility criteria carry on the same work. Act 73 may be more sophisticated than a Blaine amendment, more subtle than a COVID capacity restriction, but it is no less unconstitutional.

Amici are twenty States that share a common interest in ensuring that States' broad authority over education is exercised consistent with the First Amendment. Many amici provide public funds to religious schools, and they have done so without constitutional incident. They know firsthand that including religious schools in public benefit programs serves students and families, religious and nonreligious alike. States' authority doesn't extend to gerrymandering religious schools out of such programs through facially neutral criteria designed to accomplish what the Constitution forbids. And if

2

this Court permits it, the triple-lock becomes a template—a ready-made blueprint for any other State that wants to follow Vermont's lead. Amici States want to prevent that result, so they have filed this brief under Federal Rule of Appellate Procedure 29(a)(2).

Altogether, the First Amendment bars covert religious exclusion just as surely as overt discrimination. Act 73 is not neutral, not generally applicable, and cannot survive strict scrutiny. This Court should say so—and reverse.

## SUMMARY OF ARGUMENT

**I.** Under the Free Exercise Clause, laws must clear strict scrutiny if they are not both neutral and generally applicable.

Here, Act 73 is neither. Its three eligibility criteria are written in neutral terms but calibrated to exclude: Every religious school falls outside them, while secular schools pass through largely unaffected. Vermont compounds the problem by reserving discretion to waive the class-size requirement and shielding entire categories of secular schools from the criteria altogether. When a State covertly targets religion, like Act 73 does here, the Constitution demands justification.

Vermont offers *no* justification that holds up. It has shown neither compelling interests nor narrow tailoring. The law thus fails strict scrutiny.

3

**II.** Vermont's exclusion of religious schools follows a long and unconstitutional pattern. Governments have always found new ways to burden disfavored faiths after courts close off old ones. Vermont's own history—decades of exclusion, brief tolerance after *Carson*, and now Act 73— is the latest chapter in that story. Given that history, the Court should cast an especially skeptical eye toward laws like these. And it should decline to bless a template for other anti-religious States.

**III.** The harms Vermont inflicts are concrete. Act 73 not only exiles religious schools, but it strips Vermont's families of access to needed resources—hurting neediest families the most. Ultimately, the Act decreases educational choice and quality. So, the Act defies constitutional limits and harms Vermont children and families.

## ARGUMENT

### I.     Act 73 violates the Free Exercise Clause.

The First Amendment gives "special solicitude to the rights of religious" groups and individuals. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). States are not to be an "adversary" of religion, nor can States wield their power to "handicap religions." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 18 (1947). The "purpose of the First

Amendment" is "obviously not" to "make it … more difficult" for religious groups to operate. *Id.* at 18. Even when a State exercises its "broad police power" to further important government interests, the First Amendment imposes stiff limits. *Wisconsin v. Yoder*, 406 U.S. 205, 214, 220 (1972).

A plaintiff can prove a "free exercise violation in various ways." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). At the first step, a plaintiff may show the State "has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Id.* (cleaned up). If the policy fails on neutrality or general applicability, it must face strict scrutiny. *Id.* And a law fails strict scrutiny "unless the government can … demonstrat[e] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.*

Act 73 transgresses those constitutional limits.

### A. Act 73 is not neutral.

For decades, Vermont categorically excluded religious schools from its town tuition program. *Carson*, 596 U.S. 767, ended that. Vermont could not openly restore the exclusion, so it engineered a triple-lock instead: three facially neutral criteria that operate in combination to guarantee exactly one outcome. Every religious school is shut out. Nearly every secular school walks

through. The "objective" evidence shows that Act 73 is not neutral. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 540 (1993).

Vermont insists the law's language is neutral, but the Free Exercise Clause protects against more than just "facial discrimination." *Lukumi*, 508 U.S. at 534. It also bars any "subtle departures from neutrality" and concealed "governmental hostility" towards religion. *Id.* (cleaned up); *see also Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 634 (2018). Because laws may be facially, but not substantively, neutral, *id.*, courts must ensure they aren't carefully "gerrymandered" to target religious exercise, *Lukumi*, 508 U.S. at 534-42. A State creates an unconstitutional gerrymander when it tries to "manipulate[]" a program's definition or scope in a way that unduly burdens religion. *Carson*, 596 U.S. at 784 (cleaned up). At bottom, "nothing neutral" can be found in a program that targets religious groups. *Id.* at 781.

