# 26-1416

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students and its students' parents, NATHAN PARTINGTON, individually, O.P., by and through his father and natural guardian, Nathan Partington

*Plaintiffs-Appellants,*

T. S., K. S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve, NATHANIEL SLARVE, individually, DAWNA SLARVE, individually, A. G., M. G., by and through their parents and natural guardians, Chris and Bethany Goodwin, CHRISTOPHER GOODWIN, individually, BETHANY GOODWIN, individually,

*Plaintiffs,*

v.

ZOIE SAUNDERS, in her official capacity as Secretary of the Vermont Agency of Education, JENNIFER DECK SAMUELSON, in her official capacity as Chair of the Vermont State Board of Education, WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD,

*Defendants-Appellees,*

HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education, CHRISTINE BOURNE, in her official capacity as Windsor Southeast Supervisory Union Superintendent, HARTLAND SCHOOL BOARD; RANDALL GAWEL, in his official capacity as Orange East Supervisory Union Superintendent, JAY NICHOLS, in his official capacity as the Executive Director of The Vermont Principals' Association,

*Defendants.*

*[Cover and caption continue on next page]*

On Appeal from the United States District Court for the
District of Vermont
Case No. 2:23-cv-00652

**BRIEF OF AMICI CURIAE ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL AND THE COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES IN SUPPORT OF APPELLANTS**

Ian Speir
COVENANT LAW PLLC
13395 Voyager Pkwy #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit corporations recognized as tax-exempt under § 501(c)(3). *Amici* do not have parent corporations, do not issue stock, and are not subsidiaries or affiliates of any publicly owned corporation.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................1

TABLE OF CONTENTS .................................................................................2

TABLE OF AUTHORITIES ...........................................................................3

IDENTITY AND INTEREST OF AMICI CURIAE ................................................1

SUMMARY OF ARGUMENT .........................................................................3

ARGUMENT ...............................................................................................4

I.  Religious schools are a vital part of the American educational landscape. .....4

II.  A properly administered school-choice system allows religious families to select quality schools that align with their beliefs and practices. ........................8

III.  Punishing schools for small class sizes is irrational—it's directly contrary to the empirical evidence—and exposes Act 73's lack of neutrality. ..................11

CONCLUSION ...........................................................................................15

CERTIFICATE OF COMPLIANCE ..................................................................16

CERTIFICATE OF SERVICE..........................................................................16

ii

# TABLE OF AUTHORITIES

**Cases**

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)………………………………………………………14-15

*Hosanna-Tabor Evangelical Church & Sch. v. EEOC*, 565 U.S. 171 (2012)……8

*Mahmoud v. Taylor*, 606 U.S. 522 (2025)……………………………………….9

*Mt. View Cmty. Sch., Inc. v. City of Rutland*, 2011 VT 65…………………………5

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)……7, 8, 13

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)………………………………………….11

**Statutes and Rules**

16 V.S.A. § 821……………………………………………………………………5

16 V.S.A. § 822……………………………………………………………………4

Act R-40 (H.C.R. 23), 2017-2018 Gen. Assemb., Reg. Sess. (Vt. 2017)……3, 5, 8

FRAP 29(a)(4)(E)…………………………………………………………………..1

Laws of Vermont, 1869, No. 9, § 1………………………………………………5

**Other Authorities**

George A. Akerlof & Rachel E. Kranton, "Identity and Schooling: Some Lessons for the Economics of Education," 40 J. Econ. Literature 1167 (2002)……………7

All Saints Catholic Academy, Our Community, https://allsaintsvt.org/school-life/for-our-community................................................................................9

Archdiocese of N.Y., High School Calendar, https://catholicschoolsny.org/secondary/high-school-calendar/.............................10

Cathedral High Sch., Religious Studies, https://cathedralhs.org/religious-studies................................................................10

Jeremy D. Finn et al., The Enduring Effects of Small Classes, 103 Teachers Coll. Rec. 145 (2001)……………………………………………………..12-13

Grace Christian Sch., Christ-Centered, https://gcsvt.org/christ-centered/...............10

Grace Christian Sch., Spiritual Life, https://gcsvt.org/spiritual-life/.......................10

Greenwich Catholic Sch., Faith in Action, https://bit.ly/4f6JDyk...........................10