The government's true motives can be discerned "from both direct and circumstantial evidence." *Lukumi*, 508 U.S. at 540. "[T]he effect of a law in its real operation is [often the best] evidence of its object." *Id.* at 535. Other relevant considerations include "the historical background of the decision under challenge, the specific series of events leading to the enactment … , and

the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 540. "These objective factors bear on the question of discriminatory object." *Id.*

While Act 73 appears superficially neutral in word, it is not truly neutral in deed. "The text[] of the [statute was] gerrymandered with care" to exclude all religious schools while including the most prominent and powerful secular schools. *Lukumi*, 508 U.S. at 542.

**1.** Consider, first, Act 73's history. *See Lukumi*, 508 U.S. at 535. The "series of events leading to [Act 73's] enactment" paints a clear picture: Each time the law forced Vermont to open its doors to religious schools, Vermont found a new way to shut them again. *See id.* at 540.

Travel back to the 1960s, when Vermont's original religious school exclusion came to be. The Vermont Supreme Court held, in 1961, that state aid to Catholic schools violated the Establishment Clause. *Swart v. S. Burlington Town Sch. Dist.*, 167 A.2d 514, 520-21 (Vt. 1961). And that exclusion persisted for four decades. Not until 1994 did the Vermont Supreme Court briefly change course. It abrogated its prior decision and held that reimbursing tuition for a student attending an out-of-state Episcopal school did not violate the Establishment Clause. *Campbell v. Manchester Bd. of Sch.*

7

*Dirs.*, 641 A.2d 352, 361 (Vt. 1994). That interruption was short-lived, though. Just six years later, in 1999, the Vermont Supreme Court pivoted by stretching Vermont's Compelled Support Clause, a provision targeting compelled worship and support for clergy, to fill the gap. *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 549-62 (Vt. 1999); *see* VT. CONST. ch. I, art. 3.

That reincarnated exclusion lasted another two decades, until this Court and the Supreme Court said no more. In 2021, the Second Circuit clarified that religious schools and students have the right to participate in public benefit programs. *See In re A.H.*, 999 F.3d 98 (2d Cir. 2021). It recognized that Vermont had long deprived religious groups "of a public benefit as a result of the state's and the school districts' decades-long policy of unconstitutional religious discrimination." *Id.* at 108. And then, in 2022, the Supreme Court handed down *Carson.* 596 U.S. 767. The Court held that States could not "exclude otherwise eligible schools [from public benefit programs] on the basis of their religious exercise." *Id.* at 789. Those cases forced Vermont's hand. And the number of approved religious schools suddenly jumped from zero to fifteen. JA774.

But Vermont tolerated religious schools for only a year. *See* JA053. Vermont's Board of Education went to work. In May of 2022, it adopted

8

regulations imposing nondiscrimination requirements it knew would weed-out the religious schools. *See* 7-1 VT. CODE R. § 3:2223 (2022). Mid Vermont Christian understood this exclusion would violate its First Amendment rights, so it filed suit. JA052.

The State then pivoted in response to litigation. JA052. It told Mid Vermont Christian the school actually "*could* receive public funding" while the Board was making its final decision about the school's application. JA052 (emphasis added). But after that conditional endorsement, the State stalled— leaving Mid Vermont Christian's application in limbo—while it waited for a legislative fix. JA053.

Enter: Act 73. Even though "a very small percentage" of students "who used public funds … were going to religious schools," the Legislature set out to "halt" funds from going to that small group. Corey McDonald, *Vermont's New Education Law Signals An End to State Funding for Religious Schools*, VTDIGGER (Aug. 20, 2025, 6:18 p.m.), https://tinyurl.com/5axjc59x. Enacted on July 1, 2025, the law imposed three new requirements on "approved independent schools." In order to receive state funding, those "approved independent schools"—which include religious schools—must now: (1) be located in a school district (or supervisory union with a school district) that

9

does not operate a public school, (2) have had at least 25% of their enrollment be publicly funded during the 2023–2024 school year, and (3) comply with class-size minimums regardless of school size. 16 V.S.A. § 828. And with these requirements, the fifteen religious schools that were eligible post-*Carson* became excluded (again) from receiving public funds. *Compare* JA365-388, *with* JA389-413.