William Jeynes, "The Assessment of Various Dimensions of Religious Faith Based on Four Meta-Analyses," Interdisciplinary J. Research on Religion, vol. 9, art. 9 (2013)……………………………………………………………………….5-6

James P. Kelly, III & Benjamin Scafidi, More Than Scores: An Analysis of Why and How Parents Choose Private Schools (Friedman Found. for Educ. Choice, Nov. 2013)………………………………………………………………...14

Manhattan Catholic Schs., Faith-based curriculum, https://bit.ly/446SERQ..........10

Michael W. McConnell, Why Is Religious Liberty the "First Freedom"?, 21 Cardozo L. Rev. 1243 (2000)……………………………………………………9

Mid Vermont Christian Sch., Events/Calendar, https://www.mvcs.info/mvcs-life/events-calendar/......................................................................................10

Mid Vermont Christian Sch., Our Philosophy of Education, https://www.mvcs.info/about/our-vision/............................................................11

Nat'l Ctr. for Educ. Statistics, Characteristics of 2020-21 Public and Private K-12 School Teachers in the United States (Dec. 2022)…………………………13-14

Barbara Nye et al., The Long-Term Effects of Small Classes: A Five-Year Follow-Up of the Tennessee Class Size Experiment, Educ. Eval. & Pol'y Analysis, vol. 21, no. 2, 127–42 (Summer 1999)……………………………………………………13

Kathleen Porter-Magee, "Amid the Pandemic, Progress in Catholic Schools," *Wall St. J.*, Oct. 27, 2022, https://on.wsj.com/496F6YP................................................6

Rutland Area Christian Sch., Grades 1-8,
http://www.racsonline.com/grades-1-8/................................................................11

M. Danish Shakeel et al., "The Public Purposes of Private Education: a Civic
Outcomes Meta-Analysis," 36 Educ. Psych. Rev. 40 (2024)…………………6-7, 8

St. Francis Xavier Catholic Sch., Faith, https://www.sfxvt.org/faith..................9, 11

Cori Urban, "School Masses help bring 'faith into focus,'" *Vermont Catholic*, Oct.
17, 2022, https://bit.ly/4g83Zby.........................................................................9-10

**IDENTITY AND INTEREST OF AMICI CURIAE[1]**

The **Association of Christian Schools International** ("ACSI") is a non-denominational religious association of 2,300 Christian preschool, elementary, and secondary schools and 90 post-secondary institutions in the United States. There are 52 ACSI member schools in this Circuit, and Appellant Mid Vermont Christian School is a member. ACSI member schools educate 5.5 million children around the world, including 825,000 in the United States. Members advance the common good by providing quality education and spiritual formation to their students. Their calling relies upon a vibrant Christian faith that embraces every aspect of life.

**The Council for Christian Colleges & Universities** ("CCCU") is a higher education association of more than 170 Christian institutions around the world. Since 1976, the CCCU has served as the leading voice of Christian higher education. With campuses across the globe, including more than 130 in the U.S. and Canada and more than 30 from an additional 18 countries, CCCU institutions are accredited, comprehensive colleges and universities whose missions are Christ-centered and rooted in the historic Christian faith. Most also have curricula rooted in the arts and sciences. The CCCU's mission is to advance the cause of Christ-

---

[1] All parties consented to or did not oppose the filing of this amicus brief. No party's counsel authored this brief in whole or in part. No party or its counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amici,* their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* FRAP 29(a)(4)(E).

centered higher education and to help our institutions transform lives by faithfully relating scholarship and service to biblical truth. Together, CCCU members employ more than 96,000 faculty and staff and enroll approximately 525,000 students annually, with over 11.3 million alumni. The CCCU is committed to graduating students who make a difference for the common good as redemptive voices in the world.

## SUMMARY OF ARGUMENT

Vermont's Town Tuition Program is among the oldest school-choice systems in the country, and the State has long praised it in the language of pluralism—as a means of giving every family, "of all races, incomes, and backgrounds," the chance to find "the most suitable learning environment" for their child. Act R-40 (H.C.R. 23), 2017-2018 Gen. Assemb., Reg. Sess. (Vt. 2017).[2] A system that meant those words would welcome religious schools and the families who choose them as full and equal participants. As explained below, students at religious schools consistently outperform their public-school peers, in academics and in behavior alike, and the advantage extends to the civic virtues— tolerance, civic knowledge, and community engagement—that our republic depends on.