This pattern of events points to an anti-religious purpose, no matter what the text says.

**2.** And Vermont's legislature accomplished its goal. Its triple-lock shuts out and keeps out religious schools forever.

Start with the public funding floor—the first lock. By limiting the measurement period to the 2023-2024 school year, Vermont did two things at once. First, it made it impossible for religious schools to satisfy the floor; they had only just entered the program after being categorically excluded for two decades, after all. JA106; *see supra*, Section I.A.1. And second, it permanently closed the door to any school not already in that cohort. The pool of potentially eligible schools is fixed—frozen at the moment religious schools first became eligible post-*Carson*—and no school outside that window can ever qualify. The

10

fifteen religious schools are thus the *only* schools that could even attempt to run the rest of Act 73's gauntlet.

The geographic requirement turns the second lock. Only seventeen school districts or supervisory unions in Vermont do not operate a public school—and all seventeen are in rural areas. *See* VT. AGENCY OF EDUC., TOWN AND UNIFIED UNION SCHOOL DISTRICTS TUITIONING ONE OR MORE GRADES (Mar. 25, 2024), https://tinyurl.com/bddnzexs; U.S. CENSUS BUREAU, A STATE-SORTED LIST OF ALL 2020 CENSUS URBAN AREAS FOR THE U.S. (July 2023), https://tinyurl.com/mu984zm8 (not listing any of seventeen areas as "urban"). But "most religious schools in Vermont … are located in more-heavily populated areas." JA103; *see, e.g.*, VERMONT CATHOLIC SCHOOLS DIRECTORY 2025-2026, ROMAN CATH. DIOCESE OF BURLINGTON, https://tinyurl.com/yc6ckwh7 (last visited June 26, 2026) (showing that eleven of the twelve Catholic schools in Vermont are in urban areas). So, of the fifteen religious schools that could even attempt to satisfy this lock, virtually none are positioned in the right geography to do so. *See* JA389-413.

The class-size requirement turns the third and final lock. Vermont's religious schools characteristically operate with small class sizes. JA107. Mid Vermont Christian Head of School Vicky Fogg explained why: The school

11

"purposely keep[s] … class sizes small to ensure each student can maintain a close personal relationship with their teacher," because that relationship "helps instill [the school's religious] beliefs in every student."  JA460.  She continued:  "[L]arger classes, where one teacher is responsible for dozens of students, detract from learning and hinder[] the [religious]-model education [the school] provide[s]."  JA461.  "Small class sizes mean more one-on-one interaction, leading to better performance and spiritual discipleship."  JA461.  That is why Mid Vermont Christian has a 7.8:1 student-to-teacher ratio, Christ the King School is 14.7:1, and St. Paul's School is 5.2:1.  *Search for Private Schools*, NCES, https://tinyurl.com/yeyrt5ey (last visited June 26, 2026).  Act 73's class-size minimums thus don't just burden Mid Vermont Christian—they target the religious character of the education it, and every other religious school, provides.  Meanwhile, Vermont's secular academies—larger by design—clear the threshold comfortably.  The criterion thus burdens religiously motivated conduct while leaving the comparable secular choice mostly untouched.  That asymmetry is the hallmark of a law that is neither neutral nor generally applicable.

The triple-lock's function is plain: Act 73 created a rubric that only large, rural, historically funded secular academies can satisfy. Not a single religious school in Vermont meets all three criteria—and by design, not one ever will.

**3.** And if any doubt remains, the legislative history confirms what the triple-lock's design and history—the "strong[est] evidence"—already reveal. *See Lukumi*, 508 U.S. at 535. The bill that became Act 73 originally required a 51% public-funding floor. H. 454, 2025-2026 Leg., Reg. Sess., at 31 (Vt. 2025) (as introduced), https://tinyurl.com/yntjfa8h. It was lowered to 25% by a conference committee that included two senators with direct ties to secular schools that remained eligible under the final law. Report of the Committee of Conference on H. 454, 2025-2026 Leg., Reg. Sess., at 54 (Vt. 2025), https://tinyurl.com/265z9am4. The reason for that adjustment was not kept secret. During a Senate committee hearing, one legislator said the quiet part out loud: it was "important … that the percentage requirement be guiding the decision because otherwise we're starting to send people back to religious schools." *Hearing on H.454 Before the S. Comm. on Educ.*, 2025-2026 Leg., Reg. Sess. (Vt. 2025), at 1:51:02-1:52:17, http://bit.ly/4vdk97H.