The success of religious schools is no accident. It flows from what they are: organic communities, formed around shared beliefs, in which parents entrust teachers with the education and moral formation of their children. The promise of a genuine school-choice system is that it honors pluralism, letting families select schools whose calendars, services, and instruction enable them to practice their faith fully.

But Vermont's Act 73 betrays this promise. Its class-size minimum is the

---

[2] Available at http://bit.ly/4aoWrxs.

clearest proof. A State sincerely pursuing educational quality would not disqualify a school because its classes are too small, yet that is what Act 73 does. The evidence clearly shows that small classes produce significant and lasting gains in achievement across every subject and grade. Religious schools run small classes as a matter of course, and families seek them out for precisely that reason. By making smallness a disqualification, Vermont has regulated away a feature that improves learning, defines how these religious schools operate, and ranks among the leading reasons families choose them—diminishing the very educational quality the State claims to advance. A criterion so disconnected from any legitimate purpose betrays its true object. Act 73 launders religious discrimination through a facially secular mechanism, effecting a religious gerrymander forbidden by the Religion Clauses. This Court should reverse.

## ARGUMENT

I. **Religious schools are a vital part of the American educational landscape.**

Vermont's Town Tuition Program is one of the oldest school-choice systems in the country. Many Vermont families live in "sending districts" that operate no public school of their own. For those families, the State has long required the sending district to "provide for the … education of its students by paying tuition to a public … school … or an independent school … to be selected by the parents or guardians of the student, within or outside the State." 16 V.S.A. § 822(a)(1); *id.* §

4

821(d). The benefit follows the child and is exercised by the family: it is the parents, not the State, who select the school that best fits their child's needs.

That design dates to 1869, when Vermont first authorized districts to "make any arrangement or agreement" with private academies to "instruct … all or part of the scholars belonging to such district." *Mt. View Cmty. Sch., Inc. v. City of Rutland*, 2011 VT 65, ¶ 9 n.2 (quoting Laws of Vermont, 1869, No. 9, § 1) (internal quotation marks omitted). The State has since described its tuitioning system in glowing, pluralistic terms. As recently as 2017, the legislature declared a "School Choice Day," resolving that the system "gives parents of all races, incomes, and backgrounds the opportunity to place their child in the most suitable learning environment for that child," and that "competition for school choice … provide[s] a valuable incentive for all schools to meet diverse educational needs, thus better serving all students." Act R-40, *supra*. A school-choice system that takes those words seriously would welcome religious schools and the families who choose them as full and equal participants.

Private schools are a vital part of the American educational landscape, and religious schools play an outsized role. Students at religious schools consistently outperform students at both traditional public and public charter schools. *See* William Jeynes, "The Assessment of Various Dimensions of Religious Faith Based on Four Meta-Analyses," Interdisciplinary J. Research on Religion, vol. 9, art. 9

(2013), p.10. The effect shows up in both academics and behavior. The "academic advantage" of religious-over-public schools is about "one half of a grade point." *Id.* And "students attending Christian and other faith-based schools were more likely to show more positive behavior than were their counterparts in traditional public schools." *Id.* at 12.

Catholic schools stand out, too. Based on standardized test scores, Catholic school students are one-and-a-half to two grade levels ahead of their public school peers. Kathleen Porter-Magee, "Amid the Pandemic, Progress in Catholic Schools," *Wall St. J.*, Oct. 27, 2022, https://on.wsj.com/496F6YP. "Today, the divergence between Catholic schools and public ones is so great that if all U.S. Catholic schools were a state their 1.6 million students would rank first in the nation" in fourth- and eighth-grade reading and math assessments. *Id*.