And those legislators were not alone. Campaign-season statements by others who voted for Act 73 confirm the same purpose. Representatives

13

Masland, Emmons, Waszazak, Satcowitz, Goldman, and Hooper each declared that taxpayer money should not fund religious schools. *Candidate Questionnaire,* FRIENDS OF VT. PUB. EDUC., https://perma.cc/WYM6-AFM2. Representative Headrick foreshadowed the legislature's ultimate strategy: "We must amend the process by which religious schools have been included as recipients of Vermont's Town Tuition Program." *Id.* And Representative Holcombe, Vermont's former Secretary of Education, warned that funding religious schools risked turning Vermont into a place "like Afghanistan," JA086, called the Supreme Court "radical," and equated public funding of religious schools with "funding homophobia," *Candidate Questionnaire, supra.*

\* \* \*

These "objective" factors reveal Act 73's careful "gerrymander." *Lukumi*, 508 U.S. at 535. The numbers help give away the game. Act 73 wiped out 100% of previously eligible religious schools while leaving 74% of secular schools untouched. JA109. Eligible religious schools dropped from fifteen to zero; eligible secular schools fell only from sixty-one to forty-five. JA109. Vermont has "manipulated" the Act's scope in a way that targets religious schools—and this Court need not "exhibit a naiveté from which ordinary

14

citizens are free" to see it. *Carson*, 596 U.S. at 784. The Supreme Court is no stranger to facially neutral policies that, practically speaking, burden religious observers and "almost no others." *Lukumi*, 508 U.S. at 536; *see also Mahmoud v. Taylor*, 606 U.S. 522, 529, 538, 561 (2025). Covert burdens—like more overt ones—violate the First Amendment.

So, Act 73 is not neutral. The Free Exercise Clause bars "subtle departures from neutrality" and "governmental hostility which is masked" just as surely as it bars outright discrimination. *Lukumi*, 508 U.S. at 534 (cleaned up). Vermont's triple-lock is neither subtle nor ambiguous—it is a purpose-built exclusion of religious schools, confirmed by its design, its effect, and the words of the legislators who enacted it. The First Amendment does not permit such a statute, no matter how carefully the gerrymander was drawn.

### B. The Act also is not generally applicable.

Act 73 fails on neutrality, but that failure is not the only reason it must face strict scrutiny. It is also not generally applicable; Vermont has unfettered discretion to grant exemptions, and Act 73 carves out entire categories of secular schools from its requirements altogether.

General applicability requires a State to "appl[y] [standards] in an evenhanded, across-the-board way." *Kennedy*, 597 U.S. at 527. A law is unlikely to be generally applicable when it disproportionately "imposes burdens … on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543.

Discretion to grant an exemption defeats general applicability. When the State creates any "mechanism for granting exceptions[,] [that] renders a policy not generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). That's true even if no "exceptions have been given." *Id.*

Underinclusivity also independently defeats general applicability. A law is not generally applicable, for example, if it "prohibits religious conduct while permitting secular conduct that undermines the government's [same] asserted interests." *Fulton*, 593 U.S. at 534. And how the State "categoriz[es]" different conduct carries little weight. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020). That's because regulatory lines may themselves be gerrymandered against religion. *See id.* The relevant question is whether the government treats *any* secular conduct better than the religious conduct at issue when both implicate the State's asserted interests. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

16

In sum, general applicability demands two things: that statutory schemes foreclose discretion to selectively grant exemptions, *and* that the government pursues its interests evenhandedly—not in a way that targets religion.

Act 73 fails on both.