The positive impact goes beyond test scores and reading comprehension. Private schools also excel at something far more fundamental to the educational enterprise: forming young people for citizenship in a democratic republic. While some posit that traditional public schools are better at promoting civic values like tolerance, political participation, civic knowledge, and community engagement, the data show otherwise. "The evidence is especially strong that private schooling is correlated with higher levels of political tolerance and political knowledge and skills." M. Danish Shakeel et al., "The Public Purposes of Private Education: a

6

Civic Outcomes Meta-Analysis," 36 Educ. Psych. Rev. 40, 41 (2024). The correlation is even more pronounced for religious schools. "Religious private schooling is strongly associated with positive civic outcomes," and indeed "the Catholic school civic advantage acknowledged by some scholars ... appears to be a more general religious school civic advantage." *Id.* at 41, 73.

The reasons for a "religious school advantage" are many. For one thing, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 753–54 (2020). In other words, religious schools are serious about moral formation, and moral formation is essential to raising virtuous citizens. Relatedly, private schooling is "highly pluralistic, allowing parents to choose the specific conception of the good life to be inculcated in their child"—an environment that is "more conducive to instilling civic values in students." Shakeel et al., *supra*, at 48.

Finally, because families are able to self-select into schools that reflect their values and priorities, private schools tend to be "strong-culture" institutions that foster a sense of community identity and belonging. *Id.*; *see* George A. Akerlof & Rachel E. Kranton, "Identity and Schooling: Some Lessons for the Economics of Education," 40 J. Econ. Literature 1167, 1170–71 (2002) (because private schools

7

"have greater freedom to invest in the identity of their students," they're able to "reduce the initial social differences among students and create a community").

That sense of togetherness infuses everything a school does. It creates habits of mind and heart—ways of being and acting together that train students, parents, and teachers for democratic self-government. Religious schools don't imperil our constitutional republic. They are essential to it. "Educational pluralism seems to be a boon, and not a bane, for civic outcomes." Shakeel et al., *supra*, at 73. Any school-choice system that aims to "giv[e] the child the best chance to succeed in school and later in life," Act R-40, *supra* note **Error! Bookmark not defined.**, will welcome religious schools as vital partners.

## II.    A properly administered school-choice system allows religious families to select quality schools that align with their beliefs and practices.

Values-inculcation is "core" to the "mission" of religious schools. *Our Lady*, 591 U.S. at 754. As the "archetype of associations formed for expressive purposes," religious groups, and schools especially, are dedicated to both "expression *and inculcation* of religious doctrine." *Hosanna-Tabor Evangelical Church & Sch. v. EEOC*, 565 U.S. 171, 200–01 (2012) (Alito & Kagan, JJ., concurring) (emphasis added). Religious schools are not simply proclaiming a message outwardly to the world. They are forming students inwardly, transmitting a way of life—moral excellence, civic virtue, and faith—"to the next generation." *Id.* at 200.

8

A religious school is not a randomized cluster of students and teachers. It is an organic community formed around shared values in which parents partner with teachers and entrust them with educating their children. Absent the right of parents to voluntarily sort themselves in this way, religious schools can't do their faith-transmitting, values-inculcating work. "Education, like religion, is a powerful instrument for the inculcation of values, in which the institutions of civil society, not just of government, should play a prominent role." Michael W. McConnell, Why Is Religious Liberty the "First Freedom"?, 21 Cardozo L. Rev. 1243, 1257 (2000). "[F]or many people of faith across the country, there are few religious acts more important than the religious education of their children." *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025). That's why the Constitution "protects ... a parent's decision to send his or her child to a private religious school." *Id*.

The great promise of school-choice systems is pluralism, including religious pluralism, allowing religious families to select schools that best align with their beliefs and practices. Consider a few examples in Vermont and within this Circuit.

*Calendars and holidays*. Religious schools offer calendars that reflect the needs of the State's diverse religious communities. Catholic schools, for example, provide weekly Mass and follow the liturgical calendar.[3] Christian schools make

---

[3] **VT**: All Saints Catholic Academy, Our Community, https://allsaintsvt.org/school-life/for-our-community; St. Francis Xavier Catholic Sch., Faith, https://www.sfxvt.org/faith; *see* Cori Urban, "School Masses help bring 'faith into

room for spiritual retreats and days dedicated to prayer.[4] Observing religious holidays is not like civic observance of Memorial Day or the Fourth of July (as important as those days are, too). For religious families, holy days often involve obligatory acts and abstentions—prayer, fasting, and celebration that are essential to their faith and lives. Religious school calendars allow families to practice their faith fully, without compromise.