First, the Act gives the Vermont Board of Education discretion to grant exemptions from the class-size provision. A school that doesn't meet the class-size requirements may "develop[] an implementation plan to meet" them. 16 V.S.A. § 165(a)(9)(B). Or a "school board [may] determine that … a school … is unable [to] comply with the class size minimum standards due to geographic isolation." *Id.* In either circumstance, the Board of Education possesses authority to grant a waiver. *Id.*

In fact, the Board retains "sole discretion" to grant or deny exemptions. *Fulton*, 593 U.S. at 535. The Act sets forth no standards for granting exemptions; the Board gets to "define what qualifies as geographic isolation," and any decision it makes is "final." 16 V.S.A. § 165(a)(9)(B). The "mechanism [Vermont created] for granting exceptions[,] [thus] renders [Act 73] not generally applicable." *Fulton*, 593 U.S. at 537.

17

Second, the Act's underinclusivity also makes it not generally applicable. Indeed, Vermont's "categorizations" inherently treat secular conduct "less harshly" than comparable religious conduct. *Roman Cath. Diocese*, 592 U.S. at 17. The Act carves out entire classes of schools from the triple-lock, including out-of-state public schools, therapeutic schools, and tutorial programs. 16 V.S.A. § 828(a)(3)-(7). True, a religious school could "sponsor or operate" a therapeutic school or tutorial program. JA787. But Vermont hasn't shown they do—nor could it. JA787. So in operation, secular schools alone receive this categorically favorable treatment.

And the exempted secular schools implicate the same "asserted government interest[s]." *Tandon*, 593 U.S. at 62.

Vermont has tossed out a few different interests thus far. Act 73's stated purpose is to "ensure each student is provided substantially equal educational opportunities that will prepare them to thrive in a 21st-century world." Vt. H. 454 § 1(b)(1) (enacted). Before the district court, Vermont asserted a contradictory interest: "restrict[ing] which schools qualify for the town tuition payments in order to achieve economies of scale through a more centralized educational system." JA762.

18

Either way, the Act regulates "religious conduct" but not "secular conduct that undermines" the same interests. *Fulton*, 593 U.S. at 534. The Act grants unconditional approval to therapeutic schools and tutorial programs—all of which are secular. But all religious schools (and some secular schools) must surmount additional hurdles to gain approval. If Vermont wants to "provide[] substantially equal educational opportunities," Vt. H. 454 § 1(b)(1) (enacted), then it should apply its requirements in an "evenhanded" way, *Kennedy*, 597 U.S. at 527. And if Vermont wants to create a "more centralized educational system" by "restrict[ing] which schools qualify for the town tuition payments," JA762, the same is true: It should tighten qualifications "across-the-board," *Kennedy*, 597 U.S. at 527.

And that some "secular independent schools" must meet the new requirements doesn't make the triple-lock generally applicable. *See* JA788-789. "It is [simply] no answer that a State treats some comparable secular [groups] … as poorly as or even less favorably than the religious exercise at issue." *Tandon*, 593 U.S. at 62.

Because Act 73 is not generally applicable, it is subject to strict scrutiny for that independent reason, too.

19

### C. The Act fails strict scrutiny.

A law passes strict scrutiny only if the law (1) furthers compelling interests (2) through narrowly tailored means. *Mahmoud*, 606 U.S. at 565. And "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Act 73 is not the exception. It fails on both prongs.

**1.** Act 73's stated purpose—to provide "substantially equal educational opportunities" for all students, Vt. H. 454 § 1(b)(1) (enacted)—cannot qualify as a compelling interest because Vermont pursues it so selectively, and because Act 73 actively undermines it. A State cannot invoke a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up). By excluding all religious schools from the program, Act 73 strips an entire category of students—those whose families choose religious education—of access to public tuition funds available to their peers. And the triple-lock's specific requirements make things worse, not better: They have no coherent relationship to whether a school provides students with substantially equal educational opportunities. In other words, Vermont has never articulated why

20

it's advancing equality in education by *constraining* educational opportunity throughout the State.

Vermont's other offered interest—"restrict[ing] which schools qualify for the town tuition payments in order to achieve economies of scale through a more centralized educational system"—fares no better. JA762. This goal is not "sufficiently coherent" or measurable to qualify as a compelling interest. *SFFA v. Harvard*, 600 U.S. 181, 214 (2023). What is the goalpost? A five percent cost reduction? Ten percent? Vermont gives no answer. And without a measurable benchmark, no court can evaluate whether the triple-lock achieves Vermont's asserted goal (or whether it even moves the needle). A post-hoc economic theory, conjured in litigation to justify a religious exclusion, is not a compelling state interest.