*Unique services.* Religious schools provide services unique to the needs of the religious families they serve. Catholic schools provide Mass, reconciliation, the Eucharist, and service opportunities.[5] Christian schools provide daily or weekly chapel, community service opportunities, and mission trips.[6]

*Religious instruction.* Religious schools provide instruction in religious faith and traditions. At Catholic schools, students learn theology, Church history, Catholic morality, and vocation.[7] Christian schools integrate biblical principles into

---

focus,'" *Vermont Catholic*, Oct. 17, 2022, https://bit.ly/4g83Zby. **NY**: Archdiocese of N.Y., High School Calendar, https://catholicschoolsny.org/secondary/high-school-calendar/.

[4] **VT**: Mid Vermont Christian Sch., Events/Calendar, https://www.mvcs.info/mvcs-life/events-calendar/.

[5] **CT**: Greenwich Catholic Sch., Faith in Action, https://bit.ly/4f6JDyk. **NY**: Manhattan Catholic Schs., Faith-based curriculum, https://bit.ly/446SERQ.

[6] **VT**: Grace Christian Sch., Spiritual Life, https://gcsvt.org/spiritual-life/; *id.*, Christ-Centered, https://gcsvt.org/christ-centered/.

[7] **NY**: Cathedral High Sch., Religious Studies, https://cathedralhs.org/religious-studies.

10

the curriculum, teaching virtue and Christian living, Christian worldview, and spiritual disciplines.[8] More generally, these schools enable families to fulfill their religious obligation to ensure a religious education for their children.[9]

"Religious education is vital to many faiths practiced in the United States," *Our Lady*, 591 U.S. at 754, and the Supreme Court has underscored its importance to meeting the needs of America's diverse populations, *see id.* at 754–55 (discussing Catholics, Protestants, Jews, Muslims, Latter-Day Saints, and Seventh-Day Adventists); *Wisconsin v. Yoder*, 406 U.S. 205, 226 (1972) ("Even th[e] idiosyncratic separateness [of the Amish] exemplifies the diversity we profess to admire and encourage.").

### III. Punishing schools for small class sizes is irrational—it's directly contrary to the empirical evidence—and exposes Act 73's lack of neutrality.

Act 73 isn't religiously neutral, and its class-size minimum proves it. A State genuinely pursuing educational quality would not disqualify a school because its classes are too small, yet that is precisely what Act 73 does. The requirement is not just unsupported by the evidence—it's directly contradicted by it. And it operates

---

[8] **VT**: Mid Vermont Christian Sch., Our Philosophy of Education, https://www.mvcs.info/about/our-vision/; Rutland Area Christian Sch., Grades 1-8, http://www.racsonline.com/grades-1-8/ ("Each child is guided in learning to think biblically and in developing a Christian worldview.").

[9] *See, e.g.*, St. Francis Xavier Catholic Sch., *supra* note 3 ("We are committed to working as partners with parents in fulfilling their obligation for the Catholic formation and education of their children.").

11

to exclude the very schools whose pedagogy is defined by smallness, fencing religious schools out of a benefit the State promises to all.

The empirical evidence plainly contradicts Vermont's policy choice. Some of the most rigorous evidence on class size comes from Tennessee's Student/Teacher Achievement Ratio (STAR) experiment, a large-scale randomized controlled trial in which students and teachers were assigned at random to small classes, regular classes, and regular classes with a full-time teaching aide, maintained all day and all year for up to four years. *See* Jeremy D. Finn et al., *The Enduring Effects of Small Classes*, 103 Teachers Coll. Rec. 145–46 (2001). "The within-school randomization controlled for a host of between-school differences." *Id.* at 146. The results were unambiguous. Students who attended small classes "performed significantly better on all achievement measures in all grades than did students in full-size classes with or without teacher aides." *Id.* at 172. Children who entered a small class in kindergarten or first grade and remained there for at least three years showed "significant and noteworthy improvements in academic achievement at least through grade 8 in all school subjects." *Id.* at 174. Students in small classes for two or more years finished "3 to 8 months ahead" of their large-class peers. *Id.* at 173. And "entering a small class in kindergarten or grade 1 and remaining in that setting for at least three years produces, on average, significant

and noteworthy improvements in academic achievement at least through grade 8 in all school subjects." *Id.* at 174.[10]