Beyond that, Vermont's rationales—equal opportunity in the statute, centralization in litigation—are not merely shifting, they are inconsistent. Equal opportunity, as Vermont frames it, is an expansive goal: ensuring every student can access quality education. Centralization, as Vermont frames it, is a restrictive one: limiting which schools qualify for public funds to achieve administrative efficiency. A State genuinely pursuing either interest would not need to swap justifications between the legislature and the courthouse.

21

And a State couldn't simultaneously pursue both, because the interests point in opposite directions. The Court can rightly consider this contradiction as more evidence that these "interests" are not compelling, but illusory. *See Lukumi*, 508 U.S. at 535-40, 546-47; *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.) ("Judges are not required to exhibit a naivete from which ordinary citizens are free."); *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that under intermediate scrutiny, justifications "must be genuine, not hypothesized or invented *post hoc* in response to litigation").

The contradiction reveals what the triple-lock's design and effect already make plain: Vermont's true aim was to exclude religious schools, and the offered rationales are post hoc attempts to dress that exclusion in constitutional clothing.

**2.** Even if Vermont's interests qualified as compelling (they don't), Act 73 is not narrowly tailored to either one. A law fails narrow tailoring when it is under- or overinclusive relative to its stated goals. *Lukumi*, 508 U.S. at 546. Act 73 is both.

The triple-lock is not narrowly tailored to equal educational opportunity because it does the opposite of equalizing. As noted, excluding all religious schools—and some secular ones—from public funding does not provide

22

students with more equal access to education; it provides them with less. *See* Vt. H. 454 § 1(b)(1) (enacted). And the wholesale carve-outs for therapeutic schools, tutorial programs, and out-of-state public schools mean that the triple-lock doesn't even apply evenhandedly to the schools that remain in the program. A law that restricts access to education for some students while exempting favored categories of secular schools is not narrowly tailored to expanding educational opportunity—it is antithetical to it.

The triple-lock is no better tailored to centralization and economies of scale. If Vermont's goal is a more efficient, centralized system, the obvious means is to impose uniform requirements on all schools receiving public funds—not to exempt therapeutic schools, tutorial programs, and out-of-state public schools from the triple-lock entirely. Those exempted schools draw from the same Education Fund and implicate the same cost and efficiency concerns Vermont invokes. Carving them out while targeting religious schools exposes the centralization rationale as an afterthought.

Act 73 fails strict scrutiny on both prongs. Vermont cannot gerrymander religious schools out of a public benefit program and then manufacture justifications that its own statute contradicts.

23

**II.    Act 73 embodies an old—and unconstitutional—tradition of religious hostility corrupting government action.**

History has not been kind to religious minorities in this country, and courts have had to say so repeatedly.  That context matters here.  *See United States v. Hansen*, 599 U.S. 762, 775 (2023) (including "statutory history" as "context" that forms "the water in which [the words of a statute] swim"); *King v. Burwell*, 576 U.S. 473, 500-01 (2015) (Scalia, J., dissenting) ("Context always matters.").  "[I]f judges are to give meaningful effect to the intent of the enacting legislature, they must interpret statutory text with reference to the statute's purpose and its history." *United States v. Ressam*, 553 U.S. 272, 283 (2008) (Breyer, J., dissenting).

Governments hostile to religion are creative.  When one method of exclusion becomes legally unavailable, they find another.  Blaine-era legislatures encoded anti-Catholic prejudice in "sectarian" exclusions. Zoning authorities buried discrimination in traffic studies.  COVID-era executives capped church capacity while leaving casinos untouched.  Each time, the Supreme Court corrected the abuse—and each time, a new method emerged.

Vermont's Act 73 is the latest iteration.  But this case carries stakes beyond Vermont.  If facially neutral eligibility criteria engineered to exclude religious schools survive constitutional review, States hostile to religious

24

education will have something more valuable than a win; they will have a model. This Court should examine Act 73 with that consequence firmly in view. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part).