As the STAR researchers explained, students in small classes "invest more effort toward learning activities, take greater initiative in the classroom, and display less disruptive or inattentive/withdrawn behavior than their counterparts in full-size classes." *Id.* at 174. "At the same time, when the class is smaller, teachers are compelled to attend to all students regardless of their abilities, motivation, or classroom demeanor." *Id.* This is the same close, individualized attention through which a religious school forms its students—catechizing, mentoring, and discipling students in the faith. *See Our Lady*, 591 U.S. at 753–54. Small class sizes aren't just a moral-formational mechanism, as important as that is. They also generate "clear and consistent" academic benefits for students. Finn et al., *supra*, at 173.

Religious schools tend to run small classes, and families choose them precisely for that reason. *See* JA460–461, JA596, JA600. The federal government's data confirm that private schools, and religious schools in particular, operate markedly smaller classes than public schools. *See* Nat'l Ctr. for Educ.

---

[10] The follow-up literature confirms the durability of these effects. *See, e.g.*, Barbara Nye et al., *The Long-Term Effects of Small Classes: A Five-Year Follow-Up of the Tennessee Class Size Experiment*, Educ. Eval. & Pol'y Analysis, vol. 21, no. 2, 127–42 (Summer 1999) ("[C]lass size effects persist for at least 5 years and remain large enough to be important for educational policy. Thus, small class sizes in early grades appear to have lasting benefits.").

Statistics, Characteristics of 2020-21 Public and Private K-12 School Teachers in the United States, Tables A-7a, A-7b (Dec. 2022).[11] And parents know this. In the most comprehensive survey of why families choose private schools, "smaller class sizes" ranked among the top reasons parents gave.  James P. Kelly, III & Benjamin Scafidi, *More Than Scores: An Analysis of Why and How Parents Choose Private Schools*, at 10–13 (Friedman Found. for Educ. Choice, Nov. 2013). In fact, the religious content of the curriculum and the average class size are among the "most important" pieces of information parents seek in choosing a private school. *See id.* at 16–18, Tables 9–10. Small classes are, in short, both how religious schools operate and a central reason families seek them out.

The upshot is clear. Act 73's class-size minimum effectively punishes an educational feature that (i) improves student outcomes, (ii) is a defining feature of religious schools, and (iii) is among the top reasons families seek out religious schools in the first place. In selectively boxing out parental religious choices, Vermont has simultaneously *diminished* the educational quality it claims to be pursuing. A requirement could hardly be more poorly fitted to its asserted end.

A criterion this disconnected from any legitimate educational purpose invites the obvious inference that it was not chosen for the reason offered. "[T]he effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi*

---

[11] Available at https://nces.ed.gov/pubs2022/2022113.pdf.

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). A law's lack of neutrality is exposed where its requirements "ha[ve] every appearance of a prohibition that society is prepared to impose upon [religious adherents] but not upon itself." *Id.* at 545 (quotation omitted). Act 73's criteria fit that description precisely. A neutral pursuit of educational quality would embrace religious schools, not banish them. By doing the opposite—by making small class sizes a disqualification when they are both academically effective and religiously expressive—Act 73 effects a classic religious gerrymander, laundering religious discrimination through a facially secular mechanism whose real effect is to "target [appellants] and their religious practices." *Id.* at 535.

## CONCLUSION

*Amici* urge the Court to reverse and direct the entry of a preliminary injunction in Plaintiffs-Appellants' favor.

Respectfully submitted July 1, 2026,

*/s/ Ian Speir*

Ian Speir
Covenant Law PLLC
13395 Voyager Pkwy. #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com

*Counsel for* Amici Curiae

15

**CERTIFICATE OF COMPLIANCE**

This brief complies with the length limitation of Fed. R. App. P. 29(a)(5) and Second Circuit Rule 29.1(c) because it contains 3,240 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac (Version 16.109) in 14-point Times New Roman font.

/s/*Ian Speir*
Ian Speir


**CERTIFICATE OF SERVICE**

I certify that on July 1, 2026 the foregoing brief was served on counsel for all parties by means of the Court's CM/ECF system.

/s/*Ian Speir*
Ian Speir

16