To start, the Blaine amendments of the late 1800s were "prompted by virulent prejudice against immigrants, particularly Catholic immigrants." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 498 (2020) (Alito, J., concurring). These amendments typically barred state aid to "sectarian" institutions, especially schools. And "it was an open secret that 'sectarian' was code for 'Catholic.'" *Mitchell*, 530 U.S. at 828 (plurality opinion).

Catholics weren't the only religious group singled-out for discriminatory treatment. The "term [sectarian] was likewise used against Mormons and Jews." *Espinoza*, 591 U.S. at 501 (Alito, J., concurring). Blaine amendments proved to be a useful tool for legislatures who wanted to "penalize a disfavored religious group." Kyle Duncan, *Secularism's Laws: State Blaine Amendments and Religious Persecution*, 72 FORDHAM L. REV. 493, 497 (2003). These amendments translated "intense anxiety" about religious minorities into law. *Espinoza*, 591 U.S. at 500 (Alito, J., concurring) (cleaned up). And this "sectarian" exclusion even migrated from legislative provisions

into judicial doctrine. *See Comm. For Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 772-80 (1973); *Meek v. Pittenger*, 421 U.S. 349, 364-66 (1975), *overruled by Mitchell*, 530 U.S. 793; *Aguilar v. Felton*, 473 U.S. 402, 411-13 (1985), *overruled by Agostini v. Felton*, 521 U.S. 203 (1997).

A few decades after the Blaine amendment era, state ire turned towards Jehovah's Witnesses. "Their refusal to salute the flag, to perform military service, and their insistence on carrying on a sometimes tactless campaign of door-to-door preaching caused them to get into serious trouble with both the public and law-enforcement agencies." M. JAMES PENTON, APOCALYPSE DELAYED: THE STORY OF JEHOVAH'S WITNESSES 117 (3d ed. 2015). Many laws of the time burdened the denomination's religious exercise—from permit requirements for literature distribution, *Lovell v. City of Griffin*, 303 U.S. 444, 451 (1938), to license taxes on door-to-door evangelism, *Murdock v. Pennsylvania*, 319 U.S. 105, 106-08 (1943), to compulsory flag pledge and salute laws, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627-29 (1943). Some regulations explicitly targeted Jehovah's Witnesses. *See Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (ordinance barring a Jehovah's Witness sermon in the park, but not a Catholic mass or a Protestant service); *Niemotko*

26

*v. Maryland*, 340 U.S. 268, 272 (1951) (permit denied because of local authority's "dislike for or disagreement with the Witnesses").

Later, authorities began weaponizing local zoning laws. "Land use regulation [then] bec[a]me the most widespread obstacle to the free exercise of religion." Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. DAVIS L. REV. 755, 783 (1999). Local zoning authorities targeted minority religions in particular—both "on the face of zoning codes" and in "the highly individualized and discretionary" permitting processes. 146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy), https://tinyurl.com/3dt6jskh.

Under this discriminatory regime, "places of secular assembly [were] often not subject to the same rules." Laycock, *State RFRAs*, *supra*, at 776. So, for example, "banquet halls, clubs, [or] community centers … [were] often permitted as of right in zones where churches require[d] a special use permit." *Id.* Or these secular buildings were "permitted on special use permit where churches [were] wholly excluded." *Id.* Worse still, this land-use religious discrimination was often "covert." 146 Cong. Rec. at S7775. It "lurk[ed] behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" *Id.* at S7774.

27

Fast forward to COVID, local governments again "single[d] out houses of worship for especially harsh treatment." *Roman Cath. Diocese*, 592 U.S. at 17. New York, for example, exempted secular businesses from capacity limits, while subjecting churches to strict limits of ten or fifteen people—regardless of building size or precautions in place. *Id.* California did the same. Its regulations "treat[ed] some comparable secular activities [significantly] more favorably than at-home religious exercise." *Tandon*, 593 U.S. at 63. Across the country, "[a]t the flick of a pen, [States] … asserted the right to privilege restaurants, marijuana dispensaries, and casinos over churches, mosques, and temples." *Roman Cath. Diocese*, 592 U.S. at 22 (Gorsuch, J., concurring).

This history teaches a simple lesson: Adversaries of religion always find new ways to punish protected religious exercise.

If facially neutral eligibility criteria calibrated to exclude religious schools pass constitutional muster, other States hostile to religious education have their roadmap. Maine, Minnesota, and Maryland have already begun experimenting with analogous strategies—redefining program eligibility, imposing nondiscrimination strings, and otherwise finding new ways to accomplish post-*Carson* what the Constitution prohibits. Amici know this firsthand: States that genuinely include religious schools in public benefit

28

programs have done so without constitutional incident or administrative chaos. The Constitution permits that inclusion. It does not permit the alternative—a regime in which States may exclude religious schools so long as they are creative enough about it. This Court should act before the triple-lock becomes a template.

## III. Vermont's exclusionary strategy harms the families it purports to serve.

Act 73 "burdens not only religious schools[,] but also the families whose children attend or hope to attend them." *Espinoza*, 591 U.S. at 486. The town tuition program was designed to help Vermont students, yet Act 73 cuts people off from those benefits.

Mid Vermont Christian's exclusion harms much more than institutional interests; it denies concrete resources to children and families in need. Religious families choosing religious schools in Vermont are deprived of the same public benefits—town tuition assistance, dual enrollment programs, and early college funding—that families choosing secular schools receive. So a student at a religious school cannot take publicly funded dual enrollment courses, but an identical student at a secular school can. And Vermont leaves parents choosing religious schools to bear the financial burdens alone, but it extends financial support to most parents who choose secular schools.

29

This burden falls hardest on Vermont's neediest families. Well-off families—secular or religious—may be able to send their children to their preferred school without the State's assistance. But those in tighter circumstances have no such luxury. Act 73 further entrenches a two-tier system of education. So Vermont's setup ensures that poor and religious students have fewer educational opportunities, while rich and secular students have more. That's wrong.

The Act's specific requirements also decrease educational quality. Many studies show that smaller class sizes create "significant benefits … [for] students' achievement." Faye Antoniou, Mohammed H. Alghamdi & Kosuke Kawai, *The Effect of School Size and Class Size on School Preparedness*, 15 FRONTIERS PSYCH. 1, 2 (2024), https://tinyurl.com/4scswkhp. But the Act cuts off funding for schools with *too small* of classes. So schools providing instruction at better (lower) teacher/student ratios are penalized for that choice. Similarly, school choice increases competition between educational options; and increased competition positively impacts student achievement. Huriya Jabbar, Carlton J. Fong, Emily Germain, Dongmei Li, Joanna Sanchez, Wei-Ling Sun & Michelle Devall, *The Competitive Effects of School Choice on Student Achievement: A Systematic Review*, 36 EDUC. POL'Y 247,

247 (2019), https://tinyurl.com/29mwcv8u. But Act 73 decreases school choice by permitting public funding of approved independent schools only in the most rural areas.

Religious schools are well-suited to fill these much needed educational gaps. Vermont's religious schools, in particular, typically have smaller class sizes. JA107. In smaller classes, teachers can better meet the range of student needs. And most religious schools are located in Vermont's more populated areas. JA103. If Vermont complied with the Constitution and allowed these religious schools to participate, competition between private and public schools across the State would increase. And that would ultimately improve the quality of education for all Vermont children. West Virginia and States like it know that reality from experience; West Virginia's Hope Scholarship, for instance, funds religious and secular options on identical terms, with many religious schools participating with no difficulty. Inclusion has proved workable—and constitutional. So the experience of the States refutes any suggestion that Vermont's exclusion is necessary to a functioning program. Vermont's animus towards religion should not be permitted to erase such positive outcomes.

* * *

31

All in all, Act 73 violates the Constitution and harms Vermont children and families.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

JOHN B. MCCUSKEY
 ATTORNEY GENERAL

Michael R. Williams
 *Solicitor General*

/s/ Holly J. Wilson

Holly J. Wilson
 *Principal Deputy Solicitor General*
 *Counsel of Record*

Emily C. Ahlstrom*
 *Assistant Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov

*admitted in the District of Columbia; practicing under supervision of West Virginia lawyers

Dated: July 1, 2026

*Counsel for* Amicus Curiae *State of West Virginia*

32

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

CORI MILLS
Acting Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

34

## CERTIFICATE OF COMPLIANCE

1.      This response brief complies with Fed. R. App. P. 28.1(e)(2)(B)(i) because it contains 6,132 words.

2.      This response brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. P. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Holly J. Wilson
Holly J. Wilson